## DEPARTMENT OF EDUCATION

### 34 CFR Parts 30 and 682

**[Docket ID ED–2023–OPE–0123]**

**RIN 1840–AD93**

### Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Notice of proposed rulemaking (NPRM).

**SUMMARY:** The Secretary proposes to amend the regulations related to the Higher Education Act of 1965, as amended (HEA) to provide for the waiver of certain student loan debts.

In this NPRM, the Department proposes regulations, in accordance with the Secretary's authority to waive repayment of a loan provided by the HEA, to provide targeted debt relief as part of efforts to address the burden of student loan debt. The proposed regulations would modify the Department's existing debt collection regulations to provide greater specificity regarding certain non-exhaustive situations in which the Secretary may exercise discretion to waive all or part of any debts owed to the Department.

**DATES:** We must receive your comments on or before May 17, 2024.

**ADDRESSES:** For more information regarding submittal of comments, please see **SUPPLEMENTARY INFORMATION**. Comments must be submitted via the Federal eRulemaking Portal at *Regulations.gov.* However, if you require an accommodation or cannot otherwise submit your comments via *Regulations.gov,* please contact Rene Tiongquico at (202) 453–7513 or by email at *Rene.Tiongquico@ed.gov.*

*Federal eRulemaking Portal:* Please go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov,* including instructions for finding a rule on the site and submitting comments, is available on the site under ''FAQ.'' In accordance with the Providing Accountability Through Transparency Act of 2023 (Pub. L. 118–9), a summary of not more than 100 words in length of the proposed rule, in plain language, is posted on *Regulations.gov* in the rulemaking docket: *https://www.regulations.gov/docket/ED-2023-OPE-0123.*

*Privacy Note:* The Department's policy is to generally make comments received from members of the public available for public viewing on the Federal eRulemaking Portal at *Regulations.gov.* Therefore, commenters should include in their comments only information about themselves that they wish to make publicly available. Commenters should not include in their comments any information that identifies other individuals or that permits readers to identify other individuals. If, for example, your comment describes an experience of someone other than yourself, please do not identify that individual or include information that would allow readers to identify that individual. The Department may not make comments that contain personally identifiable information (PII) about someone other than the commenter publicly available on *Regulations.gov* for privacy reasons. This may include comments where the commenter refers to a third-party individual without using their name if the Department determines that the comment provides enough detail that could allow one or more readers to link the information to the third-party individual. If your comment refers to a third-party individual, please refer to the third-party individual anonymously to reduce the chance that information in your comment could be linked to the third party. For example, ''a former student with a graduate level degree'' does not provide information that identifies a third-party individual as opposed to ''my sister, Jane Doe, had this experience while attending University X,'' which does provide enough information to identify a specific third-party individual. For privacy reasons, the Department reserves the right to not make available on *Regulations.gov* any information in comments that identifies other individuals, includes information that would allow readers to identify other individuals, or includes threats of harm to another person or to oneself.

**FOR FURTHER INFORMATION CONTACT:** For further information related to general waivers and length of time in repayment, contact Richard Blasen at (202) 987–0315 or by email at *Richard.Blasen@ed.gov.* For further information related to current balances that exceed original amounts borrowed, contact Bruce Honer at (202) 987–0750 or by email at *Bruce.Honer@ed.gov.* For further information related to waiver eligibility based on repayment plan and targeted debt relief, contact Vanessa Freeman at (202) 987–1336 or by email at *Vanessa.Freeman@ed.gov.* For further

information related to secretarial actions and Gainful Employment programs with low financial value, contact Rene Tiongquico at (202) 453–7513 or by email at *Rene.Tiongquico@ed.gov.* For further information related to FFEL Program loans, contact Brian Smith at (202) 987–0385 or by email at *Brian.Smith@ed.gov.*

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

Since 1980, the total cost to receive a four-year postsecondary credential has nearly tripled, even after accounting for inflation.[1] Pell Grants once covered nearly 80 percent of the cost of a four-year public college degree for students from low- and middle-income families, but now they only cover a third of those costs.[2] This price growth has dramatically increased the need for students to secure student loans, particularly Federal student loans from the Department, to cover their educational costs. The gap between prices and income means that many students from low- and middle-income families have to borrow Federal student loans in addition to grants and out-of-pocket spending so they can earn a postsecondary credential. These trends have resulted in cumulative Federal loan debt of $1.6 trillion and rising for more than 43 million borrowers, which has placed a significant financial burden upon middle-income borrowers and has had an even more devastating impact on vulnerable low-income borrowers.[3]

After convening the Student Loan Debt Relief negotiated rulemaking committee (Committee) and reaching consensus on various issues discussed in this NPRM, the Department proposes regulations, in accordance with the Secretary's authority to waive repayment of a loan provided by section 432(a) of the HEA, to provide debt relief targeted to address certain specific circumstances as part of a

---

[1] Trends in College Pricing 2023: Data in Excel. Table CP–2. Available at *https://research.collegeboard.org/trends/college-pricing.*

[2] *https://www.cbpp.org/research/pell-grants-a-key-tool-for-expanding-college-access-and-economic-opportunity-need.*

[3] *https://studentaid.gov/data-center/student/portfolio; https://www.census.gov/library/stories/2021/08/student-debt-weighed-heavily-on-millions-even-before-pandemic.html; https://www.philadelphiafed.org/-/media/frbp/assets/consumer-finance/reports/cfi-sl-1-payments-resumption.pdf; https://www.aarp.org/money/credit-loans-debt/info-2021/student-debt-crisis-for-older-americans.html; https://www.stlouisfed.org/publications/economic-equity-insights/gender-racial-disparities-student-loan-debt.*

**EXHIBIT**

**B**

comprehensive effort to address the burden of Federal student loan debt. The proposed regulations would modify the Department's existing debt collection regulations to provide greater specificity regarding the Secretary's discretion to waive Federal student loan debt and specify the Secretary's authority to waive all or part of any debts owed to the Department based on a number of different circumstances, such as growth in a borrower's loan balance beyond what was owed upon entering repayment, the amount of time since the loan first entered repayment, whether the borrower meets certain criteria for loan forgiveness or discharge under existing authority, and whether a loan was obtained to attend an institution or program that was subject to secretarial actions, that closed prior to secretarial actions, or was associated with closed Gainful Employment programs with high debt-to-earnings rates or low median earnings.

**Summary of Select Provisions of This Regulatory Action**

The Department proposes to amend subparts A, C, E, and F of 34 CFR part 30 and to add a new subpart G. The Department also proposes to amend part 682 by adding a new § 682.403.

These proposed regulations, in accordance with the HEA, would specify the Secretary's discretionary authority to waive repayment of the following amounts:

• The full amount by which the current outstanding balance on a loan exceeds the amount owed when the loan entered repayment for loans being repaid on any Income-Driven Repayment (IDR) plan if the borrower's income is at or below $120,000 if the borrower's filing status is single or married filing separately, $180,000 if a borrower files as head of household, or $240,000 if the borrower is married and files a joint Federal tax return or the borrower files as a qualifying surviving spouse (§ 30.81).

• Up to $20,000 or the amount by which the current outstanding balance on a borrower's loan exceeds the balance owed upon entering repayment (§ 30.82).

• The outstanding balance of a loan taken out to pay for the borrower's undergraduate education, or a Federal Consolidation Loan or a Direct Consolidation Loan that only repaid loans received for a borrower's undergraduate education, that first entered repayment on or before July 1, 2005 (§ 30.83).

• The outstanding balance of loans that first entered repayment on or before July 1, 2000, if the borrower has any loans obtained for study other than undergraduate study (§ 30.83).

• The outstanding balance of a loan for borrowers who would be otherwise eligible for forgiveness under an IDR plan or an alternative repayment plan but who are not currently enrolled in such a plan (§ 30.84).

• The outstanding balance of a loan for borrowers determined to be otherwise eligible for loan discharge, cancellation, or forgiveness, but who did not successfully apply (§ 30.85).

• The outstanding balance of a loan obtained to pay the cost of attending an institution or program where the Secretary or other authorized Department official has issued a final decision, denial of recertification, or determination that terminates or otherwise ends the institution's or program's title IV eligibility due at least in part to the institution's or program's failure to meet required accountability standards based on student outcomes or to its failure to provide sufficient financial value to students (§ 30.86).

• The outstanding balance of a loan obtained to pay the cost of attending an institution or program that closed and the Secretary or other Department official has determined the institution or program failed, for at least one year, to meet an accountability standard based on student outcomes, or failed to deliver sufficient financial value to students and there was a pending program review, investigation, or other Department action at the time of closure (§ 30.87).

• The outstanding balance of a loan that is associated with enrollment in a Gainful Employment (GE) program that has closed and prior to closure had high debt-to-earnings rates or low median earnings rates (§ 30.88).

• In the case of FFEL Program loans held by a private loan holder or a guaranty agency, the outstanding balance of a FFEL Program loan when a loan first entered into repayment on or before July 1, 2000; when the borrower is otherwise eligible for, but has not successfully applied for, a closed school discharge; or when the borrower attended an institution that lost its title IV eligibility due to a high cohort default rate (CDR), if the borrower was included in the cohort whose debt was used to calculate the CDR or rates that were the basis for the institution's loss of eligibility (§ 682.403).

*Costs and Benefits:* As further detailed in the Regulatory Impact Analysis (RIA), the proposed regulations would specify the Secretary's authority to grant waivers that would have significant effects on borrowers, the Department, and taxpayers. For borrowers for whom the Secretary chooses to exercise his authority, the draft rules would provide significant benefits by waiving all or a portion of their repayment obligations. In cases where the Secretary decides to waive the entire outstanding balance of a loan, borrowers receiving such waivers would benefit from no longer having to repay their debt and no longer being at risk of delinquency or default. The debts that could be waived in their entirety under this proposed NPRM have the following characteristics: they are generally older; otherwise eligible for forgiveness, but the borrower has not currently enrolled in or successfully applied to receive relief; or were taken out to attend programs or institutions that failed to provide sufficient financial value as indicated by certain outcomes and conditions. Borrowers who may receive a waiver of some of their loan balances would benefit by seeing their total outstanding balance reduced, which would help with their ability to repay their loans in full in a reasonable period of time.

The Department would also benefit if the Secretary chose to exercise his discretion to issue waivers proposed in these draft rules. These benefits would largely come from no longer incurring costs to service or collect on loans that are unlikely to be otherwise repaid in full in a reasonable period.

The costs in this rule would largely come from the transfers between the Department and borrowers that would occur if the Secretary chose to use his discretion to issue waivers. There would also be some administrative costs borne by the Department to implement the proposed regulations. As detailed in Table 4.1 of the RIA, the net budget impacts across all loan cohorts through 2034 for each of the proposed changes are estimated to be as follows:

• $13.8 billion for the provision related to time since the loan first entered repayment (§ 30.83).

• $8.6 billion for the provision related to borrowers who are eligible for forgiveness based upon a repayment plan (§ 30.84).

• $15 million for the provision related to borrowers who took out loans during cohorts that caused a school to lose access to aid due to high cohort default rates (CDRs) as described in § 30.86.

• $7.6 billion for the provision related to borrowers who are eligible for a closed school loan discharge but have not successfully applied (§ 30.85).

• $27.2 billion for the provision related to borrowers who attended a gainful employment program that lost access to aid or closed (§§ 30.86 through 30.88).

• $11.0 billion for the provision related to borrowers whose current balance exceeds the amount owed upon entering repayment and are on IDR plan with income below certain thresholds (§ 30.81).

• $62.1 billion for the provision related to borrowers whose current balance exceeds the amount owed upon entering repayment (§ 30.82).

• $17.1 billion for the provisions related to borrowers with commercial FFEL loans that first entered repayment 25 years ago; who are eligible for a closed school discharge but have not applied; or who received loans to attend a school that lost access to aid due to high CDRs (682.403).

*Invitation to Comment:* We invite you to submit comments regarding these proposed regulations. For your comments to have maximum effect in developing the final regulations, we urge you to clearly identify the specific section or sections of the proposed regulations that each of your comments addresses and to arrange your comments in the same order as the proposed regulations. The Department will not accept comments submitted after the comment period closes. Please submit your comments only once so that we do not receive duplicate copies.

The following tips are meant to help you prepare your comments and provide a basis for the Department to respond to issues raised in your comments in the notice of final regulations (NFR):

• Be concise but support your claims.

• Explain your views as clearly as possible and avoid using profanity.

• Refer to specific sections and subsections of the proposed regulations throughout your comments, particularly in any headings that are used to organize your submission.

• Explain why you agree or disagree with the proposed regulatory text and support these reasons with data-driven evidence, including the depth and breadth of your personal or professional experiences.

• Where you disagree with the proposed regulatory text, suggest alternatives, including regulatory language, and your rationale for the alternative suggestion.

• Do not include personally identifiable information (PII) such as Social Security numbers or loan account numbers for yourself or for others in your submission. Should you include any PII in your comment, such information may be posted publicly.

• Do not include any information that directly identifies or could identify other individuals or that permits readers to identify other individuals. Your comment may not be posted publicly if it includes PII about other individuals.

*Mass Writing Campaigns:* In instances where individual submissions appear to be duplicates or near duplicates of comments prepared as part of a writing campaign, the Department will post one representative sample comment along with the total comment count for that campaign to *Regulations.gov.* The Department will consider these comments along with all other comments received.

In instances where individual submissions are bundled together (submitted as a single document or packaged together), the Department will post all of the substantive comments included in the submissions along with the total comment count for that document or package to *Regulations.gov.* A well-supported comment is often more informative to the agency than multiple form letters.

*Public Comments:* The Department invites you to submit comments on all aspects of the proposed regulatory language specified in this NPRM in §§ 30.1, 30.9, 30.20, 30.23, 30.25, 30.27, 30.29, 30.30, 30.33, 30.62, 30.70, 30.80–30.89, and 682.403, the Regulatory Impact Analysis, and Paperwork Reduction Act sections.

The Department may, at its discretion, decide not to post or to withdraw certain comments and other materials that are computer-generated. Comments containing the promotion of commercial services or products and spam will be removed.

We may not address comments outside of the scope of these proposed regulations in the NFR. Generally, comments that are outside of the scope of these proposed regulations are comments that do not discuss the content or impact of the proposed regulations or the Department's evidence or reasons for the proposed regulations, which includes any comments related to the Department's negotiated rulemaking for borrowers experiencing hardship.

Comments that are submitted after the comment period closes will not be posted to *Regulations.gov* or addressed in the NFR.

Comments containing personal threats will not be posted to *Regulations.gov* and may be referred to the appropriate authorities.

We invite you to assist us in complying with the specific requirements of Executive Orders 12866, 13563, 14094 and their overall requirement of reducing regulatory burden that might result from these proposed regulations. Please let us know of any further ways we could reduce potential costs or increase potential benefits while preserving the effective and efficient administration of the Department's programs and activities.

During and after the comment period, you may inspect public comments about these proposed regulations by accessing *Regulations.gov.*

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for these proposed regulations. If you want to schedule an appointment for this type of accommodation or auxiliary aid, please contact the Information Technology Accessibility Program Help Desk at *ITAPSupport@ed.gov* to help facilitate.

**Background**

Section 432(a) of the HEA describes the legal powers and responsibilities of the Secretary of Education that are relevant to this rulemaking. In particular, section 432(a)(6) provides that, "in the performance of, and with respect to, the functions, powers and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption." These provisions apply to the FFEL, Direct Loan[4] and HEAL programs.[5]

The Department's statutory waiver authority dates back to the enactment of

---

[4] Section 432(a)(6) is in, and explicitly applies to, Part B, which establishes the FFEL program. In creating the Direct Loan program, Congress established parity between the FFEL and Direct Loan program, providing that Federal Direct Loans "have the same terms, conditions, and benefits as loans made to borrowers" under the FFEL program. 20 U.S.C. 1087a(b)(2). *See Sweet* v. *Cardona,* 641 F.Supp.3d 814, 823–825 (ND Cal., 2022); *Weingarten* v. *DOE,* 468 F.Supp.3d 322, 328 (D.D.C. 2020); *McCain* v. *US,* 2011 WL 2469828 (Ct.Cl. 2011). The legislative history of the Direct Loan program shows that 20 U.S.C. 1087a(b)(2) is broadly read to apply the provisions of the FFEL statutory provisions to Direct Loan except as provided by statute or inconsistent with the different structure of the Direct Loan program. For example, the Direct Loan program provides total and permanent disability discharges, closed school loan discharges and forbearances to borrowers although none of those are mentioned in the Direct Loan statutory provisions.

[5] When transferring the HEAL loan program to the Department, Congress explicitly stated that the Secretary's powers with respect to collecting FFEL loans extend to HEAL loans. See Division H, title V, section 525(d) of the Consolidated Appropriations Act, 2014 (Pub. L. 113–76) (Consolidated Appropriations Act, 2014). The Secretary's waiver authority under section 432(a)(6) of the HEA extends to HEAL loans.

the Higher Education Act in 1965.[6] The Department has historically viewed its waiver authority as permitting the Secretary to waive the Department's right to require repayment of a debt[7] when doing so advances the goals of the title IV programs and functions, while also aligning with the HEA's overall statutory parameters and principles. Having such bounded flexibility is critical for the Department's administration of the comprehensive and complex student loan programs wherein there are unforeseen challenges that arise and, absent waiver, such challenges could interfere with the Secretary's ability to effectively and efficiently administer the title IV programs.

The Department's waiver authority operates within the context of the HEA's goals and also the principles that govern waiver more broadly. Some agencies that exercise waiver authority consider whether collection of debts would be against equity and good conscience or the best interest of the United States, thereby implicating general principles of government debt collection. Agencies have also articulated numerous factors that may weigh in favor of waiving an individual's debt, including when collection would defeat the purpose of the benefit program or impose financial hardship, among other considerations.

On June 30, 2023, the Department announced that it would conduct a negotiated rulemaking process to specify the Secretary's use of the authority to waive loan debts under section 432(a) of the HEA. This NPRM reflects regulations discussed during that process and would allow the Secretary to address significant challenges identified with student loan repayment that implicate considerations of equity and fairness, as well as a borrower's inability to repay their loans in full within a reasonable period or circumstances where the costs of enforcing the debt exceed the expected benefits of continued collection. In particular, this NPRM focuses on issues related to circumstances—

• When borrowers' balances have grown beyond what they originally owed at the start of repayment.

• When loans first entered repayment at least two decades ago.

• When a borrower is eligible for forgiveness or a discharge opportunity but has not successfully applied for such relief or enrolled in the repayment plan that would provide that forgiveness or discharge opportunity.

• When a borrower received loans for attendance in a program or at an institution that has since lost access to Federal aid because it failed to meet required student outcomes standards, was subject to an action by the Secretary due to failing to provide sufficient financial value or closed after failing required student outcomes metrics or the initiation of a Secretarial action process.

These proposed provisions account for particular challenges facing individual borrowers, while also recognizing that many borrowers are similarly situated in experiencing such circumstances. The Department has a longstanding view and practice of providing appropriate relief when it identifies specific circumstances that warrant relief and those circumstances affect multiple borrowers. Such relief, on an automated or individual basis, is appropriate when such individuals' circumstances share the features relevant for determining relief. This approach comports with the HEA's statutory requirements and can also help to improve administrative efficiency and provide consistency across borrowers.

**Public Participation**

On July 6, 2023, the Department published a notice in the **Federal Register** (88 FR 43069) announcing our intent to establish a negotiated rulemaking committee to prepare proposed regulations pertaining to the Secretary's authority under section 432(a) of the HEA, which relates to the modification, waiver, or compromise of loans.

On July 18, 2023, the Department held a virtual public hearing at which individuals and representatives of interested organizations provided advice and recommendations relating to the topic of proposed regulations on the modification, waiver, or compromise of loans. The Department has significantly engaged the public in developing this NPRM, including through review of oral comments made by the public during the public hearing and written comments submitted between July 6, 2023, and July 20, 2023. You may view the written comments submitted in response to the July 6, 2023, **Federal Register** notice on the Federal eRulemaking Portal at *Regulations.gov,* within docket ID ED–2023–OPE–0123. Instructions for finding comments are also available on the site under "FAQ." Transcripts of the public hearings may be accessed at *https://www2.ed.gov/* *policy/highered/reg/hearulemaking/ 2023/index.html.*

The Department also held three negotiated rulemaking sessions of two days each. During each daily negotiated rulemaking session, we provided an opportunity for public comment and expanded that time to one hour for the second and third sessions. The Department held a fourth two-day session in February 2024 to discuss the separate issue of possible hardship criteria for discharge and the public had an opportunity to comment on the first day of that session. Additionally, non-Federal negotiators shared feedback from their stakeholders with the negotiating committee.

**Negotiated Rulemaking**

Section 492 of the HEA, 20 U.S.C. 1098a, requires the Secretary to obtain public involvement in the development of proposed regulations affecting programs authorized by title IV of the HEA. After obtaining extensive input and recommendations from the public, including individuals and representatives of groups involved in the title IV, HEA programs, the Secretary, in most cases, must engage in the negotiated rulemaking process before publishing proposed regulations in the **Federal Register**. If negotiators reach consensus on the proposed regulations, the Department agrees to publish without substantive alteration a defined group of regulations on which the negotiators reached consensus— unless the Secretary reopens the process or provides a written explanation to the participants stating why the Secretary has decided to depart from the agreement reached during negotiations. Further information on the negotiated rulemaking process can be found at: *https://www2.ed.gov/policy/highered/ reg/hearulemaking/2023/index.html.*

On August 31, 2023, the Department published a notice in the **Federal Register**[8] announcing its intention to establish the Committee to prepare proposed regulations for the title IV, HEA programs. The notice set forth a schedule for Committee meetings and requested nominations for individual negotiators to serve on the negotiating committee. In the notice, we announced the topics that the Committee would address.

The Committee included the following members, representing their respective constituencies:

• *Civil Rights Organizations:* Wisdom Cole, NAACP, and India Heckstall (alternate), Center for Law and Social Policy.

---

[6] *See* Public Law 89–29, 79 Stat. 1246 (Nov. 8, 1965).

[7] Waiving the Department's right to repayment of all or part of a debt correspondingly releases the borrower of further liability on account of all or part of that debt.

[8] 88 FR 60163 (August 31, 2023).

**27568**    **Federal Register**/ Vol. 89, No. 75 / Wednesday, April 17, 2024 / Proposed Rules

• *Legal Assistance Organizations that Represent Students or Borrowers:* Kyra Taylor, National Consumer Law Center, and Scott Waterman (alternate), Student Loan Committee of the National Association of Chapter 13 Trustees.

• *State Officials, including State higher education executive officers, State authorizing agencies, and State regulators of institutions of higher education:* Lane Thompson, Oregon DCBS—Division of Financial Regulation, and Amber Gallup (alternate), New Mexico Higher Education Department.

• *State Attorneys General:* Yael Shavit, Office of the Massachusetts Attorney General, and Josh Divine (alternate), Missouri Attorney General's Office who withdrew from the committee during the third session.

• *Public Institutions of Higher Education, Including Two-Year and Four-Year Institutions:* Melissa Kunes, The Pennsylvania State University, and J.D. LaRock (alternate), North Shore Community College.

• *Private Nonprofit Institutions of Higher Education:* Angelika Williams, University of San Francisco, and Susan Teerink (alternate), Marquette University.

• *Proprietary Institutions:* Kathleen Dwyer, Galen College of Nursing, and Belen Gonzalez (alternate), Mech-Tech College.

• *Historically Black Colleges and Universities, Tribal Colleges and Universities, and Minority Serving Institutions (institutions of higher education eligible to receive Federal assistance under title III, parts A and F, and title V of the HEA):* Sandra Boham, Salish Kootenai College, and Carol Peterson (alternate), Langston University.

• *Federal Family Education Loan (FFEL) Lenders, Servicers, or Guaranty Agencies:* Scott Buchanan, Student Loan Servicing Alliance, and Benjamin Lee (alternate), Ascendium Education Solutions, Inc.

• *Student Loan Borrowers Who Attended Programs of Two Years or Less:* Ashley Pizzuti, San Joaquin Delta College, and David Ramirez (alternate), Pasadena City College.

• *Student Loan Borrowers Who Attended Four-Year Programs:* Sherrie Gammage, The University of New Orleans, and Sarah Christa Butts (alternate), University of Maryland.

• *Student Loan Borrowers Who Attended Graduate Programs:* Richard Haase, State University of New York at Stony Brook, and Dr. Jalil Bishop (alternate), University of California, Los Angeles.

• *Currently Enrolled Postsecondary Education Students:* Jada Sanford, Stephen F. Austin University, and Jordan Nellums (alternate), University of Texas.

• *Consumer Advocacy Organizations:* Jessica Ranucci, New York Legal Assistance Group, and Ed Boltz (alternate), Law Offices of John T. Orcutt, P.C.

• *Individuals with Disabilities or Organizations Representing Them:* John Whitelaw, Community Legal Aid Society Inc., and Waukecha Wilkerson (alternate), Sacramento State University.

• *U.S. Military Service Members, Veterans, or Groups Representing Them:* Vincent Andrews, Veteran. Originally the alternate, Mr. Andrews became the primary negotiator for this constituency group after Michael Jones withdrew from the Committee.

• *Federal Negotiator:* Tamy Abernathy, U.S. Department of Education.

At its first meeting, the Committee reached agreement on its protocols and proposed agenda. The protocols provided, among other things, that the Committee would operate by consensus. The protocols defined consensus as no dissent by any negotiator of the Committee for the committee to be considered to have reached agreement and noted that consensus votes would be taken on each separate part of the proposed rules.

The Committee reviewed and discussed the Department's drafts of regulatory language and alternative language and suggestions proposed by negotiators.

At its third meeting in December 2023, the Committee reached consensus on proposed regulations addressing the Secretary's authority to waive loan debts—when a loan is eligible for forgiveness based upon repayment plan but the borrower is not currently enrolled in such plan; based upon Secretarial actions; following a closure prior to Secretarial actions; or obtained for attendance in closed GE programs with high debt-to-earnings rates or low median earnings. In addition, the Committee reached consensus on two provisions for waivers that would apply only to FFEL Program loans held by a loan holder or guaranty agency: Those based on a determination that a borrower has not successfully applied for a closed school discharge but otherwise meets the eligibility requirements for such a discharge, and cases where a borrower received a loan for attendance at an institution that lost title IV eligibility due to high CDRs.

This NPRM includes proposed regulations on these consensus items,

identified in the summary of proposed regulations section, as well as the remaining items on the Committee's agenda, summarized generally above. The Department convened a fourth session of the negotiating committee on February 22 and 23, 2024, focused on discussing proposed regulations related to possible waivers for borrowers facing hardship. Proposed regulations for waivers for hardship are not included in this NPRM.

For more information on the negotiated rulemaking sessions, including the work of the Subcommittee, please visit: *https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/index.html*.

**Summary of Proposed Changes**

These proposed regulations would—

• Modify §§ 30.70(a)(1) and 30.70(c)(1) to specify that, when compromising a debt or when terminating or suspending collection of a debt, the Secretary may use the Federal Claims Collection Standards (FCCS).

• Add § 30.80 specifying the Secretary's authority to waive all or part of any debts owed to the Department, including, but not limited to, waivers under §§ 30.81 through 30.88.

• Add § 30.81 specifying the Secretary's authority to provide a one-time waiver of the amount by which the borrower's current loan has an outstanding principal balance exceeding the amount owed when the loan first entered repayment if they are enrolled in an IDR plan and their income is less than or equal to $120,000 if the borrower's filing status is single or married filing separately; $180,000 if the borrower's filing status is head of household; or $240,000 if their tax filing status is married filing jointly or qualifying surviving spouse.

• Add § 30.82 specifying the Secretary's authority to provide a one-time waiver of the lesser of $20,000 or the amount by which a borrower's current loan balance exceeds the balance owed when the borrower entered repayment.

• Add § 30.83 specifying the Secretary's authority to waive the outstanding balance when a borrower who only has student loans for the borrower's undergraduate studies first entered repayment on or before July 1, 2005 (20 years) or on or before July 1, 2000 (25 years) when a borrower has student loans other than loans for the borrower's undergraduate studies.

• Add § 30.84 specifying the Secretary's authority to waive the outstanding balance of a loan when a borrower is not currently enrolled in an

IDR plan, but otherwise meets the criteria for forgiveness under an IDR plan.

• Add § 30.85 specifying the Secretary's authority to waive the outstanding balance of a loan when a borrower has not applied for, or not successfully applied for, any loan discharge, cancellation, or forgiveness opportunity under parts 682 or 685, but otherwise meets the eligibility criteria for discharge, cancellation, or forgiveness.

• Add § 30.86 specifying the Secretary's authority to waive the outstanding balance of a loan obtained to attend an institution or program where the Secretary or other authorized Department official has issued a final decision, denial of recertification, or determination that terminates or otherwise ends its title IV eligibility due at least in part to the institution's or program's failure to meet required accountability standards based on student outcomes or to its failure to provide sufficient financial value to students.

• Add § 30.87 specifying the Secretary's authority to waive the outstanding balance of a loan obtained to attend a program or an institution that closed and the Secretary has determined the institution or program has not met for at least one year an accountability standard based on student outcomes; or failed to provide sufficient financial value to students and was subject to a program review, investigation, or any other Department action that remained unresolved at the time of closure.

• Add § 30.88 specifying the Secretary's authority to waive the outstanding balance of a loan received by a borrower associated with enrollment in a GE program that has closed and prior to closure either had a high debt-to-earning rate or low median earnings, or was at a GE program where the Department did not produce debt-to-earnings and earnings premium measures but the institution closed and prior to the closure received a majority of funds from programs with high debt-to-earnings or low median earnings.

• Add § 682.403(a) outlining the procedures under which the Secretary determines that a FFEL Program loan held by a lender or guaranty agency qualifies for a waiver, the waiver claim is processed, and the Secretary grants the waiver.

• Add § 682.403(b)(1) specifying the Secretary's authority to waive the outstanding balance of a FFEL Program loan if the loan first entered repayment in 2000 or earlier.

• Add § 682.403(b)(2) specifying the Secretary's authority to waive the outstanding balance of a FFEL Program loan if the borrower has not applied for, or not successfully applied for, but otherwise meets the eligibility requirements for a closed school discharge.

• Add § 682.403(b)(3) specifying the Secretary's authority to waive the outstanding balance of a FFEL Program loan if the loan was received for attendance at an institution that lost its eligibility to participate in a title IV, HEA program because of its high CDRs.

• Add §§ 682.403(c), 682.403(d), and 682.403(e) describing the waiver claim filing process for a lender, guaranty agency, and the Department.

• Add § 682.403(f) specifying that if the conditions for a waiver are met but the loan has been repaid by a Federal Consolidation Loan that has an outstanding balance, the Secretary may waive the portion of the outstanding balance of the consolidation loan attributable to such a loan once the loan has been assigned to the Secretary.

• Make conforming changes to §§ 30.1(c), 30.62(a), and 30.70(e)(1) based on revisions to the sections noted above.

**Significant Proposed Regulations**

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address proposed regulatory provisions that are technical or otherwise minor in effect. For each section of the regulations discussed, we include the statutory citation, the current regulations being revised (if applicable), the new proposed regulatory text, and the reasons for why we proposed to add new regulatory text or revise the existing regulatory text.

**34 Part 30—Debt Collection**

*Subparts A, C, E, and F (§§ 30.1(c), 30.62(a), 30.70(a)(1), 30.70(c)(1) and 30.70(e)(1))*

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* Section 30.1(c) contains the procedures that the Secretary may use in collecting on a debt owed to the United States.

Section 30.62(a) provides that for a debt based on a loan, the Secretary may refrain from collecting interest or charging administrative costs or penalties to the extent that compromise of these amounts is appropriate under the standards for compromise of a debt contained in 31 CFR part 902, which were formerly contained in 4 CFR part 103.

Sections 30.70(a)(1) and 30.70(c)(1) specify that the Secretary uses the standards in the FCCS to determine whether compromise of a debt, or suspension or termination of a debt, is appropriate.

Section 30.70(e)(1) provides that the Secretary may compromise a debt in any amount or suspend or terminate collection of a debt in any amount, if the debt arises under the FFEL Program authorized under title IV, part B, of the HEA, the Direct Loan Program authorized under title IV, part D of the HEA, or the Perkins Loan Program authorized under title IV, part E, of the HEA.

*Proposed Regulations:* These proposed regulations would identify certain conditions under which the Secretary may waive debt, identify the loan programs eligible for such waivers, clarify the existing compromise provisions, correct outdated references, and remove obsolete references. These regulations do not alter the scope of the Secretary's authority under Section 432(a) of the HEA. Relatedly, the non-exhaustive waiver provisions neither limit the Secretary's discretion to waive debt in other circumstances permitted under Section 432(a) nor do they require the Secretary to undergo rulemaking before taking any action authorized under Section 432(a). Nevertheless, by providing greater clarity regarding the Secretary's waiver authority, these regulations are beneficial to inform the public about how the Secretary may exercise waiver in a consistent manner to provide appropriate relief to borrowers in accordance with the provisions and purposes of the HEA.

Proposed § 30.1(c)(7) would provide that the Secretary may waive repayment of a debt under subpart G of 34 CFR part 30. Proposed § 30.62(a) would add to the current compromise provisions language that would allow the Secretary to waive the collection of interest or charging administrative costs or penalties on a loan in accordance with § 30.80. Proposed §§ 30.70(a)(1) and 30.70(c)(1) would specify that, when compromising a debt or when suspending or terminating a debt, the Secretary "may" use the FCCS. Proposed § 30.70(e)(1) would add HEAL Program loans to the list of loan types for which the Secretary may compromise a debt or suspend or terminate collection of a debt.

Technical corrections updating and clarifying various references and provisions contained in subparts A, C, E, and F of part 30 would also be made. In addition, severability provisions would be added to these subparts as new §§ 30.9, 30.39, 30.69, and 30.79. The severability provisions would specify that if any provision of a part is held to be invalid, the remaining provisions would not be affected.

