**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| STATE OF MISSOURI, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, <br><br> *Defendants*. | Case No. 4:24-cv-520-JAR |

# EXHIBIT 2

**Declaration of James Richard Kvaal (May 7, 2024)**



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STATE OF MISSOURI, *et al.*,

    *Plaintiffs*,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,

    *Defendants*.

Case No. 4:24-cv-520-JAR

## DECLARATION OF JAMES RICHARD KVAAL

I, James Richard Kvaal, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate:

1. I am the Under Secretary of Education at the United States Department of Education (Department). My nomination for this position was confirmed by the United States Senate on September 14, 2021, and I was sworn in on September 15, 2021. As the Under Secretary of Education, my responsibilities include the coordination of major policies, programs, and activities related to Postsecondary Education and Federal Student Aid for the Department. This includes, but is not limited to, the development of policies, procedures, and directives related to the administration of the student loan programs, including the SAVE Plan. As such, I am familiar with the terms and conditions of the Department's contracts with servicers; servicers' loan portfolios and revenues; and the expected impacts of the SAVE Plan on those portfolios and revenues. I make this declaration based on my personal knowledge and based on information provided to me in my official capacity.

1

## MOHELA's Servicing of Federal Loans

2. The Higher Education Loan Authority of the State of Missouri, or MOHELA, is one of five entities nationwide the Department has contracted to service federal student loans.

3. As of April 2024, MOHELA services 8.02 million borrowers of federally-owned student loans, a figure that includes 3.43 million borrowers enrolled in an income-driven repayment (IDR) plan. Of those 3.43 million IDR plan enrollees, 2.24 million have enrolled in the SAVE Plan.

4. The Department is in the process of updating its contractual relationship with MOHELA. The references herein to the "Legacy Contract" refer to a contractual framework that proceeds under a master contract that awarded in September of 2011, and the last of MOHELA's obligations under this framework are set to expire in December of 2024. The Department and MOHELA are in the process of implementing a framework that proceeds under a master contract called "Unified Servicing and Data Solution (USDS) Contract," which will replace the framework under the Legacy Contract. Although MOHELA continues to work under some aspects of the Legacy Contract framework, a significant portion of MOHELA's servicing work has shifted to the USDS Contract as of April 1, 2024.

5. The revenue model under the Legacy Contract differs in several respects from that of the USDS Contract. Unless otherwise specified, the statements made below pertain equally to the Legacy Contract and the USDS Contract.

6. In its role as a federal student loan servicer, MOHELA is responsible for the administrative aspects of repayment of student loans held directly by the federal government. Loan servicing includes corresponding with borrowers, collecting and processing payments, and tracking loan amounts paid and owed.

**MOHELA's Loan-Servicing Compensation and Penalties**

7. Under the Department's contracts with MOHELA, the servicer receives several forms of compensation for servicing loans.

8. Under the Legacy Contract, MOHELA receives a monthly base fee per borrower that varies according to the borrower's status. For borrowers in repayment, for example, that fee is $2.97 per borrower per month. In addition, the Legacy Contract entitles MOHELA to per-task, per-borrower fees associated with servicing, such as $0.52 per billing statement mailed to borrowers, and to one-time fees, such as $49.40 for a borrower defense discharge.

9. Under the USDS Contract, MOHELA charges the Department per-borrower fees on a tiered, line-item basis. The price tiers are progressive, with each tier applying to the next additional group of borrowers in MOHELA's servicing portfolio. The first tier covers the first 2.5 million borrowers in MOHELA's portfolio, for which it receives approximately $2.18 per borrower per month (largely irrespective of which tasks it performs for each borrower). The tier pricing decreases as the number of borrowers increases. For example, when its portfolio ranges between 5 and 7.5 million borrowers, it receives approximately $1.61 per borrower.

10. The Department's contracts with MOHELA provide for certain decreased payments and/or monetary penalties in the event of servicing errors, borrower delinquencies, and defaults.