*Reasons:* The current regulations in part 30 describe the policies and procedures that the Secretary uses to collect on a debt owed to the Department. The Department is proposing a new subpart G to part 30 which would provide greater specificity regarding the Secretary's discretion to waive Federal student loan debt. This greater specificity will allow the Department to take more transparent steps that help to consistently alleviate the significant financial burden Federal student loans have become for struggling or vulnerable borrowers by waiving some or all of their outstanding loan balances. Such waivers would either reduce monthly payments, total amounts owed, or both. The proposed new language in subpart G would require conforming changes to some of the existing regulatory language in part 30.

The proposed revision to § 30.1(c)(7) is necessary to provide a cross-reference to proposed subpart G and the proposed revision to § 30.62(a) is necessary to provide a cross-reference to proposed § 30.80.

In 2016, the Department revised § 30.70 to reflect a series of statutory changes that expanded the Secretary's authority to compromise, or suspend or terminate the collection of, debts.[9] In particular, the Department wanted to highlight the ability of the agency to resolve debts of less than $100,000 without needing to obtain approval from the U.S. Department of Justice (DOJ) and to include the ability of DOJ to seek review of resolving claims of more than $1 million. But the inclusion of this provision has created questions around whether the Department's compromise, suspension, and termination authority is strictly bound by FCCS standards. The Department's view is that it is not. To begin, the Federal Claims Collection Act (FCCA) and the FCCS regulations do not, by their own terms, apply to the Department's student loan programs.[10]

In addition, the Department's own regulations also do not strictly bind the Secretary to the FCCS. The history of revisions to 34 CFR 30.70 reflects that it has been revised over time to reflect new requirements and authorities but has consistently recognized the Secretary's broad authority to compromise student loan debts "in any amount." Reading § 30.70 as subjecting the Secretary's authority to the FCCS requirements would be contrary to the stated purpose of the 2016 amendments, which were intended to "reflect a series of statutory changes that have *expanded* the Secretary's authority to compromise, or suspend or terminate the collection of, debts" (emphasis added).[11] The proposed changes to §§ 30.70(a)(1) and 30.70(c)(1) would clarify that the Secretary's compromise, termination, and suspension authority remain broad and are not restricted by the FCCA and FCCS.

The addition of HEAL Program loans to § 30.70(e)(1) would clarify that the Secretary has the same authority to compromise, suspend, or terminate a HEAL loan debt as in the Direct Loan, FFEL, and Perkins loan programs. The negotiating committee agreed to add HEAL Program loans to § 30.70(e)(1) and raised no specific objections to the proposed conforming changes or technical corrections. Although there were no specific objections to the proposed revisions to the regulations in subparts A, C, E, and F of part 30, the Committee did not reach consensus on these proposed changes.

The severability provisions we propose to add as new §§ 30.9, 30.39, 30.69, 30.79, and 30.89 are intended to clarify that each regulatory provision in these subparts stands on its own. For the severability sections in subparts A through F of part 30, these additions reflect that the subcomponents of each section, as well as the sections themselves, are distinct. For instance, subpart C lays out the provisions related to administrative offset. The process in § 30.21 that addresses when the Secretary may offset a debt and the provisions regarding borrower notice in

§ 30.22 are separate, and those, in turn, are separate from the provisions in § 30.25 related to how an oral hearing may occur.

The severability provision in § 30.89 reflects that the different waivers proposed in subpart G each address a different set of circumstances in which the Department is concerned that borrowers may not be able to repay their loans within a reasonable period. This severability language also acknowledges that each of these proposed waivers have their own distinct rationale for their inclusion, and the effects would vary. For instance, some sections in subpart G would result in a complete waiver of a borrower's full remaining balance, while others would only result in a partial waiver. Moreover, as discussed elsewhere in this rule, there are also provisions within sections where if either element of this provision were invalidated by a reviewing court, the element that stayed in effect would continue to provide important relief to borrowers. This, for instance, can be seen in proposed §§ 30.81 and 30.82. Proposed § 682.403 is already covered by an existing severability provision in § 682.424.

These provisions were not subject to a consensus check on the part of the negotiators, although none of the negotiators raised objections to adding these provisions.

*Subpart G*

*§ 30.80  Waiver of Federal Student Loan debts.*

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 30.80 would specify the Secretary's authority to waive all or part of any Department-held FFEL Program loan, William D. Ford Federal Direct Loan, Federal Perkins Loan, and HEAL Loan debts owed to the Department under the conditions included in, but not limited to, §§ 30.81 through 30.88.

*Reasons:* Proposed new subpart G to part 30, which includes sections §§ 30.80–30.89, would provide greater specificity regarding the Secretary's discretion to waive Federal student loan debt to alleviate the significant financial burden of student loans on borrowers and their families. The regulations in part 30 pertain to debts owed to the Department, therefore proposed § 30.80

---

[9] See 81 FR 39330 (June 16, 2016); 81 FR 75926 (November 1, 2016).

[10] When the FCCA was enacted in 1966, it stated that "[n]othing in this Act shall increase or diminish the existing authority of the head of an agency to litigate claims, or diminish his existing authority to settle, compromise, or close claims."

Federal Claims Collection Act of 1966, Public Law 89–508, 4, 80 Stat. 308 (1966). And the FCCS specifically provides that it does not "preclude [ ] agency disposition of any claim under statutes and implementing regulations other than [the FCCA]," and that "[i]n such cases, the laws and regulations that are specifically applicable to claims collection activities of a particular agency generally take precedence." 31 CFR 900.4. The FCCA and FCCS do not, on their own terms, limit the Secretary's authority because the HEA endows the Secretary with separate and independent authority to compromise a debt, or suspend or terminate collection of a debt. *See* § 1082(a).

[11] 81 FR 39369 (June 16, 2016).

would only apply to student loans held by the Department. This includes FFEL Program loans that have been assigned to the Department, as well as Perkins loans and HEAL loans in default. It also includes consolidation loans that repaid a FFEL, Perkins, or HEAL loan. Waivers specific to FFEL Program loans held by private lenders or managed by guaranty agencies would be provided under proposed § 682.403 of the FFEL Program regulations. The proposed regulations for § 682.403 are discussed later in this NPRM.

Proposed § 30.80 provides an introduction to subpart G and explains the types of loans covered by this subpart. The Department proposes to include all the types of Federal student loans held by the Department, including Direct Loans, FFEL Loans, Perkins Loans, and HEAL Loans because we believe it is appropriate to consider waivers for all the loan types managed by the Secretary and organizationally consider similar subject matter under one subpart. As discussed in other sections, not all these provisions will apply equally to all loan types because there are certain benefits that are not otherwise available on all types of loans. For example, only Direct and FFEL Loans are eligible to be repaid under IDR plans.

The Department believes adding subpart G in these proposed regulations better clarifies some circumstances in which the Secretary may use his existing and longstanding authority under section 432(a) of the HEA. Current regulations do not describe how the Secretary uses this waiver authority. Clarifying how this authority would be used through these regulations would better inform the public about how the Secretary may exercise his waiver authority in a consistent and equitable manner.

Providing such specificity would also allow the Department to highlight circumstances where we are particularly concerned about borrowers' ability to successfully repay their debt in full in a reasonable period or where the costs of collection are anticipated to exceed the amount recoverable. Each of these proposed waivers are intended to address a variety of conditions that borrowers may encounter where a waiver may be appropriate. They can and would operate independently of each other.

The Committee reached consensus on proposed § 30.80.

*§ 30.81 Waiver when the current balance exceeds the balance upon entering repayment for borrowers on an IDR plan.*

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 30.81 would provide that the Secretary may waive the amount by which each of a borrower's loans has a total outstanding balance that exceeds the amount owed upon entering repayment if the borrower is enrolled in an IDR plan and meets certain additional criteria. The original balance would be measured based upon the original amount disbursed for loans disbursed before January 1, 2005, and the balance of the loans on the day after the grace period for loans disbursed on or after January 1, 2005. Waiver of repayment of consolidation loans would be based upon the original balances of the loans repaid by the consolidation loan.

A borrower would be eligible to receive this waiver once on their loans if they enrolled in an IDR plan under §§ 682.215, 685.209, or 685.221 as of a date determined by the Secretary; and the borrower's adjusted gross income, or other calculation of income as shown on acceptable documentation, demonstrates that the borrower's annual income is equal to or less than $120,000 if their tax filing status is single or married filing separately; $180,000 if their tax filing status is head of household; or $240,000 if they are married filing jointly or a qualifying surviving spouse.

*Reasons:* Over the past several years, the Department has taken several significant steps to address the negative effects of interest accrual and capitalization on borrowers. Effective July 1, 2023, the Department ceased capitalizing interest in all situations where it is not required by statute (87 FR 65904). This includes when a borrower enters repayment, exits a forbearance, leaves any IDR plan besides Income-Based Repayment (IBR), and enters default. In August 2023, the Department also implemented a provision in the SAVE plan regulations under which the Department does not charge any amount of accrued interest that is not otherwise covered by a borrower's required payment (88 FR 43820). These changes provide significant benefits that may help borrowers avoid situations where they find themselves struggling to repay their debts because their balance has grown far beyond what they originally borrowed.

The intent of the Department is to take action on a one-time basis on a borrower's loans to address excessive interest accrual on Federal student loans. The primary drivers of this accumulation are when borrowers make payments on an IDR plan that do not cover the full amount of accumulating interest; periods of non-payment, such as deferments, forbearances, delinquency, and default; and interest capitalization. Because prior to the establishment of the Saving on A Valuable Education (SAVE) Plan IDR plans were the only repayment plans where payments do not have to at least cover accumulating monthly interest, the Department is concerned that borrowers owe large balances that are higher than what they were at repayment entry from prior enrollment in IDR. Owing such large balances can result in borrowers needing to repay far more than would have been reasonably expected by the Department, and the borrower themselves, at the time that the borrower entered repayment. It can also significantly extend the amount of time a borrower needs to repay their loans in full. Prior to SAVE, interest balances climbed even though borrowers made monthly required payments on IDR plans. Echoing concerns and statements the Department heard in public comments prior to the formation of the negotiated rulemaking committee and during the public comment periods held on most days the negotiated rulemaking committee met, borrowers have reported that growing balances while in repayment can lead to negative psychological impacts on borrowers who are attempting to repay their debt but are unable to, including that they lose hope and motivation to repay their debt.[12]

Additionally, while the Department has eliminated all non-statutorily required instances of interest capitalization, borrowers today owe higher balances from previous instances of interest capitalization. Interest capitalization can significantly increase what a borrower owes and extend the time it takes to repay their loans. The Department is concerned that such instances are harmful to the borrower and should therefore be corrected retroactively by waiving the borrower's obligation to pay such interest accrual after a borrower has entered repayment.

---

[12] *https://www.pewtrusts.org/en/research-and-analysis/reports/2020/05/borrowers-discuss-the-challenges-of-student-loan-repayment; https://www.newamerica.org/education-policy/reports/in-default-and-left-behind/.*

While the Department has addressed the issue of balance growth for those in IDR going forward, there are borrowers who have spent time in repayment prior to the implementation of these changes who have experienced the balance of their loans grow such that their loan balances are now greater than what they originally borrowed. The persistence of those situations is a problem the Department seeks to address. Recent focus group reports and extensive borrower testimony have shown that growing loan balances lead to both financial and psychological challenges to successful repayment by borrowers.[13] While borrowers who experienced balance growth have a way to prevent balance growth in the future, they still must overcome the consequences of this past balance growth.

Because the Department has taken steps to address the problem of excess interest accrual and capitalization going forward, this provision would only be applied once per a borrower's loans to eliminate balance growth for all but the highest income borrowers enrolled in an IDR plan, allowing those who experienced this situation to successfully make progress on repaying their debts. Providing targeted relief in this manner would be consistent with the general principles of Federal debt collection, which permit agencies to provide relief to borrowers when there is evidence the agency would not otherwise be able to collect the debt in full within a reasonable time.[14]

The Department proposes to provide the benefits in § 30.81 only to borrowers enrolled in IDR plans for both operational and administrative reasons. First, borrowers in IDR plans have demonstrated their concern that they cannot repay their loans on the standard repayment timeline, making them an important group for the Department to consider for relief. Second, until the creation of the SAVE plan, borrowers on IDR plans frequently experienced balance growth from accruing interest, which this policy seeks to address. Specifically, the nature of the IDR plans'

lower monthly payments meant borrowers' payments often did not cover monthly interest. Borrowers in the past who did not recertify their income could also be removed from an IDR plan at which point any unpaid interest would be capitalized. For both reasons, it is reasonable for the Department to focus its resources on providing relief to borrowers on IDR plans to address the current negative effects of prior interest accumulation and potentially capitalization. In addition, administrative considerations weigh in favor of limiting the policy to borrowers in IDR because the Department has data that will allow it to verify that borrowers fall below the income cap.

The Department proposes to limit this benefit to borrowers with income below certain levels to benefit only borrowers for whom their past instances of balance growth may have a greater possible negative effect on their ability to repay their debts in the future. The SAVE plan's interest benefit works in a similar manner. As a borrower's income rises, their payment covers a greater amount of accumulating monthly interest. Eventually, for any given debt level there is an income amount at which a borrower's payment will equal or exceed accumulating monthly interest. At that point, the borrower does not derive any assistance from the SAVE plan's interest benefit.

The Department proposes to limit the benefit in this section to borrowers whose incomes are at or below a certain threshold. To determine this threshold, the Department looked at the income level at which a borrower in a single-person household would have a calculated payment on the SAVE plan that is sufficient to pay off all the interest accumulating on a monthly basis if their debt level was equal to $138,000 which is the maximum amount of Federal loans a borrower can take out for undergraduate and graduate education without taking out any PLUS loans. We exclude amounts related to PLUS loans because they do not have an absolute dollar loan limit, as they can be obtained for up to the total cost of attendance, less other aid received.

Because of the lack of an absolute dollar loan limit, there are some borrowers who have debts that are much higher than the debt loads of the overwhelming majority of borrowers. We do not think it was reasonable to anchor to such outlier amounts, and we therefore take the conservative approach of not including these dollar amounts. However, typical balances for Parent PLUS and Graduate PLUS loans are well below the amounts contemplated

here.[15] Using a value of $138,500 is inclusive of over 95 percent of loan balances in repayment. Furthermore, Parent PLUS borrowers are only eligible for an IDR plan if the borrower has repaid those Parent PLUS loans through consolidation.

We calculated income thresholds for waiver eligibility in the following way: First, we assumed that a borrower had a total balance equal to the maximum non-PLUS amount that a borrower can receive for undergraduate and graduate education, which is $138,500. We then assumed that a borrower received the maximum amount of loans for an undergraduate dependent student ($31,000) and the remainder for graduate school ($107,500). We did this calculation off a dependent undergraduate maximum because those are the more common types of student loan borrowers, and it allows undergraduate loans to make up a smaller share of the total amount borrowed. If the independent undergraduate limit were used, the SAVE payment amount would decrease due to the increased share of undergraduate loans. Using independent limits would produce an unfair income amount for dependent borrowers, while independent students are not harmed by using the dependent limit. In order to determine the interest rate to use for this analysis we assigned the unweighted average interest rate charged on undergraduate loans from the 2013–14 award year through the 2023–24 award year to the undergraduate loans and the equivalent graduate loan rate for the non-PLUS graduate loans. We used this period to generate an average interest rate because prior to 2013–14 there were different rates charged on subsidized versus unsubsidized loans. This produced averages of 4.3 percent for undergraduate loans and 5.87 percent for graduate loans. We then weighted these interest rates by the share of the balance owed for undergraduate and graduate school. This resulted in an interest rate of 5.52 percent. Next, we used the balance amount and the interest rate to calculate the amount of interest that would accumulate on $138,500 at a 5.52 percent interest rate in one month. That amount is $637.10.

We then calculated the income that a single person would need to earn to have a monthly payment on SAVE equal to $637.10. In doing this, we used the

---

[13] See 87 FR 41878 (July 13, 2022); 87 FR 65904 (November 1, 2022); 88 FR 43820 (July 10, 2023). See also *https://www.pewtrusts.org/en/research-and-analysis/reports/2020/05/borrowers-discuss-the-challenges-of-student-loan-repayment; https://www.newamerica.org/education-policy/reports/in-default-and-left-behind/.*

[14] *See* 31 U.S.C. 3711(a)(3). In addition, Congress permitted ED to compromise or collect debt pursuant to the standards articulated by ED's own debt collection regulations or Treasury's debt collection regulations, *see* 31 U.S.C. 3711(d), which similarly permit relief where there is evidence the agency would not collect the debt in full within a reasonable period of time. *See, e.g.,* 31 CFR 902.2(a)(2); 34 CFR 30.70(a)(1) (referencing 31 CFR part 902).

[15] For example, the average balance for a Parent PLUS loan recipient is almost $30,000 and the average balance for a Grad PLUS loan recipient is about $58,000. As of Q4, 2023, see Federal Student Aid Portfolio by Loan Type, available at: *https://studentaid.gov/data-center/student/portfolio.*

2024 Federal Poverty Guideline (FPL) amount of $15,060. Using those data, we calculated that a single person who owes the maximum non-PLUS amount would have to make more than $119,971 to cease receiving an interest benefit on SAVE. We then rounded that amount to the nearest $1,000, which yields a threshold of $120,000.

The Department proposes to use a threshold of $120,000 for borrowers whose tax filing status is single. We propose to adopt the same threshold for married-filing-separately taxpayers, mimicking many rules in the Internal Revenue Code that treat the two filing statuses similarly. For example, the basic standard deduction for single and married-filing-separate filers is the same. We propose to use $180,000 for a borrower whose filing status is head of household, which mimics the treatment under the Internal Revenue Code, in which the standard deduction is one-and-a-half times what is used for a single-person household (subject to rounding rules). We propose to use two times the amount for a single-person household—$240,000 for borrowers whose status is married filing jointly or qualifying surviving spouse. This too mirrors how the Internal Revenue Code handles the standard deduction for these filing statuses relative to someone whose filing status is single.

The Department acknowledges that this approach to establishing income thresholds for filing statuses besides single or married filing separately is different from how we calculate payments on IDR plans. For IDR plans, we adjust payments for larger households by using some multiplier of the Federal Poverty Guidelines based upon the size of the household. The result is that a two-person household does not have double the amount of income protected that a single-person household has. We think taking a different approach here is warranted for several reasons. The consideration under IDR plans is about ensuring borrowers have enough money set aside to cover their monthly key obligations, such as food and housing. Those items have economies of scale, which can be reflected in the household size adjustment. For instance, a two-person household may be sharing one bedroom, meaning the per-person household cost is not simply double that for a single person. By contrast, this waiver is an action that would occur once per borrower and is not focused on their monthly payment amount. Moreover, because this waiver is concerned with balance growth borrowers have experienced during their time since entering repayment, it is possible that

some of this growth would have occurred before borrowers married, had children, or otherwise grew their household size. For instance, the median age at repayment entry for borrowers is about 25, while the typical age of first marriage is about 30 for men and 29 for women.[16]

The Department is not proposing to amend the regulations for SAVE in this NPRM and will not consider comments related to adjusting the payment calculations on SAVE in response to this NPRM.

Borrowers whose income exceeds these thresholds would not receive a waiver under this provision but could have the lesser of $20,000 or the amount by which their balance upon entering repayment exceeds their current outstanding balance waived under § 30.82.

The Department's overall goal with this provision is to only address balance growth that occurred after a borrower entered repayment. We do not propose to address interest that accumulated before a borrower first entered repayment, which, prior to July 1, 2023, was capitalized on their balance at the end of the grace period. The accumulation of interest while a borrower is in school is a statutory component of Federal Student Loans.[17] However, the Department faces certain data limitations that make it impossible to accurately ascertain the balance upon entering repayment for loans disbursed before January 1, 2005. For those loans, data regarding the balance upon the end of the grace period is not stored in the Department's records. We are concerned that attempts to approximate that amount may not be accurate and could result in either providing too much or too little assistance to borrowers. Accordingly, this provision would provide differential treatment for loans based upon whether they were disbursed before or after the date by which the Department can accurately assess the balance owed upon repayment entry. For loans disbursed after January 1, 2005, we would measure the original balance based upon the last day of a borrower's grace period, so that no interest that accumulated prior to entering repayment is included. For loans disbursed before that date, the Department would use the original disbursed balance of the loan due to operational limitations. Because the Department does not have a valid and reliable data point for balance at

repayment entry for borrowers with these older loans, we think the balance at disbursement is the best available data to use for loans disbursed before January 1, 2005. This would be used only for borrowers whose loans are 20 or more years old, which also means that the vast majority of loans that are that old and are still outstanding belong to borrowers who have had long-term struggles repaying. For instance, Department data in the RIA that accompanies this NPRM show that 83 percent of borrowers whose loans are at least 20 (undergraduate debt) or 25 (graduate debt) years old have previously experienced a default. Moreover, to the extent borrowers with these older loans had subsidized loans, they would not have seen interest accumulate before entering repayment on those loans. These dates properly balance the policy goals of not waiving interest prior to repayment entry with the operational reality of using the best available data. Because the January 1, 2005, disbursement date creates a clear dividing line that establishes two groups of borrowers, one with loans disbursed before January 1, 2005, and another with loans disbursed after that date, if either element of this provision were invalidated by a reviewing court, the element that stayed in effect would continue to provide important relief to borrowers.

The Committee did not reach consensus on proposed § 30.81.

*§ 30.82   Waiver when the current balance exceeds the balance upon entering repayment.*

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 30.82 would provide that the Secretary may waive the lesser of $20,000 or the amount by which a borrower's loans have a total outstanding balance that exceeds the balance owed upon entering repayment, for loans disbursed before January 1, 2005, the balance of the loans on the day after the grace period for loans disbursed on or after January 1, 2005, or the total original principal balance of all loans repaid by a Federal Consolidation Loan or a Direct Consolidation Loan. A borrower who has received a waiver under § 30.81 would not be eligible for a waiver under this provision.

---

[16] Based on the American Community Survey 2022 5-year estimates of Median Age at First Marriage.

[17] See 20 U.S.C. 1077a and 1087e(b).

*Reasons:* Proposed § 30.82 would provide one-time relief to borrowers who experienced balance growth. While the Department has taken steps to address the harms of balance growth and interest capitalization going forward, the recent changes do not address past instances of balance growth that have resulted in some borrowers owing more than they originally did when they entered repayment. As explained, this balance growth adversely affects a borrower's ability to pay off their loans in full within a reasonable period. We are also concerned that growing balances while in repayment may lead to negative psychological impacts on borrowers who are attempting to repay their debt but are unable to do so.

There are several reasons why a borrower may have seen their loan balance grow beyond what it was when they entered repayment. They may have spent time in deferments and forbearances during which interest accumulated on their loans. This includes both deferments for unemployment or economic hardship, as well as deferments and forbearances related to military service. Borrowers may also have seen their balances grow if they previously spent time on an IDR plan during which their income-based payment amounts were not sufficient to repay all the monthly accumulating interest. Borrowers may also have spent time in which they were not repaying their loans, including periods of delinquency and in default.

Borrowers who accumulated outstanding unpaid interest also may have experienced interest capitalization events, such as after a forbearance ends or after they left an IDR plan, in which outstanding interest was added onto the loan's principal balance. Once capitalization occurs, borrowers then pay interest that is calculated off that higher principal balance, increasing the total amount of interest they need to repay.

The Department took steps in recent years to avoid balance growth and in particular to decrease the instances in which borrowers see their unpaid interest capitalize. Specifically, the Department has recently taken action to end interest capitalization where it is not required by statute as well as to create an interest benefit under the SAVE plan wherein the borrower is not charged for the remaining interest after a payment is applied. Providing relief through § 30.82 allows the Department to address the current and ongoing issues for borrowers caused by this past balance growth.

The Department proposes to make the benefits of § 30.82 available to all borrowers because we are concerned about the negative effects of balance growth regardless of borrowers' past repayment history or circumstances. While we have proposed a separate provision in § 30.81 that would provide relief for borrowers who are on an IDR plan and have incomes below certain levels, the Department sees §§ 30.81 and 30.82 as provisions that can operate in a separate and distinct manner from each other. Therefore, in developing the parameters for this provision, the Department considered the optimal structure for this provision as a standalone benefit. The only interplay between this provision and § 30.81 is the proposed limitation in § 30.82(b) that a borrower may not receive relief to address balance growth under both provisions because the Department intends to provide one-time relief from balance growth for a borrower if the Secretary exercises his discretion to grant such relief through this provision.

The Department believes it is important to provide a benefit under § 30.82 that is available to all borrowers. An automatic and universal approach is the simplest to administer and also avoids problems commonly seen by the Department with application-based benefits in which the borrowers who would most benefit from the relief fail to apply. The JP Morgan Chase Institute found in 2022 that there are two borrowers who could benefit from IDR for every one that is enrolled.[18] Similarly, the U.S. Department of the Treasury found that 70 percent of borrowers who were in default in 2012 would have benefitted from a reduced payment of an IDR plan at the time.[19] Providing this benefit on a broadly applicable, automatic basis would allow us to reach all borrowers who face the adverse effects of balance growth and would create a streamlined process.

However, because the Department would provide a universal benefit, we do not believe it would be appropriate to provide uncapped relief. In particular, there are borrowers who have experienced amounts of balance growth significantly higher than all other borrowers who have seen their balances grow. The Department is concerned that waiving those excessive amounts of balance growth would provide unnecessary windfall benefits in which

there would be significant costs incurred to help a relatively small number of borrowers.

We propose capping the amount of relief at $20,000 for a borrower which would strike the balance between granting a level of benefits that would provide assistance to borrowers while not granting windfall amounts of relief. This $20,000 amount represents the 90th percentile of the amount by which balances exceed what borrowers originally owed upon entering repayment. This amount is informed by using a statistical approach to identify excess balance values that are dissimilar to most other values. There are several common ways of defining outliers in a distribution, and we use a process here that uses multiples of the interquartile range, referred to as a ''fence.''[20] The upper inner fence is commonly defined as the 75th percentile value plus the interquartile range multiplied by 1.5. In Department data, the inner fence is about $18,500, which we round up to $20,000 to create a simpler value to understand.

A cap on relief under this provision also acknowledges that generally borrowers must have larger loan balances in order to experience greater amounts of balance growth, and that typically borrowers with larger loan balances have greater earnings potential than those with lower loan balances.

Examples highlight the connection between loan balance amounts and the potential for balance growth. Consider a borrower who owes $9,500 at an interest rate of 4.32 percent, the maximum amount of debt an undergraduate student can take out in a single year and the average interest rate for undergraduate loans over the last 11 years. If they did not make a single payment for 10 years their balance would grow by $4,104. By contrast, a borrower who owes $150,000 all in graduate loans at an interest rate of 5.87 percent (the average graduate rate over the last 11 years), would see their balance grow by $88,050 if they did not make a payment over 10 years. Therefore, among two otherwise similarly situated borrowers, the borrowers who owe more, particularly in graduate loans, will see their balance grow faster.

Borrowers with very high balances tend to have higher incomes than do lower-balance borrowers. That may be because many higher-balance borrowers

---

[18] *www.jpmorganchase.com/institute/research/household-debt/student-loan-income-driven-repayment.*

[19] U.S. Government Accountability Office, 2015. Federal Student Loans: Education Could Do More to Help Ensure Borrowers are Aware of Repayment and Forgiveness Options. GAO–15–663.

[20] For more information on this approach see the National Institute of Standards and Technology, *https://www.itl.nist.gov/div898/handbook/prc/section1/prc16.htm,* or statistical textbooks such as Ott & Longnecker, *An Introduction to Statistical Methods and Data Analysis.*

accumulated some or most of their debt from graduate school, and among college-educated individuals, those with a graduate degree generally have higher wages than those with only an undergraduate credential or without any credential at all.[21] A higher earning borrower may not only have a greater ability to pay off their debt in full in a reasonable period, there is also a greater likelihood that they may be on an earnings trajectory in which their initial earnings start out lower and then increase over time. For instance, many health care professions start with lower wages until the individual completes their residency. This earnings growth phenomenon is something the Department has acknowledged in other contexts, such as in the Financial Value Transparency and GE final regulations in which the Department proposes to assess the earnings of graduates from certain programs from the period six or seven years after completion instead of the standard three or four years used for most other program types. Based upon the proposed cap of $20,000 on balance growth, we looked at data on borrowers who experienced balance growth to try to understand any points where borrowers who would receive relief beyond that cap amount appear to have a greater likelihood of showing their ability to repay their debt. This analysis included looking at factors such as the share of borrowers with loans from graduate school, the rate at which borrowers received Pell Grants, and whether students had past evidence of default. While the Department does not have data on borrower incomes, we imputed income for borrowers based on individuals with similar demographic and educational characteristics from Census data. This procedure is imperfect, but we believe it provides a reasonable approximation of income. We found that borrowers who had less than $20,000 of excess balance were less likely to have gone to graduate school and have a lower imputed income. They

were also more likely to have received a Pell Grant or to have experienced student loan default. This further confirmed our belief that preventing windfall amounts of relief also helped make this provision better targeted.

The Department specifically invites feedback from the public on the approaches considered here. In particular, we are interested in comments on whether to consider a higher or lower cap on the amount of balance growth that could be waived and on the rationales for choosing such caps. We also welcome feedback on whether there should be separate waiver policies to consider unique circumstances of different groups of borrowers and how they might be affected by balance growth. Such groups, for example, could recognize the effect of balance growth as being different for parent borrowers versus student borrowers because the former have less access to IDR plans and as a result have less of an ability to have balances forgiven after a certain period in repayment.

The different dates for measuring the original balance in § 30.82(a) reflect data limitations the Department faces in accurately calculating the right balance to use as a baseline. These data limitations are explained in the discussion of reasons for § 30.81.

During the third negotiated rulemaking session, the Department proposed two regulatory sections that are similar to proposed § 30.82. The Committee did not reach consensus on these proposed sections.

*§ 30.83  Waiver based on time since a loan first entered repayment.*

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 30.83(a)(1) specifies the conditions under which the Secretary may waive the outstanding balance of Federal student loans received for the borrower's undergraduate study.

Under this proposed rule, borrowers would have their outstanding balances waived only for loans that were received for undergraduate study or Direct Consolidation Loans that repaid only loans that were obtained for undergraduate study, and which first entered repayment on or before July 1, 2005. Proposed § 30.83(a)(2) describes the conditions under which the

Secretary may grant waivers on outstanding balances of Federal student loans other than those loans that were received for undergraduate study, and first entered repayment on or before July 1, 2000.

Proposed § 30.83(b) specifies how the Department would calculate the date when a loan originally entered repayment. For a loan that is not a PLUS loan or a consolidation loan, the Department would use the day after the loan's initial grace period ends. For PLUS loans made to either a parent or a graduate or professional student, the Department would use the date the loan is fully disbursed. For a Federal Consolidation Loan or Direct Consolidation Loan made prior to July 1, 2023, the Department would consider the earliest date a loan repaid by the consolidation loan had the following occur:

• For a non-PLUS, non-consolidation loan, the day after its initial grace period ended,

• For a PLUS loan to a graduate or professional student or a parent, the date the loan was disbursed.

For a Direct Consolidation Loan made on or after July 1, 2023, the date for measuring repayment entry would be based upon the latest day a loan repaid by the consolidation loan had its initial grace period end or was fully disbursed.

*Reasons:* The standard repayment plan that acts as the default option for borrowers provides a repayment schedule of 120 monthly installments of fixed amounts, the equivalent of 10 years.[22] Similarly, the income contingent repayment authority provides that borrowers repay over an extended period, but such repayment period is not to exceed 25 years.[23] More recently, the IBR plan provides that a borrower's repayment term ends when they reach the equivalent of 20 or 25 years of monthly payments, depending on when they first took out loans.[24]

The Department is concerned that despite the presence of ways for repayment to end, too many borrowers end up owing loans for years, if not decades, longer than the repayment plans generally require. In estimates presented later in the RIA, millions of borrowers have been in repayment for over 20 or 25 years.[25] The Department

---

[21] Borrowers with professional doctoral degrees, which include fields like medicine, pharmacy, veterinary medicine, and law, have the highest cumulative student loan balances among those who have completed postsecondary education (see *https://nces.ed.gov/programs/coe/indicator/tub/ graduate-student-loan-debt*). These are also fields that tend to have the highest wages (see for example, *https://www.bls.gov/oes/current/oes_ nat.htm*). Borrowers with master's degrees or higher, also tend to have higher debt (see Bhutta et al. ''Changes in U.S. Family Finances from 2016 to 2019: Evidence from the Survey of Consumer Finances,'' Federal Reserve Bulletin, 2020, 106 (5). *https://www.federalreserve.gov/publications/files/ scf20.pdf*) For research on the returns to graduate degrees, see, for example, Altonji & Zhong (2021). The labor market returns to advanced degrees. *Journal of Labor Economics*, 39(2).

[22] See 20 U.S.C. 1078(b)(9)(A)(i) and 20 U.S.C. 1087e(d)(1)(A).

[23] See 20 U.S.C. 1087e(d)(1)(D).

[24] See 20 U.S.C. 1098e.

[25] There is also evidence of many borrowers being in repayment for a long time in a paper by the Urban Institute using credit panel data estimated that there are nearly 100,000 borrowers with loans that were first originated prior to 1990, making

Continued

is particularly concerned that when loans persist for this long, they are unlikely to be repaid in a reasonable period of time. In recognition of this problem, Congress and the Department have made several statutory and regulatory changes to the student loan program so that borrowers can fully repay their debt within a reasonable time. However, borrowers who took out loans prior to the creation of these changes spent years or decades without the generous benefits that exist today and, as a result, may have faced more repayment challenges and be less likely to retire their debts within a reasonable time. The Department has already taken some steps to address this concern through the payment count adjustment. In that situation, the Department was concerned that because of inaccurate recordkeeping, borrowers may not have received appropriate credit toward forgiveness on IDR plans that they had earned. We were also worried about incorrect application of policies designed to limit repeated use of forbearances or properly tracking which deferments are supposed to count toward forgiveness. To that end, we credit all months a borrower spent in a repayment status, plus any months during which a borrower spent 12 consecutive or 36 cumulative months in a forbearance, and any deferments besides being in-school prior to 2013. We also do not reset progress toward forgiveness based upon loan consolidation. While the payment count adjustment provides important assistance, it does not capture the full set of circumstances in which a borrower may struggle to accrue time to forgiveness. This includes time spent in default and time spent in forbearance that does not meet the criteria of the payment count adjustment.