11. Under the Legacy Contract, the base monthly fee MOHELA receives per delinquent borrower decreases commensurate with the length of the delinquency. The base monthly fee for current borrowers under the Legacy Contract, $2.97 per borrower, decreases to $2.34 per borrower for delinquencies between 6 and 30 days, and continues to decrease

3

in steps until it reaches $0.50 per borrower for borrowers 271 or more days in delinquency.

12. Under its USDS Contract, MOHELA is penalized quarterly for failing to meet pre-defined performance metrics that apply on a portfolio-wide basis. Those failures result in MOHELA's portfolio-wide payments being reduced by specific percentages, up to 5% per metric and up to 20% in aggregate, across metrics.

13. Servicing errors that fall outside the per-fee reductions and percentage-based, portfolio-wide reductions described above may result in additional penalties under both Legacy and USDS Contracts. For example, MOHELA once failed to send timely billing notices to more than half of its borrowers returning to repayment after the COVID-related freeze, resulting in a $7.2 million penalty.

14. When a borrower defaults, the borrower's loan account is removed from the servicer's portfolio. Fees to the servicer associated with servicing the defaulted account also cease at the point of default.

**Costs of Servicing**

15. The costs MOHELA incurs for servicing are primarily labor costs, incurred in corresponding with borrowers and updating borrowers' account information. For example, one category of account updates are annual recertifications of income.

16. Borrowers with delinquent accounts cost more for MOHELA to service than borrowers with current accounts. At least some of the increased costs are due to the additional labor required to reach out to borrowers and to solicit payment, as well as to educate borrowers about the need for payment.

17. A borrower with monthly payments of $0 is among the cheapest borrowers to service, maximizing profit to MOHELA, as minimal labor is required to service the borrower's

4

account and no payments can be missed, while the servicer continues to receive fees without any risk of suffering financial losses due to loan delinquencies or defaults.

18. MOHELA currently has approximately 1.15 million SAVE borrowers with a $0 payment that are always current.

**Servicer Performance Tracking and Portfolio Rebalancing**

19. The Department regularly tracks its servicers' performance. The tracking metrics the Department uses include overall performance of the servicer's loan portfolio (e.g., the number of borrowers with current and delinquent accounts and the number of defaults), overall customer satisfaction rates, contact center performance metrics and interaction quality (e.g., the accuracy of information provided to borrowers seeking assistance) and back office processing accuracy.

20. The Department's contracts with its servicers provide expressly for rebalancing of borrowers among servicers, from weak performers to strong performers.

21. MOHELA's Legacy Servicing Contract expressly gives the Department the right to reallocate existing borrowers and "waives and releases all current and future claims against the Department of Education, Office of Federal Student Aid regarding its account allocation decisions and methodology for existing borrower loans."

22. MOHELA's new USDS Contract states that the Department "reserves the right to unilaterally shift current borrower accounts among USDS Servicers at the [Department's] direction when it is in the best interest of [the Department] or its borrowers, at no additional cost to [the Department]. It is anticipated that the movement of borrower accounts will be done with reasonable and prudent cause…The allocation of new borrower account volume during Task Order performance will be determined based on the performance of each USDS Servicer in relation to the other USDS Servicers

5

awarded."

23. Strong performance results in the growth of a servicer's loan portfolio in several ways: Higher performing servicers are assigned more new borrowers than lower performing servicers each quarter; lower performing servicers may have borrowers reassigned to higher performing servicers; and decommissioning servicers (servicers withdrawing from their contracts with the Department) will generally have their loan portfolio reassigned to servicers that can handle the additional load.

24. In addition to the monetary penalties described above, weak performance can result in the reduction of a servicer's loan portfolio through rebalancing.

25. When servicer performance issues are identified, the Department pauses or reduces allocation of new borrowers to a particular servicer until those issues are resolved. During this time the remaining servicers will have their allocations increased.