The Department views proposed § 30.83 as providing a waiver to borrowers who have had their loans for such an extended period that they are unlikely to fully repay within a reasonable period.

In drafting § 30.83, the Department has proposed to adopt several parameters to mirror the existing IDR plans. For instance, we would use debt relief thresholds of 20 or 25 years because those are the same periods available on IDR plans. We propose

applying this provision to loans that entered repayment on or before July 1, 2005 for borrowers who do not have any graduate loans because these borrowers will have been in repayment for all or part of 20 calendar years or more when the regulation is implemented; and we propose applying this provision to loans that entered repayment on or before July 1, 2000 for borrowers who have any graduate loans because these borrowers will have been in repayment for all or part of 25 calendar years when this provision is implemented. We also elected to use the differential treatment of undergraduate and graduate borrowers that exists in SAVE and was carried over from the since-replaced Revised Pay As You Earn (REPAYE) plan. The Department further believes after reviewing information identified in FSA's Enterprise Data Warehouse, that the differential treatment for undergraduate versus graduate loans is reasonable because Department data show that undergraduate borrowers go into delinquency or default at significantly higher rates than graduate borrowers. According to these data, 90 percent of borrowers who are in default on their loans had only taken out loans for their undergraduate education. By contrast, only 1 percent of borrowers who are in default only had graduate loans.

In proposing this treatment of loans that entered repayment a long time ago, the Department would not adopt the terms for a shortened period until forgiveness that is included in SAVE. That provision allows borrowers to receive forgiveness after as few as 120 payments if their original principal balance was $12,000 or less. The Department does not think it is appropriate to adopt that threshold here because this timeline is only available under the SAVE plan. By contrast, the goal of § 30.83 is to address situations where borrowers have been unable to fully repay in a reasonable time and have not even been able to repay in full over an extended period. This extended period is consistent with the forgiveness timelines on other IDR plans, which provide repayment terms of up to 20 or 25 years.

The Department also proposes to include language in § 30.83(b) explaining how we would determine the date of repayment entry in several different situations. For loans that are not PLUS loans or consolidation loans, we propose to use the date after the final day of a loan's grace period. That is the most intuitive date associated with what it means to enter repayment. For PLUS loans made to either a parent or a graduate or professional student we

propose using the day the loan is fully disbursed. This recognizes that PLUS loans have multiple options for when borrowers enter repayment. Since 2008, parent borrowers have had the option to defer repayment entry until after the dependent undergraduate leaves school. But not all choose to do this, and some parents choose to enter repayment right away, in which case their repayment entry date is the same as the disbursement date. Similarly, graduate borrowers have the option to decline their in-school deferment. Using the date of disbursement is therefore a consistent treatment of PLUS loans regardless of whether the borrower elected to go into repayment right away.

The Department proposes a simpler solution for picking the date to assign for repayment entry for a consolidation loan. We are concerned that simply counting the date of the consolidation loan's disbursement would be unfair to borrowers because it could result in erasing years of time since repayment entry for borrowers, unwittingly. The Department has addressed concerns about a full reset of forgiveness clocks through consolidation in recent regulations on IDR and PSLF and maintains that concern here. In those circumstances we have addressed that issue through using a weighted average of the underlying loans.[26] Instead, for this regulation we propose an approach that is simpler to administer and clearer to understand. For consolidation loans made before July 1, 2023, we propose using the earliest date that any loan that was repaid by a consolidation loan ended its initial grace period or was disbursed in the case of a PLUS loan. We propose this date of July 1, 2023, because it was the day after the Department announced this rulemaking in a press release and there was no way a borrower could have known to consolidate and receive this benefit.[27] As such, borrowers could not have engaged in any strategic consolidation to receive this benefit before July 1, 2023. For consolidation loans disbursed on or after July 1, 2023, we propose to instead use the latest date that any loan repaid by the consolidation ended its initial grace period, or in the case of a PLUS loan was disbursed. By establishing these different thresholds, a borrower's repayment progress will not fully reset when a borrower consolidates loans on which a borrower had previously made payments. In addition,

---

them well more than 30 years old. The author also estimated that 1.5 million borrowers had a loan with an origination date before 2000. The author notes these statistics may well be an underestimate because older debts may no longer appear on a borrower's credit report even though they are still outstanding. *https://www.urban.org/sites/default/files/publication/101492/when_student_loans_linger_0.pdf.*

[26] See 34 CFR 685.209(k)(4)(v)(B) and 34 CFR 685.219(c)(3).

[27] *https://www.ed.gov/news/press-releases/fact-sheet-president-biden-announces-new-actions-provide-debt-relief-and-support-student-loan-borrowers.*

this also makes certain that a borrower could not consolidate after the Department announced this proposal in order to receive a waiver of newer loans alongside older ones. We have determined that this approach is more operationally feasible and carries a lower risk of errors.

During negotiated rulemaking, the Department proposed only waiving loans that first entered repayment 20 or 25 years ago at the time we would implement this section. Negotiators and public commenters raised significant concerns about how such an approach would create a ''cliff effect'' in which a borrower who falls just a month or two short of 20 or 25 years would not be eligible for a waiver, despite facing significant financial burden of student loan debt over time and facing many of the same repayment challenges as those borrowers eligible for relief under this provision.

The Department understands the concerns raised by negotiators and members of the public about the challenges with operating this policy only once. At the same time, however, the Department is concerned that an ongoing policy would not recognize how the Department has taken steps to address many repayment challenges on a going-forward basis by introducing several new IDR plans, including the new SAVE plan, which should make it substantially easier going forward for borrowers to make payments that qualify for forgiveness. We have not yet identified a solution to this issue that would still encourage borrowers who have not yet reached forgiveness to continue making required payments until they reach the 20- or 25-year mark. And for any solution for this cliff, we would need a way to appropriately model the likelihood that a borrower does take necessary steps in the future to be eligible for relief under this approach so that we can assign it the proper estimated cost in the net budget impact.

Given the considerations outlined above and in light of the changes the Department has made under recent IDR plans, we invite feedback from the public about how to acknowledge and address the repayment challenges of borrowers who entered repayment a long time ago, but not long enough to immediately qualify under this provision, and who are unlikely to repay their loan in full in a reasonable period. We also invite feedback on how to determine the likelihood that any borrower who does not yet reach forgiveness under the proposed policy would qualify for forgiveness under any suggested alternative one. For example,

if the Department were to award credit toward forgiveness timelines for all months since entering repayment up until July 2024 (when all of SAVE's provisions become effective), and a borrower first entered repayment at least 15 years ago, what standards are appropriate for determining whether the borrower reaches the 20- or 25-year threshold in light of the Department's recent steps to fix repayment challenges through SAVE? In addition, how would the Department determine the likelihood that such borrower ultimately takes necessary steps to reach a 20 or 25-year forgiveness threshold under the proposed standard?

The Committee did not reach consensus on proposed § 30.83.

*§ 30.84 Waiver when a loan is eligible for forgiveness based upon repayment plan.*

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 30.84 would specify that the Secretary may waive the outstanding balance of a loan for borrowers who are otherwise eligible for forgiveness under an IBR plan, Income-contingent Repayment (ICR) plan, or an alternative repayment plan but are not currently enrolled in the plan where they could receive forgiveness. The amount of the waiver would be the same as what the borrower would receive under the applicable IDR plan. Currently borrowers who are repaying their loans under an IDR plan must meet the eligibility requirements to enroll and qualify for forgiveness of their Federal student debt. Under all IDR plans, any remaining loan balance is forgiven if their loans are not fully repaid at the end of the repayment period.

*Reasons:* Congress and the Department have provided borrowers with various income-based repayment plan options over time. The Department currently offers four IDR plans: the IBR plan, ICR plan, Pay as You Earn Repayment (PAYE) plan, and the new SAVE plan that replaced the former REPAYE plan. For purposes of this NPRM we refer to IBR, ICR, PAYE, SAVE, and REPAYE collectively as IDR plans.

The HEA sets forth the requirements for borrowers to receive relief under the terms of the various IDR plans. For both ICR and IBR, a borrower may receive

relief as long as they have accumulated the requisite amount of time making qualified payments or being in a qualified deferment.[28] The HEA does not require these qualifying payments or deferments to occur while the borrower is enrolled in an ICR plan to receive relief under ICR,[29] nor must they occur while a borrower is on an IBR plan to receive relief under IBR.[30] Rather, the HEA permits borrowers to receive relief under these plans so long as the borrower participates in them at some point after such qualifying payments or deferments have occurred.[31] While the HEA's ICR and IBR provisions do specify steps and procedures for obtaining a borrower's income information to calculate reduced payments under these plans, there is no requirement that borrowers provide such information as a condition of receiving relief. Instead, the HEA leaves the specific details of how to operationalize the procedures for enrolling in IDR plans up to the Secretary. Under this proposed provision, the Secretary would use information within the Department's possession to identify borrowers already eligible for relief and provide them with the opportunity to enroll in the IDR plan by choosing not to opt-out of receiving a waiver.

Such waivers would benefit many borrowers because the Department's current IDR regulations require borrowers to apply to enroll in IDR plans.[32] Unfortunately, Department experience and independent research shows that there have been persistent challenges getting borrowers who would benefit from IDR plans to enroll in them.[33] And when borrowers do enroll, large shares of them fail to successfully recertify and stay enrolled. For example, one study by the JP Morgan Chase Institute found that for every borrower enrolled in IDR there are two others who would benefit from such a plan but

---

[28] See 20 U.S.C. 1087e(e)(7) (ICR provision describing qualifying payments and deferments for relief); 20 U.S.C. 1098(b)(7) (IBR provision describing qualifying payments and deferments for relief).

[29] See 20 U.S.C. 1087e(e)(7).

[30] 20 U.S.C. 1098(b)(7) (stating the Secretary may repay or cancel any outstanding balance of principal and interest for a borrower who ''at any time, elected to participate in'' an IBR plan and meets the conditions for qualified payments or deferment).

[31] See 20 U.S.C. 1087e(e)(7); 20 U.S.C. 1098(b)(7).

[32] 34 CFR 685.209(l).

[33] Goldstein, Adam, Charlie Eaton, Amber Villalobos, Parijat Chakrabarti, Jeremy Cohen, and Katie Donnelly. ''Administrative Burden in Federal Student Loan Repayment, and Socially Stratified Access to Income-Driven Repayment Plans.'' *RSF: The Russell Sage Foundation Journal of the Social Sciences* 9, no. 4 (2023): 86–111.

are not enrolled.[34] Similarly, the Federal Reserve Bank of Philadelphia found that many borrowers were unaware of the new SAVE plan, especially among borrower groups who were most likely to benefit from it, and potential beneficiaries remained uncertain even after learning about plan features and benefits.[35]

The Department is concerned that its past practices of administering IDR plans have made it too challenging for borrowers to successfully navigate these processes. The result has been borrowers struggling to figure out which IDR plan is best, determine whether they are eligible, and then submit an application.[36]

Under the Department's current regulations, borrowers must also re-enroll in the IDR plan each year and risk being removed from the plan if they fail to recertify their participation in a timely basis. The Department has taken many steps in recent years to address this problem. We created the SAVE plan, which addresses many of the issues that borrowers experienced in other IDR plans. We also are implementing a regulatory change[37] that makes it possible for borrowers to automatically recertify their IDR enrollment by providing approval for the disclosure of their Federal tax information.

The Department is also concerned about how past challenges with administering IDR plans may have exacerbated these issues for borrowers with older loans. In April 2022, the Department announced it was taking executive action to address concerns about a lack of consistent tracking of borrower progress toward forgiveness and improper implementation of policies designed to limit the use of extended time in forbearances.[38] Through that process we have identified and provided relief to hundreds of

thousands of borrowers who were eligible for IDR forgiveness but had not enrolled. Simultaneously, the Department put in place processes to fix these issues going forward, including giving borrowers a clear count of their progress toward forgiveness and addressing the use of forbearances. However, we are concerned that there is still a group of borrowers who did not reach forgiveness through the payment count adjustment and who are not so new to borrowing that all their time in repayment would be covered by these improvements. In particular, these would be borrowers who are eligible for the forgiveness benefits under the SAVE plan, which provides forgiveness after as few as 120 months (10 years) in repayment for borrowers who originally took out $12,000 or less. Keeping borrowers such as these in the repayment system when they could receive a discharge immediately creates costs for the Department because we have to continue to pay servicers to manage these loans.

The Department proposes applying this section to borrowers repaying under all types of IDR plans, including those created under the income-contingent repayment authority and IBR, and the alternative plan. We include the alternative plan as well because that plan contains an option to provide borrowers forgiveness after a set period of time, even if they have not paid off the full balance. In that regard it is similar to IDR plans. By contrast, other payment plans do not provide forgiveness and so are not appropriate to include in this section.

In applying this waiver, the Secretary would provide borrowers with relief identical to what they would have otherwise received on the relevant IDR plan. They are not receiving benefits any larger than they otherwise would have if they successfully navigated the enrollment or re-enrollment process.

The non-Federal negotiators supported the Department's proposal to waive the outstanding balance of loans and encouraged the Department to automate the process and expedite the approval and debt relief as much as possible.

The Committee reached consensus on proposed § 30.84.

### § 30.85  Waiver when a loan is eligible for a targeted forgiveness opportunity.

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or

demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 30.85 would provide that the Secretary may waive up to the entire outstanding balance of a loan where the Secretary determines that a borrower has not successfully applied for, but otherwise meets the, eligibility requirements for any other loan discharge, cancellation, or forgiveness program under 34 CFR parts 682 or 685. This includes opportunities such as false certification discharge, closed school loan discharges, and Public Service Loan Forgiveness (PSLF).

The proposed regulations also specify that if a borrower has a Direct Consolidation Loan or a Federal Consolidation Loan where only part of it would meet the criteria of this section that the Secretary may waive the portion of the outstanding balance of the consolidation loan attributable to such loan.

*Reasons:* The HEA outlines several opportunities for borrowers in the Direct or FFEL Programs to receive Federal student loan forgiveness in certain situations if the borrower meets the eligibility requirements. For both loan types, this includes forgiveness when a borrower is enrolled at a school that closes, if they have a total and permanent disability, or have a loan that has been falsely certified. Direct Loan borrowers are also eligible for PSLF.

The Department has historically seen many situations where borrowers do not successfully apply for available relief when they are eligible. For example, in August 2021, the Department issued a final rule that provided automatic forgiveness for borrowers who were identified as eligible for a total and permanent disability discharge through a data match with the Social Security Administration.[39] The Department had been using such a match for years to identify eligible borrowers but required them to opt in to receive relief. After switching to an opt out model, we have provided relief to more than 350,000 borrowers, showing that a default of inclusion helps these programs to reach the people who need them. Absent this action it is possible many of these borrowers would still have loans today. Similarly, GAO studies of closed school loan discharges have found that many borrowers eligible for a closed school loan discharge fail to apply, and that those who in the past received automatic closed school loan discharges after a three-year waiting period were

[34] *https://www.jpmorganchase.com/institute/research/household-debt/student-loan-income-driven-repayment#finding-1.*

[35] *https://www.philadelphiafed.org/-/media/frbp/assets/consumer-finance/reports/cfi-sl-payments-3-resumption.pdf.*

[36] Herbst, Daniel. ''The impact of income-driven repayment on student borrower outcomes.'' *American Economic Journal: Applied Economics* 15, no. 1 (2023): 1–25.; Conkling, Thomas S., and Christa Gibbs. ''Borrower experiences on income-driven repayment.'' *Consumer Financial Protection Bureau, Office of Research Reports Series* 19–10 (2019).

[37] *https://www.federalregister.gov/documents/2023/07/10/2023-13112/improving-income-driven-repayment-for-the-william-d-ford-federal-direct-loan-program-and-the-federal.*

[38] *https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=.*

[39] 87 FR 65904 (November 1, 2022).

highly likely to default during the waiting period.[40]

The waivers proposed in this section would build on efforts made by the Department over the past several years to improve regulations for existing discharge programs to allow the Secretary to award borrowers relief under different programs if we determine that they otherwise meet the criteria. Beyond the regulatory programs to automatically provide discharges to eligible borrowers, the Secretary may have or obtain information showing that additional borrowers are or should be eligible for relief on their loans. For example, borrowers whose schools closed while they were enrolled outside of the time periods that the Department provided automatic relief would nonetheless be eligible for this relief if they applied. By giving these borrowers an opportunity to obtain the relief intended for them by choosing not to opt out, this rule would make that relief available in a fairer manner that lessens the burdens on borrowers. Although schools can be liable for relief provided based on the closed school discharge regulation, schools would not face a liability for waivers granted under this section. Because the Secretary would have waived the amounts owed by the borrower there is no liability that could then be established against the institution and then pursued through administrative proceedings.

It is possible that a borrower whose loans have been consolidated could have some of the loans repaid by the consolidation that are eligible for a waiver and some that would not be. For example, a borrower could have loans from one school that are eligible for a closed school loan discharge and other loans that are not. In such situations the Department would waive repayment of the portion of the consolidation loan attributable to that loan repaid by the consolidation loan that is eligible for the waiver.

Overall, the Department believes that this waiver will provide additional flexibility and help get relief to more borrowers who are eligible for Federal student loan forgiveness.

One non-Federal negotiator opposed this proposed regulation. The negotiator stated concerns for other borrowers who are already eligible for Federal student loan discharges who would be treated differently under the waiver authority and may lose other benefits currently provided by existing Federal student loan discharge programs. This same negotiator provided an example of a borrower who may face tax

consequences if they receive this benefit under the waiver instead of utilizing other discharge programs where such a discharge would be statutorily excluded from being considered taxable income. By law, there is no Federal taxation on Federal student loans forgiven by the Department through the end of 2025.[41] Before any usage of this authority the Department would also consider whether a borrower is already eligible for a discharge under the existing forgiveness opportunity.

The Committee did not reach consensus on proposed § 30.85.

§ 30.86    Waiver based upon Secretarial actions.

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Under proposed § 30.86(a), the Secretary may waive the entire outstanding balance of a loan associated with attending an institution or a program at an institution if the Secretary or other authorized Department official took certain final agency actions. These final agency actions are: termination of the institution or academic program's participation in the title IV, HEA programs; a denial of the institution's request for recertification; or determination that the institution or program loses title IV eligibility. To qualify under this section, the final agency action must have been taken in whole or in part due to the institution or academic program failing to meet an accountability standard based on student outcomes for determining eligibility in the title IV, HEA programs or the Department determining that the institution or program failed to deliver sufficient financial value to students. Such situations that are evidence of failure to provide sufficient financial value include when the institution or program has engaged in substantial misrepresentations, substantial omissions, misconduct affecting student eligibility, or other similar activities. Currently, proposed 30.86(a)(2) also includes the following language: "this paragraph applies to circumstances when the institution or program has lost accreditation at least in part due to such activities." The intent of the consensus

language was to clarify that the underlying finding that supports the Department's determination that an institution or program failed to deliver financial value under proposed § 30.86(a)(2) could be a finding made by the Department or it could be a finding made by an accreditor that terminated accreditation based at least in part on that finding. Since the Committee reached consensus on the language included in 30.86, the Department included it in these proposed regulations. However, the Department believes that this intent could be stated more clearly as: "The institution or program has failed to deliver sufficient financial value to students, including in situations where either (i) the Department has determined that the institution or program has engaged in substantial misrepresentations, substantial omissions, misconduct affecting student eligibility, or other similar activities; or (ii) the Department has determined that the accrediting agency has terminated its accreditation based at least in part upon a finding that the institution or program has engaged in the activities described in paragraph (a)(2)(i) of this section." The Department invites comments on this possible change.

Proposed § 30.86(b) would specify that the waiver applies to a borrower's loans received for attending that program or school during the period that corresponds with the findings or outcomes data unless the Department believes the use of a different period is appropriate. In the case of a Federal Consolidation Loan or Direct Consolidation Loan that has an outstanding balance, under proposed § 30.86(c) the Secretary would waive the portion of the outstanding balance of the consolidation loan attributable to such loan received for attending that program or school during the period that corresponds with the findings or outcomes data.

*Reasons:* Conducting rigorous oversight and enforcing accountability measures are key functions for the Department.[42] Identifying situations in which institutions or programs are failing to meet requirements of the HEA and taking action to prevent the flow of future title IV aid dollars is an important way to solidify that taxpayer funds are well spent and to protect future borrowers and aid recipients from harm.

---

[40] https://www.gao.gov/assets/gao-21-105373.pdf.

[41] See Title IX, Subtitle G, Part 8, section 9675 of the American Rescue Plan Act, 2021 (Pub. L. 117–2).

[42] Some examples of the Department's oversight and compliance measures over institutions include but are not limited to: program reviews authorized under Sec. 498A of the HEA; requiring most institutions to submit a compliance and financial audit authorized under Sec. 487(c) of the HEA; and others.

However, while we take aggressive action to protect future borrowers and aid recipients, we often do not address loans held by borrowers who attended programs or institutions at the very time we observed the issues that led to the termination of future aid receipt. For example, a borrower who attended an institution that lost access to aid because of high CDRs, is still left to repay their loans, even as the Department takes steps to protect future borrowers from going into debt at those institutions.

This waiver would provide relief to borrowers who received loans to attend programs or institutions that lost access to title IV aid for specific agency actions if they took out loans during the period that generated the outcomes data that led to the aid termination or who attended during the period covered by evidence that was used to justify cutting off title IV aid into the future.

The Department believes waivers in this situation are appropriate because we think it is unfair to expect borrowers to continue repaying loans from a time when we know the issues at the institution or program were so significant that they warranted adverse Secretarial action. These are loans where we know the borrower is not getting the benefit of the bargain one should expect when they take out loans for postsecondary education or, in cases such as substantial misrepresentation, that the loans should not have been made in the first place.

Waivers of Federal student loan debt under proposed § 30.86 would only apply after a final agency action. That means the institution would have exhausted its administrative appeals for that final action. For example, if the Secretary denies an institution's request for recertification, that institution would still be afforded the opportunity to appeal that denial in accordance with 34 CFR part 668, subpart G and only until the institution exhausts its appeals options for the denial of the recertification—or indicates that it does not intend to appeal the decision—would the Department consider waiving affected borrowers' loan balances in accordance with this regulation. If an institution does not appeal a liability in a specific finding in a Final Program Review Determination (FPRD), the finding in that FPRD would be considered final. Relying only on final agency actions also means that instances in which the Secretary initiates an action and then does not finalize it due to a successful appeal would not be included. For example, if an institution successfully appeals a failing CDR and does not lose aid eligibility, borrowers

who attended the institution would not be eligible for a waiver under this section.

The Department also recognizes that sometimes agency actions are ultimately resolved through settlements. We propose that settlements where there is an acknowledgement of wrongdoing would qualify as a final agency action under this section, while settlements that lack such an acknowledgement of wrongdoing would not. We believe this approach is appropriate because the proposed regulation applies if the Department determines the program or institution failed an accountability measure related to student outcomes or failed to provide sufficient financial value.

Institutions would also not be liable for the costs associated with any waivers granted under this section. Because this is an exercise of the Secretary's waiver authority there would not be a liability to seek against an institution. The one exception is for liabilities related to certain loans issued while an institution appeals or requests for an adjustment to its CDR. Liabilities for those amounts are discussed in § 668.206(f).

This waiver would be used only when the termination of the institution's title IV participation occurred for specific reasons. These fall into two categories. The first is the institution's failure of accountability standards based on student outcomes, namely those related to CDRs and Gainful Employment. This includes failures of those measures that occurred in the past when they resulted in loss of title IV eligibility.[43] The Department chose these types of measures because those are situations in which the Department directly measured the outcomes of borrowers in a specific cohort and found the results so lacking that aid could not continue.

An institution would have to fail its CDR or GE metrics enough times to warrant a final action from the Department and that failure would have to be sustained following any appeal options available to the institution or program.

This waiver would not apply to the failure of other metrics that are not directly tied to student outcomes. This includes the calculation of an institution's financial responsibility

composite score prescribed in 34 CFR part 668, subpart L or for proprietary institutions, their 90/10 non-Federal revenue calculation prescribed in 34 CFR 668.28. These other performance standards are important but do not directly measure student outcomes.

The Department is not concerned that granting a waiver based upon student outcomes would create an incentive for future borrowers to willfully default on their loans or take other actions that could cause the program to fail the debt-to-earnings or earnings premium measures used in Gainful Employment. First, all these measures operate on the observed outcomes across either all borrowers who entered repayment or all those who received title IV aid and graduated. They also generally require measuring performance across multiple years. The lone exception to this being a one-year CDR in excess of 40 percent, which leads to a loss of loan eligibility. Intentionally failing the measure would require extremely coordinated activity across likely multiple years of students. Making such a situation further unlikely is the fact that the consequences of intentionally failing a measure with uncertain odds of success could be significant. Defaulting on a student loan has significant consequences. Borrowers can see their credit scores plummet and tax refunds seized. Regarding Gainful Employment metrics, borrowers would be having to settle for lower earnings, which has additional effects on their ability to afford basic necessities.

The second type of actions relate to situations where there is a determination that the institution or program failed to deliver sufficient financial value. We propose defining this as findings that an institution engaged in substantial misrepresentations or omissions of fact, misconduct affecting student eligibility, or other similar activities. We chose these situations because those would be cases in which the institution engaged in behavior that affected the value of what a borrower received for their loans. For instance, if the Department terminates aid on a prospective basis because it finds that an institution had been consistently lying to borrowers about their ability to get jobs when in fact internal statistics showed that fewer than half of students obtained employment in the field in which they were being prepared then that is a sign that the borrower did not receive what they were promised. We would also waive repayment of the loans of borrowers who were included in those periods used to determine that the actual employment rates were far lower than what was promised. Waivers

---

[43] There are some institutions that previously lost title IV eligibility because of failing CDRs, and qualifying loans associated with those institutions would be eligible. By contrast, there are not any programs that previously lost title IV eligibility based on failing GE measures because the prior rule was rescinded before any program lost eligibility, and the new rule does not go into effect until July 2024.

granted because of this section could also include circumstances where the Secretary terminates aid because an institution or program loses accreditation at least in part for the same type of reasons.

The Department recognizes that borrowers eligible for relief under this provision may also be eligible for relief under the Department's other discharge programs, such as borrower defense. As a general matter, the Department does not see a problem with providing overlapping pathways to relief. Such overlaps are not uncommon in the student loan system. For example, there have been many borrowers who have been eligible for both a closed school loan discharge and a borrower defense discharge. In such instances, the Department has opted to proceed with the most operationally efficient discharge since the borrower receives the same benefits under either option. Where possible, the Department intends to provide eligible borrowers relief through other existing discharge programs, such as borrower defense or closed school discharge. But the Department's experience is that there are some circumstances where a borrower may not receive relief under these discharges but meets the conditions of § 30.86(a)(2).

Waivers in this section would not be granted in response to every action the Department takes to terminate aid access at an institution. For instance, an institution that loses access to aid because of financial problems, solely because it closed, or other situations that do not speak to the returns received by students would not be captured here. Because those aid loss circumstances do not relate to the benefit received by borrowers, we do not think it is appropriate to include them here as a waiver. The Department would make the determination as to whether an action meets this requirement for each institution or program.

Final actions under proposed § 30.86 would include those sanctions in 34 CFR part 668, subparts G and H, other final actions stemming from an institution's loss of eligibility under 34 CFR part 600, subpart D, as well as other final action by the Department. As the Department explained during negotiated rulemaking sessions, these final actions are situations where the Secretary or other Departmental official has taken formal action to cease an institution or program's participation in the title IV, HEA programs on a prospective basis.

A non-Federal negotiator encouraged us to include an institution's loss of accreditation as a condition under which the Department could waive

repayment of Federal student loan debt and another negotiator believed a more expansive general loss of title IV eligibility should be used as a basis for waiving repayment. The Department concurred and incorporated in § 30.86(a)(2), circumstances when the institution or program loses accreditation as a basis for waiving Federal student loan debt under this proposed section.

Under proposed § 30.86(b), the Department would apply this provision to a borrower's loans received for attending that institution or program during the period that corresponds with the findings or outcomes data that forms the basis for the final action for this waiver. For example, if an institution lost access to title IV aid due to CDRs in excess of the statutory limits for borrowers who entered repayment in 2016, 2017, and 2018, then we would waive repayment of the loans from that institution of borrowers who borrowed during that period. Similarly, if an institution lost access to aid because of substantial misrepresentations in a nursing program in 2023, then we would waive repayment of the loans of borrowers who took out loans for that program in that period of the final action.

Limiting this waiver only to borrowers whose enrollment overlaps during the corresponding period enables the scope of the findings or outcomes data to apply to similarly situated borrowers and provides consistent treatment to all affected borrowers. At the same time, the Department recognizes that there could be unique circumstances in which the period used for the Secretarial action does not fully capture the period during which the Department believes the actions covered by this section otherwise occurred. In such circumstances, proposed § 30.86(b), allows for the Secretary to designate an alternative period for determining a borrower's eligibility for a waiver. Examples of such considerations could be capturing additional years related to CDR failures where the Department has reason to believe an institution would have failed except for efforts to manipulate rates to keep them artificially low. Another instance might also be years that took place after an investigation that led to a Secretarial action and a school action started but the institution later closed making it infeasible for the Department to add the years after its investigation finished to be included in the period of identified conduct. For example, if the Department investigated an institution from 2020 to 2022 and finished the process of a Secretarial action in 2024,

after which the school closed, the Secretary may choose to consider whether loans disbursed from 2023 and 2024 should also be considered under this provision.

Finally, the Department also concurred with a non-Federal negotiator who suggested we include an additional paragraph which states that if the conditions of the waiver are met and the loan was repaid by a consolidation loan that has an outstanding balance, the Department would waive the portion of the outstanding balance of the consolidation loan attributable to such loan. We believe that it is logical to waive only the underlying loan that was part of a consolidation loan associated with the final action associated for this waiver. Borrowers who otherwise consolidated their loans would have a pathway toward this waiver and would not lose their opportunities for this waiver because of the consolidation.

The Committee reached consensus on proposed § 30.86.

### § 30.87  Waiver following a closure prior to Secretarial actions.

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Under proposed § 30.87(a)(1), the Secretary may waive the entire outstanding balance of a loan associated with attending an institution or a program at an institution if the institution or program closes and the Secretary or other authorized Department official has determined that, based on the most recent reliable data for an institution or program, the institution or program has not satisfied, for at least a year, an accountability standard based on student's outcomes for determining that institution or program's eligibility for title IV funds. Under proposed §§ 30.87(a)(2)(i) and (ii) the Secretary may also waive the entire outstanding balance of a loan associated with attending a closed institution or a closed program at an institution if the institution or program failed to deliver sufficient financial value to students and is the subject of a Departmental action that remains unresolved at the time of that institution or program's closure, in whole or in part, on certain conduct specified in regulation.

Currently, proposed § 30.87(a)(2)(i) also includes the following language: "this paragraph applies to

circumstances when the institution or program has lost accreditation at least in part due to such activities.'' The intent of the consensus language was to clarify that the underlying finding that supports the Department's determination that an institution or program failed to deliver sufficient financial value under proposed § 30.87(a)(2)(i) could be a finding made by the Department or it could be a finding made by an accreditor that terminated accreditation based at least in part on that finding. Since the committee reached consensus on the language included in 30.87, the Department has included it in these proposed regulations. However, the Department believes the intent could be stated more clearly as: ''The institution or program has failed to deliver sufficient financial value to students, including in situations where either (A) the Department has determined that the institution or program has engaged in substantial misrepresentations, substantial omissions, misconduct affecting student eligibility, or other similar activities; or (B) the Department has determined that the accrediting agency has terminated its accreditation based at least in part upon a finding that the institution or program has engaged in the activities described in (A).'' The Department invites comments on this possible change.

Under proposed § 30.87(b), a waiver under this section would apply to a borrower's loans received for attending that institution or program during the period that corresponds with the findings or outcomes data. Proposed § 30.87(c) would provide that in the case of Federal Consolidation Loans and Direct Consolidation Loans, the Secretary would waive the portion of the outstanding balance of the consolidation loan attributable to such loan received for attending that institution or program during the period that corresponds with the findings or outcomes data.

Institutions or programs that close where the Secretary determined that the institution or program has not satisfied an accountability standard based on student outcomes would include institutions that fail or failed to meet the CDR standards prescribed in 34 CFR part 668, subpart N and programs that do not lead to Gainful Employment prescribed in 34 CFR part 668, subpart S. An institution or program that failed to deliver sufficient financial value to students would include an institution or program that engaged in: substantial misrepresentations, substantial omissions, misconduct affecting student

eligibility, or circumstances around loss of accreditation associated with such activities. The Department would predicate this determination through a program review, investigation, or any other action that remains unresolved at the time of closure and that action as based in whole or in part to the aforementioned misconduct.

Waivers of Federal student loan debt under proposed § 30.87 would apply to actions the Department has taken as soon as one year after the institution or program has not satisfied an accountability standard based on student outcomes. This provision would also apply to an institution or program failing to deliver sufficient financial value to students and was the subject to a program review, investigation, or any other Department action that remains unresolved at the time of closure and that action was based, in whole or in part, on such conduct.

Under these proposed regulations, we would not assess liabilities against the institution as a result of the Secretary waiving a borrower's Federal student loan debt. As such, institutions would not be subject to any request to repay funds waived under this provision.

*Reasons:* Similar to proposed § 30.86, the Department seeks to capture circumstances where an institution or program failed accountability standards based on student outcomes. The main difference between this provision and § 30.86 is that § 30.87 captures situations in which an institution or program chooses to close before the action becomes final and could be considered under § 30.86. The Department is proposing a separate section to address situations where an institution or program has closed because we have seen past situations where programs or institutions fail accountability measures and voluntarily close, and the closure leaves the Department with insufficient data to conduct a final agency action. The same is true of situations in which the Department begins an investigation or program review related to whether the institution or program is providing sufficient financial value, but the institution or program chooses to close before that investigation or program review is finished. When that occurs, the Department may not finish those processes. In the circumstances described above, the Department believes that it would be reasonable for the Secretary to infer that in the absence of additional data or completion of program review or investigation that the Department would have terminated aid access going forward and the borrower would be eligible for a waiver. In other

words, we do not hold borrowers responsible for the Department's inability to obtain necessary additional information. Institutions and programs, meanwhile, are not affected by this inference because they have ceased participation in the title IV programs and would not face any liabilities from these waivers.