26. In April 2024, MOHELA sent the Department a letter requesting that up to 1.5 million of MOHELA's borrowers be reassigned to another servicer. MOHELA describes that request as being based on the existing contracts, but the Department disagrees with that explanation. The Department's contracts with MOHELA do not contemplate reduction of loan servicing portfolio size, or reassignment of borrowers, under the circumstances MOHELA identifies. Nonetheless, the Department agreed to transfer the borrowers to improve service to borrowers whose accounts are managed by MOHELA.

**SAVE's Impact on Borrowers and Servicers**

27. As part of the Department's transition to the SAVE Plan, MOHELA requested and has received more than $1.6 million in transition costs.

28. The SAVE Plan's shortened time to forgiveness will discharge the loans of borrowers otherwise at risk of default and delinquency at a disproportionately high rate.

6

29. The Department estimates that a substantially higher portion of MOHELA's borrowers will be eligible for $0 monthly payments under SAVE than have been eligible under prior IDR plans. A definite estimate is difficult to make because a borrower's income is a central determinant of her required monthly payment under SAVE, and the Department lacks current income information on every borrower.

30. SAVE eliminates a prior requirement that borrowers enrolling in SAVE after having been on another repayment plan provide income documentation for the years they were not on REPAYE/SAVE. Servicers, including MOHELA, can reasonably be expected to expend lesser costs on processing this paperwork as a result of this change.

31. SAVE will allow borrowers to opt into automatic annual recertification of income for IDR plans, which will reduce the costs required of MOHELA to maintain those borrowers' accounts.

32. By reducing monthly payment amounts for many borrowers, SAVE will result in some borrowers' accounts remaining outstanding longer than they otherwise would. While SAVE provides for a discharge after ten years of payments for borrowers with an original balance of $12,000 or less, there are up to 5.25 million borrowers serviced by MOHELA (approximately 65% of the borrowers MOHELA services for the Department) that could be eligible for SAVE and have original principal balances exceeding $12,000.

33. From the time early implementation of SAVE began until mid-April 2024, roughly 28,000 MOHELA borrowers have seen discharges as a result of SAVE's shortened forgiveness period and roughly 53,000 more MOHELA borrowers have been identified as eligible for SAVE forgiveness and are being processed.

**MOHELA's FFEL Portfolio**

34. Separately from its loan servicing portfolio, MOHELA derives revenue from Federal

Family Education (FFEL) loans. FFEL loans are held by MOHELA but insured by guaranty agencies and reinsured by the federal government. Interest rates on FFEL loans are set by statute.

35. The average age of a FFEL loan held by MOHELA is 21 years, with ages ranging from 14 to 44 years.

36. One subset of MOHELA's FFEL loans consists of "FFEL consolidation loans," a category distinct from direct consolidation loans described below. MOHELA must pay to the Department monthly rebate fees on FFEL consolidation loans equivalent to 0.62% or 1.05% per annum of the unpaid principal balance and accrued interest on the loans, depending on the age of the loan. MOHELA is not permitted to charge the borrower these fees.

**FFEL Consolidation**

37. FFEL loans owned by MOHELA are eligible for consolidation into a Direct Consolidation Loan from the federal government in certain circumstances.

38. When a FFEL loan owned by MOHELA is consolidated into a Direct Consolidation Loan, MOHELA receives a payment equal to the entire amount owed by the borrower, which includes outstanding principal and any accrued interest.

39. When a borrower consolidates one of MOHELA's FFEL consolidation loans into a Direct Consolidation Loan, MOHELA is no longer required to pay the rebate fees referred to in paragraph 36. MOHELA saw rebate fee costs decrease by $1.2 million in Fiscal Year 2023, a large proportion of which was due to consolidation.

40. Independent of the SAVE plan, MOHELA has already seen a strong trend of borrowers consolidating FFEL loans into direct consolidation loans. Starting in December 2021— long before the announcement of the SAVE Plan—through December 2023,

8

MOHELA's FFEL portfolio has decreased by approximately $400 million. Over the same period, MOHELA saw roughly $250 million in direct consolidations, which reflects about 63% of the decrease in MOHELA's FFEL portfolio.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of May 2024.

_____
James Richard Kraal