While § 30.87 is designed to provide parity with the waivers in § 30.86 so that a borrower is not made worse off because a school decided to close, this provision would not cover all borrowers enrolled at the school at the time of closure. Because the institution closed, borrowers who did not complete and were enrolled at or just before the date of closure would be eligible for a closed school discharge.

Some examples highlight the differences between § 30.86 and § 30.87 that necessitate a separate section. In general, institutions are subject to loss of eligibility to participate in the Direct Loan[44] and Pell Grant[45] programs if that institution's CDR is equal to or greater than 30 percent for each of its three most recent cohort fiscal years. An institution that voluntarily closes to avoid loss of eligibility due to a high CDR would not face sanctions, but those students could still be repaying loans incurred for attendance in what would otherwise be an ineligible institution. Proposed § 30.87 would cover such instances if an institution or program voluntarily closes.

The Department has encountered situations in the past during oversight and compliance measures over institutions and programs where those institutions or programs choose to close before further reviews can be completed. During program reviews, investigations, or other actions, institutions would voluntarily close the institution or program rather than face the consequences of sanctions. Borrowers enrolled at those institutions or programs who did not continue their postsecondary education would be eligible for a closed school loan discharge if the institution closed. But a borrower who completed their program during this period would not be eligible for a closed school discharge. A borrower who graduated, meanwhile, may also not be able to raise a successful defense to repayment claim based on the specific factual circumstances. This provision would provide an alternative path to relief where the Department has sufficient evidence to determine the institution or

[44] Section 435(a)(2) of the HEA (20 U.S.C. 1085(a)(2)).

[45] Section 401(j) of the HEA (20 U.S.C. 1070a(j)).

program did not provide sufficient financial value.

This waiver would operate in a manner separate and distinct from closed school loan discharges. The idea behind closed school loan discharges is to provide relief to borrowers who are left with loan debt and are unable to complete their programs. That is why closed school loan discharges are unavailable to borrowers who graduated. By contrast, the purpose of this waiver is to provide relief to borrowers who did not get the benefit of the bargain of postsecondary education in the sense that their institution or program did not meet required student outcomes standards or failed to provide sufficient financial value, but it closed prior to the final agency action that would have made that determination. The underlying reason for the waiver and for why relief would be appropriate are different from the reason for closed school discharges. Negotiators expressed support for this provision during negotiated rulemaking sessions.

One negotiator encouraged us to also include an institution or program's loss of accreditation as a condition of waiving Federal student loan debt under this section. In response, the Department concurred and incorporated in proposed § 30.87(a)(2)(i) circumstances when the institution or program loses accreditation as a basis for waiving Federal student loan debt.

Similar to § 30.86, this provision would only provide waivers to borrowers who took out loans during the period used to measure student outcomes or for the program review or investigation. For example, if an institution had a high CDR for borrowers who entered repayment in 2019 and then closed, the Department would waive loans taken to attend that institution for borrowers in that repayment cohort. Borrowers whose loans are not included in those periods would not receive a waiver.

The Committee reached consensus on proposed § 30.87.

**§ 30.88    Waiver for closed Gainful Employment (GE) programs with high debt-to-earnings rates or low median earnings.**

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.
*Proposed Regulations:* Under proposed § 30.88(a), the Secretary may

waive the entire outstanding balance of a loan received by a borrower associated with enrollment in a GE program if the following conditions are met: the program or institution closed; the GE program was not a professional medical or dental program; and, for a period in which the borrower received loans for enrollment in the GE program, the Secretary has reliable and available data demonstrating that title IV recipients in the GE program failed the debt-to-earnings rates or earnings premium measure described in § 30.88(a)(3).

For purposes of a waiver under § 30.88(a)(3)(i), the GE program would be considered failing if that program had a debt-to-earnings rate greater than 8 percent of their median annual earnings and 20 percent of their median discretionary income. Discretionary earnings would be calculated as median annual earnings minus 150 percent of the Federal Poverty Guideline for a single individual for the measurement year. Denominators of either measures that are zero or negative would be considered a failure if the numerator is a non-zero number. A GE program would also be considered failing if it fails the earnings premium measure described in § 30.88(a)(3)(ii). For the earnings premiums measure, a GE program would be considered failing if the median annual earnings of GE program graduates are equal to or less than the median annual earnings for typical high school graduates in the labor force (*i.e.,* either working or unemployed) between the ages of 25–34. The median annual earnings would be compared to the high school graduates in the State in which the institution is located, or nationally in the case of a GE program at a foreign school, or if fewer than 50 percent of the students in the GE program are from the State where the institution is located.

Under proposed § 30.88(b), a GE program would be identified by its six-digit Classification of Instructional Program (CIP) code, the institution's six-digit Office of Postsecondary Education ID (OPEID) number and the program's credential level. If the Department does not have reliable and available data at the GE program's six-digit CIP code, it would use the four-digit CIP code. The Department would calculate the annual loan payment by determining the median loan debt of students who completed the GE program during the applicable cohort and amortizing that debt based upon the average of the Direct Unsubsidized Loan interest rates based on the applicable credential level and the years preceding the completion year.

Additionally, under proposed § 30.88(c), the Secretary may waive loans received for enrollment in a GE program if the institution closed, and the institution received a majority of its title IV funds for GE programs for which the Department could calculate debt-to-earnings rates and earnings premium measures, and the Department was unable to calculate measures for that program.

Proposed § 30.88(d) would provide that in the case of Federal Consolidation Loans and Direct Consolidation Loans, the Secretary waives the portion of the outstanding balance of the consolidation loan attributable to such loan received for attending that GE program in the corresponding period for which the Secretary is waiving those borrowers' Federal student loan debt.

*Reasons:* The Department published final regulations related to GE to address ongoing concerns about educational programs that are supposed to prepare students for gainful employment in a recognized occupation but that instead leave them with unaffordable amounts of student loan debt in relation to their earnings, or with no gain in earnings compared to others with no more than a high school education.[46] Going forward, if a program fails to meet the standards required of the GE rates, borrowers may be eligible for waivers under either § 30.86 or § 30.87. However, the Department is also concerned about circumstances in which it has evidence that a program is failing to meet the GE standards and the program closes. Such situations may not result in a waiver under § 30.87 even though the Department knows that the borrowers included in the metrics are facing challenges similar to those where programs formally fail the measures once and then close.

The provisions in § 30.88 particularly would address situations where there have been data showing failures of GE metrics, but they are not necessarily official rates, and the program has closed. For example, during rulemaking processes to establish GE regulations, the Department released debt-to-earnings rates about programs across the country. In January 2017,[47] the Department also produced a round of official rates under the 2014 GE final rule[48] but did not publish subsequent GE rates under those rules. In response to these rates some institutions preemptively closed programs that did

---

[46] 88 FR 70004 (October 10, 2023).
[47] See January 17, 2017 Gainful Employment Electronic Announcement #100—Upcoming Release of Final Gainful Employment Debt-to-Earnings (D/E) Rates.
[48] 79 FR 64890 (October 31, 2014).

not meet the standards. The Department believes it is important to provide a waiver in these situations because these metrics show similar concerns about the potential that a borrower may be unable to successfully repay their loans. We believe it is reasonable to draw an inference in favor of the borrower since the program closed and there will not be other data available showing the longer-term performance of the program.

While the proposed waiver in § 30.88 would only be available when an institution or program closes, it is distinct from closed school discharge. The purpose of a closed school discharge is to provide relief to a borrower who is unable to complete their program. That is why it excludes graduates from eligibility. By contrast, this proposed waiver would provide relief to borrowers where data shows that the typical borrower who took out loans is not getting the benefit of the bargain. The purpose of the closure requirement is to address how the Department would handle situations where it does not have, and has no way to obtain, additional data that would otherwise be needed to take a final agency action and deny continued title IV participation if the institution or program were to continue to fail the metrics. This section establishes how the Department would go about drawing an inference in favor of the borrower to determine that they did not receive the benefit of the bargain.

Because the circumstances addressed in proposed § 30.88 are not ones where the Department would calculate official GE rates, we have crafted a framework to explain how the Secretary would otherwise assess a GE program's debt-to-earnings rates and earnings premium measure for purposes of this section.

In § 30.88(a)(2) the Department explains that we would not apply this section to GE medical or dental programs. These are GE programs identified as Doctor of Medicine (MD), Doctor of Osteopathy (DO), or Doctor of Dental Science (DDS) based upon their level and CIP code. We propose to not include those programs here because in past versions of the GE regulations we have said that students in these programs would have had their earnings evaluated after a longer time following graduation than other types of programs. The Department does not have data for this longer measurement period so we cannot accurately assess these GE programs.

Section 30.88(a)(3) describes how the Department would calculate whether a program fails to meet GE standards. These definitions for debt-to-earnings and earnings premium are all modeled

on how the Department proposes to calculate these measures in the recently finalized GE regulation.[49] The definitions for debt-to-earnings rates are also similar to what was used in the GE regulations finalized in 2014.[50]

The provisions in § 30.88(b) provide greater detail related to how the Department would identify programs as well as how we would calculate typical earnings and debt payments. In § 30.88(b)(1), we propose identifying GE programs by the six-digit CIP code level, or at the four-digit CIP code if we did not have data available. We propose this to mirror the definition of a GE program defined in 34 CFR 668.2. We more fully explain in the 2023 GE final rule [51] our analysis of data coverage and our basis for assessing GE programs at the six-digit CIP code and, where appropriate, the four-digit CIP code to meet the minimum n-size requirements for GE metrics. This approach also recognizes the data limitations that exist related to past data used to assess GE programs.

Other provisions of § 30.88(b) similarly reflect choices made and explained in greater detail in the 2023 GE final rule. This includes how we would calculate the annual loan payment and calculate median annual earnings.

The language in proposed § 30.88(c) addresses circumstances where borrowers attended programs that did not have GE results calculated at an institution that has since closed. It proposes to provide relief to students who borrowed to enroll in a program at an institution that closed in which, prior to the closure, the institution received a majority of its title IV, HEA funds from programs that met the conditions under proposed § 30.88(a)(3) and there were no metrics calculated for that program. Because the majority of the title IV, HEA funds received by the institution went to failing programs, the Secretary could reasonably infer that the title IV, HEA funds that went to other programs for which there were insufficient data would have likely failed, as well, and such borrowers should be granted relief. Loans from programs at such an institution where we did have data showing the program did not fail the GE metrics would not result in a waiver.

Finally, § 30.88(d) clarifies that if the conditions of the waiver are met and the loan was repaid by a Federal Direct Consolidation Loan or a Direct Consolidation Loan that has an outstanding balance, the Department

would waive the portion of the outstanding balance of the consolidation loan attributable to such loan. We believe that it is logical to waive the only underlying loan associated with this waiver that was part of a consolidation loan. Borrowers who otherwise consolidated their loans would have a pathway toward this waiver and would not have their chances at a waiver foreclosed because of the consolidation.

The Committee reached consensus on proposed § 30.88. The Department has made one clarifying technical change to this language in paragraph (a)(2) to change the word "this" to "the program."

## Part 682—Federal Family Education Loan (FFEL) Program

*Subpart D—Administration of the Federal Family Education Loan Programs by a Guaranty Agency Waiver of FFEL Program Loan Debt (§ 682.403)*

*Statute:* Section 432(a) of the HEA (20 U.S.C. 1082(a)) provides that in the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 682.403(a) would outline the procedures under which the Secretary may determine that a FFEL Program loan held by a guaranty agency or a lender qualifies for a waiver of all or a portion of the outstanding balance and the steps for providing a waiver. Under proposed § 682.403(a)(1), the Secretary would notify the lender that a loan qualifies for a waiver and the lender would submit a claim to the guaranty agency. The guaranty agency would pay the claim, be reimbursed by the Secretary, and assign the loan to the Secretary. After the loan is assigned, the Secretary would grant the waiver. Proposed § 682.403(a)(2) would define the terms "the lender" and "the guaranty agency" for the purposes of waiver claims under proposed § 682.403.

Proposed § 682.403(b) would specify the conditions under which the Secretary waives FFEL Program loans held by a guaranty agency or a lender. A FFEL Program loan would qualify for a waiver under one of the following conditions—

• The loan first entered repayment on or before July 1, 2000;

• The borrower has not applied for, or not successfully applied for, a closed

---

[49] 88 FR 70004 (October 10, 2023).

[50] 79 FR 64890 (October 31, 2014).

[51] 88 FR 70035, 70127 (October 10, 2023).

school discharge but otherwise meets the eligibility requirements for the discharge; or

• The loan was received for attendance at an institution that lost its eligibility to participate in any title IV, HEA program because of its CDR and the borrower was included in the cohort whose debt was used to calculate the CDR or rates that were the basis for the loss of eligibility.

Proposed § 682.403(c) would provide that if the Secretary determines that a loan qualifies for a waiver, the Secretary notifies the lender and directs the lender to submit a waiver claim to the applicable guaranty agency and to suspend collection activity, or maintain a suspension of collection activity, on the loan.

Proposed § 682.403(d) would describe the waiver claim procedures. Under proposed § 682.403(d)(1), the guaranty agency would be required to establish and enforce standards and procedures for the timely filing of waiver claims by lenders.

Proposed § 682.403(d)(2) would require the lender to submit a claim for the full outstanding balance of the loan to the guaranty agency within 75 days of the date the lender received the notification from the Secretary. Under proposed § 682.403(d)(3), the lender would be required to provide the guaranty agency with an original or a true and exact copy of the promissory note and the notification from the Secretary when filing a waiver claim. Proposed § 682.403(d)(4) would allow a lender to provide alternative documentation deemed acceptable to the Secretary if the lender is not in possession of an original or true and exact copy of the promissory note.

Proposed §§ 682.403(d)(5) and (d)(6) would require the guaranty agency to review the waiver claim and determine whether it meets the applicable requirements. If the guaranty agency determines that the claim meets the requirements specified in proposed §§ 682.403(d)(3) and 682.403(d)(4) the guaranty agency would be required to pay the claim within 30 days of the date the claim was received.

Under proposed § 682.403(d)(7) the lender would be required to return any payments received on the loan during the suspension of collection activity or after receiving the claim payment to the sender.

Under proposed § 682.403(d)(8) the Secretary would reimburse the guaranty agency for the full amount of a claim paid to the lender after the agency pays the claim to the lender. Proposed § 682.403(d)(9)(i) would require the guaranty agency to assign the loan to the

Secretary within 75 days of the date the guaranty agency pays the claim and receives the reimbursement payment. If the guaranty agency is the loan holder, under proposed § 682.403(d)(9)(ii) the guaranty agency would be required to assign the loan on the date that the guaranty agency receives the notice from the Secretary.

After the guaranty agency assigns the loan, the Secretary may waive the borrower's obligation to repay up to the entire outstanding balance of the loan, as provided under proposed § 682.403(d)(10). After the Secretary grants the waiver, under proposed § 682.403(d)(11) the Secretary would notify the borrower, the lender, and the guaranty agency that the borrower's obligation to repay the debt or a portion of the debt, has been waived.

Proposed § 682.403(e)(1) would require a guaranty agency to return any payments received on the loan during the suspension of collection activity or after the guaranty agency assigned the loan to the Secretary. The guaranty agency would also be required to notify the borrower that there is no obligation to make payments on the loan unless the borrower received a partial waiver or unless the Secretary directs otherwise. Under proposed § 682.403(e)(2), the guaranty agency would remit to the Secretary any payments received after it has notified the borrower. Under proposed § 682.403(e)(3), if the Secretary receives any payments on the loan after waiving the entire outstanding balance on the loan, the Secretary would return these payments to the sender.

Proposed § 682.403(f) would provide that if the conditions for a waiver specified in proposed § 682.403(b) are met on a loan that has been repaid by a Federal Consolidation Loan with an outstanding balance, the Secretary may waive the portion of the outstanding balance of the consolidation loan attributable to the loan that qualifies for waiver once the loan has been assigned to the Secretary.

*Reasons:* The proposed regulations applicable to FFEL Program loans held by a guaranty agency or lender are intended to mirror some of the proposed regulations in 34 CFR part 30 that would apply to FFEL Program loans held by the Department. Since no new FFEL Program loans have been made on or after July 1, 2010, some of the provisions in part 30 that would apply to Direct Loans are not applicable to FFEL Program loans. Therefore, the proposed FFEL-only regulations are more limited than the proposed regulations that would apply to all student loans held by the Department.

In proposed § 682.403(b)(1) the Department proposes to provide a waiver for a FFEL loan that first entered repayment at least 25 years ago. The Department proposes a different time in repayment requirement for FFEL loans from what is in proposed § 30.83 because the version of IBR that is available in the FFEL program only provides forgiveness after 25 years of payments. There is no forgiveness option after 20 years the way there is for Department-held loans.

The Department proposes to include § 682.403(b)(1) because we are concerned that borrowers who first entered repayment a long time ago may not be able to repay their loans in a reasonable period. It would come with full compensation for the outstanding balance to lenders. The existence of repayment plans that provide forgiveness after an extended period in repayment indicates Congress's concern with borrowers being stuck in repayment for an unreasonable period of time and reflects Congress's intent that borrowers have paths to relief, so they are not stuck with their loans forever. We are concerned that many borrowers with older loans have spent years, if not decades, in repayment before being able to benefit from those options and might otherwise be trapped by their debts until they pass away. We have proposed applying this provision to loans that entered repayment on or before the July 1, 2000, because these borrowers will have been in repayment for all or part of 25 calendar years or more when the regulation is implemented. This approach reflects the more limited data the Department has in its possession about commercial FFEL borrowers. We are proposing 25 years because FFEL borrowers have access to an income driven repayment plan that provides forgiveness after 25 years. Similar to proposed § 30.83, this provision would only be exercised once per borrower.

The Committee did not reach consensus on proposed § 682.403(b)(1).

The Committee did reach consensus on proposed §§ 682.403(b)(2) and 682.403(b)(3), which would provide waivers for FFEL borrowers who qualify for, but have not received, a closed school discharge and for borrowers who attended an institution that lost its title IV eligibility due to high CDRs, if the borrower was included in the cohort whose debt was used to calculate the CDRs that were the basis for the loss of eligibility. Regarding waivers based on a school's loss of title IV eligibility, the Department modified proposed §§ 682.403(b)(3) by adding clarifying language specifying that the borrower's loan must have been in the cohort of

loans that resulted in the school losing title IV eligibility for a borrower to qualify for a waiver under this provision.

The Department proposes waivers for closed school discharges because that is a forgiveness opportunity that is available to FFEL borrowers which we are concerned that many eligible borrowers do not appear to be aware of and, as a result, may be unnecessarily struggling with unaffordable loans. For example, a 2021 study by the Government Accountability Office found that at least 42 percent of discharges from 2013 to 2021 were automatic discharges, indicating that a substantial share of borrowers may not have been aware of the potential for discharge or may have struggled with the application.[52] Further, more than half of borrowers who received an automatic discharge were in default on their loans, and an additional 21 percent had experienced at least one delinquency spell that lasted 90 days or longer.[53] Exercising waivers in these situations would help borrowers who have a high likelihood of being in default for loans that they should not have to repay.

The Department proposes to include waivers for borrowers who took out loans that are captured in CDRs that led to institutional ineligibility because we are concerned that when the Secretary cuts off aid to an institution for this reason it is a sign that a borrower is not getting the benefit of the bargain. This provision provides equitable treatment for the borrowers whose results showed their loans were not faring well with those who were protected after that point because the institution was no longer eligible to participate in the Federal student loan programs. One of the non-Federal negotiators urged the Department to provide FFEL regulations that were robust, clear, and detailed. The Department responded by providing detailed proposed FFEL regulations outlining the waiver claims filing process for waivers granted to FFEL borrowers whose loans are held by a private lender or a guaranty agency. These proposed regulations are modeled on the regulations in § 682.402 governing other loan discharges in FFEL, specifically the regulations governing total and permanent disability (TPD) discharges. As with TPD discharges, the Department would make the determination of eligibility,

rather than the lender or the guaranty agency before a claim is filed. The Department would then direct the lender to file a claim with the guaranty agency. The claim would be for the outstanding balance of the loan less any unpaid late fees and unpaid collection costs. The process for filing and paying the claim and assigning the loan to the Department would be essentially the same process used for TPD discharge claims. In the case of a consolidation loan, the claim would be for the outstanding principal and interest of the consolidation loan, even if only a portion of the consolidation loan qualifies for a waiver. After the guaranty agency pays the claim and the Department reimburses the guaranty agency, the guaranty agency assigns the consolidation loan to the Department. The Department would then waive repayment on the portion of the consolidation loan attributable to loans eligible for a waiver. This is consistent with proposed § 682.403(f) and several other provisions in these proposed regulations that allow the Secretary to waive a portion of a Federal Consolidation Loan (or, for Direct Loans, a Direct Consolidation Loan) if one or more of the underlying loans qualifies for a waiver. The Department would then resume collection on the portion of the consolidation loan that was not waived.

The suspension of collection activity, which is generally authorized for brief periods during which an application is submitted, or a claim is filed, would be deemed to be a forbearance in cases where payment resumes on the loan after it has been assigned to the Secretary.

Once a FFEL Program loan is assigned to the Department, the Department would be responsible for furnishing information about the loan to consumer reporting agencies and would report the reduction or elimination of the outstanding balance to consumer reporting agencies after granting the waiver. Guaranty agencies and lenders would only be responsible for reporting that the loan has been assigned to the Department, as they currently do for TPD discharges.

During negotiated rulemaking, the Department proposed providing more time for the claims process, giving 75 days for a lender to submit a claim, and 75 days for the guaranty agency to pay the claim. The Department believes that the timeframes are appropriate, since the Department will have already determined that the borrower qualifies for a waiver before notifying the lender. There would be no requirement that the lender or guaranty agency conduct an

additional review of borrower eligibility. Therefore, the claims process would be entirely administrative on the part of the lender and the guaranty agency. There would be no need for a guaranty agency or lender to review an application or to request additional information from a borrower, which is sometimes the case with other loan discharges. However, the Department acknowledges that initially there may be a large volume of FFEL borrowers qualifying for the waivers specified in § 682.403. Therefore, we would work with guaranty agencies and lenders who may have difficulty meeting these timeframes and be flexible in enforcing the requirements in proposed §§ 682.403(d)(2) and 682.403(d)(9).

The Committee did not reach consensus on the proposed regulations in §§ 682.403(a), (c), (d), (e) and (f) that would establish the procedures for processing a waiver claim and stipulate that if the conditions for a waiver are met on a loan that has been consolidated, the Secretary would waive repayment of the portion of the consolidation loan attributable to the loan that qualifies for waiver.

After the third negotiating session, the Department determined that it would be appropriate to specify in regulation that, when filing a waiver claim, a lender may provide alternative documentation in the event that the lender does not possess the original promissory note or a true and exact copy of the promissory note. This is consistent with the Department's practice with regard to accepting alternative documentation for loan assignments.

The Department also noted that the proposed regulations did not address the treatment of payments received after the Department has notified the lender that the loan qualifies for a waiver and before the payment of a waiver claim. Therefore, the Department added proposed language specifying that payments on the loan received during the suspension of collection activity— which would occur at the start of the waiver claim process—would be returned to the sender by either the lender or by the guaranty agency, as applicable. The Department believes that returning payments at this stage of the process is appropriate, because the Department has already determined that the borrower's loan qualifies for a waiver. Accepting payments inadvertently submitted on a loan that may have its entire outstanding balance waived would unnecessarily deprive the borrower of the payment amounts submitted.

[52] GAO–21–105373, COLLEGE CLOSURES: Many Impacted Borrowers Struggled Financially Despite Being Eligible for Loan Discharges *https://www.gao.gov/assets/gao-21-105373.pdf.*

[53] Ibid.

## Executive Orders 12866 (as Modified by 14094) and 13563

### Regulatory Impact Analysis

Under Executive Order 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is ''significant'' and, therefore, subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866, as amended by Executive Order 14094, defines a ''significant regulatory action'' as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $200 million or more (adjusted every 3 years by the Administrator of OIRA for changes in gross domestic product), or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or Tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise legal or policy issues for which centralized review would meaningfully further the President's priorities, or the principles stated in the Executive Order, as specifically authorized in a timely manner by the Administrator of OIRA in each case.

This proposed regulatory action will have an annual effect on the economy of $200 million or more. Table 4.1 in this RIA provides an estimate of the net budget effects of each provision of this proposed rule. We also provide estimates of the administrative costs for these provisions. Because the net budget effect is larger than $200 million a year, this proposed regulatory action is subject to review by OMB under section 3(f) of Executive Order 12866 (as amended by Executive Order 14094). Notwithstanding this determination, we have assessed the potential costs and benefits, both quantitative and qualitative, of this proposed regulatory action and have determined that the benefits will justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency ''to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible.'' The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include ''identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes.''

We are issuing these proposed regulations only on a reasoned determination that their benefits would justify their costs. In choosing among alternative regulatory approaches, we selected those approaches that in the Department's estimation best balance the size of the estimated transfer and qualitative benefits and costs. Based on the analysis that follows, the Department believes that these proposed regulations are consistent with the principles in Executive Order 13563.

We have also determined that this regulatory action will not unduly interfere with State, local, territorial, and Tribal governments in the exercise of their governmental functions.

As required by OMB Circular A–4, we compare the proposed regulations to the current regulations. In this regulatory impact analysis, we discuss the need for regulatory action, the summary of key proposed provisions, potential costs and benefits, net budget impacts, and the regulatory alternatives we considered.

Elsewhere in this section under *Paperwork Reduction Act of 1995,* we identify and explain burdens specifically associated with information collection requirements.

### 1. Congressional Review Act Designation

Pursuant to the Congressional Review Act (*5 U.S.C. 801 et seq.*), the Office of Information and Regulatory Affairs designated that this rule is covered under *5 U.S.C. 804(2)* and *(3).*

### 2. Need for Regulatory Action

Postsecondary education is a critical pathway for entering and succeeding in the middle class. Generally, earning a postsecondary credential provides individuals with a range of personal benefits in the labor market, including higher income and lower unemployment risk.[54] In addition to individual benefits related to earnings and employment, additional education provides a host of individual benefits including greater access to benefits like health insurance, increased job satisfaction and overall happiness.[55] Increasing levels of postsecondary attainment also have spillover benefits for communities and society that benefit those who never attended or completed postsecondary education. For example, researchers have documented that wages of non-college graduates rise when the supply of college graduates increases.[56] Increases in education is also linked to higher civic participation, reduced crime, and improved health of future generations.[57]

The high price of postsecondary education, however, means that large

[54] Barrow, L. & Malamud, O. (2015). Is College a Worthwhile Investment? *Annual Review of Economics,* 7(1), 519–555. Card, D. (1999). The Causal Effect of Education on Earnings. *Handbook of Labor Economics,* 3, 1801–1863.

[55] Oreopoulos, P. & Salvanes, K.G. (2011). Priceless: The Nonpecuniary Benefits of Schooling. *Journal of Economic Perspectives,* 25(1), 159–184.

[56] Moretti, Enrico. ''Estimating the social return to higher education: evidence from longitudinal and repeated cross-sectional data.'' *Journal of econometrics* 121, no. 1–2 (2004): 175–212.

[57] Currie, Janet, and Enrico Moretti. ''Mother's education and the intergenerational transmission of human capital: Evidence from college openings.'' *The Quarterly journal of economics* 118, no. 4 (2003): 1495–1532; Lochner, Lance, ''Nonproduction Benefits of Education: Crime, Health, and Good Citizenship,'' in E. Hanushek, S. Machin, and L. Woessmann (eds.), *Handbook of the Economics of Education,* Vol. 4, Ch. 2, Amsterdam: Elsevier Science (2011); Ma, Jennifer, and Matea Pender. *Education Pays 2023: The Benefits of Higher Education for Individuals and Society.* Washington, DC: College Board. Milligan, Kevin, Enrico Moretti, and Philip Oreopoulos. ''Does education improve citizenship? Evidence from the United States and the United Kingdom.'' *Journal of public economics* 88, no. 9–10 (2004): 1667–1695.; Lochner, Lance, and Enrico Moretti. ''The effect of education on crime: Evidence from prison inmates, arrests, and self-reports.'' *American economic review* 94, no. 1 (2004): 155–189.

shares of Americans seeking postsecondary credentials rely on Federal student loans to pay for college.[58] Though the rate of student borrowing has declined slightly in recent years, there have been appreciable changes in who borrows for college and how much debt they have taken on over the last several decades.[59] For instance, in the early 1990s, approximately one-third of full-time undergraduates received Federal student loans.[60] Following the Great Recession, the total dollar amount of annual student loan borrowing increased, reaching a peak in the 2010–11 school year.[61] These trends are shown in Table 2.1.

TABLE 2.1—SHARE OF FULL-TIME UNDERGRADUATES BORROWING FOR COLLEGE AND AMOUNT BORROWED

| Academic year | Share borrowing federal loans % | Average amount borrowed in given year (2019–20 dollars) | Median amount borrowed in given year (2019–20 dollars) |
|---|---|---|---|
| 2003–2004 | 46 | $7,419 | $6,306 |
| 2007–2008 | 52 | 9,101 | 6,804 |
| 2011–2012 | 53 | 8,417 | 7,347 |
| 2015–2016 | 50 | 8,643 | 7,017 |
| 2019–2020 | 42 | 6,526 | 6,250 |

*Note:* Excludes Parent PLUS loans. Data comes from the 2016 and 2020 National Postsecondary Aid Study (available at *https://nces.ed.gov/datalab/powerstats/table/moxnjs* and *https://nces.ed.gov/datalab/powerstats/table/kwjatm*).

Federal student loans allow students and families who lack the necessary funds to pay for postsecondary education with their current resources to borrow money to pay for that education that can be repaid using the earnings gains that come from obtaining a credential. While this works out for many borrowers, too often Federal loans do not have the intended result.

Student loan debt can add to the risk of going to college, because students who experienced an income shock, had bad luck in the job market, or went to a school that misled them about benefits can be burdened by their loan debt obligations. For some borrowers, the extent of debt needed to finance a credential is more than they can sustain from the earnings gains they obtained. These borrowers may see some returns from their education, but they aren't sufficient to repay their debt in a reasonable timeframe.

Many borrowers with lower incomes or who are otherwise financially vulnerable, such as retirees and those who have reported challenges making ends meet, have struggled to meet their student loan payments.[62] Student loan payment challenges are also commonly faced by borrowers who do not complete their credentials. An estimated 40 percent of borrowers who began postsecondary education in 2012 had student debt, but did not have a degree five years later.[63] Individuals with greater educational attainment tend to have higher earnings, and borrowers who do not complete their educational programs are particularly likely to have poor labor market outcomes.[64] Borrowers with debt but no degree can be in a situation where they borrowed in anticipation of degree-boosted earnings, but instead need to manage loan payments without such wage gains.

Through other actions, the Department is working to make certain that students gain value from their postsecondary education. For instance, the Department published final Financial Value Transparency and Gainful Employment rules in 2023 that aim to protect borrowers from career-training programs that do not provide sufficient financial value for their graduates and to better inform all families about the financial returns they could expect from programs.[65] Those actions are forward looking, however, and do not address some of the challenges faced by students in the past. For example, once fully implemented, the 2023 Financial Value Transparency and Gainful Employment rules will rely on outcomes data from previous students to prevent future students from using federal aid for programs where students are unlikely to be able to afford their debt payments. However, while future students will gain protection, past students whose experiences were documented have limited avenues for relief.

The potential debt relief contemplated in this proposed rule could help some borrowers who receive relief to better afford necessities, prepare for retirement, invest in other assets, and safeguard against financial shocks. This relief may also help guard against a "chilling effect" on postsecondary attainment, as prospective students may avoid higher education due to the negative consequences of debt experienced by many middle-income and low-income borrowers. And if students decide not to attend higher education because they are worried about the risk related to student loans, then communities, and the country clearly will miss out on the aforementioned benefits that increasing levels of postsecondary education brings, including higher economic growth, higher civic participation, reduced crime, and improved health.

Challenges with repaying Federal student loans manifest in several ways in broader trends within the portfolio. Prior to the start of the national pause on student loan interest, repayment, and collections in 2020, about one million borrowers a year defaulted on their Federal student loans for the first

[58] According to 2022 Digest of Education Statistics (Table 331.10), 34.6 percent of undergraduates received Federal student loans for the 2019–20 academic year.

[59] Fry, Richard. "The changing profile of student borrowers." (2014). Pew Research Center. *https://www.pewresearch.org/social-trends/2014/10/07/the-changing-profile-of-student-borrowers/*.

[60] U.S. Department of Education, National Center for Education Statistics. Digest of Education Statistics 2022. Table 331.60.

[61] Ma, Jennifer and Matea Pender (2023), Trends in College Pricing and Student Aid 2023, New York: College Board.

[62] *https://www.census.gov/library/stories/2021/08/student-debt-weighed-heavily-on-millions-even-before-pandemic.html*; *https://www.philadelphiafed.org/-/media/frbp/assets/consumer-finance/reports/cfi-sl-1-payments-resumption.pdf*; *https://www.aarp.org/money/credit-loans-debt/info-2021/student-debt-crisis-for-older-americans.html*.

[63] *https://nces.ed.gov/datalab/powerstats/table/Lcvndq*.

[64] Looney, Adam and Constantine Yannelis. "A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions they Attended Contributed to Rising Loan Defaults." *Brookings Papers on Economic Activity*, 2015; Ma, Jennifer, and Matea Pender. *Education Pays 2023: The Benefits of Higher Education for Individuals and Society.* Washington, DC: College Board.

[65] 88 FR 70004 (October 10, 2023).

time.[66] While some of these borrowers will successfully exit default, many others will likely remain in default for years if not decades. According to analysis of the Department's internal data, as of the end of 2020, there were about 1.5 million borrowers with ED-held loans in default who had been in that status for at least nine years.

The proposed regulations would permit the Secretary to provide relief to borrowers in the form of waiving some or all of the outstanding balance of a loan. The Secretary could provide this relief to borrowers where collection is not in the interest of the Department because certain borrowers would not otherwise have access to relief that is appropriate under the circumstances. In some cases, the proposed relief aligns to changes in the student loan programs that have recognized the necessity of relief, but where such changes took effect after the point at which many borrowers obtained their loans. These subsequent changes implicate considerations of equity and fairness, as well as the low likelihood of a borrower repaying the loan in a reasonable time period, and the costs of enforcing the debt which are not justified by the expected benefits of continued collection.

The proposed rules address several distinct situations where the Department believes the use of waiver is appropriate. Though a borrower may qualify for a waiver under multiple provisions, each of these proposed regulatory sections is distinct and separate from the other.

One section of the proposed rule would address situations where borrowers have loan balances that exceed what they originally borrowed. This provision would address the problem of prior excess interest accrual and capitalization, which the Department has considered at length.[67] The Department has addressed these problems going forward through the SAVE repayment plan that limits the accrual of unpaid interest when borrowers make their required payments, as well as separate regulatory changes that eliminated all non-statutory capitalization events starting July 1, 2023.[68] But these new policies do

not provide relief to borrowers with years or even decades of accrued interest, and such borrowers continue to experience the harms of excess interest as described below.

Any loan subject to interest requires a borrower to repay more than the original balance of the loan. For example, a $10,000 loan with a five percent interest that is repaid over 10 years would result in total payments of just over $12,700. However, when a borrower's outstanding balance exceeds what they originally borrowed, they will need to pay significantly more to retire their debts than they would have under the repayment schedule they had at the start of repayment. This can extend the borrower's time in repayment, including the possibility that a loan is never repaid. As the Department has noted in prior regulatory actions that address interest accrual and capitalization going forward, borrowers whose balances have grown excessively may experience additional psychological and financial barriers to repayment and be more likely to fall into delinquency or default.[69] Since the new policies reflected in the SAVE plan do not address prior balance growth, many borrowers with years of accrued interest face the negative effects of excess interest accrual. Indeed, many comments that the Department received in July 2023 when the Department solicited input from the public at the start of the student debt relief negotiated rulemaking process, similarly shared that balance growth has negative psychological effects on repayment. Many borrowers expressed that they felt that having unanticipated balances that far exceeded what they had originally borrowed made it impossible to ever repay their loans and indicated that they would be better able to afford their debts if balances could be brought down to the amount they originally borrowed and expected to repay. Borrowers who spoke during the public comment periods provided during negotiated rulemaking sessions reiterated these concerns.

The proposed rules contain a separate section that focuses on loans that first entered repayment a long time ago and are still outstanding. Under the standard repayment plan borrowers repay their

debt over 10 years by making equal monthly installments. More recently, borrowers have increasingly turned to IDR plans that provide forgiveness after either 20 or 25 years when the borrower makes payments that are largely driven by their income and family size. As a result, essentially every borrower has access to a repayment option that allows them to be debt-free by some point between 10 and 25 years of repayment.

Unfortunately, many borrowers see their loans persist long past these points. Many of these borrowers have spent considerable time in default where they are already subject to powerful collection tools that can result in the garnishment of wages, seizure of tax refunds, negative credit reporting, and even litigation. Analysis of Department data reveals that among borrowers who entered repayment over 25 years ago and whose loans are still outstanding, 74 percent have been in default at some point, while among borrowers whose loans matured over 20 years ago, 64 percent have been in default at some point. Analysis by the Urban Institute suggested that of borrowers who took out loans before 1990 and who still had debt recorded on their consumer report in 2018, 16 percent were in default on some or all of their student debt as of 2018.[70]

Borrowers with older loans also would not have initially been eligible for the significant number of additional benefits created for borrowers over the last several years. The presence of these benefits, such as reduced payments and shorter timelines to forgiveness, may have helped many of these borrowers better manage their debt and retire it sooner.

Furthermore, loans that have been in repayment for a long time tend to be held by older borrowers who are closer to or beyond retirement age, at which point their income may decline. Analysis of Department data reveals that among borrowers who entered repayment 20 years ago and whose loans are still outstanding, the median borrower age was 54 years, and 64 percent are older than the age of 50.

---

[66] https://studentaid.gov/sites/default/files/DLEnteringDefaults.xls.

[67] See, e.g., 88 FR 43820, 43851 (July 10, 2023).

[68] Id.; 87 FR 65904, 65957 (November 1, 2022).

[69] See, e.g. 88 FR 43820, 43951 (July 10, 2023); 88 FR 1894, 1905 (January 11, 2023); 87 FR 41878 (July 13, 2022), 41919; 87 FR 65904, 65957 (November 1, 2022).

[70] Blagg, Kristin. (2020) When Student Loans Linger: Characteristics of Borrowers Who Hold Loans Over Multiple Decades. Urban Institute. https://www.urban.org/sites/default/files/publication/101492/when_student_loans_linger.pdf.

A different provision of the proposed rule addresses the challenge where borrowers continue to repay loans even though, if they applied, they would be eligible to have their debts forgiven, either through one of the IDR plans or targeted forgiveness opportunities authorized by the HEA, such as PSLF. Historically, the Department has seen that borrowers frequently are not aware of the steps they need to take to get relief and end up making payments or put themselves at avoidable risk of default and delinquency. For example, for years, the Department had a data match with the Social Security Administration that identified borrowers who were eligible for a total and permanent disability discharge. Despite being told they were eligible, hundreds of thousands of borrowers did not apply.

In 2021, the Department changed its regulations to automatically provide a discharge to borrowers identified as eligible for this benefit through this match. This included an option for borrowers to opt out. As a result, 323,000 borrowers received discharges for the first time when the Department re-ran this match with the new policy and thousands more continue to be approved for automatic relief each quarter.[71] Policies like the automatic discharges based upon the SSA match show the importance of using approaches that grant forgiveness to borrowers without requiring them to find out about benefits and apply, one of the key goals behind this proposed provision.

Similarly, a substantial share of borrowers fail to or delay recertifying their income for purposes of an IDR plan after their first year in the plan, even when it appears that remaining on IDR would benefit them financially.[72] Transaction costs and lack of information, among other factors, can negatively impact take-up of public and social programs. This is not unique to student loans, as evidenced from a wide variety of programs such as those related to food and income supports also demonstrate that not all who can benefit actually sign up.[73] However, take-up of social programs can be increased by reducing administrative costs and burdens, including by having automatic enrollment.[74]

Finally, there are many borrowers who received loans to attend programs or institutions that lost access to the title IV, HEA programs after those programs or institutions failed to meet required accountability standards, failed to deliver sufficient financial value, or closed during the process to determine whether the institution or program should lose access to title IV aid for those reasons. In these situations, the Department or other entities took action to protect borrowers and taxpayers from the harms caused by these programs or institutions. However, students who borrowed to enroll in programs or institutions that later lost access to the title IV, HEA programs and whose experiences were captured in the outcomes measures that lead to such protection, are still left to repay the debt.

The Department is concerned that requiring such borrowers to continue to repay their debts puts them at increased risk of default and delinquency due to the identified flaws at the program or institution. For example, the recent Financial Value Transparency and Gainful Employment regulations (88 FR 70004) (2023 GE rule) protect students from financial harm that can come about if they attend a Gainful Employment program that consistently produces graduates with very low earnings or earnings that are too low to repay typical debt. If the experience of borrowers upon which those failing outcome measures are based are used to support cutting off future title IV aid to the institution, then those borrowers who attended these failing programs should also receive similar protections.

The Department believes that these proposed regulations would appropriately address the challenging situations outlined above that can affect the likelihood that a borrower repays their loan in a reasonable timeframe. Through these targeted and distinct exercises of waiver the Department would deliver relief to borrowers who need the assistance, while continuing to collect from borrowers who are able to repay.

*Summary of Proposed Key Provisions*

Table 2.2 below summarizes the proposed provisions in the NPRM. It does not include technical changes.

TABLE 2.2—SUMMARY OF PROPOSED KEY PROVISIONS

| Provision | Regulatory section | Description of proposed provision |
|---|---|---|
| Use of Federal Claims Collections Standards (FCCS). | § 30.70(a)(1)(c)(1) | Indicate the Secretary may use the FCCS standards to determine whether to compromise a debt. |
| Creation of a new subpart related to waiver | § 30.80 | Create a new section identifying when the Secretary may waive Federal student loan debt owed to the Department. |
| Waiver when current balance exceeds the balance upon entering repayment for borrowers on an income-driven repayment plan. | § 30.81 | The Secretary may waive the amount by which a loan's current outstanding balance exceeds the balance upon entering repayment for borrowers in an income-driven repayment plan whose income falls at or below certain thresholds. |
| Waiver when the current balance exceeds the balance upon entering repayment. | § 30.82 | The Secretary may waive the lesser of $20,000 or the amount by which a loan's current outstanding balance exceeds the balance upon entering repayment for borrowers who do not meet the requirements of § 30.81. |
| Waiver when a loan first entered repayment 20 or 25 years ago. | § 30.83 | The Secretary may waive outstanding loan balances for a loan that first entered repayment on or before July 1, 2000 or July 1, 2005, depending on whether a borrower has loans for graduate study. |
| Waiver when a borrower is eligible for forgiveness based upon repayment plan. | § 30.84 | The Secretary may waive outstanding loan balances if a borrower is not enrolled in but is otherwise eligible for forgiveness under certain repayment plans. |

[71] https://www.ed.gov/news/press-releases/over-323000-federal-student-loan-borrowers-receive-58-billion-automatic-total-and-permanent-disability-discharges.

[72] Herbst, Daniel. "The impact of income-driven repayment on student borrower outcomes." *American Economic Journal: Applied Economics* 15, no. 1 (2023): 1–25.; Conkling, Thomas S., and Christa Gibbs. "Borrower experiences on income-driven repayment." *Consumer Financial Protection Bureau Office of Research Reports Series* 19–10 (2019).

[73] See the review in Ko & Moffit (2022). Take-up of Social Benefits. *NBER Working Paper 30148*. Also see various articles in "Administrative Burdens and Inequality in Policy Implementation" Part I and Part II in *RSF: The Russell Sage Foundation Journal of the Social Sciences*, volume 9, issues 4 and 5, 2023.

[74] Currie, Janet (2006). The Take-up of Social Benefits. In *Public Policy and the Income Distribution*. Russell Sage Foundation. Herd & Moynihan (2018). *Administrative Burdens*. Russell Sage Foundation.

TABLE 2.2—SUMMARY OF PROPOSED KEY PROVISIONS—Continued

| Provision | Regulatory section | Description of proposed provision |
|---|---|---|
| Waiver when a loan is eligible for a targeted forgiveness opportunity. | § 30.85 | The Secretary may waive the outstanding balance of a loan when the Secretary determines that a borrower has not successfully applied for, but otherwise meets the eligibility requirements for, any loan discharge, cancellation, or forgiveness opportunity under part 682 or 685. |
| Waiver based upon Secretarial actions | § 30.86 | The Secretary may waive the outstanding balance of a loan if the institution or program has lost access to title IV, HEA programs for reasons stemming entirely or in part to failing accountability standards related to student outcomes or failing to deliver sufficient financial value. |
| Waiver following closures prior to Secretarial actions | § 30.87 | The Secretary may waive the outstanding balance of a loan used to enroll in a program or institution that failed to meet required student outcome measures or which was subject to an unresolved Department action related to failing to provide sufficient financial value, and the program or institution closed prior to the finalization of such actions. |
| Waiver for programs with high debt-to-earnings rates or low median earnings. | § 30.88 | The Secretary may waive the outstanding balance of a loan used to enroll in a program or institution that closed and prior to the closure had unacceptably high debt-to-earnings rates or median earnings that failed to exceed those of a high school graduate. |
| Waiver of commercial FFEL debts | § 682.403 | Lays out procedures for paying claims to FFEL loan holders so the Secretary may waive commercial FFEL loans that first entered repayment at least 25 years ago, that are eligible for a closed school loan discharge where a borrower has not successfully applied, or owed by a borrower in the cohort whose debt was used to calculate the institution's failing cohort default rates that resulted in ineligibility for title IV, HEA programs. |

**3. Discussion of Costs, Benefits and Transfers**

Overall, the proposed rules would result in costs in the form of transfers from the Federal Government to student loan borrowers. The size of these transfers would vary based upon the regulatory provision in question. The Department believes that these transfers provide significant benefits to borrowers in the form of waiving their obligation to repay some or all of their Federal student loan debt. The Department would also see benefits from waivers granted as a result of the provisions in these draft rules by preventing or reducing costly collection on loans that are unlikely to be repaid in a reasonable period. Similar benefits would accrue to private holders of loans from the FFEL Program. Finally, the proposed rules would result in some costs in the form of administrative expenses for the Department to implement these provisions. When considering all these factors, the Department believes that the benefits from these proposed rules outweigh the costs. What follows is a discussion of costs, benefits, and transfers for each of the distinct regulatory provisions.

*Data Used in This RIA*

This section describes the data used in the regulatory impact analysis. To generate information about the expected number of borrowers who would receive relief under these proposed rules, the Department relied upon non-public records contained in the administrative data the Department uses to administer the title IV, HEA programs.

The primary data used in the RIA is a five percent random sample of the Federal student loan portfolio with at least one open title IV, HEA student loan as of December 31, 2023. We are using a random sample including over two million borrowers, but we present all estimates in the analyses below in terms of the full portfolio. The data we use for modeling in the RIA are stored in the National Student Loan Data System (NSLDS), maintained by the Department's Office of Federal Student Aid. The Department determined that a sample of this size was appropriate to provide reasonable estimates of the impact of the proposed regulation. A sample of this size is also similar to what the Department uses in budgeting modeling and the modeling of net budget impacts of its rules.

To provide context for data on which borrowers would be affected by different provisions, Table 3.1 describes the characteristics of the sample, which is representative of the student loan portfolio overall.[75] This sample is different from the one used to produce the net budget impact described elsewhere in this RIA. A further description of the sample used for cost modeling can be found in the net budget impact section of this RIA.

TABLE 3.1—CHARACTERISTICS OF BORROWERS IN THE SAMPLE USED TO ESTIMATE THE EFFECTS OF THIS PROPOSED RULE

| | Percent |
|---|---|
| Share of Federal Student Loan Borrowers Who: | |
|     Have Any Parent PLUS Loans | 9 |
|     Ever Received a Pell Grant * | 62 |
|     Ever Had a Default | 27 |
|     Age <30 | 31 |
|     Age 30–50 | 49 |
|     Age 50+ | 20 |
|     Highest Level Enrolled: 1st or 2nd Year Undergrad | 44 |
|     Highest Level Enrolled: 3+ Year Undergrad | 35 |
|     Highest Level Enrolled: Graduate School | 19 |
|     Oldest Loan In Repayment <10 Years | 47 |

[75] We use a random sample of borrowers where sample descriptive statistics match those of the full portfolio.

TABLE 3.1—CHARACTERISTICS OF BORROWERS IN THE SAMPLE USED TO ESTIMATE THE EFFECTS OF THIS PROPOSED RULE—Continued

|  | Percent |
|---|---|
| Oldest Loan In Repayment 10–20 Years | 33 |
| Oldest Loan In Repayment 20+ Years | 11 |

**Notes:** Based on five percent random sample of Federal student loan borrowers. All numbers are rounded. Highest level enrolled is sourced from loan data for the academic level for which the student borrowed; unless otherwise specified, this could include borrowers who have exited school, and also students in school.

\* Pell Grant status is unavailable for most borrowers who entered repayment on their last loan before 1999. As such, these figures may understate the share of borrowers who are Pell Grant recipients.

To understand repayment outcomes for a constant set of borrowers over time, we also use a random sample of borrowers who had their last Federal student loan mature in 2012 and follow these borrowers for 10 years to understand repayment trends.[76] By 2023, some borrowers in this sample have paid down their loans, but a substantial share still have a loan balance. These data provide a perspective of repayment progress for the length of the standard repayment plan, which is 10 years. These data also come from the NSLDS maintained by the Department's Federal Student Aid office.

Because it uses an income limit, for analyses of eligibility related to §§ 30.81, these data were supplemented with publicly available data from the U.S. Census Bureau, which we used to impute information about borrower incomes based on individuals with similar demographic and educational characteristics from Census data.[77] For analyses related to § 30.85, data from NSLDS was supplemented with publicly available data on closed schools from Federal Student Aid's website.[78] For analyses related to §§ 30.86, 30.87, and 30.88, data from NSLDS was supplemented with publicly available data from the "2022 Program Performance Data" that was released by the Department with the 2023 GE rule and historical cohort default rate (CDR) data.[79]

---

[76] This comparison is based on historical data, which may be different than future trends, which is a necessary tradeoff to consider medium- or long-term repayment trajectories for borrowers.

[77] Because imputed income is an approximation, we also estimate the number of borrowers who could be eligible, regardless of income. To the extent that a larger or smaller number of borrowers qualify under § 30.81 because of income, then the number of borrowers that qualified under § 30.82 would decline or increase by the equivalent number.

[78] As of February 15, 2024. Available at *https://www2.ed.gov/offices/OSFAP/PEPS/closedschools.html*.

[79] The 2022 Program Performance Data is available for download at: *https://www.federalregister.gov/documents/2023/05/19/2023-09647/financial-value-transparency-and-gainful-employment-ge-financial-responsibility-*

*administrative*, historical cohort default rate data is available at: *https://fsapartners.ed.gov/knowledge-center/topics/default-management/archived-press-packages*.

*Analysis of Costs, Benefits, and Transfers for Each Proposed Regulatory Section*

The sections that follow contain a discussion of the costs, benefits, and transfers for the different proposed regulatory provisions if the Secretary chooses to grant waivers under such provisions. Each of these provisions would include administrative costs for the Department to implement these changes. Because these administrative costs generally represent baseline expenses that would occur in order to implement any one of these provisions, we provide a separate discussion of administrative costs at the end of this part of the RIA.

*§ 30.81   Waiver when the current balance exceeds the balance upon entering repayment for borrowers on an IDR plan.*

The proposed rules would result in costs in the form of transfers from the Department to IDR borrowers in the form of waiving the amount of accrued interest and capitalized interest on an outstanding loan. Waiving these amounts would reduce future payments by borrowers to the Department. They would also create administrative costs for the Department to implement, which are discussed at the very end of this subsection of the RIA.

The extent of transfers and their associated cost would vary significantly depending on the borrower and their repayment experience. The cost of such transfers for borrowers enrolled in an IDR plan would be small in many cases. IDR plans offer forgiveness for borrowers after a set number of monthly payments (typically either 240 or 300 payments, though the SAVE plan can provide forgiveness after as few as 120 payments). Prior to the creation of the SAVE plan, a borrower whose IDR payment was insufficient to cover all the accumulating interest was likely to see their outstanding balance grow beyond what they originally borrowed.

That is because borrowers were responsible for all unpaid interest, except for what accumulated on a subsidized loan for the first three consecutive years in repayment; or if they were on REPAYE, they would be responsible for 50 percent of interest not covered on the monthly payment for the first three years of repayment for unsubsidized loans and all periods beyond the first three years of repayment for all loan types.

In the final rule that created the SAVE plan, the Department estimated that 70 percent of borrowers on IDR had monthly payments that did not cover the full amount of accumulating interest.[80] For example, a borrower who originally took out $30,000 in unsubsidized loans at a five percent interest rate could see as much as $30,000 in accumulated interest forgiven at the end of 20 years if they had a $0 monthly payment for that whole period. That means significant portions of the amounts being waived under these regulations are likely to be forgiven later in repayment anyway. The remaining portion that was likely to be repaid would represent a transfer from the Department to borrowers. That said, borrowers still receive a benefit from having these amounts waived now instead of being forgiven later. The Department received numerous public comments from borrowers about the negative effects they experience from seeing their balances grow even while making payments. Those comments evidence the significant psychological effects felt by borrowers in trying to manage their payments. Providing relief from growing balances would address those concerns highlighted by borrowers.

Borrowers seeking PSLF may see similar benefits. For these public service workers, waiving accrued or capitalized interest will generally represent the expense of waiving amounts now that would otherwise be forgiven when the borrower hits the ten-year forgiveness period. Like IDR forgiveness, the cost of

---

[80] 88 FR 43851 (July 10, 2023).

this transfer will depend on how much the waived amounts would have been repaid.

We estimate that about 6.4 million borrowers will receive relief under § 30.81.[81] Under our estimate for § 30.81, for modeling purposes, we do not assume that borrowers will switch into an IDR plan in order to receive a waiver under this provision; these borrowers are captured under § 30.82. Table 3.2 shows the demographic characteristics of borrowers who would be eligible to receive a waiver under this proposal. Among those who would be eligible for relief under this provision, 76 percent received a Pell Grant at some point during their postsecondary career, 68 percent are women, and around one-third spent two years or less in higher education. Over half of these borrowers have been in repayment for at least 10 years. In addition, nearly one-quarter had been in default at some point.

TABLE 3.2—ESTIMATED NUMBER AND CHARACTERISTICS OF BORROWERS WHO WOULD BE ELIGIBLE FOR A WAIVER UNDER § 30.81

| | |
|---|---|
| Number of Borrowers Receiving Any Forgiveness under this provision | 6.4 M |
| Of Those Receiving Forgiveness, Share Who: | |
| Have Any Parent PLUS Loans | 4% |
| Ever Received a Pell Grant * | 76% |
| Ever Had a Default | 24% |
| Age <30 | 20% |
| Age 30–50 | 64% |
| Age 50+ | 15% |
| Highest Level Enrolled: 1st or 2nd Year Undergrad | 35% |
| Highest Level Enrolled: 3+ Year Undergrad | 38% |
| Highest Level Enrolled: Graduate School | 27% |
| Oldest Loan In Repayment <10 Years | 45% |
| Oldest Loan In Repayment 10–20 Years | 47% |
| Oldest Loan In Repayment 20+ Years | 8% |

**Notes:** Results from a five percent sample of the student loan portfolio. All numbers are rounded. Borrowers are considered on IDR if the loan is in repayment on any IDR plan, including plans where the borrower no longer has a partial financial hardship.

* Pell Grant status is unavailable for most borrowers who entered repayment on their last loan before 1999. As such, these figures may understate the share of borrowers who are Pell Grant recipients.

Borrowers on IDR plans are particularly likely to see their balances grow over time. We examined a sample panel of borrowers who were enrolled in any IDR plan for at least three years from 2012 to 2022 and compared them to borrowers who were enrolled in a standard ten-year repayment plan for at least three years. As shown in Table 3.3, borrowers who were enrolled in any IDR plan for at least three years were more likely than borrowers with at least three years in a standard repayment plan to have their balance grow. By 2022, borrowers who spent a substantial amount of time repaying under IDR were 12 percentage points more likely to have seen their balance grow than borrowers repaying on a standard plan.

TABLE 3.3—SHARE OF BORROWERS WITH BALANCES GREATER THAN WHAT THEY OWED UPON ENTERING REPAYMENT

| Year | At least 3 years in standard repayment (percent) | At least 3 years in IDR (percent) |
|---|---|---|
| 2013 | 65 | 81 |
| 2014 | 59 | 79 |
| 2015 | 52 | 75 |
| 2016 | 46 | 71 |
| 2017 | 42 | 67 |
| 2018 | 38 | 64 |
| 2019 | 34 | 60 |
| 2020 | 32 | 58 |
| 2021 | 31 | 56 |
| 2022 | 29 | 54 |

**Notes:** Based on a sample of borrowers who last entered repayment on a non-consolidated loan in 2012. All numbers are rounded. Borrowers who were both on IDR for more than three years and on a standard ten-year repayment plan for more than three years are excluded from the analysis.

§ 30.82 Waiver when the current balance exceeds the balance upon entering repayment.

Borrowers who would be eligible for this provision include some IDR borrowers whose incomes are too high to qualify for relief under § 30.81 and also non-IDR borrowers. A substantial portion of IDR borrowers experience balance growth because their income-based payments do not fully cover the accruing interest on their loans. For non-IDR borrowers, the extent of transfers will be dependent upon their repayment history. All of the standard,

---

[81] Additionally, we imputed income to provide an approximation of borrowers' incomes to estimate how many borrowers would qualify under this provision. However, because imputed income is an approximation, we also estimate the number of borrowers who could be eligible, regardless of income. In this estimate, 7.0 million borrowers have balance growth and are enrolled in an IDR plan. Because this estimate does not use an income limit, this number serves as a likely upper bound on the number of borrowers who would receive a waiver under § 30.81. If there were a larger number of borrowers that qualified under § 30.81, then the number of borrowers that qualified under § 30.82 would decline by the equivalent number.

extended, and graduated repayment plans require borrowers to at least cover monthly accruing interest with their monthly payment. However, if borrowers spend time in deferment, forbearances, delinquency, or default, they will accrue interest that can be capitalized into principal. For borrowers in a deferment, interest that accrues on their unsubsidized Stafford or PLUS loans will be added to their principal balance when they exit the deferment. The same is true for borrowers who left a forbearance prior to the payment pause. However, regulations that went into effect on July 1, 2023, ended the practice of capitalizing interest for borrowers when they leave a forbearance going forward.

Many of the borrowers who would be eligible to receive a waiver under this proposed regulation spent time in statuses that have broader societal value. For instance, some borrowers were in deferment or forbearance because they served in active-duty military or the national guard. Thirty-six percent of borrowers who first entered postsecondary education in 2003–04 and received at least one military or law enforcement loan deferment had owed more than they did upon entering repayment twelve years later.[82] Borrowers who used a forbearance or deferment to avoid default because of unemployment or economic hardship, and now find themselves with loan balances they will struggle to retire in a reasonable period, would also benefit from this proposal. Sixty-three percent of borrowers who started their education in 2003–04 and received at least one economic hardship deferment owed more than they did upon entering repayment 12 years later.[83]

We estimate that 19.1 million borrowers would be eligible for relief under § 30.82. This number does not include borrowers currently on IDR who would be eligible for a waiver under § 30.81. However, it does include some borrowers who are on IDR but whose incomes are too high to qualify for a waiver under § 30.81.[84] To get a sense of the effect of this policy, Table 3.4 below models the characteristics of borrowers who have experienced balance growth in excess of their balance at repayment entry. Among those whose balance is at least $1 above what they owed upon entering repayment, 68 percent ever received a Pell Grant, and 38 percent ever defaulted. Almost half of these borrowers only enrolled for the first year or two of their undergraduate education and around 80 percent only enrolled for undergraduate education.

Table 3.4—Estimated Number and Characteristics of Borrowers Who Would Be Eligible for Waivers Under § 30.82

| | |
|---|---|
| Number of Borrowers Receiving Any Forgiveness Under this Provision | 19.0 M |
| Of Those Receiving Forgiveness, Share Who: | |
| Have Any Parent PLUS Loans | 12% |
| Ever Received a Pell Grant * | 68% |
| Ever Had a Default | 38% |
| Age <30 | 26% |
| Age 30–50 | 51% |
| Age 50+ | 23% |
| Highest Level Enrolled: 1st or 2nd Year Undergrad | 49% |
| Highest Level Enrolled: 3+ Year Undergrad | 30% |
| Highest Level Enrolled: Graduate School | 19% |
| Oldest Loan In Repayment <10 Years | 52% |
| Oldest Loan In Repayment 10–20 Years | 37% |
| Oldest Loan In Repayment 20+ Years | 11% |

**Notes:** Results from a five percent sample of the student loan portfolio. All numbers are rounded. Borrowers are considered to have experienced balance growth if they owe at least $1 above their balance at the start of repayment. Commercial FFEL loans and borrowers who are currently in school or have loans that have not yet entered repayment are excluded.

* Pell Grant status is unavailable for most borrowers who entered repayment on their last loan before 1999. As such, these figures may understate the share of borrowers who are Pell Grant recipients.

One way of contextualizing the experience of borrowers who have experienced balance growth is to follow a cohort of borrowers over time. For this analysis, the Department examined data over a 10-year period for a group of borrowers who last entered repayment in 2012, to the end of 2022. Borrowers are grouped by either: having paid off their loans by the end of 2022, owing less than their balance at repayment, or owing more than their balance at repayment. Table 3.5 shows the time spent in statuses (expressed in months) where borrowers are not actively paying or may be paying less than covered interest in an IDR plan.

In the sample, among borrowers who are still in repayment, borrowers who still owe more than they owed at the start of repayment 10 years later spent much longer in forbearance or deferment than borrowers whose loan balance has not grown. The average and median amounts of time a borrower who experienced balance growth spent in forbearance were 30 and 23 months, respectively. This is more than twice the amount of time spent in forbearance for borrowers who did not have balance growth. Similarly, borrowers in the sample who experienced balance growth were in deferment for longer periods than those who did not experience balance growth. Borrowers in the sample with balance growth also had longer average periods of default than borrowers still in repayment, but without balance growth, and were more likely to be using an IDR plan to repay their debt.

---

[82] https://nces.ed.gov/datalab/powerstats/table/sejwfb.

[83] https://nces.ed.gov/datalab/powerstats/table/sejwfb.

[84] As noted earlier in footnote 25, we estimated a sensitivity of the number of borrowers who could be eligible, regardless of income.

TABLE 3.5—MONTHS IN CERTAIN STATUSES AMONG BORROWERS WHO ENTERED REPAYMENT IN 2012

| | 2012 Borrowers with no balance growth by end of 2022 | | 2012 Borrowers with balance growth by end of 2022 | |
| --- | --- | --- | --- | --- |
| | Average | Median | Average | Median |
| Forbearance | 13 | 5 | 30 | 23 |
| Deferment | 7 | 0 | 11 | 0 |
| Default | 15 | 0 | 30 | 0 |
| IDR | 12 | 0 | 27 | 0 |

**Notes:** Based on a random sample of approximately 150,000 borrowers who last entered repayment on a non-consolidated loan in 2012. All numbers are rounded. A borrower is considered to have spent a year in IDR if they are in an IDR plan as of the end of a given year (including non-partial financial hardship) and did not spend all of their previous year in a non-payment status (forbearance, deferment, or default). Months are rounded to the nearest month.

This section would provide the Secretary with discretionary waiver authority that could create costs for the Department due to the transfers that arise from waiving some loan amounts. However, because the waivers in this proposal would not result in forgiving any of the original principal, the government would still be in a position to collect the full amount originally disbursed.

While the proposed regulations would create costs in the form of transfers for the Federal Government, it would also provide benefits. As previously described, recent borrower reports suggest that growing loan balances can lead to both financial and psychological challenges to successful repayment by borrowers.[85] The Department also must pay for either the ongoing servicing of loans in repayment or the costs of collecting on defaulted loans, even if those loans are not expected to lead to large amounts of revenue in the future.

Other borrowers may benefit from reduced loan payments. Borrowers on payment plans other than IDR would see their monthly payments decrease if the Department waives any capitalized interest. Borrowers on non-IDR plans may also see their time to repayment reduced, as the total amount of payments needed to retire their debt decreases. The extent of these effects on borrowers repaying under an IDR plan are more challenging to assess, as they would be affected by whether borrowers are close to reaching certain caps on payments that exist in plans such as IBR and PAYE. In such situations, it could result in either a reduced payment, repaying the loan before reaching forgiveness, or both.

Beyond transfers, the Department estimates that there would be administrative costs for the implementation of this benefit. These costs are discussed at the very end of this subsection of the RIA.

*§ 30.83    Waiver based on time since a loan first entered repayment.*

The proposal to permit the Secretary to waive loans that first entered repayment 20 or 25 years ago, if exercised, would create costs in the form of transfers between the Federal Government and borrowers. Borrowers would receive significant benefits from no longer having to repay old loans, and the Federal Government would also see benefits from no longer servicing or collecting on loans that are largely not expected to be repaid in full. Finally, this proposal would have administrative costs for the Department to implement. Each is discussed in more detail below, except for the administrative costs, which are discussed at the end of this subsection of the RIA.

The size of the transfers between the Federal Government and borrowers would depend on the borrower's repayment history and the likelihood that an older loan would otherwise have been repaid. Under the default repayment plan created by Congress (the standard repayment plan), borrowers repay their loans over 120 equal installments—the equivalent of 10 years of monthly payments. From 1965–2010, most student loan borrowers made fixed monthly payments over a set period of time. Starting in 1994, borrowers with Direct Loans had an option to make payments based upon their income through the ICR plan. It provides forgiveness after 25 years of monthly payment but was not used extensively. In 2007, Congress created the IBR plan, which gave all Direct and FFEL student borrowers access to a more generous repayment plan tied to borrowers' income. Legislation in 2010 followed by regulations in 2012 and 2015 further improved the terms of IDR plans and expanded the options for Direct Loan borrowers. From 2010 to 2018 the share of undergraduate borrowers in IDR plans grew from 11 percent to 24

percent.[86] Currently, about one-third of federally managed loan recipients are in IDR plans.[87]

With one exception, all other Federal loan repayment options result in the debt being repaid or forgiven after no more than 25 years. For instance, all IDR plans provide forgiveness after 20 or 25 years. The one exception is for higher-balance consolidation loans—typically those with starting balances of at least $60,000—which can be repaid over 30 years.[88] The idea then, is that most student loans will be repaid over roughly a decade, with nearly all others being paid off within 25 years at the latest.

The size of transfers that would be generated by this policy depends on how many loans that would be eligible for waiver under this policy are set to be repaid or, alternatively, are likely to simply linger and eventually be forgiven through discharges due to a borrower's death or total and permanent disability. For instance, based on analysis of Department data, in 2022, there were more than 1 million borrowers with loans that have been in default for at least 20 years. During this period these borrowers could have been subject to negative credit reporting, wage garnishment, tax refund offset, and even litigation. If these loans are still outstanding after all this time notwithstanding the availability of those powerful collection tools, the odds that they would be fully repaid in a reasonable period are unlikely. For instance, among borrowers who started college in 2004 and ever defaulted on a

[85] *https://www.pewtrusts.org/en/research-and-analysis/reports/2020/05/borrowers-discuss-the-challenges-of-student-loan-repayment; https://www.newamerica.org/education-policy/reports/in-default-and-left-behind/.*

[86] Congressional Budget Office (2020). Income-Driven Repayment Plans for Student Loans: Budgetary Costs and Policy Options. *https://www.cbo.gov/publication/56277.*

[87] Based on Q4 2023 data on Direct Loans and ED-held FFEL borrowers in Repayment, Deferment, and Forbearance from the FSA Data Center, Portfolio by Repayment Plan, available at: *https://studentaid.gov/data-center/student/portfolio.*

[88] Eligibility for a 30-year repayment plan on a consolidation loan is based upon total education loan indebtedness, which can include non-Federal debts.

Federal loan, only about one-third paid off that loan in full within 12 years.[89]

Even loans not in default may not be fully repaid in a reasonable period. For instance, a borrower may have spent extended periods in forbearance because they could not afford their payments. While doing so will allow them to avoid default, it will put them further away from successful repayment due to the accumulation of interest.

Older loans are also going to be held by older borrowers. The older the borrower, the greater the likelihood that they will stop working prior to successful repayment. Forty-one percent of non-Parent PLUS borrowers 62 years of age and older with an open loan have held their student loans for more than 20 years, and 30 percent of borrowers 62 years of age and older with an open loan have held their student loans for more than 25 years.[90] Waiving such loans would not create significant costs in the form of transfers for the Government because it is unlikely to get significant

additional payments from a retired borrower.

The costs of these transfers would be greater for loans where the Government was expecting to see significant repayments. Some of these situations are impossible to anticipate at any given scale, such as borrowers who suddenly come into money from an inheritance or divorce settlement and are either able to repay their loans voluntarily or see a large increase in amounts obtained from enforced collections. Another situation would relate to borrowers who are on a 30-year repayment plan. For student borrowers, the Government would be forgoing the final five years of payments, while for a borrower with a consolidation loan that repaid a Parent PLUS loan and did not have any graduate loans, it would be forgoing 10 years of payments. The Department projects that it would be five years of foregone payments instead of 10 for student borrowers because in order to qualify for a plan with a 30-year amortization period, the borrower must

have a level of debt above what a borrower can take out in principal for their own undergraduate education. These would be borrowers who would be eligible to receive a waiver 25 years after entering repayment. Parent borrowers, meanwhile, would be eligible to receive a waiver 20 years after entering repayment, assuming they had no graduate debt of their own.

Table 3.6 provides estimates of the number of borrowers who would be eligible to receive benefits under this provision and their characteristics. About 2.6 million borrowers are expected to be eligible for relief because they first entered repayment on or before either July 1, 2000, or July 1, 2005, depending on whether they have loans for graduate study. Forgiveness of debt among borrowers who entered repayment 20 or 25 years ago particularly helps older borrowers, with over 60 percent aged over 50. Additionally, over 80 percent of borrowers had previously had a default.

TABLE 3.6—ESTIMATED NUMBER AND CHARACTERISTICS OF BORROWERS WHO WOULD BE ELIGIBLE FOR WAIVERS UNDER § 30.83

| | Borrowers at 20/25 years of forgiveness |
|---|---|
| Number of Borrowers Receiving Any Forgiveness Under this Provision | 2.6 M |
| Of Those Receiving Forgiveness, Share Who: | |
| Have Any Parent PLUS Loans | 10% |
| Ever Received a Pell Grant * | 36% |
| Ever Had a Default | 83% |
| Age <30 | 0% |
| Age 30–50 | 37% |
| Age 50+ | 63% |
| Highest Level Enrolled: 1st or 2nd Year Undergrad | 49% |
| Highest Level Enrolled: 3+ Year Undergrad | 30% |
| Highest Level Enrolled: Graduate School | 14% |
| Oldest Loan In Repayment 20–25 Years | 41% |
| Oldest Loan In Repayment 25–30 Years | 30% |
| Oldest Loan In Repayment 30+ Years | 29% |

**Notes:** Results from a five percent sample of the student loan portfolio. All numbers are rounded. Forgiveness in 2024 is based on having at least one non-commercial FFEL loan enter repayment 20 years ago (if no graduate debt) or 25 years ago (any graduate debt).
* Pell Grant status is unavailable for most borrowers who entered repayment their last loan before 1999. As such, these figures may understate the share of borrowers who are Pell Grant recipients.

Waiving old loans would significantly benefit borrowers. For older borrowers, ending required loan payments would reduce one source of financial obligations for their final years in the workforce, putting them in better shape for retirement and reducing their need to rely on other sources of funds in their final years. It also could give some borrowers who currently have to work

to repay their loans the ability to retire. Of the borrowers with loans 20 or 25 years old, 63 percent are over 50 years old.

The Government would also see benefits from waiving older loans. Continuing to pay the cost of collecting or servicing older debts that are unlikely to be repaid generates costs for taxpayers that may never be recouped. If a borrower defaults on their debt, a

portion of their Social Security benefit may be offset to repay the student loan; for some borrowers, this reduction moves their benefits income below the Federal poverty line.[91]

§ 30.84   *Waiver when a loan is eligible for forgiveness based upon repayment plan.*

This provision would provide the Secretary with discretionary waiver authority that could create costs in the

[89] Based on Beginning Postsecondary Students Longitudinal Surveys 2004/2009. *https://nces.ed.gov/datalab/powerstats/table/loivbe.*

[90] *https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/data-on-older-borrowers-and-parents-session-2.pdf.*

[91] SOCIAL SECURITY OFFSETS: Improvements to Program Design Could Better Assist Older

Student Loan Borrowers with Obtaining Permitted Relief. United States Government Accountability Office. December 2016. *https://www.gao.gov/assets/gao-17-45.pdf.*

form of transfers from the Federal Government to student loan borrowers. These waivers would apply in situations where borrowers would be eligible to receive relief if they otherwise meet the eligibility requirements for forgiveness under existing repayment plans, but they have not applied. Waiver is appropriate because borrowers often struggle to navigate the myriad loan repayment plans available to them. As a result, the Department frequently observes that borrowers who could receive immediate forgiveness are unaware of, or are unable to take, the steps needed to receive relief. The cost of the transfers that would occur from providing relief under this section therefore represent the expense associated with providing relief to borrowers who could not or did not know how to opt into existing benefits.

This provision is separate and distinct from § 30.85. This section only applies to borrowers who would be eligible for a discharge based upon one of the repayment plans that result in forgiveness after a set period. This includes all IDR plans, as well as the alternative repayment plan. By contrast, § 30.85 is focused on possible relief for borrowers who otherwise qualify for forgiveness opportunities. There is no guarantee that a borrower eligible for a waiver under § 30.84 would be eligible for one under § 30.85 or vice versa.

Providing waivers for borrowers who are eligible for relief but who have not successfully applied for certain repayment plans provides significant benefits for borrowers and the Department. For borrowers, they would receive the benefit of no longer needing to repay their student loan. This removes the risk of delinquency and default and also means that they no longer need to devote a portion of their income to the student loans being forgiven. They also derive benefits by receiving relief automatically and not needing to spend the time to navigate the repayment system. The Department, meanwhile, benefits by no longer paying

for the cost of servicing a loan that is otherwise eligible for a discharge. Continuing to cover such costs is an unnecessary expenditure of Federal funds. It can also create added costs and work for the Department if the borrower applies later and is then eligible for refunds of payments that they made after the point when they were eligible for forgiveness. The Department also benefits by providing relief automatically instead of needing to pay to process individual borrower applications.

Table 3.7 reports estimates of the number of borrowers who would be eligible for forgiveness under the SAVE plan, but who are not currently enrolled in that plan. We estimate that about 1.7 million borrowers will receive partial or complete forgiveness (with over half receiving full forgiveness) as of December 31, 2023. Nearly 70 percent of these borrowers received a Pell Grant and over one-third had a prior default.

TABLE 3.7—ESTIMATED CHARACTERISTICS OF BORROWERS WHO WOULD BE ELIGIBLE FOR WAIVERS UNDER § 30.84

| | |
|---|---:|
| Number of borrowers receiving any forgiveness | 1.7 M |
| Of Those Receiving Forgiveness, Share Who: | |
| Have Any Parent PLUS Loans | 5% |
| Ever Received a Pell Grant * | 66% |
| Ever Had a Default | 45% |
| Age <30 | 0% |
| Age 30–50 | 72% |
| Age 50+ | 27% |
| Highest Level Enrolled: 1st or 2nd Year Undergrad | 65% |
| Highest Level Enrolled: 3+ Year Undergrad | 26% |
| Highest Level Enrolled: Graduate School | 7% |
| Oldest Loan In Repayment <10 Years | 0% |
| Oldest Loan In Repayment 10–20 Years | 75% |
| Oldest Loan In Repayment 20+ Years | 24% |

**Notes:** Results are from analysis of a five percent sample of the student loan portfolio. All numbers are rounded. Borrowers whose original loan disbursement was less than $12,000 and who have made 120 payments were classified as eligible, as were borrowers who had an additional 12 payments for each $1,000 borrowed above that amount. Eligibility ends at 19 years of payments on $21,000 or original principal balance for borrowers who only have undergraduate loans or 24 years for borrowers who originally took out $24,000 and have any graduate loans. Borrowers above that point would receive the typical forgiveness on SAVE at 20 or 25 years. Parent PLUS loans and FFEL loans were excluded from this analysis, but borrowers with these types of loans may still be eligible for forgiveness on other Federal loans they hold.

\* Pell Grant status is unavailable for most borrowers who entered repayment on their last loan before 1999. As such, these figures may understate the share of borrowers who are Pell Grant recipients.

Waivers under this provision would generate two types of costs. One is costs in the form of transfers from the Department to the borrower. However, as discussed, these would be transfers borrowers could already receive if they were to take the necessary steps to apply for the specific repayment plan. While these do show up as costs in this proposed rule, we believe the benefits of providing this relief automatically and the savings generated from such an approach are better than incurring the costs to provide this relief on an individual basis.

Action under these provisions would come with costs for the Department in

the form of administrative expenses to implement this change. These costs are discussed at the end of this subsection of the RIA.

§ 30.85  *When a loan is eligible for a targeted forgiveness opportunity.*

This provision provides the Secretary with discretionary waiver authority that, if exercised, would create costs in the form of transfers between the Department and borrowers who see some or all of their outstanding loan balances waived. It would also provide benefits to borrowers by granting them relief for which they would otherwise have to apply. This automatic relief would also provide benefits to the

Department because it would no longer need to pay to service loans that could otherwise be forgiven and could apply relief automatically instead of on an individual basis. This provision would also create some administrative costs for the Department to implement this provision. Administrative costs are discussed in a separate section at the end of this subsection of the RIA.

For borrowers, the benefits would be most felt by the individuals who are least likely to apply for relief, because we anticipate that borrowers who are aware of the targeted forgiveness opportunities will successfully apply for them. The Department anticipates that

the benefits of this provision will be most felt by borrowers who are at the greatest risk of default and delinquency because those are the borrowers who are the least engaged with the student loan system. Comparisons of borrowers who successfully applied for relief versus those who received it through automatic action highlight the extent to which more at-risk borrowers get left behind by a process that requires borrowers to apply. For instance, past studies of closed school loan discharges by GAO found that the borrowers who did not

apply for this relief and instead received an automatic discharge were far more likely to be in default than those who successfully applied.[92]

Table 3.8 reports estimates of the number of and characteristics of borrowers who would be eligible for a waiver under § 30.85. To estimate the potential effect of § 30.85 we looked at borrowers who are eligible but have not applied for a closed school loan discharge. This is the forgiveness opportunity where the Department has information in its systems necessary to

determine eligibility and provides a strong source for estimating the number of potential waivers that the Secretary may grant under this provision. The Secretary may grant waivers based on eligibility for other forgiveness programs, but such waivers would depend on the Department obtaining additional information, such as fact-specific indicators of misconduct of colleges or data matches with States or other Federal entities to determine eligibility for PSLF.

TABLE 3.8—ESTIMATED NUMBER AND CHARACTERISTICS OF BORROWERS WHO WOULD BE ELIGIBLE FOR WAIVERS UNDER § 30.85

| | |
|---|---|
| Number of Borrowers Receiving Any Forgiveness Under this Provision | 0.26 M |
| Of Those Receiving Forgiveness, Share Who: | |
| Have Any Parent PLUS Loans | 6% |
| Ever Received a Pell grant* | 73% |
| Ever Had a Default | 39% |
| Age <30 | 25% |
| Age 30–50 | 48% |
| Age 50+ | 27% |
| Highest Level Enrolled: 1st or 2nd Year Undergrad | 66% |
| Highest Level Enrolled: 3+ Year Undergrad | 21% |
| Highest Level Enrolled: Graduate School | 9% |
| Oldest Loan In Repayment <10 Years | 57% |
| Oldest Loan In Repayment 10–20 Years | 24% |
| Oldest Loan In Repayment 20+ Years | 13% |

**Notes:** Results are from analysis of a five percent sample of the student loan portfolio. All numbers are rounded. Borrower is counted if their loan maturity date was within one year after the school's closure date or their loan's disbursement was within one year before the closure date. Borrower's loans are included if they are Direct or federally-managed FFEL loans.

*Pell Grant status is unavailable for most borrowers who entered repayment on their last loan before 1999. As such, these figures may understate the share of borrowers who are Pell Grant recipients.

The Department would also benefit from providing discharges under § 30.85, which would stop the Department from paying for the costs of servicing or collecting loans that are otherwise eligible to be forgiven. In addition, some targeted forgiveness opportunities, such as closed school discharges, include provisions that refund payments for borrowers. Processing refunds is costly and time-consuming for the Department, so providing relief sooner and reducing the number of future unnecessary payments that must be refunded is also more efficient for the Department. Finally, the Department would benefit from providing automatic relief instead of processing individual applications because the more streamlined process reduces administrative burden and costs.

Waivers granted under this section would create some costs. The Department believes the costs associated with the discharges themselves are outweighed by the benefits because this is relief that a borrower would otherwise receive anyway if they

submitted the right paperwork at the right time. To that end, the cost is essentially capturing revenue the Department receives because borrowers are either unaware of certain discharge programs or do not successfully apply.

§ 30.86   Waiver based upon Secretarial actions.

This section provides the Secretary with discretionary waiver authority that, if exercised, would create costs in the form of transfers between the Department and borrowers by providing loan discharges. It would not create any transfers between institutions of higher education and the Department. Relief provided to borrowers under this section would be done as a waiver, which means there would be no liability to seek against an institution.

The waivers granted under this section would provide significant benefits to borrowers. Through this provision, borrowers would no longer have to repay loans they took out to attend programs or institutions that have lost access to Federal student financial aid based on Secretarial actions that determined their program or

institution failed to provide sufficient financial value or failed a student outcomes accountability measure, provided that the borrowers attended the program during the corresponding time period. For instance, the Department would waive outstanding loans taken out by borrowers who were part of cohorts whose data showed their institution or program did not meet required title IV accountability standards because of unacceptably high rates of student loan default, had poor levels of debt compared to the earnings of graduates, or failed to provide graduates a financial return equal to or greater than the earnings of a high school graduate who never pursued postsecondary education. These are loans where at least some significant share of the borrowers are exhibiting either direct signs of struggle or experiencing circumstances, such as excessive debt burdens, that suggest that there is a strong likelihood of inability to repay.

The other waivers that may be provided under this section would similarly benefit borrowers. The

92 https://www.gao.gov/assets/gao-21-105373.pdf.

Department has seen in the past that borrowers who take out loans to attend programs or institutions that engaged in substantial misrepresentations such as lying about crucial issues like expected earnings or job placement rates of graduates or similar indicia often also had high rates of delinquency and default.

These waivers would significantly benefit borrowers by no longer making them repay loans where there is either existing evidence of high rates of default or factors that strongly correlate with challenges in repayment. These waivers would particularly benefit borrowers who are in default, as they would no longer face negative credit reporting, wage garnishment, the seizure of tax refunds, or other forms of enforced collections. Removing these loans from their consumer reports would also likely improve their credit scores since more than 80 percent of these borrowers have

had a default, which could have downstream benefits in terms of securing other forms of credit other than Federal student loans, as well as in other contexts like tenant or employment screening. If this waiver results in the waiver of all of a borrower's defaulted Federal student loans, the borrower may also be able to obtain new loans or Federal grant aid to attend a program or institution that would provide them with better value.

The Department would also benefit from this provision. It would no longer need to pay for the costs of servicing or collecting on loans where borrowers have already demonstrated they are part of cohorts that had high rates of default or are burdened by excessive debt compared to their earnings or have extremely low earnings. The Department is unlikely to fully collect such loans or to do so in a reasonable period. The costs of providing such

discharges may not be as significant as the Department may not be likely to receive significant repayments or collection from these loans. For these reasons, we believe that the costs of these discharges would be outweighed by the benefits.

Table 3.9 below shows the estimated number of borrowers who would be eligible for relief because they attended institutions that failed the cohort default rate metrics between 1992–2020 and subsequently lost eligibility to disburse Federal financial aid.[93] In total, we estimate that less than 0.01 million borrowers who attended schools that failed CDR metrics and then subsequently lost eligibility to disburse title IV aid would be eligible for waivers under this provision. About 30 percent of the borrowers who would experience relief under this provision received a Pell Grant.

TABLE 3.9—ESTIMATED NUMBER AND CHARACTERISTICS OF BORROWERS WHO WOULD BE ELIGIBLE FOR WAIVERS UNDER § 30.86

| | |
|---|---|
| Number of Borrowers Receiving Any Forgiveness Under this Provision: | 0.01 M |
| Of Those Receiving Forgiveness, Share Who: | |
| Have Any Parent PLUS Loans | 6% |
| Ever Received a Pell Grant | 31% |
| Ever Had a Default | 83% |
| Age <30 | 2% |
| Age 30–50 | 29% |
| Age 50+ | 69% |
| Highest Level Enrolled: 1st or 2nd Year Undergrad | 83% |
| Highest Level Enrolled: 3+ Year Undergrad | 10% |
| Highest Level Enrolled: Graduate School | 2% |
| Oldest Loan In Repayment <10 Years | 9% |
| Oldest Loan In Repayment 10–20 Years | 21% |
| Oldest Loan In Repayment 20+ Years | 70% |

**Notes:** Results from a five percent sample of the student loan portfolio. All numbers are rounded. Forgiveness in 2024 is based on having at least one loan with a positive outstanding balance from an institution that failed the CDR metrics since 1998 and was closed or not providing title IV aid to students as of 2002, having a loan from an institution that lost eligibility for Title IV between 1999 and 2014 due to CDR sanctions, or having a loan from an institution that failed the CDR metrics from 2015–2020 and was closed or not providing Title IV aid to students as of 2022. Borrower's loans are included if they are Direct or federally-managed FFEL loans.

\* Pell status is unavailable for most borrowers who entered repayment on their last loan before 1999.

The above estimates in Table 3.9 also do not include borrowers who would be eligible to receive relief because they attend a program that fails GE metrics and loses access to Federal aid. Under the GE accountability framework from the 2023 GE Rule, all certificate and diploma programs at public and private nonprofit institutions and educational programs at for-profit institutions of higher education with a sufficient

number of completers will be assessed annually on whether they meet debt-to-earnings and earnings premium standards. Under those regulations, the Department will hold career training programs accountable for keeping debt affordable and producing economic mobility by revoking eligibility for Federal student aid programs if programs fail metrics in two of three consecutive years.[94] Such actions will

protect future students against unaffordable loan burdens; however, the borrowers whose earnings were captured in the failing debt-to-earnings or earnings premium standards also merit relief. For example, the first two official GE metrics will be published in 2025 and 2026, based on the experiences of students who attended years earlier.[95] If a program fails the same metric in both years, students will

---

[93] For schools that had high CDR metrics prior to 1999 or from 2015 to 2020, we do not have an exact accounting of which of schools were able to successfully appeal their potential sanctions. Therefore, we approximate which schools lost eligibility to disburse Title IV aid by comparing the list to data on Title IV eligibility from the Integrated Postsecondary Education Data System (IPEDS), as of 2002 (for 1992–1998) and 2022 (2015–2020).

[94] There are two key metrics under the GE regulations, a debt-to-earnings (D/E) rate and an earnings premium (EP) test. Programs that fail either metric in a single year will be required to provide warnings to current and prospective students. Programs that fail the same metric in two of three consecutive years will not be eligible to participate in Federal student aid programs. See *https://www2.ed.gov/policy/highered/reg/*

*hearulemaking/2021/gainful-employment-notice-of-final-review-factsheet.pdf.*

[95] Depending on the number of students who completed the program, the cohort period will either be two years or four years. For example, for D/E and EP measure calculations during the 2023–24 award year, the two-year cohort period will be award years 2017–18 and 2018–19 and the four-year cohort period will be award years 2015–16, 2016–17, 2017–18, and 2018–19.

no longer be able to borrow Federal loans or receive Pell Grants to attend that program, but students who attended during the years on which the failing metrics are based would be eligible for relief on their Federal loans under these proposed regulations.

The RIA that accompanied the 2023 GE final regulations estimated that approximately 700,000 students annually are in programs that could fail the standards in the GE rule. After the GE accountability framework goes into effect in 2024, and after programs may start to become ineligible to participate in the title IV, HEA aid programs in 2026, the GE RIA estimates that the number of students in failing programs will gradually decline, reducing the number of students eligible for relief under this provision in the future.

This RIA does not include a separate analysis of the potential effect on borrowers from § 30.86(a)(2). The Department anticipates that waivers that could be granted in these situations would occur on a case-by-case basis. For past cohorts, the number of institutions that lost access to aid under these provisions is generally small. And some of those institutions, such as Marinello Schools of Beauty, have since been covered by actions to discharge groups of loans based upon borrower defense to repayment findings. For future borrowers, the Department cannot predict administrative actions that have yet to occur, so it is not possible to assign a likely cost to future loan cohorts.

Finally, this provision would create small administrative costs for the Department to implement. Administrative costs are discussed separately at the end of this subsection of the RIA.

§ 30.87  *Waiver following a closure prior to Secretarial actions.*

The waivers granted under this section would have transfers, benefits, and costs that are similar to those under § 30.86. However, these elements would affect a distinct group of borrowers who would not be eligible for a waiver under § 30.86 and would only have some overlap with borrowers eligible under § 30.88. These borrowers are in a different situation than borrowers eligible for relief under § 30.86 because they borrowed to attend an institution or program that failed to meet certain outcomes standards or was in the middle of a Secretarial action related to not providing sufficient financial value, but the institution or program closed before the Department completed the action to remove aid eligibility. Similar to § 30.86, this provision would not create any transfers between institutions and the Department because amounts that are waived could not be recouped from the school.

Borrowers would benefit from this provision because they would no longer have to repay loans taken out to attend programs or institutions that had been exhibiting evidence of excessively poor student loan outcomes or otherwise failing to provide sufficient financial value. Loans taken out in these situations are likely to result in higher rates of delinquency and default, meaning that the waivers under this section would provide added benefits such as protecting borrowers from negative credit reporting, the possibility of wage garnishment, tax refund or Social Security benefit seizure, and other forms of enforced collections.

The Department would also benefit from waivers granted under this section. As discussed, these loans are owed by borrowers who are more likely to struggle to repay their debts and the Department may need to incur greater costs to provide the borrowers with more targeted outreach and more help to navigate repayment. If these loans are older, it is also less likely that the Department would be collecting significant sums from the borrowers, reducing the likelihood that the loans will be fully repaid.

As noted above, the costs of this provision would largely come from the transfers granted to borrowers when a loan is discharged. We are not including specific modeling of these transfers because we believe the potential effect of this section would be much smaller than what is captured in § 30.86. We believe the largest effect is likely to be related to borrowers who attended institutions that preemptively closed when cohort default rates were first created, as we have seen few to no schools close in recent years due to impending loss of Federal aid from high default rates. While there are closures that occur before other Secretarial actions are finalized, this occurs more on a case-by-case basis and typically does not occur in large numbers. This provision provides critical benefits to the borrowers who would be eligible for relief, but we do not think it operates on a large enough scale to model.

For example, borrowers who attended programs that failed the previously published GE rates released in 2017, based on the 2015 debt measure year, would be eligible for a waiver under this provision. However, current data limitations related to program information in NSLDS for the cohorts included in those 2017 rates prevent us from estimating the number of borrowers who would be eligible for waivers under this provision.[96]

Finally, this provision would create administrative costs to implement. Administrative costs are discussed separately at the end of this subsection of the RIA.

§ 30.88  *Waiver for closed Gainful Employment (GE) programs with high debt-to-earnings rates or low median earnings.*

Waivers granted under this section would provide transfers, benefits, and costs that are similar to a portion of those that could occur under § 30.87. However, these benefits would affect a distinct group including those that are not otherwise captured under any other provision. The reasons for waivers under this section are also narrower than those in §§ 30.86 and 30.87.

Table 3.10 below shows the estimated number of borrowers who would be eligible for waivers because they attended a program that failed the GE metric for any reason based on the data from the 2015, 2016, and 2017 Award Years released in 2023 along with the GE Rule Regulatory Impact Analysis and also did not have any students who received Title IV aid from 2018 onwards.[97]

---

[96] These data are available *https://studentaid.gov/ sites/default/files/GE-DMYR-2015-Final-Rates.xls.*

[97] The Department released a data file called the 2022 Program Performance Data ("2022 PPD") along with the proposed rule titled "Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB)" available at: *https://www.regulations.gov/ document/ED-2023-OPE-0089-0086.* These data include program performance information, using measures based on the typical debt levels and post-enrollment earnings of program completers.

TABLE 3.10—ESTIMATED NUMBER AND CHARACTERISTICS OF BORROWERS WHO WOULD BE ELIGIBLE FOR WAIVERS UNDER § 30.88

| | |
|---|---|
| Number of Borrowers Receiving Any Forgiveness Under this Provision: | 0.01 M |
| Of Those Receiving Forgiveness, Share Who: | |
| Have Any Parent PLUS Loans | 6% |
| Ever Received a Pell Grant | 78% |
| Ever Had a Default | 33% |
| Age <30 | 15% |
| Age 30–50 | 70% |
| Age 50+ | 15% |
| Highest Level Enrolled: 1st or 2nd Year Undergrad | 60% |
| Highest Level Enrolled: 3+ Year Undergrad | 13% |
| Highest Level Enrolled: Graduate School | 27% |
| Oldest Loan In Repayment <10 Years | 86% |
| Oldest Loan In Repayment 10–20 Years | 14% |
| Oldest Loan In Repayment 20+ Years | 0% |

**Notes:** Results from a five percent sample of the student loan portfolio. All numbers are rounded. Borrower's loans are included if they are Direct or federally-managed FFEL loans.

* Pell Grant status is unavailable for most borrowers who entered repayment on their last loan before 1999. As such, these figures may understate the share of borrowers who are Pell Grant recipients.

The number of students who attended such programs is likely higher than this estimate, but data limitations prevent us from including in this estimate borrowers who attended programs that failed the 2011 Gainful Employment Informational Metrics.[98]

The waivers under this provision would create costs in the form of transfers. Such transfers would go to borrowers who have loans used to enroll in programs that produced results that according to data from the Department show that they had high debt-to-earnings or low earnings premium measures that did not meet basic standards of financial value, but the program closed prior to the issuance of formal GE rates under the new GE rule. While these programs did not have the formal failures that would qualify for a discharge under §§ 30.86 and 30.87, the outcomes are so poor that, when paired with closure, the Department's concerns about borrowers' ability to repay loans from these programs are similar.

The Department would also benefit by waiving these loans. As discussed, these loans are from borrowers who attended programs with data showing that graduates take on more debt than is reasonable or whose earnings are worse than what a high school graduate earns. Borrowers in such situations are more likely to struggle to repay their debts and may incur greater costs for the Department in the form of more targeted outreach and more help to navigate repayment. If these loans are older, it is also less likely that the Department may be collecting significant sums from them, reducing the likelihood that they will

be repaid. Beyond costs in the form of transfers, implementing this provision will come with small administrative costs for the Department. Administrative costs are discussed separately at the end of this subsection of the RIA.

*Part 682—Federal Family Education Loan (FFEL) Program*

*Subpart D—Administration of the Federal Family Education Loan Programs by a Guaranty Agency*

*§ 682.403   Waiver of FFEL Program Loan Debt.*

The costs, benefits, and transfers under proposed § 682.403 would differ slightly depending on whether the loan is currently in repayment or in default at a guaranty agency. For loans in repayment, proposed § 682.403 would result in transfers between the guaranty agency using Federal funds to pay the FFEL loan holder and then assigning that loan to the Department for eventual waiver. The size of this transfer would be equal to the full outstanding balance of the loan owed to private loan holders, plus unpaid interest and fees, as applicable. Such a transfer would not occur for loans in default at a guaranty agency. For these loans, the former private loan holder had already been paid a default claim payment by the guaranty agency using Federal funds. The costs from a transfer would be more directly from the Department to the borrower, as the guaranty agency would assign the loan to the Department, which would then waive the remaining balance.

These waivers would provide significant benefits to borrowers, who would be relieved of their obligation to make further payments on their loans.

For § 682.403(b)(1) the benefits are similar to those provided in § 30.83 for borrowers whose loans are managed by the Department and are at least 25 years old. Such waivers would benefit borrowers who have been unable to fully repay their loans over a reasonable period of time. Such borrowers tend to be older and many of these borrowers have spent time in default. Waiving such loans provides relief to borrowers who have shown persistent challenges with repayment and, in the case of older borrowers, would likely improve their financial stability in their final years.

The benefits of § 682.403(b)(2) are similar to some of those of § 30.85, which provides a waiver for borrowers eligible for a targeted forgiveness opportunity. In this case, only borrowers who would otherwise be eligible for a closed school loan discharge but have not applied would be covered. These borrowers would receive a discharge were they to apply. However, as research from GAO has shown, many borrowers eligible for closed school loan discharges in the past have not successfully applied for this relief, and many of these borrowers end up in default.[99] This provision would benefit such borrowers by granting them relief and ensuring they do not unnecessarily experience default.

The benefits of § 682.403(b)(3), meanwhile, are similar to the benefits that would be available under § 30.86 for borrowers who attend institutions that become ineligible for Federal aid because of high cohort default rates. These waivers would apply to borrowers who are part of cohorts that produced the high rates of default

[98] These data are available at *https://studentaid.gov/data-center/school/ge/data*.

[99] *https://www.gao.gov/assets/gao-21-105373.pdf*.

resulting in title IV ineligibility, meaning many such borrowers are likely either currently in default or have spent time in default in the past. These waivers would significantly benefit borrowers by no longer making them

repay loans where there is existing evidence of borrowers struggling to repay their loans at high rates that exceed the Department's accountability standards. Table 3.11 below shows the number and characteristics of borrowers

who would be eligible for waivers under § 682.403. Of note is the fact that 45 percent of these borrowers ever experienced a default, and we estimate about 30 percent are currently in default.

TABLE 3.11—ESTIMATE OF THE NUMBER AND CHARACTERISTICS OF BORROWERS WHO WOULD BE ELIGIBLE FOR WAIVERS UNDER § 682.403

| | |
|---|---|
| Number of Borrowers Receiving Any Forgiveness Under this Provision | 0.9 M |
| Of Those Receiving Forgiveness, Share Who: | |
| Have Any Parent PLUS Loans | 14% |
| Ever Received a Pell grant * | 19% |
| Ever Had a Default | 45% |
| Age <30 | 0% |
| Age 30–50 | 27% |
| Age 50+ | 73% |
| Highest Level Enrolled: 1st or 2nd Year Undergrad | 24% |
| Highest Level Enrolled: 3+ Year Undergrad | 34% |
| Highest Level Enrolled: Graduate School | 36% |
| Oldest Loan In Repayment <10 Years | 0% |
| Oldest Loan In Repayment 10–20 Years | 0% |
| Oldest Loan In Repayment 20+ Years | 99% |

**Notes:** Results from a five percent sample of the student loan portfolio. All numbers are rounded. Forgiveness is for borrowers with any commercial FFEL loans that entered repayment on July 1, 2000 or earlier, borrowers with at least one commercial FFEL loan with a positive outstanding balance to attend an institution that failed CDR metrics between 1992 and 1998 or 2015 to 2020, and was closed or not providing title IV aid to students as of 2002 or 2022 respectively, or having a loan to attend an institution that lost eligibility for title IV between 1999 and 2014 due to CDR sanctions, or from a school that closed just after, or during, the student's enrollment.

\* Pell status is unavailable for most borrowers who entered repayment on their last loan before 1999.

The Department would benefit from the provisions in § 682.403, as well. Some of these loans have already been in default in the past and may not be repaid. In those cases, taxpayers have already compensated the lender for the default and the debt may not be collected. In addition, and as noted earlier, these provisions are similar to several of the waiver provisions for Department-held loans. The Department benefits from treating borrowers with commercially held FFEL loans in a similar manner as borrowers with ED-held loans because it streamlines providing relief to borrowers who could consolidate into the Direct Loan program and it reduces the Department's need to respond to borrower confusion.

The waivers may also provide some benefits for holders of FFEL loans by fully paying off loans that are either unlikely to ever be repaid or that may not be repaid in a reasonable period. In the years before the FFEL program stopped issuing new loans, many lenders chose to securitize their outstanding loans by issuing asset-backed securities. This approach creates long-term bond obligations that must be repaid using the payments made by borrowers and any subsidies received from the Department. However, the growth in the number of borrowers using the IBR plan to repay these privately held FFEL loans may be resulting in fewer incoming payments

than expected. In 2020, the *Wall Street Journal* reported how some student loan asset-backed securities were extending the anticipated pay off date of the bond by decades, including as much as 54 years to avoid potential write-downs by credit rating agencies.[100] Compensating a lender for outstanding amounts of loans that are not on track to be repaid even after 20 or 25 years since entering repayment may provide a benefit to lenders and bond holders that are otherwise struggling to receive sufficient repayments.

The bulk of the costs from this provision would accrue to the Department by paying guaranty agencies to compensate loan holders for the outstanding value of loans that the Secretary chooses to waive. The Department believes these costs are justified because the benefits to the Department and the borrower to address loans that are unlikely to be fully repaid are significant. In some cases, such as loans owed by borrowers who attended closed schools, these are also debts that could be forgiven otherwise as soon as the borrower submits certain paperwork.

We anticipate administrative expenses associated with the provisions in proposed § 682.403. We think these costs would be reasonable because the provisions in this section largely mirror

existing regulations for processing certain discharges in the FFEL program, which have been used for some time. To that end, loan servicers and guaranty agencies would not need to stand up a whole new process. That means any costs would likely relate to producing the necessary paperwork for a lender to submit a claim to the guaranty agency and for the guaranty agency to process that claim and assign the loan to the Department. The Department would also incur administrative costs to receive and then waive an assigned loan, which are discussed in the separate section on administrative costs at the end of this subsection of the RIA. But this assignment and waiver process would also leverage existing channels. Finally, it is possible that some lenders could face costs from no longer receiving the quarterly special allowance payments (SAP) that are payable to FFEL loan holders on certain loans. These amounts vary based upon when a loan was disbursed and other factors.[101] The extent to which forgoing future SAP payments on a loan represents a cost will depend significantly on whether the loan was otherwise being repaid as expected or not. For example, a loan holder that was receiving lower than anticipated payments due to a borrower being on IBR may be financially better off to have the loan paid off and forgo the SAP

100 https://www.wsj.com/articles/a-borrower-will-be-114-when-bonds-backed-by-her-student-loans-mature-11578393002.

101 https://fsapartners.ed.gov/sites/default/files/2023-01/SAPMemoQ42022.pdf.

payment. A loan that is otherwise being paid down might see some costs due to forgoing SAP. But this would also require factoring in the value of receiving payments today instead of hypothetical future ones.

*Administrative Costs*

These proposed rules would create administrative costs for the Department if the Secretary were to exercise his discretion to provide waivers under any of these sections. These costs are reported as a separate section because they generally represent a set of baseline expenses that the Department would incur. The marginal costs of implementing one change but not another would vary depending on the proposed regulatory section in question. For instance, the marginal cost of implementing § 30.82 on top of § 30.81 is smaller than it would be if the Department were to implement § 30.82 on top of § 30.83. Accordingly, we are presenting an overall estimate, the cost of which would be lower for solely the

provisions related to §§ 30.83 through 30.85. The Department does include a separate discussion for § 682.403, which is a different process that would involve granting a waiver after taking assignment of a loan. We estimate these cumulative costs would be largely split across the 2024 and 2025 fiscal years.

Overall, the Department estimates that the waivers in §§ 30.81 through 30.88 would require one-time administrative expenses of approximately $13.0 million. These costs are associated with changes to Department systems and contractors. In addition, we estimate an additional cost of $18.0 million for waivers associated with § 682.403. This is due to the assumption of a per-borrower cost for processing the waiver on an assigned loan.

*Unduplicated Estimate of the Number of Borrowers Receiving Waivers Because of §§ 30.81 Through 30.88 and Part 682, Subpart D*

The estimates in the above discussion showed the projected effect of each

waiver as a distinct action. An exception to this is the estimate for § 30.82, which does not include borrowers who are eligible in § 30.81. Doing so reflects the separate and independent nature of the provisions and how the rationale behind each is unique. However, it is possible that a given borrower could end up in multiple categories. Therefore, to assist readers in understanding the combined total of these potential waivers, we present Table 3.12 below. This table shows the estimated effect of these provisions in terms of the number of borrowers affected. The total for each provision is included independently, and matches the numbers provided in the tables above. In the last row, we display that 27.6 million unique borrowers, de-duplicated across all provisions, that would receive a waiver. This number removes duplication from the tables that are found elsewhere in this subsection of the RIA.

TABLE 3.12—ESTIMATED NUMBER OF BORROWERS WHO WOULD BE ELIGIBLE FOR WAIVERS UNDER VARIOUS PROVISIONS

| | Number of borrowers (millions) |
|---|---|
| § 30.81   Waiver when the current balance exceeds the balance upon entering repayment for borrowers on an IDR plan | 6.4 |
| § 30.82   Any balance growth Up to $20K | 19.0 |
| § 30.83   Waiver based on time since a loan first entered repayment | 2.6 |
| § 30.84   Waiver when a loan is eligible for forgiveness based upon repayment plan | 1.7 |
| § 30.85   Waiver when a loan is eligible for a targeted forgiveness opportunity | 0.3 |
| § 30.86   Waiver based upon Secretarial actions | <0.1 |
| § 30.88   Waiver for closed Gainful Employment (GE) programs with high debt-to-earnings rates or low median earnings | <0.1 |
| Part 682   Federal Family Education Loan (FFEL) Program Subpart D—Administration of the Federal Family Education Loan Programs by a Guaranty Agency | 0.9 |
| Unique Borrowers across §§ 30.81 through 30.88 and Part 682, Subpart D | 27.6 |

**Notes:** All numbers are rounded.

4. Net Budget Impact

Table 4.1 provides an estimate of the net Federal budget impact of these proposed regulations that are summarized in Table 2.2 of this RIA. This includes both costs of a

modification to existing loan cohorts and costs for loan cohorts from 2025 to 2034. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs

reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. The baseline for estimating the cost of these final regulations is the President's Budget for 2025 (PB2025).

TABLE 4.1—ESTIMATED BUDGET IMPACT OF THE NPRM

[$ in millions]

| Section | Description | Modification score (1994–2024) | Outyear score (2025–2034) | Total (1994–2034) |
|---|---|---|---|---|
| § 30.83 | Loans that first entered repayment 20 or 25 years ago as of FY2025. | 13,762 | ....................... | 13,762 |
| § 30.84 | Eligible for forgiveness on an IDR plan but not currently enrolled in an IDR plan. | 8,663 | ....................... | 8,663 |
| § 30.86 | Took out loans during cohorts that caused school to lose access to aid due to high CDRs. | 15 | ....................... | 15 |
| § 30.85 | Eligible for a closed school loan discharge but has not successfully applied. | 7,565 | ....................... | 7,565 |

TABLE 4.1—ESTIMATED BUDGET IMPACT OF THE NPRM—Continued

[$ in millions]

| Section | Description | Modification score (1994–2024) | Outyear score (2025–2034) | Total (1994–2034) |
|---|---|---|---|---|
| § 30.86–§ 30.88 ...................... | Borrowed to attend a gainful employment program that lost access to aid or closed. | 11,927 | 15,274 | 27,201 |
| § 30.81 .................................... | Current balance exceeds amount owed upon entering repayment for borrowers on an IDR plan with income below certain thresholds. | 10,966 | ....................... | 10,966 |
| § 30.82 .................................... | Current balance exceeds amount owed upon entering repayment for borrowers not on an IDR plan or who are on an IDR plan but have incomes above the thresholds in 30.81. | 62,094 | ....................... | 62,094 |
| § 682.403 ............................... | Commercial FFEL loans that first entered repayment 25 years ago; eligible for a closed school discharge, but have not applied; or loans to attend a school that lost access to aid due to high CDRs, for applicable cohort. | 17,053 | ....................... | 17,053 |

It is possible that borrowers may qualify for more than one provision, but they can only receive one waiver of the full outstanding balance of a loan. Accordingly, the primary budget estimate stacks the scores in the order shown with waivers resulting in the full relief of a loan's outstanding balance evaluated prior to considering waivers related to partial forgiveness of amounts related to balance growth. However, all the relief available to borrowers of FFEL loans is reflected in one estimate after the estimates for the other provisions. The Department believes this stacked estimation is appropriate for the primary estimates of the proposed regulations.

*Methodology for Budget Impact*

The Department estimated the budget impact of the provisions in this draft rule that permits the Secretary to waive some or all of the outstanding balance of loans through changes to the Department's Death, Disability, and Bankruptcy (DDB) assumption that handles a broad range of loan discharges or adjustments, the collections assumption to reflect balance changes on loans that ever defaulted, and the IDR assumption for effects on borrowers in those repayment plans. The projected amount of forgiveness is estimated based on administrative data about the loan portfolio that allows us to identify loans eligible for the various waivers. The DDB assumption is used in the Student Loan Model (SLM) to determine the rate and timing of loan discharges due to the death, disability, bankruptcy, or other discharge of the borrowers. The SLM is designed to calculate cash flow estimates for the Department's Federal postsecondary student loan programs in compliance with the Federal Credit Reform Act (FCRA) and all relevant federal guidance. The SLM calculates

student loan net cost estimates for loan cohorts where a cohort consists of the loans originated in a given budget (fiscal) year. The model operates with input data obtained from historical experience and other relevant data sources. The SLM cash flow components range from origination fees through scheduled principal and interest payments, defaults, collections, recoveries, and fees. The cash flow time period begins with the fiscal year of first disbursement and ends with the fiscal year of the events at the end of the life of the loan: repayment, discharge, or forgiveness.

For each loan cohort, the SLM contains separate DDB rates by loan program, population (Non-Consolidated, Consolidated Not From Default, and Consolidated From Default), loan type, and budget risk group (Two-Year Public and Not-for-Profit, Two-Year Proprietary, Four-Year Freshman and Sophomore, Four-Year Junior and Senior, and Graduate Student). The DDB rate is the sum of several component rates that reflect underlying claims data and assumptions about the effect of policy changes and updated data on future claims activity. In general, DDB claims are aggregated as the numerator by fiscal year of origination and population, program, loan type, risk group, and years from origination until the DDB claims. Zeros are used for any missing categories in the numerator. Net loan amounts are aggregated as the denominator by fiscal year of origination and population, program loan type, and risk group. The DDB rate is simply the ratio of the numerator to the denominator. Because the SLM only allows for DDB rates to be specified up to 30 years from origination, DDB claims occurring more than 30 years after origination are included in the year 30 rate. DDB rates for future cohorts are

forecasted using weighted averages of prior year rates and have a number of additions and adjustment factors built into it to capture policies or anticipated discharges that are not reflected in the processed discharge data yet including adjustments for anticipated increased borrower defense and closed school activity.

For estimates related to waivers granted to borrowers enrolled in IDR repayment plans, the Department has a borrower and loan type level submodel that generates representative cashflows for use in the SLM. This IDR submodel contains information about borrowers' time in repayment, the use of deferments and forbearances, estimated incomes and filing statuses, and annual balances. For these estimates, we also imputed whether the borrower would be eligible for the waivers related to CDR or GE in proposed §§ 30.86 through 30.88. Therefore, we are able to identify the borrowers in the IDR submodel who would be eligible for one of the proposed waivers and incorporate that effect either by ending the payment cycle for borrowers who receive a total balance waiver or eliminating the excess balance for borrowers who would be eligible for waivers under either §§ 30.81 or 30.82.

Partial forgiveness of balances for borrowers already modeled to be on an IDR plan can have three different effects depending upon whether or not the borrower was expected to get IDR forgiveness prior to these waivers, and whether the waiver changes that anticipated outcome. These effects are:

1. Before and after the policy is applied, borrowers are expected to receive some IDR forgiveness at the end of their repayment term. For these borrowers, the waivers would affect the amount ultimately forgiven, but because payments are based upon income and

the amount of time borrowers are expected to repay is unchanged, there is no effect on the amount of anticipated future payments.

2. The borrower was expected to receive IDR forgiveness before the policy's application, but afterward is now expected to pay off their balance before receiving IDR forgiveness. Because these borrowers are now expected to repay in less time, there is some reduction in the amount of anticipated future payments.

3. Before applying the policy, the borrower was expected to retire their loan balance prior to receiving IDR forgiveness, but as a result of the policy is now expected to retire their balance sooner. Because these borrowers are now expected to repay in less time, there is some reduction in the amount of anticipated future payments.

We project that most borrowers modeled to be on IDR would end up in the first group. Since these borrowers would not see a change in the amount they pay before receiving forgiveness, we do not assign a cost to the waivers for these borrowers. Any costs associated with the forgiveness of amounts above the balance owed at repayment entry for IDR borrowers is limited to the minority of borrowers in the second and third groups, for whom the forgiveness reduces the number of payments needed to fully repay their loan. The result is we do not anticipate significant costs for the waivers that would be granted under §§ 30.81 or 30.82 for borrowers in IDR.

We are not assigning an estimated outyear budget cost to the provisions in § 30.84 related to borrowers who are eligible for forgiveness on a repayment plan but have not successfully enrolled in such plan. We already assign a high percentage of future borrowers who would be eligible for forgiveness on an IDR plan as being in an IDR plan, including those with lower balances. Therefore, our assumption is that this provision will only affect borrowers who have already accumulated time in repayment.

For estimates related to the effects of the proposed waiver provisions on borrowers with loans not in IDR plans, the Department's approach is to: (1) estimate the potential waiver amounts borrowers would be eligible for and aggregate them by loan cohort, loan type, and budget risk group used in the SLM; (2) Add the waiver amounts for non-defaulted, non-IDR borrowers to the Department's baseline DDB assumption in FY 2025; and (3) remove the amounts associated with the waiver provisions from defaulted, non-IDR borrowers from the baseline collections assumption.

The revised IDR, DDB and collections groups are run in a SLM scenario for each provision to generate the estimates in Table 4.1. To produce the potential waiver amounts in Step 1 of this process, the Department developed a loan level file based on the FY2022 sample of NSLDS information used for preparing budget estimates. Information from this file allows the evaluation of times in repayment that qualify for one of the provisions and anticipated balances at the end of FY2024 for use in calculating the amount that the Secretary may waive for borrowers who have experienced balance growth.

To help estimate the costs of §§ 30.86 through 30.88, as well as § 682.403(b)(3), the Department reviewed information about institutions that lost eligibility to participate in title IV for CDR and the relevant timeframes for those actions and identified loans that would be eligible for a CDR-based waiver under § 30.86 and § 682.403(b)(3). Similarly, we identified loans for borrowers that entered repayment within a fiscal year of an institution's closure in the list of closed schools and assumed they would be eligible for a total balance waiver under § 30.85 and § 682.403(b)(3).[102] To estimate the effects of § 30.88, similar identification was made of students with outstanding loan balances who attended GE programs that failed the GE metrics based on the data from the 2015, 2016, and 2017 Award Years released in 2023 and did not have any students who received Title IV aid from 2018 onwards, as shown in Table 3.10. Approximately 7.4 percent of loans made by cohort 2024 in our sample qualified for total balance waiver under one of these provisions. The proposed waivers in these three sections are also applicable going forward, but the Department does not estimate a significant cost related to the CDR or closed school waiver provisions. No institutions have lost eligibility based on CDR performance since the 2014 CDR rates and only 28 institutions have lost eligibility on this basis since 1997, so we do not expect this to be a significant source of waivers for future cohorts. We also assume that closed school discharges for future loan cohorts are already captured in our baseline estimates especially given the automatic closed school discharge provision now in effect.[103] Therefore, the primary

source of outyear costs estimated for these provisions is Gainful Employment performance, and a separate process using the results of the model used to estimate the cost of that regulation was used to generate an estimate for cohorts 2021–2034.

These estimates are all based off the same random sample of borrowers that is used for all other budget estimation activity related to Federal student loans for the Department. Currently, the most recent sample available is from the end of FY2022, which is the best currently available data that maintains the Department's consistent scoring practices. The Department recognizes from its general ledger records that there have been a significant number of loan discharges granted since that sample was pulled. This particularly includes forgiveness tied to IDR and PSLF.

In this NPRM, the Department provides our best budget estimates based on the most recent sample used in the required baseline, while noting that this data does not allow the Department to adjust for these recent discharges because they occurred after the date the sample used in that baseline was generated. The Department's PB2025 baseline projects its best estimates of future discharges based on the sample data and other information available when the baseline is developed. As a new sample is drawn and updated balances and loan information are available for analysis, we will incorporate that into the analysis of these waiver provisions in the final rule so that we do not attribute existing discharges to these waivers. For instance, between 2022 and 2023 the Department approved hundreds of thousands of additional discharges for borrowers through fixes to IDR and PSLF as well as automatic relief for borrowers with a total and permanent disability, and discharges based upon borrower defense findings and covered by related court settlements. These discharges include almost $44 billion in approved discharges for more than 901,000 borrowers through IDR, approximately 200,000 borrowers through a court settlement, and more than 150,000 borrowers through PSLF. The discharges also include a few tens of thousands of borrowers through total and permanent disability discharges. The Department also approved roughly 10,000 new discharges based upon borrower defense to repayment findings

---

[102] Federal Student Aid, *Closed School Search File.xlsx* downloaded 2/15/2024 from *https://www2.ed.gov/offices/OSFAP/PEPS/closedschools.html.*

[103] These provisions are currently administratively stayed pending appeal in *Career Colleges and Schools of Texas* v. *U.S. Department*

*of Education*, No. 23–50491 (5th Cir.). Because the rule has not been permanently enjoined nor has a court found that the challenge to the rule is likely to succeed on the merits, the Department maintains this assumption for these purposes.

and continued processing relief for previously approved discharges.

While the Department's best estimates based on the most recent sample cannot adjust for such discharges for the reasons explained above, we can anticipate these different types of discharges are most likely to affect certain provisions. Discharges through income-based repayment could primarily reduce the costs of § 30.83; those for PSLF could primarily affect the cost of § 30.81; and those for borrower defense and other types of discharges could primarily affect § 30.82 because these borrowers are less likely to be on an IDR plan, or they could affect the costs of §§ 30.85 through 30.88 because some of these borrowers may have otherwise been eligible for a closed school loan discharge or attended programs that failed to provide sufficient financial value because they failed to meet standards of debt-to-earnings or earnings premium and have closed. We anticipate having a more recent sample for FY2023 available by the time we write a final rule. As a result, we anticipate that final rule would reflect those discharges that have already occurred, which may affect the results in the net budget estimate for the final rule.

*Gainful Employment*

The Department used the information about projected passage and failure rates of GE programs (also described as program transition rates) in the 2023 final GE regulation [104] along with enrollment and average loans in the associated categories and respective years to calculate the total amount of Federal loans that students in programs that fail GE metrics will get relief from 2021–2034 under § 30.86. In our modeling we do not project that institutions will voluntarily close programs prior to a failure or other Secretarial action based on failing to deliver sufficient financial value, so we

do not include any modeling for § 30.87. The rates for 2026 represent the program transition rates before the second GE metrics will be published and programs could lose eligibility for students who attend to borrow Federal loans and receive Pell Grants. For our budget estimate, the time frame for applying these rates was extended back to 2021 to account for students who attended during the years on which the metrics are based and would subsequently get relief on their associated Federal loans. As done in the analyses of the 2014 and 2023 GE regulations, the Department assumes institutions at risk of warning or sanction would take at least some steps to improve program performance by improving program quality, increasing job placement and academic support staff, and lowering prices (leading to lower levels of debt). Evidence and further discussion of this can be found in the 2023 GE regulation. Therefore, the rates for 2027 to 2033 represent the program transition rates after programs could be sanctioned and reflect an increase in the probability of having a passing result. In this analysis, the rates for 2027 to 2033 were used in calculating the amount of total relief for cohorts 2027 to 2034, extending to the last outyear of the current budget window.

To calculate the percent of enrollment by program type, performance category, and cohort that would receive relief, the program transition rates for the given year were transformed to account for students whose loans would be eligible for forgiveness in that year, in the next year, and two years out. These percents are shown below in Table 4.2. For all enrollment at programs that fail for a second time and are deemed to become ineligible moving forward, students in qualifying cohorts would be eligible to receive relief on their associated loans to attend those programs, which is indicated by the 100 percent for pre-ineligible programs. To estimate the

percent of enrollment at programs with one failure (for D/E, EP, or both) whose students would be eligible for forgiveness in the next year, the rate of one failure was multiplied by the rate of a following second failure that would cause the program to become ineligible moving forward. To estimate the percent of enrollment at programs that are passing in a given year but whose students would be eligible to receive relief in two years, the rate of a passing program getting a failure in the next cycle was multiplied by the rate of it failing again. For example, the program transition assumptions for GE programs in the 2023 GE rule [105] shows that for 4-year programs in 2027, the rate of passing programs expected to fail D/E, EP, or both in the next year are 3.1 percent, 0 percent, and 0.2 percent, respectively. The rates of each of these paths for a passing program to fail a metric in the following year were multiplied by the rates of the program failing the same or both metrics again and becoming ineligible, 73.5 percent for EP, 87.7 percent for DE, and 89.6 percent for both. Once those two sets of rates are multiplied by their failure status and summed together, the final estimate for the percent of enrollment at passing programs in 2027 to become eligible for relief in 2 years is 2.5 percent, calculated by ((3.1 percent * 73.5 percent) + (0 percent * 87.7 percent) + (0.2 percent * 89.6 percent)). Last, students at programs that were already deemed ineligible in the past would not receive Federal aid to attend and therefore not be eligible to receive relief on those loans, which is indicated by the 0 percent for ineligible programs. These percentages were multiplied by the enrollment and average loans calculated in the 2023 GE regulation in the associated categories (loan type and budget risk group) and respective years (cohorts 2021–2026 and 2027–2034) to calculate the total loans that would be eligible for relief under § 30.86.

TABLE 4.2—PERCENT OF ENROLLMENT THAT WOULD BE ELIGIBLE FOR RELIEF BY PROGRAM TYPE AND PERFORMANCE CATEGORY

|  | 2021–2026 | 2027–2034 |
|---|---|---|
| Proprietary 2-year or less |  |  |
| Pass | 7.8 | 5.3 |
| Fail D/E only | 81.2 | 76.2 |
| Fail EP only | 89.2 | 84.2 |
| Fail Both | 96.6 | 91.6 |
| Pre-Ineligible | 100.0 | 100.0 |
| Ineligible | 0.0 | 0.0 |
| Public and Nonprofit 2-year or less |  |  |
| Pass | 2.2 | 0.8 |
| Fail D/E only | 39.5 | 34.5 |

[104] 88 FR 70158 (October 10, 2023).    [105] 88 FR 70158 (October 10, 2023).

TABLE 4.2—PERCENT OF ENROLLMENT THAT WOULD BE ELIGIBLE FOR RELIEF BY PROGRAM TYPE AND PERFORMANCE CATEGORY—Continued

|  | 2021–2026 | 2027–2034 |
|---|---|---|
| Fail EP only | 52.7 | 47.7 |
| Fail Both | 70.9 | 65.9 |
| Pre-Ineligible | 100.0 | 100.0 |
| Ineligible | 0.0 | 0.0 |
| 4-year |  |  |
| Pass | 4.7 | 2.5 |
| Fail D/E only | 78.6 | 73.6 |
| Fail EP only | 96.5 | 91.3 |
| Fail Both | 94.6 | 89.6 |
| Pre-Ineligible | 100.0 | 100.0 |
| Ineligible | 0.0 | 0.0 |
| Graduate |  |  |
| Pass | 2.4 | 0.4 |
| Fail D/E only | 80.1 | 75.1 |
| Fail EP only | 0.0 | 0.0 |
| Fail Both | 91.3 | 86.3 |
| Pre-Ineligible | 100.0 | 100.0 |
| Ineligible | 0.0 | 0.0 |

Once estimated, the dollar amounts of forgiveness from this gainful employment performance metric is aggregated by cohort, loan type, and budget risk group and divided by the net loan volume for those same categories. This generated an adjustment factor based on the modeled future GE rate performance that is added to the PB2025 baseline DDB rate. To get the full potential cost of the GE related provisions, those increased DDB rates were fed into the second step of the main estimation process for the non-IDR estimate so that the combined effects on DDB can be loaded as one DDB assumption group in the SLM as increased DDB rates. This resulted in the increase in costs associated with the gainful employment provision of approximately $27.2 billion for cohorts 1994–2034.

*Budget Impact Sensitivities*

While the primary estimates presented in Table 4.1 are based on the best data the Department has available currently, we recognize some of the impacts depend on borrower action in the period since our data was extracted and the implementation of the proposed waiver provisions. One effect is the response of programs and institutions if they have a program that fails the GE regulations. The primary estimate includes assumptions that some failing programs improve and therefore do not fail again and lose access to title IV, HEA programs. In the alternative budget scenario, we model the effects if there is no improvement by failing GE programs. We use the results of that scenario from the gainful employment final rule to estimate the higher outyear costs displayed in Table 4.3.

Another modeling assumption that affects the net budget impact of the proposed waivers relates to the payment behavior of borrowers in FY 2024. Payments and interest have resumed following the multi-year COVID–19 payment pause and the extent to which borrowers do not make payments and accumulate additional interest or make payments and therefore reduce interest that has already accumulated will affect the net budget impact. The Department has looked at payment reports from the initial months since the return to repayment and looked at the percentage of outstanding balances in repayment were less than 31 days delinquent. In the primary net budget impact score, we assumed that half of the borrowers that were more than 31 days late in the non-IDR, non-defaulted part of our sample would start to make payments prior to the rule taking effect and did not add additional interest to their balance. For this alternative, we added a year of interest to all borrowers in deferment, forbearance, or over 30 days delinquent statuses to estimate the effect of this payment behavior factor.

TABLE 4.3—ALTERNATE BUDGET SCENARIOS

| Alternative scenario | Description | Modification score (1994–2024) | Outyear score (2025–2034) | Total (1994–2034) |
|---|---|---|---|---|
| Payers in FY2024 | The estimated balances in FY2024 depend on assumption about borrower payment behavior. This alternative adds a year of interest to the 37% of borrowers not in a good payment status (under 30 days delinquent) in January 2024 payment reporting. This compares to the primary estimate in which half of those borrowers in delinquent, deferred, or forbearance status were treated as paying. | 68,272 | 0 | 68,272 |
| GE No Program Improvement | Uses the No Program Improvement estimate from GE modeling to estimate increased outyear impact from more students being in programs that fail the accountability measures. | 11,927 | 19,835 | 31,762 |

**5. Accounting Statement**

As required by OMB Circular A–4, we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these regulations. Table 5.1 provides our best estimate of the changes in annual monetized transfers that may result from these proposed regulations.

TABLE 5.1—ACCOUNTING STATEMENT: CLASSIFICATION OF ESTIMATED EXPENDITURES

[In millions]

| Category | Benefits |
|---|---|
| Reduction in loans that are unlikely to be repaid in full in a reasonable period ......................................................................... | Not quantified |
| Increased ability for borrowers to repay loans that have grown beyond their balance at repayment entry ...................... | Not quantified |
| Reduced administrative burden for Department due to reduced servicing, default, and collection costs ......................... | Not quantified |

| Category | Costs |
|---|---|
|  | 2% |
| Costs of compliance with paperwork requirements for guaranty agencies and commercial FFEL loan holders .............. | $12.06 |
| One-time administrative costs to Federal government to update systems and contracts to implement the proposed regulations ......................................................................................................................................................................... | 3.4 |

| Category | Transfers |
|---|---|
| Reduced transfers from borrowers due to waivers: ...................................................................................................... | 2% |
| Based on excess balances upon entering repayment of IDR borrowers under income limits in § 30.81 .......................... | 1,197 |
| Based on excess balances upon entering repayment of all borrowers in § 30.82 .......................................................... | 6,777 |
| Based on time in repayment in § 30.83 ......................................................................................................................... | 2,893 |
| Based on eligibility for forgiveness in IDR in § 30.84 .................................................................................................... | 945 |
| Based on eligibility for forgiveness from Closed School in § 30.85 ............................................................................... | 826 |
| Based on eligibility for forgiveness from CDR in § 30.86 .............................................................................................. | 2 |
| Based on eligibility for forgiveness from GE in § 30.86–§ 30.88 ................................................................................... | 2,848 |
| Based on provisions affecting commercial FFEL borrowers in § 682.403 ....................................................................... | 1,861 |

Expenditures are classified as transfers from the Federal government to affected student loan borrowers.

**6. Alternatives Considered**

The Department considered the option of not proposing these regulations. However, we believe these rules are important to inform the public about how the Secretary would exercise his longstanding authority related to waiver in a consistent manner. The Department thinks foregoing these proposed regulations would reduce transparency about the Secretary's discretionary use of waiver. For all the reasons detailed above, such waivers would produce substantial, critical benefits for borrowers and the Department, among others, and reduce some costs for the Department as well. Overall, the Department's analysis of costs and benefits weighs in favor of the proposed regulations.

As part of the development of these proposed regulations, the Department engaged in a negotiated rulemaking process in which we received comments and proposals from non-Federal negotiators representing numerous impacted constituencies. These included higher education institutions, legal assistance organizations, consumer advocacy organizations, student loan borrowers, civil rights organizations, state officials, and state attorneys general. Non-Federal negotiators submitted a variety of proposals relating to the issues under discussion.

Information about these proposals is available on our negotiated rulemaking website at *https://www2.ed.gov/policy/ highered/reg/hearulemaking/2023/ index.html.*

In drafting this NPRM, the Department considered many alternatives. For provisions related to waiving balances beyond what a borrower owed upon entering repayment, we considered several ideas that would have provided a capped amount of relief for borrowers that met certain conditions. For instance, during negotiated rulemaking we considered capping the amount of a waiver at $20,000 for borrowers on IDR plans with incomes at or below 225 percent of the Federal poverty guidelines. However, many negotiators raised concerns that the amount of relief granted was too low to fully address the issue of balance growth. They also raised concerns that having such an income cap would miss many middle-income borrowers who have also experienced balance growth and need assistance. We were convinced by these comments that it would be better to provide relief to a wider group of borrowers and instead protect against providing undue benefits to the highest income borrowers, which is reflected in this proposed rule in § 30.81. We thought this approach was superior to alternative ways to address concerns about targeting, such as

providing a sliding scale of relief that would decrease as income rises. We were concerned that such an approach would be operationally complicated and confusing to explain to borrowers. Similarly, we considered providing up to $10,000 in relief for borrowers not on an IDR plan or whose incomes were above a certain threshold as opposed to the $20,000 limit proposed in this draft rule. However, we were persuaded during negotiated rulemaking that a relief threshold of $10,000 would miss providing sufficient assistance to large numbers of borrowers who need the help to successfully manage their debts.

Regarding the waiver in § 30.83 for loans that entered repayment a long time ago, we considered applying the thresholds for shortened time to forgiveness present in the SAVE plan. This provision provides forgiveness after as few as 10 years of payments for borrowers who originally took out $12,000 or less, with a sliding scale of an additional year of payments for each added $1,000 in borrowing. However, we thought such an approach would not be appropriate because this timeline is only available under the SAVE plan. By contrast, the goal of § 30.83 is to address situations where borrowers have been unable to fully repay in a reasonable time and have not even been able to repay in full over an extended period. This extended period is consistent with

the forgiveness timelines on other IDR plans, which provide repayment terms of up to 20 or 25 years.

For the provisions in § 682.403, the Department considered two alternatives. We considered permitting waivers for loans that first entered repayment 20 years ago instead of 25. However, the only IDR plan available to FFEL borrowers provides forgiveness after 25 years, so we did not think it was appropriate to select a forgiveness period that is otherwise unavailable for these borrowers. We also considered including a provision similar to § 30.84 for borrowers who are eligible for but haven't applied for IBR. However, we do not believe we would have the data to make such a determination so did not include it.

### 7. Regulatory Flexibility Act

The Secretary certifies, under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), that this final regulatory action would not have a significant economic impact on a substantial number of "small entities."

These regulations will not have a significant impact on a substantial number of small entities because they are focused on arrangements between the borrower and the Department. They do not affect institutions of higher education in any way, and these entities are typically the focus on the Regulatory Flexibility Act analysis. As noted in the Paperwork Reduction Act section, burden related to the final regulations will be assessed in a separate information collection process and that burden is expected to involve individuals more than institutions of any size.

### 8. Paperwork Reduction Act

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps provide that: the public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Proposed § 682.403 in this NPRM contains information collection requirements. Under the PRA, the Department would, at the required time, submit a copy of these sections and an Information Collections Request to the Office of Management and Budget (OMB) for its review.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number. In the final regulations, we would display the control numbers assigned by OMB to any information collection requirements proposed in this NPRM and adopted in the final regulations.

*Section 682.403—Waiver of FFEL Program loan debt.*

*Requirements:* The NPRM proposes to amend part 682 by adding a new § 682.403 to allow the Secretary to waive specific Federal Family Education Loan (FFEL) Program loans held by private lenders or managed by guaranty agencies.

In the case of FFEL Program loans held by a private loan holder or a guaranty agency, under proposed § 682.403(a) the Secretary may waive the outstanding balance of a FFEL Program loan when a loan first entered into repayment on or before July 1, 2000; when the borrower is otherwise eligible for, but has not successfully applied for, a closed school discharge; or when the borrower attended an institution that lost its title IV eligibility due to a high CDR, if the borrower was included in the cohort whose debt was used to calculate the CDR or rates that were the basis for the institution's loss of eligibility. If the Secretary chose to exercise his discretion under this section, the Secretary would notify the lender that a loan qualifies for a waiver and the lender would be instructed to submit a claim to the guaranty agency. The guaranty agency would pay the claim, be reimbursed by the Secretary, and assign the loan to the Secretary. After the loan is assigned, the Secretary would grant the waiver.

Sections 682.403(c), and (d) describe the specific requirements of the waiver claim filing process for a lender, and guaranty agency, with the Department.

Section 682.403(c) *Notification* provides that if the Secretary determines that a loan qualifies for a waiver, the Secretary notifies the lender and directs the lender to submit a waiver claim to the applicable guaranty agency and to suspend collection activity or to maintain suspension of collection activities on the loan.

Section 682.403(d) *Claim Procedures* describes the waiver claim procedures. Under proposed § 682.403(d)(1), the guaranty agency would be required to establish and enforce standards and procedures for the timely filing of waiver claims by lenders.

Proposed § 682.403(d)(2) would require the lender to submit a claim for the full outstanding balance of the loan to the guaranty agency within 75 days of the date the lender received the notification from the Secretary. Under proposed § 682.403(d)(3), the lender would be required to provide the guaranty agency with an original or a true and exact copy of the promissory note and the notification from the Secretary when filing a waiver claim. Proposed § 682.403(d)(4) would allow a lender to provide alternative documentation deemed acceptable to the Secretary if the lender is not in possession of an original or true and exact copy of the promissory note.

Proposed §§ 682.403(d)(5) and (d)(6) would require the guaranty agency to review the waiver claim and determine whether it meets the applicable requirements. If the guaranty agency determines that the claim meets the requirements specified in proposed §§ 682.403(d)(3) and 682.403(d)(4) the guaranty agency would be required to pay the claim within 30 days of the date the claim was received.

Proposed § 682.403(d)(9)(i) would require the guaranty agency to assign the loan to the Secretary within 75 days of the date the guaranty agency pays the claim and receives the reimbursement payment. If the guaranty agency is the loan holder, under proposed § 682.403(d)(9)(ii) the guaranty agency would be required to assign the loan on the date that the guaranty agency receives the notice from the Secretary.

*Burden Calculations*

§ 682.403(d)(1)   *Claim Procedures.* The proposed regulatory changes would add burden to lenders and guaranty agencies and would require a new collection in the Federal Student Aid information collection catalog. As noted in Table 3.11 in this RIA and explained in the costs, benefits, and transfers section, we currently estimate that approximately 900,000 commercial FFEL borrowers would qualify for this waiver claim. Of these, an estimated 300,000 are currently in default at a guaranty agency and therefore are not affected by the claim procedures related to lenders. These waivers affect the current 314 lenders (268 For-Profit and 46 Not-For-Profit) and the current 12

guaranty agencies (6 Not-For-Profit and 6 Public). Among those 12 guaranty agencies we estimate that about 80 percent of borrowers would be processed by Not-For-Profit guarantors and 20 percent would be processed by Public guarantors. The costs are estimated using the median hourly wage of $31.60 reported by the Bureau of Labor Statistics for loan officers.[106] We estimated the number of hours needed per task in the sections below based upon discussions with Department staff that have worked on similar processes in the past. These figures and considerations are the basis for the following estimations.

The proposed regulations in § 682.403(d)(1) *Claim Procedures* would require the 12 guaranty agencies to establish and enforce standard procedures of timely waiver filing by affected lenders.

We estimate that these procedures would follow the current discharge processes that guaranty agencies utilize, therefore minimizing development of the new procedures. We estimate that it would take each guaranty agency two hours to draft the required standard procedures for a total of 24 hours (12 guaranty agencies × 2 hours).

### § 682.403(d)(1) CLAIM PROCEDURES—OMB CONTROL NUMBER 1845–NEW

| Affected entity | Respondent | Responses | Burden hours | Cost $31.60 per hour |
|---|---|---|---|---|
| Private non-profit | 6 | 6 | 12 | $379 |
| Public | 6 | 6 | 12 | 379 |
| Total | 12 | 12 | 24 | 758 |

§§ 682.403(d)(2), (3), and (4) *Claim Procedures.*

The proposed regulations in §§ 682.403(d)(2), (3), and (4) *Claim Procedures* would require affected lenders to submit claims to the guaranty agencies based on the notification received from the Department as established in § 682.403(c) within seventy-five days of receiving the notification. The documentation includes the original or a true and exact copy of the promissory note, and the notification received from the Department. If a lender does not have the original or true and exact copy of the promissory note, it may submit alternate documentation acceptable to the Secretary.

We are estimating that each lender would require three hours per borrower to gather the required documentation together and prepare to submit the documentation to the appropriate guaranty agency for a total of 1,800,000 hours (600,000 borrowers × 3 hours).

### §§ 682.403(d)(2), (3), AND (4) CLAIM PROCEDURES—OMB CONTROL NUMBER 1845–NEW

| Affected entity | Respondent | Responses | Burden hours | Cost $31.60 per hour |
|---|---|---|---|---|
| Private non-profit | 46 | 90,000 | 270,000 | $8,532,000 |
| For-profit | 268 | 510,000 | 1,530,000 | 48,348,000 |
| Total | 314 | 600,000 | 1,800,000 | 56,880,000 |

§ 682.403(d)(5) *Claim Procedures.*

The proposed regulations in § 682.403(d)(5) *Claim Procedures* would require affected guaranty agencies to review the waiver claim and supporting documentation from the lenders to determine that the document meets the requirements of §§ 682.403(d)(3), and (4).

We estimate that it would take each guaranty agency one hour to review the incoming documentation for a total of 600,000 hours (600,000 borrower documentation files × 1 hour).

### § 682.403(d)(5) CLAIM PROCEDURES—OMB CONTROL NUMBER 1845–NEW

| Affected entity | Respondent | Responses | Burden hours | Cost $31.60 per hour |
|---|---|---|---|---|
| Private non-profit | 6 | 480,000 | 480,000 | $15,168,000 |
| Public | 6 | 120,000 | 120,000 | 3,792,000 |
| Total | 12 | 600,000 | 600,000 | 18,960,000 |

§ 682.403(d)(6) *Claim Procedures.*

The proposed regulations in § 682.403(d)(6) *Claim Procedures* would require affected guaranty agencies, after determining waiver claims submitted by the lender meet the regulatory requirements, to pay the waiver claim to the lenders within 30 days of receipt of the waiver claim.

We estimate that it would take each guaranty agency 20 minutes to prepare and submit the payment for a total of 198,000 hours (600,000 borrower waiver claim payment × .33 hours).

---

[106] *https://www.bls.gov/oes/current/ oes132072.htm.*

§ 682.403(d)(6) Claim Procedures—OMB Control Number 1845–NEW

| Affected entity | Respondent | Responses | Burden hours | Cost $31.60 per hour |
|---|---|---|---|---|
| Private non-profit ................................................ | 6 | 480,000 | 158,400 | $5,005,440 |
| Public ................................................ | 6 | 120,000 | 39,600 | 1,251,360 |
| Total ................................................ | 12 | 600,000 | 198,000 | 6,256,800 |

§ 682.403(d)(9) *Claim Procedures.* The proposed regulations in § 682.403(d)(9) *Claim Procedures* would require affected guaranty agencies to assign a loan that it paid through the waiver claim process within 75 days of the date that it pays the waiver claim to the lender or the date of notification from the Department if the guaranty agency is the lender.

We estimate that it would take each guaranty agency one hour to assign the loans which have been paid through the waiver claim process or that was otherwise already at the guarantor for a total of 900,000 hours (900,000 borrower documentation files × 1 hour).

§ 682.403(d)(9) Claim Procedures—OMB Control Number 1845–NEW

| Affected entity | Respondent | Responses | Burden hours | Cost $31.60 per hour |
|---|---|---|---|---|
| Private non-profit ................................................ | 6 | 720,000 | 720,000 | $22,752,000 |
| Public ................................................ | 6 | 180,000 | 180,000 | 5,688,000 |
| Total ................................................ | 12 | 900,000 | 900,000 | 28,440,000 |

Consistent with the discussions above, the following chart describes the sections of the proposed regulations involving information collections, the information being collected and the collections that the Department would submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the information collections. The monetized net cost of the increased burden for institutions, lenders, guaranty agencies and students, using wage data developed using Bureau of Labor Statistics (BLS) data. For institutions, lenders, and guaranty agencies we have used the median hourly wage for Loan Officers, $31.60 per hour according to BLS. *https://www.bls.gov/oes/current/oes132072.htm.*

COLLECTION OF INFORMATION

| Regulatory section | Information collection | OMB control No. and estimated burden | Estimated cost $31.60 per hour |
|---|---|---|---|
| § 682.403(d)(1) ...................... | Under proposed § 682.403(d)(1) the guaranty agency would be required to establish and enforce standards and procedures for the timely filing of waiver claims by lenders. | 1845–NEW; 24 hours ............ | $758 |
| § 682.403(d)(2), (3), & (4) ...... | The proposed regulations in 682.403(d)(2), (3), and (4) *Claim Procedures* would require affected lenders to submit claims to the guaranty agencies based on the notification received from the Department as established in 682.403(c) within seventy-five days of receiving the notification. The documentation includes the original or a true and exact copy of the promissory note, and the notification received from the Department. If a lender does not have the original or true and exact copy of the promissory note, it may submit alternate documentation acceptable to the Secretary. | 1845–NEW; 1,800,000 .......... | 56,880,000 |
| § 682.403(d)(5) ...................... | The proposed regulations in 682.403(d)(5) *Claim Procedures* would require affected guaranty agencies to review the waiver claim and supporting documentation from the lenders to determine that the document meets the requirements of 682.403(d)(3), and (4). | 1845–NEW; 600,000 ............ | 18,960,000 |
| § 682.403(d)(6) ...................... | The proposed regulations in 682.403(d)(6) *Claim Procedures* would require affected guaranty agencies, after determining waiver claims submitted by the lender meet the regulatory requirements, to pay the waiver claim to the lenders within thirty days of receipt of the waiver claim. | 1845–NEW; 198,000 ............ | 6,256,800 |

COLLECTION OF INFORMATION—Continued

| Regulatory section | Information collection | OMB control No. and estimated burden | Estimated cost $31.60 per hour |
|---|---|---|---|
| § 682.403(d)(9) ...................... | The proposed regulations in 682.403(d)(9) *Claim Procedures* would require affected guaranty agencies to assign a loan that it paid through the waiver claim process with- in seventy-five days of the date that it pays the waiver claim to the lender or the date of notification from the Department if the guaranty agency is the lender. | 1845–NEW; 900,000 ............. | 28,440,000 |
| Total ................................. | ................................................................................................. | 1845–NEW; 3,498,024 .......... | 110,537,588 |

If you wish to review and comment on the Information Collection Requests, please follow the instructions in the **ADDRESSES** section of this notification. Note: The Office of Information and Regulatory Affairs in OMB and the Department review all comments posted at *www.regulations.gov.*

In preparing your comments, you may want to review the Information Collection Request, including the supporting materials, in *www.regulations.gov* by using the Docket ID number specified in this notification. This proposed collection is identified as proposed collection 1845–NEW.

We consider your comments on these proposed collections of information in—

• Deciding whether the proposed collections are necessary for the proper performance of our functions, including whether the information will have practical use.

• Evaluating the accuracy of our estimate of the burden of the proposed collections, including the validity of our methodology and assumptions.

• Enhancing the quality, usefulness, and clarity of the information we collect; and

• Minimizing the burden on those who must respond.

Consistent with 5 CFR 1320.8(d), the Department is soliciting comments on the information collection through this document. Between 30 and 60 days after publication of this document in the **Federal Register**, OMB is required to make a decision concerning the collections of information contained in these proposed priorities, requirements, definitions, and selection criteria. Therefore, to make certain that OMB gives your comments full consideration, it is important that OMB receives your comments on these Information Collection Requests by May 17, 2024.

**9. Intergovernmental Review**

This program is subject to Executive Order 12372 and the regulations in 34 CFR part 79. One of the objectives of the Executive Order is to foster an intergovernmental partnership and a strengthened Federalism. The Executive order relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

This document provides early notification of our specific plans and actions for this program.

**10. Assessment of Education Impact**

In accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e–4, the Secretary particularly requests comments on whether these final regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

**11. Federalism**

Executive Order 13132 requires us to provide meaningful and timely input by State and local elected officials in the development of regulatory policies that have Federalism implications. ''Federalism implications'' means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The proposed regulations do not have Federalism implications.

*Accessible Format:* On request to the program contact person(s) listed under **FOR FURTHER INFORMATION CONTACT,** individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register.** You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Adobe Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 30*

Claims, Income taxes.

*34 CFR Part 682*

Administrative practice and procedure, Colleges and universities, Loan programs-education, Reporting and recordkeeping requirements, Student aid, Vocational education.

**Miguel A. Cardona,**

*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary of Education proposes to amend parts 30 and 682 of title 34 of the Code of Federal Regulations as follows:

**PART 30—DEBT COLLECTION**

■ 1. The authority citation for part 30 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3(a)(1), and 1226a–1, 31 U.S.C. 3711(e), 31 U.S.C. 3716(b) and 3720A, unless otherwise noted.

■ 2. Section 30.1 is amended by:
■ a. Revising paragraph (a)(2).
■ b. Revising paragraph (b).
■ c. Redesignating paragraphs (c)(7) and (c)(8) as paragraphs (c)(8) and (c)(9).
■ d. Adding a new paragraph (c)(7).

The additions and revisions read as follows:

**§ 30.1 What administrative actions may the Secretary take to collect a debt?**

(a) * * *

(2) Refer the debt to the Government Accountability Office for collection in accordance with § 30.70(f).

\* \* \* \* \*

(b) In taking any of the actions listed in paragraph (a) of this section, the Secretary complies with the requirements of the Federal Claims Collection Standards (FCCS) at 31 CFR parts 900–904 that are not inconsistent with the requirements of this part.

\* \* \* \* \*

(c) \* \* \*

(7) Waive repayment of a debt under subpart G of this part;

\* \* \* \* \*

■ 3. Add § 30.9 to read as follows:

### § 30.9   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any other person, act, or practice will not be affected thereby.

### § 30.20   [Amended]

■ 4. Section 30.20 is amended by:
■ (a) In paragraph (a)(1)(ii), removing the words "IRS tax refund" and adding, in their place, the words "Treasury Offset Program".
■ (b) In paragraph (b)(2), adding the word "or" after the semicolon.
■ (c) In paragraph (b)(3)(ii), removing the semicolon and the word "or" and adding, in their place, a period.
■ (d) Removing paragraph (b)(4).
■ 5. Section 30.23 is amended by revising paragraph (b)(1) to read as follows:

### § 30.23   How must a debtor request an opportunity to inspect and copy records relating to a debt?

\* \* \* \* \*

(b) \* \* \*

(1) All information provided to the debtor in the notice under § 30.22 or § 30.33(b) that identifies the debtor, the debt, and the program under which the debt arose, together with any corrections of that identifying information; and

\* \* \* \* \*

### § 30.25   [Amended]

■ 6. Section 30.25(c)(1)(ii)is amended by removing the citation "(a)(1)" and adding, in its place, the citation "(a)".

### § 30.27   [Amended]

■ 7. Section 30.27(c) is amended by removing the citation "4 CFR 102.11" and adding, in its place, the citation "31 CFR 901.8".

### § 30.29   [Amended]

■ 8. Section 30.29(a)(3) is amended by removing the citation "4 CFR 102.3"

and adding, in its place, the citation "31 CFR 901.3".

### § 30.30   [Amended]

■ 9. Section 30.30(a)(3) is amended by removing the citation "4 CFR 102.3" and adding, in its place, the citation "31 CFR 901.3".
■ 10. Section 30.33 is amended by revising the section heading to read as follows:

### § 30.33   What procedures does the Secretary follow for Treasury Offset Program offsets?

\* \* \* \* \*

■ 11. Add § 30.39 to read as follows:

### § 30.39   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any other person, act, or practice will not be affected thereby.
■ 12. Section 30.62 is amended by revising paragraphs (a), (b)(1), and (d)(1).

The revisions read as follows:

### § 30.62   When does the Secretary forego interest, administrative costs, or penalties?

(a) For a debt of any amount based on a loan, the Secretary may refrain from collecting interest or charging administrative costs or penalties to the extent that compromise of these amounts is appropriate under the standards for compromise of a debt contained in 31 CFR part 902 or to the extent that waiver of repayment of these amounts is appropriate under § 30.80.

(b) \* \* \*

(1) Compromise of these amounts is appropriate under the standards for compromise of a debt contained in 31 CFR part 902; or

\* \* \* \* \*

(d) \* \* \*

(1) The Secretary has accepted an installment plan under 31 CFR 901.8;

\* \* \* \* \*

■ 13. Add § 30.69 to read as follows:

### § 30.69   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any other person, act, or practice will not be affected thereby.
■ 14. Section 30.70 is amended by revising paragraphs (a)(1), (c)(1), (c)(2), and (e)(1) as follows:

### § 30.70   How does the Secretary exercise discretion to compromise a debt or to suspend or terminate collection of a debt?

(a)(1) The Secretary may use the standards in the FCCS, 31 CFR part 902,

to determine whether compromise of a debt is appropriate if the debt arises under a program administered by the Department, unless compromise of the debt is subject to paragraph (b) of this section.

\* \* \* \* \*

(c)(1) The Secretary may use the standards in the FCCS, 31 CFR part 903, to determine whether suspension or termination of collection action on a debt is appropriate.

(2) Except as provided in paragraph (e) of this section, the Secretary—

\* \* \* \* \*

(e)(1) Subject to paragraph (e)(2) of this section, under the provisions of 31 CFR part 902 or 903, the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the Federal Family Education Loan Program authorized under title IV, part B, of the HEA, the William D. Ford Federal Direct Loan Program authorized under title IV, part D of the HEA, the Perkins Loan Program authorized under title IV, part E, of the HEA, or the Health Education Assistance Loan Program authorized under sections 701–720 of the Public Health Service Act, 42 U.S.C. 292–292o.

■ 15. Add § 30.79 to read as follows:

### § 30.79   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any other person, act, or practice will not be affected thereby.

■ 16. Add subpart G to read as follows:

### Subpart G—Waiver of Federal Student Loan Debts

Sec.
30.80   Waiver of Federal student loan debts.
30.81   Waiver when the current balance exceeds the balance upon entering repayment for borrowers on an IDR plan.
30.82   Waiver when the current balance exceeds the balance upon entering repayment.
30.83   Waiver based on time since a loan first entered repayment.
30.84   Waiver when a loan is eligible for forgiveness based upon repayment plan.
30.85   Waiver when a loan is eligible for a targeted forgiveness opportunity.
30.86   Waiver based upon Secretarial actions.
30.87   Waiver following a closure prior to Secretarial actions.
30.88   Waiver for closed Gainful Employment programs with high debt-to-earnings rates or low median earnings.
30.89   Severability.

## §30.80  Waiver of Federal student loan debts.

The Secretary may waive all or part of any debts owed to the Department arising under the Federal Family Education Loan Program authorized under title IV, part B, of the HEA, the William D. Ford Federal Direct Loan Program authorized under title IV, part D, of the HEA, the Federal Perkins Loan Program authorized under title IV, part E, of the HEA, and the Health Education Assistance Loan Program authorized by sections 701–720 of the Public Health Service Act, 42 U.S.C. 292–292o, under the conditions included in, but not limited to, §§ 30.81 through 30.88.

## §30.81  Waiver when the current balance exceeds the balance upon entering repayment for borrowers on an IDR plan.

(a) Pursuant to the authority to waive debt that the Secretary is unable to collect in full under the standards prescribed in 31 U.S.C. 3711(d), and subject to paragraphs (b) and (c) of this section, the Secretary may waive one time the amount by which each of a borrower's loans has a total outstanding balance that exceeds—

(1) The original principal balance of that loan for loans disbursed before January 1, 2005;

(2) The balance of that loan on the day after the end of its grace period for loans disbursed on or after January 1, 2005;

(3) The balance of a Federal or Direct Parent and Graduate PLUS Loan the day after it is fully disbursed; or

(4) The amounts determined under paragraph (a)(1), (2), or (3) of this section, as applicable, for all loans repaid by a Federal Consolidation Loan or a Direct Consolidation Loan.

(b) A borrower is eligible for the waiver described in paragraph (a) of this section if—

(1) The borrower is enrolled in an IDR plan under §§ 682.215, 685.209, or 685.221 as of a date determined by the Secretary; and

(2) The borrower's adjusted gross income, or other calculation of income as shown on documentation of income acceptable to the Secretary, demonstrates that the borrower's annual income as calculated under § 685.209 is either—

(i) Less than or equal to $120,000 if the borrower files a Federal tax return as single or married filing separately);

(ii) Less than or equal to $180,00 if the borrower files a Federal tax return as a head of household; or

(iii) Less than or equal to $240,000 if the borrower is married and files a joint Federal tax return or is a qualifying surviving spouse.

## §30.82  Waiver when the current balance exceeds the balance upon entering repayment.

(a) Subject to paragraph (b) of this section, the Secretary may waive one time the lesser of $20,000 or the amount by which each of a borrower's loans has a total outstanding balance that exceeds—

(1) The original principal balance of that loan for loans disbursed before January 1, 2005;

(2) The balance of that loan on the day after the end of its grace period for loans disbursed on or after January 1, 2005;

(3) The balance of a Federal or Direct Parent and Graduate PLUS Loan the day after it is fully disbursed; or

(4) The amounts determined under paragraphs (a)(1), (2), or (3) of this section, as applicable, for loans repaid by a Federal Consolidation Loan or a Direct Consolidation Loan.

(b) A borrower who has received a waiver under § 30.81 is not eligible for a waiver under paragraph (a) of this section.

## §30.83  Waiver based on time since a loan first entered repayment.

(a) The Secretary may waive the outstanding balance of a loan for a borrower—

(1) Who is repaying only loans received for undergraduate study or a Direct Consolidation Loan that repaid only loans received for undergraduate study if the loan first entered repayment on or before July 1, 2005; or

(2) Who has loans other than loans described in paragraph (a)(1) of this section if the loan first entered repayment on or before July 1, 2000.

(b) For the purpose of this section, a loan enters repayment on—

(1) For a Federal Stafford Loan, a Direct Subsidized Loan, or a Direct Unsubsidized Loan, the day after the initial grace period ends;

(2) For a Federal Parent and Graduate PLUS Loan or a Direct Parent and Graduate PLUS Loan, the day the loan is fully disbursed;

(3) For a Federal Consolidation Loan or Direct Consolidation Loan made before July 1, 2023, the earliest day as determined under paragraphs (c)(1) or (2) of this section for loans that were repaid by that consolidation loan; or

(4) For a Direct Consolidation Loan made on or after July 1, 2023, the latest day as determined under paragraphs (c)(1) or (2) of this section for loans that were repaid by that consolidation loan.

## §30.84  Waiver when a loan is eligible for forgiveness based upon repayment plan.

The Secretary may waive the entire outstanding balance of a loan if the

Secretary determines that a borrower is not enrolled in, but otherwise meets the eligibility requirements for forgiveness under—

(a) An income-based repayment plan under § 682.215 or § 685.221;

(b) An income-contingent repayment plan under § 685.209; or

(c) An alternative repayment plan under § 685.208(l).

## §30.85  Waiver when a loan is eligible for a targeted forgiveness opportunity.

(a) The Secretary may waive the entire outstanding balance of a loan if the Secretary determines that a borrower has not applied or not successfully applied for, but otherwise meets the eligibility requirements for, any loan discharge, cancellation, or forgiveness opportunity under part 682 or 685.

(b) If the conditions for waiver in paragraph (a) of this section are met but the loan has been repaid by a Federal Consolidation Loan or Direct Consolidation Loan that has an outstanding balance, the Secretary may waive the portion of the outstanding balance of the consolidation loan attributable to such loan.

## §30.86  Waiver based upon Secretarial actions.

(a) Subject to paragraph (b) of this section, the Secretary may waive the entire outstanding balance of a loan associated with attending an institution or a program at an institution if the Secretary or other authorized Department official has issued a final decision that terminated the institution or program's participation in the title IV, HEA programs or denied the institution's request for recertification, or the Secretary or other authorized Department official has otherwise determined that the institution or the program in which the student was enrolled is no longer eligible for its students to receive assistance under the title IV, HEA programs and that decision, denial, or determination was due, in whole or in part, to any of the following circumstances:

(1) The program or institution has failed to meet an accountability standard based on student outcomes established under the HEA or its implementing regulations for determining eligibility for participation in the title IV, HEA programs.

(2) The program or institution has failed to deliver sufficient financial value to students, including in situations where the institution or program has engaged in substantial misrepresentations, substantial omissions, misconduct affecting student eligibility, or other similar activities;

this paragraph applies to circumstances when the institution or program has lost accreditation at least in part due to such activities.

(b) The waiver described in paragraph (a) of this section is limited to loans that were borrowed to attend that program or institution during the period that corresponds with the findings or outcomes data that forms the basis for the action described in paragraph (a) of this section, unless the Secretary determines that the use of a different period is appropriate.

(c) If the conditions for waiver in paragraph (a) of this section are met but the loan has been repaid by a Federal Consolidation Loan or Direct Consolidation Loan that has an outstanding balance, the Secretary may waive the portion of the outstanding balance of the consolidation loan attributable to such loan.

### § 30.87   Waiver following a closure prior to Secretarial actions.

(a) Subject to paragraph (b) of this section, the Secretary may waive the entire outstanding balance of a loan associated with attending a program or institution if the program or institution has closed and the Secretary or other authorized Department official has determined that—

(1) Based on the most recent reliable data for that program or institution, the program or institution has not satisfied, for at least one year, an accountability standard based on student outcomes established under the HEA or its implementing regulations for determining eligibility for participation in the title IV, HEA programs; or

(2) The program or institution—

(i) Failed to deliver sufficient financial value to students including in situations where the institution or program has engaged in substantial misrepresentations, substantial omissions, misconduct affecting student eligibility, or other similar activities; this paragraph applies to circumstances when the institution or program has lost accreditation at least in part due to such activities; and

(ii) Is the subject of a program review, investigation, or any other Department action that remains unresolved at the time of closure and that is based, in whole or in part, on the conduct described in paragraph (a)(2)(i) of this section.

(b) The waiver described in paragraph (a) of this section is limited to loans that were borrowed to attend that program or institution during the period that corresponds with the findings or outcomes data that forms the basis for the action described in paragraph (a) of this section, unless the Secretary determines that the use of a different period is appropriate.

(c) If the conditions for waiver in paragraph (a) of this section are met but the loan has been repaid by a Federal Consolidation Loan or Direct Consolidation Loan that has an outstanding balance, the Secretary may waive the portion of the outstanding balance of the consolidation loan attributable to such loan.

### § 30.88   Waiver for closed Gainful Employment programs with high debt-to-earnings rates or low median earnings.

(a) The Secretary may waive the outstanding balance of a loan received by a borrower associated with enrollment in a Gainful Employment (GE) program as described in 20 U.S.C. 1002(b)(1)(A)(i) and (c)(1)(A) if—

(1) The program or institution closed;

(2) The Secretary makes the determination that the program was not a program that prepares students to become a doctor of medicine or osteopathy or a doctor of dental science; and

(3) For the period in which the borrower received loans for enrollment in the program, the Secretary has reliable and available data demonstrating that, for students who received title IV, HEA assistance—

(i)(A) The median annual loan payment of graduates from the program is greater than 20 percent of the median annual earnings for graduates, minus 150 percent of the applicable Federal Poverty Guideline for the year being measured or the denominator of such calculation is zero or negative; and

(B) The median annual loan payment of graduates from the program is greater than eight percent of the median annual earnings for graduates of the program or the denominator of such calculation is zero; or

(ii) The median annual earnings of graduates from the program are equal to or less than the median annual earnings for working adults aged 25–34, who either worked during the year or indicated they were unemployed (*i.e.,* not employed but looking for and available to work) when interviewed, with only a high school diploma (or recognized equivalent)—

(A) In the State in which the institution is located; or

(B) Nationally, if fewer than 50 percent of the students in the program are from the State where the institution is located, or if the institution is a foreign institution.

(b) In determining whether a program meets the requirements under paragraph (a) of this section, the Secretary—

(1) Identifies a program using the program's six-digit CIP code as assigned by the institution or determined by the Secretary, in combination with the institution's six-digit Office of Postsecondary Education ID (OPEID) number and the program's credential level, unless the Secretary does not have reliable and available data at the six digit-level, in which case the Secretary will use the four-digit CIP code;

(2) Calculates the annual loan payment based upon the average of—

(i) The interest rate on Direct Unsubsidized Loans for undergraduate students for the three consecutive award years ending in the latest completion year for the students whose median debt payment is being calculated for graduates of undergraduate certificate programs, post-baccalaureate certificate programs, and associate degree programs; or

(ii) The interest rate on Direct Unsubsidized Loans for graduate students for the three consecutive award years ending in the latest completion year for the students whose median debt payment is being calculated for graduates of graduate certificate programs and master's degree programs; or

(iii) The interest rate on Direct Unsubsidized Loans for undergraduate students for the six consecutive award years ending in the latest completion year for the students whose median debt payment is being calculated for graduates of bachelor's degree programs; or

(iv) The interest rate on Direct Unsubsidized Loans for graduate students for the six consecutive award years ending in the latest completion year for the students whose median debt payment is being calculated for graduates of doctoral programs and first professional degree programs; and

(3) Calculates the median annual earnings of program graduates by considering earnings in the third year subsequent to graduation.

(c) The Secretary may also apply the waiver described in paragraph (a) of this section for loans received for enrollment in a GE program at an institution—

(1) If the institution has since closed;

(2) Prior to the closure, the institution received a majority of its title IV, HEA funds from programs that met the conditions described in paragraph (a)(3) of this section; and

(3) The Secretary did not have data to evaluate the program's performance as described in paragraph (a)(3) of this section.

(d) If the conditions for waiver in paragraph (a) or (c) of this section are met but the loan has been repaid by a

Federal Consolidation Loan or Direct Consolidation Loan that has an outstanding balance, the Secretary may waive the portion of the outstanding balance of the consolidation loan attributable to such loan.

**§ 30.89    Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any other person, act, or practice will not be affected thereby.

## PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

■ 17. The authority citation for part 682 continues to read as follows:

**Authority:** 20 U.S.C. 1071–1087–4, unless otherwise noted.

Section 682.410 also issued under 20 U.S.C. 1078, 1078–1, 1078–2, 1078–3, 1080a, 1082, 1087, 1091a, and 1099.

■ 20. Add § 682.403 to read as follows:

**§ 682.403    Waiver of FFEL Program loan debt.**

(a) *General.* (1) This section specifies the rules and procedures under which—

(i) The Secretary determines that a FFEL Program loan qualifies for a waiver of all or a portion of the outstanding balance and notifies the lender of any such determination;

(ii) The lender submits a waiver claim to the applicable guaranty agency;

(iii) The guaranty agency pays the claim, is reimbursed by the Secretary, and assigns the loan to the Secretary; and

(iv) The Secretary grants the waiver.

(2) For the purposes of this section, references to—

(i) *The lender* includes the guaranty agency if the guaranty agency is the holder of the loan at the time the Secretary determines that the loan qualifies for a waiver, except that the waiver claim filing requirements applicable to the lender do not apply to the guaranty agency; and

(ii) *The guaranty agency* means the guaranty agency that guarantees the loan.

(b) *Determination of qualification for a waiver by the Secretary.* The Secretary may waive the borrower's obligation to repay up to the entire outstanding balance on an FFEL Program loan if the loan qualifies for a waiver under one of the following conditions:

(1) *First entered repayment on or before July 1, 2000.*

(i) The Secretary may waive the outstanding balance of a loan if the loan first entered repayment on or before July 1, 2000.

(ii) For the purpose of this section, a loan enters repayment on—

(A) For a Federal Stafford Loan, the day after the initial grace period ends;

(B) For a Federal PLUS Loan, the day the loan is fully disbursed; or

(C) For a Federal Consolidation Loan, the earliest day as determined under paragraph (b) (1) (ii)(A) and (B) of this section for any loan that was repaid by that consolidation loan.

(2) *Closed school discharge.* The Secretary may waive the borrower's obligation to repay up to the entire outstanding balance of a loan where the Secretary determines that a borrower has not applied or not successfully applied for, but otherwise meets the eligibility requirements for, a closed school discharge on that loan under § 682.402(d).

(3) *Cohort default rate.* For loans received for attendance at an institution that lost its eligibility to participate in any title IV, HEA program because of its cohort default rate, as defined in 20 U.S.C. 1085(m), the Secretary may waive the outstanding balance of the loan, provided that the borrower was included in the cohort whose debt was used to calculate the cohort default rate or rates that were the basis for the loss of eligibility.

(c) *Notification.* If the Secretary determines that a loan qualifies for a waiver under paragraph (b) of this section, the Secretary provides notice to the lender that the lender must—

(1) Submit a waiver claim to the applicable guaranty agency; and

(2) Suspend collection activity, or maintain a suspension of collection activity, on the borrower's FFEL Program loan.

(d) *Claim procedures.* (1) The guaranty agency must establish and enforce standards and procedures for the timely filing by lenders of waiver claims.

(2) The lender must submit a claim for the full outstanding balance of the loan to the guaranty agency, within 75 days of the date the lender received the notification from the Secretary described in paragraph (c) of this section.

(3) The lender must provide the guaranty agency with the following documentation when filing a waiver claim:

(i) An original or a true and exact copy of the promissory note.

(ii) The notification described in paragraph (c) of this section.

(4) If the lender is not in possession of an original or true and exact copy of the promissory note, the lender may submit alternative documentation acceptable to the Secretary, such as

documentation of a borrower's affirmation of the debt.

(5) The guaranty agency must review the waiver claim and determine whether the claim meets the requirements of paragraphs (d)(3) and (d)(4) of this section.

(6) If the guaranty agency determines the waiver claim meets the requirements of paragraph (d)(3) and (d)(4) of this section, the guaranty agency must pay the claim within 30 days of the date the claim was received by the guaranty agency.

(7) If the lender receives any payments on the loan from or on behalf of the borrower during the suspension of collection activity or after receiving a claim payment from the guaranty agency, the lender must promptly return the payments to the sender.

(8) The Secretary reimburses the guaranty agency for the full amount of a claim paid to the lender after the agency pays the claim to the lender.

(9) The guaranty agency must assign the loan to the Secretary within 75 days of—

(i) The date the guaranty agency pays the claim and receives the reimbursement payment; or

(ii) The date the guaranty agency receives the notification described in paragraph (c) of this section if the guaranty agency is the lender.

(10) After the guaranty agency assigns the loan, the Secretary may waive the borrower's obligation to repay up to the entire outstanding balance of the loan.

(11) After the Secretary grants the waiver, the Secretary notifies the borrower, the lender, and the guaranty agency that the borrower's obligation to repay the debt or a portion of the debt, has been waived.

(e) *Payments received during the suspension of collection activity or after the Secretary's payment of a waiver claim.*

(1) If the guaranty agency receives any payments from or on behalf of the borrower on a loan during the suspension of collection activity or after the loan has been assigned to the Secretary in accordance with paragraph (d) of this section, the guaranty agency must promptly return these payments to the sender. At the same time that the agency returns the payments, it must notify the borrower that there is no obligation to make payments on the loan after the Secretary has granted a waiver unless—

(i) The borrower received a partial waiver of the outstanding balance of the loan; or

(ii) The Secretary directs the borrower otherwise.

(2) If the guaranty agency has returned a payment to the borrower, or the borrower's representative, with the notice described in paragraph (e)(1) of this section, and the borrower (or representative) continues to send payments to the guaranty agency, the agency must remit all of those payments to the Secretary.

(3) If the Secretary receives any payments from or on behalf of the borrower on the loan after the Secretary waives the entire outstanding balance of a loan, the Secretary returns the payments to the sender.

(f) If the conditions for waiver in paragraph (b) of this section are met but the loan has been repaid by a Federal Consolidation Loan that has an outstanding balance, the Secretary may waive the portion of the outstanding balance of the consolidation loan attributable to such loan once the loan has been assigned to the Secretary.

[FR Doc. 2024–07726 Filed 4–16–24; 8:45 am]

**BILLING CODE 4000–01–P**