# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA

STATE OF MISSOURI, *et al.*,

          *Plaintiffs*,

     v.

UNITED STATES DEPARTMENT OF
EDUCATION, *et al.*,

          *Defendants*.

Case No. 2:24-cv-00103-JRH-BWC

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY, OR, IN THE ALTERNATIVE, FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

JILL E. STEINBERG
United States Attorney
Southern District of Georgia

SHANNON H. STATKUS
Assistant United States Attorney
South Carolina Bar No. 70410
Post Office Box No. 2017
Augusta, Georgia 30903
Tel.: (706) 724-0517

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

STEPHEN M. PEZZI
 D.C. Bar No. 995500
 Senior Trial Counsel
SIMON GREGORY JEROME
 D.C. Bar. No. 1779245
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 514-2705
Email: simon.g.jerome@usdoj.gov

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

    A.   The Ongoing Student Debt Relief Rulemaking. .............................................3

    B.   The Change Request Process Associated with the SDR Rulemaking....................5

    C.   This Lawsuit.............................................................................................9

ARGUMENT ..................................................................................................................10

I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION. ....................................10

    A.   There is no final agency action to review...................................................11

    B.   No Plaintiff has Article III standing. ........................................................13

II.   PLAINTIFFS' MOTIONS SHOULD BE DENIED. ....................................................25

    A.   Plaintiffs are not likely to succeed on the merits of their APA claims. ..................26

    B.   Plaintiffs have not shown certainly impending irreparable injury. ..........................27

    C.   The public interest would be disserved by an injunction.....................................28

III.  PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD. ..........................................28

    A.   Any relief should be limited to redressing any cognizable injuries of any Plaintiff State that can establish standing. ..........................................................29

    B.   The Court lacks authority to enter relief directly against the President................31

CONCLUSION..................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Action on Smoking & Health v. Dep't of Lab.,*
    28 F.3d 162 (D.C. Cir. 1994) ............................................................ 16, 19

*Air Excursions, LLC v. Yellen,*
    66 F.4th 272 (D.C. Cir. 2023) ................................................................. 21

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,*
    103 F.4th 765 (11th Cir. 2024) ............................................................... 26

*Arcis v. Fla. Sec'y of State,*
    772 F.3d 1335 (11th Cir. 2014) .............................................................. 13

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ................................................................... 31

*Atlantic Mut. Ins. Co. v. Comm'r,*
    523 U.S. 382 (1998) ............................................................................... 18

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................... 11

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ........................................................................... 14

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos,*
    344 F. Supp. 3d 158 (D.D.C. 2018) ........................................................ 27

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .................................................................... 29, 30, 31

*California v. Texas,*
    593 U.S. 659 (2021) ............................................................................... 17

*Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.,*
    964 F.3d 1250 (11th Cir. 2020) .............................................................. 11

*Church v. City of Huntsville,*
    30 F.3d 1332 (11th Cir. 1994) ................................................................ 13

*City of S. Mia. v. Governor of Fla.,*
    65 F.4th 631 (11th Cir. 2023) ..................................................... 14, 15, 16

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................... 14, 16, 17, 24

*Ctr. for L. & Educ. v. U.S. Dep't of Educ.,*
    209 F. Supp. 2d 102 (D.D.C. 2002) ........................................................................12

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ..............................................................................................17

*El Paso Nat. Gas Co. v. Fed. Energy Regul. Comm'n,*
    50 F.3d 23 (D.C. Cir. 1995) ..................................................................................20

*Evansmill Townhomes Owners' Ass'n v. Broner,*
    No. 1:22-cv-3595, 2022 WL 17920438 (N.D. Ga. Sept. 8, 2022) ........................25

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ......................................................................................14, 23

*FEC v. Cruz,*
    596 U.S. 289 (2022) ..............................................................................................22

*Florida v. Mellon,*
    273 U.S. 12 (1927) ..........................................................................................23, 24

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ..............................................................................................31

*Ga. Republican Party v. Secs. & Exch. Comm'n,*
    888 F.3d 1198 (11th Cir. 2018) ............................................................................16

*Garrison v. U.S. Dep't of Educ.,*
    636 F. Supp. 3d 935 (S.D. Ind. 2022) ..................................................................22

*Georgia v. President of the United States,*
    46 F.4th 1283 (11th Cir. 2022) ............................................................27, 29, 30

*Gill v. Whitford,*
    585 U.S. 48 (2018) ................................................................................................29

*Gonzalez v. Governor of Ga.,*
    978 F.3d 1266 (11th Cir. 2020) ............................................................................26

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) ..............................................................................................29

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ..............................................................................................23

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
    607 F.3d 453 (7th Cir. 2010) ................................................................................18

*Hilton v. Braunskill,*
    481 U.S. 770 (1987) ...............................................................................................25

*In re Murray Energy Corp.,*
    788 F.3d 330 (D.C. Cir. 2015) ............................................................................11

*Initiative & Referendum Inst. v. Walker,*
    450 F.3d 1082 (10th Cir. 2006) ...........................................................................13

*Jacobson v. Fla. Sec'y of State,*
    974 F.3d 1236 (11th Cir. 2020) .................................................................... 13, 18

*Kansas v. Biden,*
    ---F. Supp. 3d---, 2024 WL 2880404 (D. Kan. June 7, 2024) ...........................22

*Kansas v. Department of Labor,*
    ---F. Supp. 3d---, 2024 WL 3938839 (S.D. Ga. Aug. 26, 2024) ........................30

*Keener v. Convergys Corp.,*
    342 F.3d 1264 (11th Cir. 2003) ...........................................................................29

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) .............................................................................................13

*La. Energy & Power Auth. v. Fed. Energy Regul. Comm'n,*
    141 F.3d 364 (D.C. Cir. 1998) ............................................................................20

*Labrador v. Poe,*
    144 S. Ct. 921 (2024) ...........................................................................................29

*Lewis v. Casey,*
    518 U.S. 343 (1996) .................................................................................28, 29, 30

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................... 13, 24

*Mackinac Ctr. for Pub. Pol'y v. Cardona,*
    102 F.4th 343 (6th Cir. 2024) ....................................................................... 20, 21

*Mama Bears of Forsyth Cnty. v. McCall,*
    642 F. Supp. 3d 1338 (N.D. Ga. 2022) ...............................................................27

*Miller v. French,*
    530 U.S. 327 (2000) .............................................................................................31

*Minn. Auto Dealers Ass'n v. Minnesota,*
    520 F. Supp. 3d 1126 (D. Minn. 2021)...............................................................15

*Mississippi v. Johnson,*
   71 U.S. (4 Wall.) 475 (1866) ................................................................................. 31

*Missouri v. Biden,*
   ---F.4th---, 2024 WL 3738157 (8th Cir. Aug. 9, 2024) .................................... *passim*

*Murthy v. Missouri,*
   144 S. Ct. 1972 (2024) ...................................................................................... *passim*

*Nat'l Parks Conservation Ass'n v. Norton,*
   324 F.3d 1229 (11th Cir. 2003) ............................................................................ 11

*Nebraska v. Biden,*
   636 F. Supp. 3d 991 (E.D. Mo. 2022) ................................................................. 14

*Nebraska v. Biden,*
   52 F.4th 1044 (8th Cir. 2022) .............................................................................. 30

*Newdow v. Roberts,*
   603 F.3d 1002 (D.C. Cir. 2010) ........................................................................... 32

*Nken v. Holder,*
   556 U.S. 418 (2009) .............................................................................................. 28

*Oklahoma v. Biden,*
   577 F. Supp. 3d 1245 (W.D. Okla. 2021) ........................................................... 32

*Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.,*
   831 F.3d 961 (8th Cir. 2016) ............................................................................... 20

*Pennsylvania v. Kleppe,*
   533 F.2d 668 (D.C. Cir. 1976) ............................................................................. 24

*Pennsylvania v. New Jersey,*
   426 U.S. 660 (1976) ........................................................................................ 22, 23

*Porter v. Warner Holding Co.,*
   328 U.S. 395 (1946) .............................................................................................. 31

*Powell v. Noble,*
   798 F.3d 690 (8th Cir. 2015) ............................................................................... 27

*Pub. Citizen v. Bowen,*
   833 F.2d 364 (D.C. Cir. 1987) ............................................................................. 11

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
   324 F.3d 726 (D.C. Cir. 2003) ............................................................................. 26

*Sampson v. Murray,*
    415 U.S. 61 (1974) ...........................................................................................31

*Sherley v. Sebelius,*
    610 F.3d 69 (D.C. Cir. 2010) ...........................................................................19

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ...........................................................25, 27, 28

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) ...........................................................................................17

*Sorenson Commc'ns, LLC v. FCC,*
    897 F.3d 214 (D.C. Cir. 2018) ...........................................................................20

*Starbucks Corp. v. McKinney,*
    144 S. Ct. 1570 (2024) ..............................................................................31, 32

*TransUnion v. Ramirez,*
    594 U.S. 413 (2021) ...............................................................................18, 30

*Trudeau v. Fed. Trade Comm'n,*
    456 F.3d 178 (D.C. Cir. 2006) ...........................................................................26

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ...........................................................................................30

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ...........................................................................................30

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
    578 U.S. 590 (2016) ...........................................................................................10

*U.S. Navy SEALs 1-26 v. Biden,*
    578 F. Supp. 3d 822 (N.D. Tex. 2022) .............................................................32

*U.S. Telecom Ass'n v. FCC,*
    295 F.3d 1326 (D.C. Cir. 2002) ........................................................................20

*United States v. Richardson,*
    418 U.S. 166 (1974) ...................................................................................20, 24

*United States v. Texas,*
    599 U.S. 670 (2023) ...................................................................................24, 32

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...........................................................................................18

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ...................................................................................................31

*Wilding v. DNC Servs. Corp.,*
    941 F.3d 1116 (11th Cir. 2019) ...............................................................................30

*Windsor v. United States,*
    379 F. App'x 912 (11th Cir. 2010) ...........................................................................26

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .....................................................................................................26

*Wood v. Raffensperger,*
    501 F. Supp. 1310 (N.D. Ga. 2020), *aff'd*, 981 F.3d 1307 ....................................14

*Wood v. Raffensperger,*
    981 F.3d 1307 (11th Cir. 2020) .......................................................................... 13, 14

*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016) ................................................................................25

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) .................................................................................................24

## CONSTITUTION

U.S. Const. art. III, § 2................................................................................................13

## STATUTES

5 U.S.C. § 704...........................................................................................................10

5 U.S.C. § 705..................................................................................................... 26, 31

5 U.S.C. § 801(a)(3)...................................................................................................27

5 U.S.C. § 805...........................................................................................................27

20 U.S.C. § 1071..........................................................................................................3

20 U.S.C. § 1078(b)(1)(D)(i) .....................................................................................18

20 U.S.C. § 1082(a)(1) .................................................................................................3

20 U.S.C. § 1082(a)(6) .................................................................................................3

20 U.S.C. § 1087a.........................................................................................................3

20 U.S.C. § 1087aa(a) ................................................................................................3

20 U.S.C. § 1098a(a)(1) ..............................................................................................3

20 U.S.C. § 1098a(b)(1) ..............................................................................................3

42 U.S.C. § 292.............................................................................................................3

Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat 1219 .........................2

Consolidated Appropriations Act of 2014 § 525, Pub. L. 113-76, 128 Stat. 5. ......3

## REGULATIONS

34 C.F.R. § 682.100 ...................................................................................................16

34 C.F.R. § 682.209(b)(2) .........................................................................................18

34 C.F.R. § 685.100 ...................................................................................................16

34 C.F.R. § 685.220 ...................................................................................................16

*Negotiated Rulemaking Committee; Public Hearing,*
    88 Fed. Reg. 43,069 (July 6, 2023) ................................................................ 3, 8

*Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family
    Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education
    Assistance Loan (HEAL) Program,*
    89 Fed. Reg. 27,564 (Apr. 17, 2024) ..................................................................passim*

## OTHER AUTHORITIES

Andey Yuskov, *State Individual Income Tax Rates, 2024,* Tax Foundation (Feb. 20, 2024),
    https://perma.cc/CU4A-5LT2 ........................................................................22

## **INTRODUCTION**

The Department of Education is considering promulgating a new rule that would provide student debt relief. But the regulatory process has not reached its end. The Department has not published a final rule on student debt relief. Nor has it discharged (or could it discharge) a single dollar of student loan balances pursuant to what remain only *proposed* regulations. All the steps it has taken to date, including the Department's work with third parties, were merely preparatory and did not indicate that any discharge of student debt would occur before the issuance of a final rule.

The Department has contracted with a network of servicers to carry out the day-to-day tasks of loan administration, including payment processing, balance monitoring, and, when appropriate, discharge. When changes to loan administration are proposed, the Department follows a well-established process of information-gathering and testing across multiple rounds, with an eye toward ensuring that the Department's and servicers' multiple database systems housing borrower data—a complex and technically intricate environment—remain interoperable. Such a process not only is sound managerial practice, but is explicitly provided for in the contracts that govern Department-servicer relationships. Through iterative rounds of this process, the Department receives valuable input about the technical feasibility and cost of its proposals. And most importantly for present purposes, this testing does not obligate the Department—or its servicers—to take any real-world action vis-à-vis a borrower's account. In the context of the change request process at issue in this case, until the Department instructs its servicers to take action pursuant to a final rule, its proposals in the NPRM are nothing more than that—proposals. And like any proposal, they are subject to change until they are actually finalized.

It is entirely unsurprising, then, that when the Department published a notice of proposed rulemaking related to student debt relief late last spring, it instructed its servicers to provide cost estimates related to that proposal and requested that they assess the feasibility of implementing an eventual version of the rule. The "change request" form through which it did so, and later communications about the change request (after the servicers' contracts were modified), reveal

precisely what the notice of proposed rulemaking itself announced publicly: that the Department is considering adopting a new rule.

Plaintiffs have nonetheless manufactured a crisis. Rather than contacting the Department to ask about the change request documents, Plaintiffs rushed to court and sought emergency relief against what they believed to be the premature forgiveness of student debt, before a final rule was promulgated. The Court granted an emergency TRO, based solely on Plaintiffs' motion, but should now dismiss the case and deny Plaintiffs' request for a preliminary injunction.

At the threshold, this case should be dismissed for lack of venue, for the reasons articulated in a concurrently filed motion to dismiss—in short, because no Plaintiff (and certainly no Plaintiff with Article III standing) resides in the Southern District of Georgia within the meaning of the federal venue statute. If the Court does not dismiss the case entirely for lack of venue, it should nevertheless decline to enter a preliminary injunction (or extend the TRO, or grant any other form of injunctive relief) because it presently lacks jurisdiction to do so. To start, this case, brought under the Administrative Procedure Act, targets a contemplated agency action—not a final one. Even if final agency action were found to exist, no Plaintiff has standing. Plaintiffs can point to no definite, certainly impending financial harm to either Missouri's state loan instrumentality or North Dakota's state bank. Their back-up theory of tax revenue loss, rejected in other litigation as recently as several months ago, is foreclosed by Supreme Court precedent.

Moving past these jurisdictional defects, Plaintiffs fare no better under the criteria governing the issuance of injunctive relief. They cannot fairly be said to be likely to succeed on the merits of any of their claims under the Administrative Procedure Act (APA) when the APA requires finality, which is lacking here. They have not shown concrete, certainly impending injury for standing purposes, and so they necessarily have not shown the irreparable harm that an injunction demands. And the public interest favors Defendants: though the State Plaintiffs face no threat of harm from a *proposed* rule, the temporary restraining order entered already demonstrates the disruption to Executive Branch work that this case threatens. In short, no injunctive relief is warranted.

## BACKGROUND

**A.      The Ongoing Student Debt Relief Rulemaking.**

Congress passed the Higher Education Act in 1965 to "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219 (1965). Through its original provisions and subsequent amendments, the Act advances that purpose by establishing several student loan programs. As relevant here, the Department's student loan programs include the Federal Family Education Loan (FFEL) Program, 20 U.S.C. § 1071 ("Robert T. Stafford Federal Student Loan Program"), the Direct Loan Program, *id.* § 1087a, the Perkins Loan Program, *id.* § 1087aa(a), and the Health Education Assistance Loan Program, 42 U.S.C. § 292.[1]

The Act confers on the Secretary of Education broad powers and duties to superintend federal student loans, including the ability to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption," 20 U.S.C. § 1082(a)(6), as well as to "prescribe such regulations as may be necessary to carry out the purposes of this part," *id.* § 1082(a)(1).[2] Before the Secretary may exercise his rulemaking authority under section 1082(a), the Act requires extensive "public involvement," 20 U.S.C. § 1098a(a)(1), through the negotiated rulemaking process. *Id.* ("The Secretary shall obtain public involvement in the development of proposed regulations for this subchapter."); *id.* § 1098a(b)(1) ("After obtaining the advice and recommendations described in subsection (a)(1) and before publishing proposed

---

[1] Responsibility for Health Education Assistance Loans, which were created under statutory authority distinct from the Higher Education Act, was transferred from the Secretary of Health and Human Services to the Secretary of Education in 2014. Consolidated Appropriations Act of 2014 § 525, Pub. L. 113-76, 128 Stat. 5.

[2] This provision appears in the section of the United States Code pertaining to the FFEL Program. When Congress established the other loan programs described (or, in the case of the HEAL Program, transferred it to the Department of Education, *see supra* n.1), it extended the same powers to those programs. *See Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program*, 89 Fed. Reg. 27,564, 27,566 nn.4 & 5 (Apr. 17, 2024). The Perkins Loan Program's authorizing statute features a similar provision to the one quoted, at 20 U.S.C. § 1087hh(2).

regulations in the Federal Register, the Secretary shall prepare draft regulations implementing this subchapter and shall submit such regulations to a negotiated rulemaking process.").

In July 2023, the Department began a negotiated rulemaking process to explore whether it would be appropriate to enact regulations "relate[d] to the modification, waiver, or compromise of Federal student loans"; in other words, student debt relief (SDR). *Negotiated Rulemaking Committee; Public Hearing*, 88 Fed. Reg. 43,069, 43,069-70 (July 6, 2023). Through the negotiated rulemaking committee it established for this purpose, the Department sought to craft regulations that "would allow the Secretary to address significant challenges identified with student loan repayment that implicate considerations of equity and fairness, as well as a borrower's inability to repay their loans in full within a reasonable period or circumstances where the costs of enforcing the debt exceed the expected benefits of continued collection." 89 Fed. Reg. at 27,567. After an initial public hearing, the committee proceeded to its work, eventually considering a set of proposed debt-related regulations. *Id.*

The negotiated rulemaking process continued with the publication, last April, of a notice of proposed rulemaking (NPRM) outlining a series of regulations that would, if enacted, explain how the Secretary intended to exercise his authority to waive debts held by the Department in certain situations, shown here with the numbering of proposed regulatory additions to Title 34 of the Code of Federal Regulations, Part 30 ("Debt Collection"):

- 30.81: Waiver when the current balance exceeds the balance upon entering repayment for borrowers on an income-driven repayment (IDR) plan;
- 30.82: Waiver when the current balance exceeds the balance upon entering repayment;
- 30.83: Waiver based on time since a loan first entered repayment;
- 30.84: Waiver when a loan is eligible for forgiveness based upon repayment plan;
- 30.85: Waiver when a loan is eligible for a targeted forgiveness opportunity;
- 30.86: Waiver based upon Secretarial actions;
- 30.87: Waiver following a closure prior to Secretarial actions; and
- 30.88: Waiver for closed Gainful Employment programs with high debt-to-earnings rates or low median earnings.

89 Fed. Reg. 27,613. As explained in further detail below, only proposed sections 30.81 through 30.84

are implicated by Plaintiffs' motions. *See infra.* Proposed sections 30.81 and 30.82 would provide one-time relief, *see* 89 Fed. Reg. at 27,571, 27,574, on a partial basis, to eliminate the portion of certain loans that exceeds the principal balance when the loans entered repayment, *see id.* at 27,614.[3] Proposed section 30.83 would waive the balances of loans that first entered repayment a long time (20 or 25 years) ago but have not been repaid in full. *See id.* And proposed section 30.84 would waive the balance of a loan if a borrower would be entitled to forgiveness under a repayment plan in which she is not enrolled, including an income-contingent repayment (ICR) plan. *See id.* In separate litigation, the Eighth Circuit has enjoined the Department pending appeal from providing forgiveness based on its authority to promulgate ICR plans. *Missouri v. Biden*, No. 24-2332, 2024 WL 3738157, at *4 (8th Cir. Aug. 9, 2024). If a final version of proposed section 30.84 is promulgated during that injunction's pendency, the Department will not use it to grant forgiveness to individuals who would be entitled to forgiveness under ICR plans in which they are not enrolled, during that injunction's pendency. Declaration of James Kvaal ¶ 37 (Kvaal Decl.), Ex. 1.

In addition to laying out these proposed provisions, the NPRM details public comments the Department received after the negotiated rulemaking process, explains changes it made during that process, and solicits further public comments. *See generally* 89 Fed. Reg. 27,564. The Department will consider the comments it receives in shaping the contours of any final rule, which has been neither finalized nor published. *See* Kvaal Decl. ¶ 32.

**B.    The Change Request Process Associated with the SDR Rulemaking.**

For the administration of the student loans it owns, the Department relies on contracted loan servicers, whose responsibilities include corresponding with borrowers, collecting and processing payments, processing discharges, and tracking loan amounts paid and owed. Kvaal Decl. ¶¶ 2-4. Those contractual relationships are memorialized in, and governed by, several contracts the Department has entered into with those servicers. *Id.* ¶ 5.

---

[3] Separate provisions were proposed for this category of relief with differing eligibility criteria between the two. *See* 89 Fed. Reg. at 27,614.

Those contracts between the Department and its servicers set out a formal "change request" process that the Department ordinarily follows when it seeks to alter aspects of the servicers' administration of loans. *Id.* ¶ 6. Naturally, a requested change by the Department often entails corresponding shifts in the servicers' expenditures of time and resources. And, given the complexity of the technical systems the Department and the servicers use to maintain and administer student loan data, *see id.* ¶ 7, such changes require extensive coordination between the Department and servicers to test feasibility, identify problems, and ensure a smooth transition to operations under new rules, *see id.* ¶ 8. The change-request process accommodates cost and feasibility considerations alike by establishing an iterative series of consultations between the Department and servicers, in which the Department identifies proposed changes and solicits the cost of implementing them. *See id.* ¶ 7. Through the change-request process, which often includes multiple exchanges of information, the Department and servicers together are able to refine their cost estimates and the details of any changes the Department ultimately decides to adopt. *See id.* ¶ 7-10.

Throughout the duration of a change-request process, the Department remains free to alter its proposals, or even to abandon them entirely. *Id.* ¶¶ 10. If the Department opts to pursue a proposed change, it must conclude a contract modification with the servicers. *Id.* ¶ 9. And even once concluded, a contract modification will not itself compel the servicers to take any particular action with respect to any loan account. Rather, actions taken pursuant to a contract modification are generally carried out (and with respect to the process at issue in this case, would *only* be carried out) after the Department issues, and the servicers receive, instructions to do so. *Id.* ¶ 12.

As part of the ongoing rulemaking process described above, the Department—shortly after the NPRM's publication last April—began a change request process aimed at identifying cost and feasibility factors relevant to the proposed SDR rules. *Id.* ¶ 15. By undertaking the change request process in tandem with its deliberations on the NPRM, the Department sought to position itself to transition smoothly to loan administration under the final version of the rule, should a final version of the rule eventually be adopted. *Id.* ¶ 14. Those preparations have been taking place for months, *id.* ¶¶ 15, and have resulted in contract modifications, *id.* ¶ 30.

A May 31 version of Business Operations Change Request Form 7037 (CR 7037), attached to the Complaint as Exhibit D, illustrates one step in the process. As the Department stated (at 1) in the "details" section, its Federal Student Aid (FSA) component envisioned implementing "additional types of loan forgiveness for borrowers." Ex. D to the Compl. at 1. The criteria identified for operationalizing those additional types of forgiveness unsurprisingly track a subset of the criteria the Department identified in the NPRM: "Measure 1" for proposed regulations 30.81 and 30.82, "Measure 2" for 30.83, and "Measure 3" for 30.84. *Compare* 89 Fed. Reg. at 27,568-69 (explaining these proposed regulations), *with* Ex. D to the Compl. at 3 (describing the "Measures"). The Department built upon these generic descriptions with an exhaustive list of the tasks it intended for servicers to prepare themselves to implement, from submitting to the Department "principal and interest balance of every loan on their system[s]," Ex. D to the Compl. at 3, to "apply[ing] loan forgiveness to loans included in" certain files, *id.* at 4, to notifying borrowers "after forgiveness has been applied," *id.* at 6, to ensuring internal administrability by using particular technical codes, *id.* at 8. *See* Kvaal Decl. ¶ 16 ("CR 7037 identifies a series of tasks the Department contemplated requiring servicers to be able to perform as of a target implementation date of final regulations.").

For all these identified tasks, the Department instructed the servicers to "provide a breakout level of effort . . . and cost for each requirement listed below." Ex. D to the Compl. at 3. And as is customary in the Department's dealings with its servicers, and necessary to ensure that they can prepare accurate cost estimates, CR 7037 identified an "[a]nticipated implementation date" of September 1. *Id.* at 1. That target date reappears numerous times in the CR. *See, e.g.*, *id.* at 3 ("The servicers shall submit to NSLDS the 9/1/2024 principal and interest balance of every loan on their system."); *id.* at 4 ("All forgiveness shall be applied with an effective date of 9/1/2024."). Some imprecise language notwithstanding, that date—as explained in the Kvaal Declaration at paragraph 18—was always tentative, subject to the promulgation of a final rule and subsequent instructions to servicers to execute under that rule. *Id.* ¶¶ 18-19.

In addition to its quote request, CR 7037 previewed the testing the Department intended to conduct for the identified tasks. It explained that the Department would require from servicers certain

documentation related to "User Acceptance Testing," along with a sample operational report, a test borrower notification, and a compliance statement.  *Id.* ¶ 26.; Ex. D to the Compl. at 2.  A detailed list of testing-related "artifacts" that servicers would be obligated to submit, Ex. D to the Compl. at 2 ("Artifacts Due Date"), followed near the end of the change request form, *id.* at 9.  As Exhibit G to the Complaint shows, the Department later followed up with servicers on testing.  Ex. G to the Compl. at 1.  Even greater testing-related detail appears in Exhibit H, which contains a follow-up email related to questions and answers servicers had submitted about implementation of the changes foreseen in CR 7037.  *See generally* Ex. H to the Compl.  Several of the servicers' questions, which are included in a table in Exhibit H, refer to an email campaign the Department undertook in which it requested that borrowers not wishing to receive forgiveness under a final version of the rule decline their potential eligibility.  *See, e.g.*, Ex. H to the Compl. at 3 (question 78); *see also* Ex. C to the Compl. (an email in this campaign).

Shedding further light on the Department's repeated interactions with its servicers in anticipation of a final rule being promulgated in this rulemaking is a July 9 email from the Department, in which MOHELA was asked to provide an "[i]mpact [a]nalysis" (including cost data, Ex. L to the Compl. at 5) in response to Change Request 7109.  *See id.* at 2.  CR 7109 reiterates the Department's intention to promulgate a final rule in early September 2024, and explains that it will need additional call center support to educate borrowers about the anticipated rules.  *Id.*  All told, these exhibits show little more than the NPRM did:  evidence of an agency working through the practical implications of implementing an SDR rule.

Plaintiffs' suggestions of impropriety, in contrast, arise solely from their misinformed readings.  Those errors present themselves at every turn.  Plaintiffs' naked assertion that "[t]here is nothing tentative about the Department's demands," Pls.' Br. at 19 (citing Ex. D to the Compl.), ignores that no final rule has been promulgated, Kvaal Decl. ¶ 32; absent such regulatory action, the Department will not discharge loan balances, *id.* ¶ 34.  So too for Plaintiffs' notion that the CR's use of "shall," as is customary in change requests, effects immediate, binding obligations in the present.  *See* Pls.' Br. at 40-41; Kvaal Decl. ¶ 20.  They similarly use CR 7037 as evidence that MOHELA will itself be forced

to bear administrative costs, when the very same document explicitly asks the servicers to provide estimates of the cost of the proposed changes. Pls.' Br. at 23. Similar misapprehensions infect Plaintiffs' characterizations of the other change-request evidence. Plaintiffs' assertion that CR 7037 requires backdating forgiveness—which it does not—is based on the incorrect assumption that the CR's tentative dates are set in stone. *See* Pls.' Br. at 14; Kvaal Decl. ¶ 18. Likewise, the CR's dates are only "anticipated," and remain subject to change, until a contract modification is signed and instructions are given pursuant to it (after a final rule is promulgated, if one is), *id.* ¶ 9-12, even if that word is present in one part of the CR but absent from another. *See* Pls.' Br. at 19.

To this day, no rule has been finalized, and servicers have not been instructed to execute any final rule or to discharge any debt under the NPRM. Kvaal Decl. ¶ 32-33.

**C.    This Lawsuit.**

Plaintiffs—the States of Alabama, Arkansas, Florida, Georgia, Missouri, North Dakota, and Ohio—filed this suit on September 3, challenging the NPRM. Compl., ECF No. 1. Their complaint includes four counts under the APA: Counts I and II allege agency action in excess of statutory authority (with the only material distinction being references to the major-questions doctrine in Count I), *see id.* ¶¶ 130-84; Count III alleges arbitrary and capricious action, *see id.* ¶¶ 185-208; and Count IV alleges action in violation of statutorily required procedures, *see id.* ¶¶ 209-220. Plaintiffs named as defendants the United States Department of Education and President Biden and Dr. Miguel A. Cardona in their official capacities. *See id.* at 1. Alongside their complaint, Plaintiffs filed an emergency motion to "stay" the Department's purposed action under the APA, or, in the alternative, for a temporary restraining order and preliminary injunction. Mot., ECF No. 5.

Two days later, on the basis of Plaintiffs' emergency motions alone, the Court entered a 14-day temporary restraining order prohibiting Defendants from "implementing the Third Mass Cancellation Rule" (a term used by Plaintiffs to describe the NPRM). TRO at 5, ECF No. 17. The Order also enjoins Defendants "from mass canceling student loans, forgiving any principal or interest, not charging borrowers accrued interest, or further implementing any other actions under the Rule or instructing federal contractors to take such actions." *Id.* As described above and in the Kvaal

9

Declaration, the Department neither discharged loan debts under any SDR authority nor intended to (absent the publication of a final rule) prior to the entry of the temporary restraining order.  *See* Kvaal Decl. ¶ 34.  However, the Department recognized that the TRO could be read to prohibit Defendants from further preparation with its servicers for a final SDR rule.  Accordingly, shortly after receiving the Court's order and out of an abundance of caution, the Department issued stop-work orders to its servicers requiring them to cease activities related to Change Requests 7037 and 7109.  *See* Ex. 2.  In a concurrently filed motion, Defendants respectfully seek that the Court clarify, based on the more complete record now before it, that the order does *not* prohibit Defendants from (1) continuing their preparatory work with servicers to ensure that they are prepared to implement a final SDR rule once published, or (2) eventually promulgating a final rule itself.

## **ARGUMENT**

Plaintiffs' challenge in this lawsuit can be reduced to a claim that the NPRM, which advances only a *tentative* agency view, would (if promulgated as proposed) establish a policy with which Plaintiffs disagree.  There exists no final rule, however, nor is the Department surreptitiously making policy changes out of public view.  Plaintiffs are thus facing neither actual nor imminent injury, as they claim.

These jurisdictional defects suffice to deny relief.  If the Court concluded otherwise, though, it should still decline to enter an injunction because Plaintiffs have not stated a single APA claim in their complaint, much less shown a likelihood of success on one.  For the same reasons their standing arguments are meritless, so too are their claims of irreparable harm.  And the public interest weighs in Defendants' favor.  For all these reasons or any of them, the Court should deny relief.

## I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION.

For the reasons articulated in Defendants' concurrently filed Motion to Dismiss, this action was brought in an impermissible venue.  Dismissal is warranted on that basis alone.  But if the Court proceeds to consider Plaintiffs' motions for injunctive relief, it should deny them for other threshold reasons.  Namely, there is no final agency action on which the Court can act, and no Plaintiff has Article III standing.

### A.    There is no final agency action to review.

In the Eleventh Circuit, a court possesses subject matter jurisdiction to review agency action under the APA only if that action is "final." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003) ("[F]ederal jurisdiction is similarly lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704."); *see also Canal A Media Holding, LLC v. USCIS*, 964 F.3d 1250, 1255 (11th Cir. 2020) ("In our circuit, dismissal for the reason that the challenged agency action was not a final order is a dismissal for lack of subject-matter jurisdiction." (citations omitted)).  To qualify as "final" under the APA, a challenged action must "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  The action must also "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 177-78).  Here, there exists no final agency action to review.

Notices of Proposed Rulemaking are the paradigm of non-final agency action, as they merely propose, rather than adopt, new rules.  The words of then-Judge Kavanaugh confirm what common sense suggests: by definition, "[p]roposed rules meet neither of the two requirements for final agency action:  (i) They are not the 'consummation of the agency's decisionmaking process,' and (ii) they do not determine 'rights or obligations,' or impose 'legal consequences.'"  *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (quoting *Bennett*, 520 U.S. at 177-78).  Unsurprisingly, the NPRM at issue here explicitly contemplates subsequent, superseding regulatory action, *see* 89 Fed. Reg. at 27,606 ("We anticipate having a more recent sample for FY2023 available *by the time we write a final rule*." (emphasis added)), as do the Department's own public communications, *see* Ex. C to the Compl. ("We're currently working to finalize new regulations . . . If finalized as we have already proposed, the regulations would . . ."), evincing that the Department has not consummated its decisionmaking process.  Accordingly, the NPRM does not constitute final agency action.  *See Pub. Citizen v. Bowen*, 833 F.2d 364, 366 (D.C. Cir. 1987) ("The 1985 notice, even without the later developments, bore considerable indicia of non-finality," including "the location of the statement in a notice of *proposed* rulemaking." (emphasis in

original)); *Ctr. for L. & Educ. v. U.S. Dep't of Educ.*, 209 F. Supp. 2d 102, 111 (D.D.C. 2002) ("There has not been a final agency action here. The rulemaking process at issue is at an intermediate stage. The proposed rules have only recently been published. Education will shortly be reviewing comments from interested members of the public, and Education also plans several regional meetings at which individuals will have the opportunity to provide input. Only after completion of this process will final rules be published. It is the final rule which will 'mark the consummation of the agency's decisionmaking process' and set forth the agency's 'definitive' position." (citations omitted)).

As a practical matter, the absence of final agency action here—even if not a jurisdictional obstacle, as it is—would frustrate judicial review of Plaintiffs' claims. Most centrally, Plaintiffs' contentions that the Department has acted "in excess of statutory authority," Compl. at 29 & 35, "in violation of [the] separation of powers, *id.* at 29, arbitrarily and capriciously, *id.* at 41, and "in violation of statutory procedures," *id.* at 46, by "trying to mass cancel" student loans, *id.* ¶ 1, would require an actual—not merely proposed—action by the agency promulgating a final rule and specifying its substance. Without a final rule, there is no Department rule or action for the Court to evaluate.

Plaintiffs' complaint concedes that a final rule has not been published. Compl. ¶ 5 ("the Secretary is implementing this plan *without* publication . . .") (emphasis in original); *see also* Pls.' Mot. at 1. Plaintiffs claim that the NPRM was "set in stone" the day it issued, thus amounting to final agency action. Pls.' Br. at 19-20. This argument is based on Plaintiffs' misunderstanding that Change Request 7037 requires immediate loan forgiveness. But, as discussed above, the Kvaal Declaration clearly establishes that the change request process effects no change as to borrowers until the Department instructs the servicers to take action after the promulgation of a final rule. The Department has not promulgated such a rule or issued such instructions here. CR 7037 does not, therefore, instruct any servicer to forgive any loans or otherwise require immediate loan forgiveness. Kvaal Decl. ¶ 30. For that reason CR 7037 is distinct from the agency actions at issue in *Biden v. Texas*, 597 U.S. 785, 808 (2022), where the Supreme Court found internal agency memoranda to constitute final agency action. *See* Pls.' Br. at 20. As the context of the change request process shows, the agency here has made no "statement" that was "designed to implement, interpret, or prescribe law or policy." *Cf. Texas*, 597

U.S. at 810.

Plaintiffs' unsupported allegations that the Department has secretly forgiven loans, Pls.' Br. at 20, do not change these routine facts of the Department's operations with its contractors. Moreover, that CR 7037 contemplates the Department finalizing an SDR rule by this month simply adds a (tentative) timeline to what the Department had already (as publicly as possible, through the Federal Register) indicated: that it was, in fact, contemplating as much. Until those regulations are finalized, however, no final agency action exists, and this Court lacks jurisdiction.

### B.      No Plaintiff has Article III standing.

With jurisdiction limited to "Cases" and "Controversies, U.S. Const. art. III, § 2, federal courts are not "free-wheeling enforcers of the Constitution and laws." *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc)). Through their vigorous enforcement of a plaintiff's obligation to show standing, which is assessed as of the time of the filing of the complaint, *Arcis v. Fla. Sec'y of State*, 772 F.3d 1335, 1340 (11th Cir. 2014), federal courts maintain constitutional guardrails around the exercise of their power. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Standing is no "mere pleading requirement[,]" but rather "an indispensable part of the plaintiff's case." *Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). As this Court recognized in its September 5 order, *see* TRO at 3, a plaintiff must establish standing at every stage of a case, *Church*, 30 F.3d at 1336, including when seeking emergency injunctive relief, *Wood v. Raffensperger*, 501 F. Supp. 1310, 1320 (N.D. Ga. 2020), *aff'd*, 981 F.3d 1307. That means these Plaintiffs "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). At the preliminary-injunction stage, Plaintiffs must make a "clear showing" of these elements. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024).

Plaintiffs have not met the "bedrock" requirement of standing.[4]  *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 378 (2024).  They rely heavily on a rhetorical sleight of hand, conjuring the threats posed by what they call the "Third Mass Cancellation Rule."  Pls.' Br. at 20.  But no such rule exists.  Behind the label are an NPRM and anodyne regulatory processes, with no direct connection to Plaintiffs or immediate impact on them.  Put otherwise, all that connects Plaintiffs' allegations of future injury to the Department's recent activities is an "attenuated chain of possibilities," which does not suffice to invoke this Court's jurisdiction.  *See City of South Miami v. Governor of Fla.*, 65 F.4th 631, 637 (11th Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).

**1.**  Plaintiffs begin with the Higher Education Loan Authority of Missouri (MOHELA), invoking the role MOHELA played in two other cases.  Pls.' Br. at 22 (citing *Biden v. Nebraska*, 143 S. Ct. 2355, 2356 (2023) and *Missouri v. Biden*, No. 24-2332, 2024 WL 3738157, at *3 (8th Cir. Aug. 9, 2024)).  In those cases, the Supreme Court and Eighth Circuit held that Missouri had standing on the view that the closing of direct loan accounts serviced by MOHELA would cost MOHELA fees it otherwise would have earned from servicing those accounts.  *Nebraska*, 143 S. Ct. at 2356; *Missouri*, 2024 WL 3738157, at *3.  The factual contexts there were materially different from this case, however.  In *Nebraska* and *Missouri*, the Administration had announced a final intention to forgive certain student loans when Plaintiffs moved for injunctive relief.  *Nebraska v. Biden*, 636 F. Supp. 3d 991, 996 (E.D. Mo. 2022) (debt relief plan pursuant to HEROES Act announced in August; suit filed in September); *Missouri*, 2024 WL 3738157, at *3 (Final Rule promulgated almost one year before suit filed).  In other words, the government had actually taken some final regulatory action.

Here, in contrast, what Plaintiffs call the "Third Mass Cancellation Rule" is nothing more than a proposal—which might be finalized in substantially different form, or not finalized at all.  Accordingly, Plaintiffs cannot say that MOHELA's purported loss of servicing revenues (*see* Pls.' Br.

---

[4] Although the Court concluded otherwise in its temporary restraining order, it appropriately emphasized that its findings were tentative.  *See* TRO at 4-5.

at 23-24) is "certainly impending," much less that it is an "actual" injury. *See City of South Miami*, 65 F.4th at 637. As the Kvaal Declaration establishes, the Department would only forgive student loan balances under a final version of the standards proposed in the NPRM if and when a final rule is eventually promulgated. Kvaal Decl. ¶ 34. As a result, the feared injury could materialize, if ever, only after the Department promulgates a final rule and issues instructions to the servicers to begin implementing forgiveness. *Id.* ¶¶ 30-34; *see Minn. Auto Dealers Ass'n v. Minnesota*, 520 F. Supp. 3d 1126, 1137 (D. Minn. 2021) ("Defendants' proposed emissions rules must go through multiple additional steps in the administrative rulemaking process before taking effect[.]"). Such uncertainty is fatal to standing. *See City of South Miami*, 65 F.4th at 637.

Plaintiffs' theory of standing through administrative costs to MOHELA is even weaker. They point to Change Requests 7037 and 7019, insisting that MOHELA will be required to expend "enormous administrative capital" to comply with the costs of implementing a version of the proposed rules. Pls.' Br. at 22-23 (citing Exs. D & L to the Compl.). In fact, their contention that "MOHELA must cover" administrative costs stemming from eventual implementation of an SDR rule is belied by their own evidence: both change requests make explicit that the Department is soliciting cost *proposals* in order to compensate the servicers. *See* Ex. D to the Compl. 3 (instructing servicers to "provide a breakout level of effort . . . *and cost* for each requirement listed below" (emphasis added)); Ex. L to the Compl. at 5 ("The Debt Relief CR to the BPO Providers is intended to aid BPO Providers by providing funding to assist with onboarding and training costs for new personnel[.]"). More generally, the entire change request process is premised on the notion that servicers are to be compensated for changes in operations. *See* Kvaal Decl. ¶ 7. It strains credulity to suggest that obtaining a price quote from a contractor injures him, rather than foretelling increased business.

Plaintiffs attempt to avoid this conclusion by conjecturing that borrowers will consolidate their

FFEL loans, which MOHELA owns outright, into direct loans that the government holds.[5]  Pls.' Br. at 24-25.  They say that the proposed rule will encourage borrowers to consolidate "to take advantage of . . . balance or interest forgiveness."  *Id.* at 25.  And that consolidation will harm MOHELA by depriving it of servicing revenue (for FFEL loans it services for Navient, *id.* at 24), and of interest income (from FFEL loans it owns outright, *id.* at 25).  These theories are not only grounded in a "highly attenuated chain of possibilities," *City of South Miami*, 65 F.4th at 637, but they also invite the Court "to endorse . . . guesswork as to how independent decisionmakers will exercise their judgment." *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1202 (11th Cir. 2018) (quoting *Clapper*, 568 U.S. at 413). The Court should decline to do so.

At the outset, the supposed "incentive to consolidate," Pls.' Br. at 24, does not actually exist. Plaintiffs' best evidence is a proposed rule that itself creates no rights or obligations, and therefore no meaningful incentive to do anything at all.  *See Action on Smoking & Health v. Dep't of Labor*, 28 F.3d 162, 165 (D.C. Cir. 1994) ("[N]o legal consequences presently attach to OSHA's inclusion of ETS in the proposed omnibus rulemaking[.]").  Treating the proposed rule as if it is in effect, Plaintiffs home in on proposed section 30.84, which would (if promulgated as proposed) authorize forgiveness benefits based on certain repayment plans for individuals not enrolled in those plans.  Pls.' Br. at 25; *see also* 89 Fed. Reg. at 27,614.  But the Department has stated that it will provide forgiveness under a finalized version of section 30.84, if at all, only so long as forgiveness under the other payment plans in question—an income-based, income-contingent, or alternative repayment plan—is otherwise permitted by law.  Kvaal Decl. ¶ 37.  And an injunction pending appeal entered by the Eighth Circuit currently prohibits the Department from implementing forgiveness under ICR plans.  *Missouri*, 2024 WL 3738157, at *4.  So Plaintiffs cannot claim that harm from consolidation is certainly impending— not only because the proposed rules remain only proposals, but also because if the proposed rules

---

[5] The federal government itself owns direct student loans.  *See* 34 C.F.R. § 685.100.  FFEL loans, in contrast, may be owned by the government itself or by non-governmental entities.  *See id.* § 682.100.  Under certain circumstances, a FFEL borrower may "consolidate" her FFEL loan into a direct loan owned by the federal government.  *See id.* § 685.220.

went into effect tomorrow, the Eighth Circuit's injunction would prevent the feared-of effect with respect to proposed section 30.84. *See Clapper*, 568 U.S. at 409.

Even if an incentive to consolidate did exist, the bare existence of such an incentive is not sufficient to make out a viable claim of injury. Plaintiffs must show at least that borrowers "will likely react" to that incentive "in predictable ways." *California v. Texas*, 593 U.S. 659, 675 (2021) (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019)). And in truth, the causes of consolidation are many, making it impossible to determine which consolidations stem from a hypothetical future promise of loan forgiveness, and which are caused by other factors. Between December 2021 and December 2023, after all, MOHELA's own FFEL portfolio declined by approximately $400 million, approximately 63 percent of which was due to consolidation. Ex. K to the Compl. ¶ 40.

Plaintiffs have offered little more than speculative economic assumptions to suggest that the potential of future forgiveness could induce borrowers to consolidate, falling well short of their obligation to show injury that is "fairly traceable" to the conduct complained of. *See Murthy*, 144 S. Ct. at 1986; *see also id.* (reiterating that "a federal court cannot redress 'injury that results from the independent action of some third party not before the court,'" *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976), and so a plaintiff must show more than "guesswork" regarding causation).

Plaintiffs highlight the fact that "consolidations . . . spiked" in 2022, when forgiveness under the HEROES Act was announced, and again in January and February of this year. Pls.' Br. at 25 (citing Ex. M to the Compl.). But the larger context of that data suggests at most correlation, not causation (to say nothing of the inherent difficulty of showing causation when the decisions of independent actors are at play, *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975)). Indeed, the same chart, Ex. M to the Complaint, shows the number of borrowers consolidating, a figure more indicative of actual incentives to consolidate (given the variation in borrowers' balances). Ex. M to the Compl. And that figure varies considerably in the 60 months captured by the chart, ranging between 547 to 1,107 in late 2022 (the first period Plaintiffs highlight) and between 201 and 803 in the monthly figures for 2024. *See id.* Plaintiffs' chosen metric, the monthly consolidation total, is also elastic. Between July and December 2022, for example, the total consolidated sum rose and fell (from as low as $11.9

million to as high as $28.2 million, with ups and downs in between), before dropping in January 2023 to $3.1 million. *Id.* All of this confirms the common-sense intuition that many factors affect consolidation, and that the incentives to consolidate are not the simplistic ones Plaintiffs describe.

Continuing down Plaintiffs' chain of speculative future possibilities, they treat as automatic that consolidation will harm MOHELA, if it occurs. But they do not explain why that is so. For the FFEL loans MOHELA owns, at least, MOHELA will receive full payment of the outstanding amount of the loan, principal and interest accrued to date—as even Plaintiffs admit, *see* Pls.' Br. at 25—upon consolidation. As a general matter, a party holding a loan suffers no injury when the loan is repaid in full, excluding future predicted interest income. Indeed, the terms of the FFEL program specifically provide that borrowers have the right to "accelerate" their loans at any time (and to do so without penalty). *See* 20 U.S.C. § 1078(b)(1)(D)(i); 34 C.F.R. § 682.209(b)(2). It makes little sense to treat as "injury" here a result explicitly contemplated by a statutory provision MOHELA knew of when it acquired the FFEL loans in question. More generally, when a lender receives full satisfaction of the outstanding principal and accrued interest in accordance with the loan's terms, such a result "would ordinarily be cause for celebration, not a lawsuit." *TransUnion v. Ramirez*, 594 U.S. 413, 437 (2021). To hold otherwise would disregard a fundamental economic concept: the time value of money. *See Atlantic Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 384 (1998) ("[A] dollar today is worth more than a dollar tomorrow[.]" (quotation marks omitted)); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (explaining the value of "having cash now rather than a promise, however reliable, of cash later"). Early repayment in full lets the holder recoup the time value of the loaned money and avoid the risk of loss from a borrower's default, which is the economic equivalent of the interest payments that it would otherwise collect in the future. *See Habitat Educ. Ctr.*, 607 F.3d at 458 ("If you part with money, you lose liquidity (the instant ability to deploy cash) and in addition incur a risk of never getting your money back. So you demand compensation for parting with money, and that compensation normally takes the form of interest at a specified rate . . . .").

Plaintiffs also cannot meet the second requirement of standing: traceability. Traceability requires that the plaintiff's complained-of harms stem from the actions challenged. *Jacobson*, 974 F.3d

at 1253. In their complaint and motions, Plaintiffs have taken aim at the NPRM and email communications. But because those actions have no legally binding effect, they cannot be the cause of the injuries plaintiffs insist will come to pass if the Department undertakes loan forgiveness along the lines proposed.

**2.** Plaintiffs' fallback option for standing is the Bank of North Dakota, which will allegedly suffer injury from the proposed rule, thereby injuring North Dakota itself. These arguments are sketched even more faintly than those related to MOHELA. Plaintiffs claim that the Bank will suffer competitive injury from the proposed rule; specifically, "many would-be student loan borrowers" who might consider refinancing their federal loans with the Bank will decline to borrow from the Bank "if loans issued by the Federal Government will no longer require repayment." Pls.' Br. at 27.

There are two fatal threshold deficiencies with this argument. To start, the rule is only proposed—and so the supposed incentives facing North Dakota borrowers are illusory. *See Action on Smoking & Health*, 28 F.3d at 165. Moreover, it is questionable whether the competitive injury doctrine Plaintiffs invoke applies to the federal government. In some circuits, a plaintiff may show standing by alleging that agency action "'lift[s] regulatory restrictions on [its] competitors or otherwise allow increased competition' against [it]." *Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 226 (D.C. Cir. 2018) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)); *see also Owner-Operator Indep. Drivers Ass'n v. Dep't of Transp.*, 831 F.3d 961, 967 (8th Cir. 2016). Here, though, Plaintiffs have not cited any example of a court extending the competitor-standing doctrine to a case where the alleged competitor is the government itself. Pls.' Br. at 28 (citing only a D.C. Circuit opinion with no government competitor).

There is good reason to doubt whether such an extension would be appropriate. The federal government takes countless regulatory steps that might affect public demand (and therefore price) for a given good or service on offer from private companies, like its own procurement decisions. To find standing wherever a commercial entity was aggrieved by such a choice would convert courts into "open forum[s] for the resolution of political or ideological disputes," *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring), a result the Supreme Court has fastidiously rejected.

Consistent with that notion, courts have applied the competitor-standing doctrine only in the context of competition between two non-governmental actors. *Sherley*, 610 F.3d at 72, 74 (a party competing for a government grant had standing to challenge agency action that "benefit[ted] his rival" and "intensified the competition for a share in a fixed amount of money"); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 366 (D.C. Cir. 1998) (allowing a "competitor and customer" of an energy company to challenge agency approval of the company's application "to sell . . . energy at market-based rates"); *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (finding that a party had standing to challenge an agency order permitting its competitor to "offer lower prices for the same telecommunications services"). This factual setting is materially dissimilar, given the absence of any non-governmental competitor.

In any event, looking beyond these legal problems with Plaintiffs' theory, it is also shot through with factual uncertainties that make any claim of actual or imminent injury far too speculative. *See Sherley*, 610 F.3d at 73 ("[T]he basic requirement common to all [competitor standing] cases" is that the allegedly unlawful competitive benefit must be shown to result in "an actual or imminent increase in competition."); *see also El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) ("The nub of the 'competit[or] standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause [a plaintiff] to lose business, there is no need to wait for injury from specific transactions to claim standing."). Much like the consolidation theory discussed above, this argument would reduce the many questions a student-loan borrower asks herself before choosing a lender into a single one: is the loan potentially eligible for forgiveness under a proposed rule?

But borrowers' choices are not so simple. In the very context of the student loan marketplace, the Sixth Circuit recently rejected a non-profit's competitive-injury claim based solely on speculation. *See Mackinac Ctr. for Public Pol'y v. Cardona*, 102 F.4th 343, 355-56 (6th Cir. 2024). Similarly here, Plaintiffs offer little more than their own view that potential loan discharge is superior to other benefits (some of which Plaintiffs themselves identify, like lower interest rates and "the convenience of the Bank working directly with in-state post-secondary institutions." Pls.' Br. at 27), and so this standing

argument should meet the same fate. In fact, in emphasizing the purported superior appeal of the (again, proposed) rule, Plaintiffs advance a patently incorrect reading of what that rule might do. Borrowers would purportedly forgo refinancing through the Bank, Plaintiffs say, because the proposed SDR rules would "seek to implement the SAVE Rule." Pls.' Br. at 27. Putting aside the Department's stated intention not to implement a finalized version of the proposed § 30.84 (which would forgiveness akin to that available on ICR plans to borrowers not enrolled in them) so long as the forgiveness authorities applicable to the SAVE Plan are enjoined, Kvaal Decl. ¶ 37., the SDR proposal would not directly alter borrowers' payments whatsoever. *See* 89 Fed. Reg. 27,613-15.

All told, Plaintiffs must offer far more than they have to prove that the NPRM will move the needle for borrowers in one direction or another, and thus that North Dakota has shown standing through one bank. *Air Excursions, LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023) ("[T]he competitor standing doctrine supplies the link between increased competition and tangible injury but does not, by itself, supply the link between the challenged conduct and increased competition."); *Mackinac Ctr.*, 102 F.4th at 356.[6]

**3.** In a last-ditch effort to establish standing, Plaintiffs turn to a tax-revenue theory that no court has adopted in the prior student-loan cases in which it was advanced. Plaintiffs note that four of the seven of them (Missouri, Georgia, North Dakota, and Ohio) tie their state definitions of taxable income to the federal definition, Pls.' Br. at 28, and that the federal definition will exclude loan forgiveness effectuated through the end of 2025, *id.* at 29. Because (in their telling) the Department will forgive loans before 2026 that it otherwise would have forgiven afterward, they will experience loss in the form of missed tax revenues. *Id.* at 29. This roundabout standing theory is incorrect for multiple independent reasons, as Defendants also argue in a concurrently filed motion to dismiss.

---

[6] For the reasons explained in Defendants' motion to dismiss for lack of venue, even if Missouri or North Dakota or both have Article III standing, that is not enough for this suit to proceed in this forum, because Plaintiff Georgia's residence is the only conceivable basis for venue in this Court. None of the standing theories discussed above applies to Plaintiff Georgia.

Every court to consider this theory of standing in challenges to other student-debt relief actions has rejected it. This Court should too.

First, these States' alleged harm would result from their own choices to tie their tax laws to the Internal Revenue Code. The Supreme Court's decision in *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), squarely forecloses a State's effort to claim standing on such a self-generated basis. There, Pennsylvania sought to show standing to challenge a New Jersey tax by arguing that, because Pennsylvania provided a credit for taxes paid to other States, a tax increase in New Jersey would lead to a loss of tax revenue in Pennsylvania. *Id.* at 664-65. The Supreme Court rejected that theory, explaining that nothing required Pennsylvania to provide the credit, that any harm to Pennsylvania was thus "self-inflicted," and that "[n]o State can be heard to complain about damage inflicted by its own hand." *Id.* at 664; *see also FEC v. Cruz*, 596 U.S. 289, 297 (2022) (summarizing *Pennsylvania*).

Any reduction in the States' tax revenues here is self-inflicted in the same way. States need not use the same definition of gross income as the federal government does, and in fact they routinely exercise their independence in this area by defining income in a variety of different ways. Plaintiff Florida, for example, chooses not to tax personal income at all. *See* Tax Foundation, *State Individual Income Tax Rates, 2024* (Feb. 20, 2024), https://perma.cc/CU4A-5LT2. All other States are likewise free to depart from the Internal Revenue Code's approach and to treat student-loan discharges from 2021 to 2025 as taxable state income. If they choose not to, any resulting reduction in their tax revenues is fairly traceable not to the Secretary's plan, but instead, as in *Pennsylvania*, to "decisions by their respective state legislatures" about how to structure their own tax laws. 426 U.S. at 664. Every court to consider this question in the context of student-debt relief has reached that same conclusion. *See Kansas v. Biden*, 2024 WL 2880404, at *17 (D. Kan. June 7, 2024) (holding that "[t]he SAVE Plan didn't cause plaintiffs' injuries—plaintiffs' own tax policy caused them," and that "in general, reduced state tax revenue doesn't qualify as an injury in fact sufficient to confer standing on a state"); *Garrison v. Dep't of Educ.*, 636 F. Supp. 3d 935, 937 (S.D. Ind. 2022) (no standing to challenge debt relief based on "an increased state tax burden" because "the Federal Government's student loan relief program did not injure" plaintiffs, rather, "[t]he State's legislative decision did").

Second, even apart from the self-inflicted nature of the States' asserted harm, the Supreme Court's decision in *Florida v. Mellon*, 273 U.S. 12 (1927), establishes that a federal policy's incidental effects on state tax revenues are not judicially cognizable injuries. There, Florida sought to establish standing to challenge a federal inheritance tax by arguing that the tax would prompt the "withdrawal of property" from the State, diminishing its tax base. *Id.* at 18. The Supreme Court rejected that argument, explaining that Florida was required to show a "direct injury" and that any harm caused by the federal tax was, "at most, only remote and indirect." *Id.* (emphasis omitted). That analysis equally applies here: Just as Florida could not establish standing by claiming that state tax revenues would decline because of a federal policy, the States here cannot do so either. *See Kansas*, 2024 WL 2880404, at *16-17 (citing *Florida*, 273 U.S. at 12-18).

Plaintiffs' contrary view would have dramatic implications. Virtually all federal actions—from prosecuting crime to imposing taxes to managing property—have some incidental effects on state finances. If such incidental effects suffice for standing, every State would have standing to challenge almost any federal policy. That would flout Article III's case-or-controversy requirement and convert the federal courts into "an open forum for the resolution of political or ideological disputes." *Richardson*, 418 U.S. at 192 (Powell, J., concurring); *see Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing."). The Supreme Court has repeatedly stressed those sorts of concerns in rebuffing broad theories of Article III standing, including in other recent litigation between States and the United States. *Cf., e.g.*, *United States v. Texas*, 599 U.S. 670 (2023).[7]

Third, the States' theory of reduced tax revenues is "too attenuated" and "too speculative." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024). "Standing is not 'an ingenious academic

---

[7] To that end, Plaintiffs' complaint (but not their TRO motion) contains many unexplained references to their "sovereign" and "quasi-sovereign" interests. Compl. ¶¶ 11-23. To the extent that Plaintiffs mean to half-heartedly invoke some sort of *parens patriae* theory, it is settled that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (citation omitted).

exercise in the conceivable'"; rather, a plaintiff must show that its asserted injury is "certainly impending." *Lujan*, 504 U.S. at 564 n.2, 566 (citations omitted); *Clapper*, 568 U.S. at 409. First and foremost, Plaintiffs' claimed injury stems from a proposed, not actual, rule. Moreover, the hypothesized loss of tax revenues starting in 2026 is neither certain nor impending. Instead, it depends on the assumption that if borrowers did not receive discharges under the plan, they would receive discharges for other reasons; that those discharges would not occur until 2026 or later; and that neither state nor federal law would change in the meantime. The States' theory thus depends on a "speculative chain of possibilities," which does not suffice to establish standing. *Murthy*, 144 S. Ct. at 1993.

Nor can Georgia rely on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992). There, Oklahoma adopted discriminatory regulations with the avowed purpose of reducing purchases of coal from Wyoming. *Id.* at 443. The Supreme Court held that Wyoming had standing to challenge the Oklahoma laws under the Commerce Clause because it had suffered "a direct injury in the form of a loss of specific [coal] tax revenues." *Id.* at 448. But here, Plaintiffs do not claim that the Department targeted or discriminated against them. *Cf. Kansas*, 2024 WL 2880404, at *17 ("The SAVE Plan doesn't target plaintiffs or their tax policies."). They allege, at most, that debt relief will have incidental effects on its general tax revenues, which is not a cognizable Article III injury. *See Florida*, 273 U.S. at 18.

Finally, Plaintiffs cannot avoid this result by recasting their theory of self-inflicted injury as a "sovereign injury" arising from some imagined pressure to "change state tax law" to avoid the revenue losses they fear. Compl. ¶ 122. The four states whose definitions of taxable income track the federal definition retain their "sovereign" interests in full—nothing in any of the challenged agency actions (nor any provision of federal law) requires any State to include or exclude loan forgiveness from its state-law definition of taxable income, nor otherwise constrains state tax law in any relevant sense. In other words, the question is not whether these States must "change state tax law" to avoid an injury— they simply cannot claim any Article III injury from its own "state tax law" in the first place. *Id.*

\*       \*       \*

In sum, Plaintiffs' theories of standing are nothing more than hypothetical claims of harm that could come to pass if other events also occur, *see* Pls.' Br. at 22-26 (MOHELA), 26-28 (Bank of

North Dakota); or else injuries that Plaintiffs will suffer, if at all, at their own hands, *see id.* at 28-29 (state tax revenues), assuming a final rule is promulgated in the form Plaintiffs expect, and the Department acts pursuant to it.  But Article III does not permit federal litigation built on speculation or self-inflicted harm.  For these reasons, Plaintiffs have not carried their standing burden.

## II.    PLAINTIFFS' MOTIONS SHOULD BE DENIED.

Because Plaintiffs challenge non-final agency action, and because they lack standing, the Court lacks subject matter jurisdiction to reach the merits of this dispute.  *Murthy*, 144 S. Ct. at 1985; *see Evansmill Townhomes Owners' Ass'n v. Broner*, No. 1:22-cv-3595, 2022 WL 17920438, at *2 (N.D. Ga. Sept. 8, 2022) (denying a motion for a temporary restraining order for lack of subject matter jurisdiction).  But in any event, Plaintiffs' motions are meritless.

"A preliminary injunction is an 'extraordinary and drastic remedy,'" for which Plaintiffs "bear[] the 'burden of persuasion' to clearly establish all four of [the] prerequisites" for its issuance.  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).  Those four prerequisites are (1) a likelihood of success on the merits; (2) irreparable harm to the movant from the withholding of relief; (3) that the balance of the equities tips in the movant's favor, and (4) that a preliminary injunction would be in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[8]

All of Plaintiffs' claims arise under the APA, which presupposes the existence of final agency action that is absent here.  Because they have not surmounted this threshold obstacle, they are unlikely to succeed on the merits of their claims.  As detailed more fully above, Plaintiffs' claims of harm are so attenuated as to mean standing is lacking; by extension, they cannot point to certainly impending irreparable harm.  And a preliminary injunction that affects non-final agency action does violence to

---

[8] Plaintiffs also move for a "stay" under 5 U.S.C. § 705, which permits a court to "postpone the effective date" of an agency action "to the extent necessary to prevent irreparable injury."  Pls.' Br. at 51.  But they concede that the traditional four-factor preliminary-injunction test governs relief under that statute. *Id.* at 18 (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  Likewise, the standards governing the issuance of a temporary restraining order are the same as those that govern a preliminary-injunction motion.  *Windsor v. United States*, 379 F. App'x 912, 916-17 (11th Cir. 2010).

regular administrative order, pushing the public interest against such relief. The motions should be denied.

### A.    Plaintiffs are not likely to succeed on the merits of their APA claims.

As Plaintiffs recognize, the first preliminary-injunction factor is "generally the most important." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 775 (11th Cir. 2024) (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020)); *see* Pls.' Br. at 18 (citing *Am. All.*). Here, then, their failure to establish that their four claims are even cognizable under the APA is fatal.

The complaint brings four claims, all arising under the APA: agency action in excess of statutory jurisdiction, Compl. ¶¶ 130-57; action in excess of statutory authority, Compl. ¶¶ 158-84; arbitrary and capricious agency action, Compl. ¶¶ 185-208; and agency action in violation of statutory procedures, Compl. ¶¶ 209-220. The same absence of finality that deprives the Court of subject matter jurisdiction means that Plaintiffs have not stated an APA claim, *see Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006) (citing *Reliable Auto. Sprinkler Co. v. CPSC*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action . . . , there is no doubt that appellant would lack a cause of action under the APA." (alteration in original))), much less shown a likelihood of success on one.

Plaintiffs' arguments illustrate the point. Plaintiffs cannot plausibly fault the Secretary for exceeding the limits of his statutory powers, Pls.' Br. at 30-41, when the government has not even definitively decided what the scope of any SDR rules will be, if the ongoing rulemaking produces them at all, Kvaal Decl. ¶ 32. Likewise, it borders on the absurd to say (as Plaintiffs nonetheless do) that the Department has violated the Congressional Review Act[9] because of a rule's effective date that has not even been promulgated. *See* Pls.' Br. at 42; 5 U.S.C. § 801(a)(3). As for Plaintiffs' ill-founded accusation that the Department is attempting to skirt judicial orders in other litigation, *see* Pls.' Br. at 41-42, the Kvaal Declaration definitively puts the idea to rest, Kvaal Decl. ¶ 37. Plaintiffs' sundry

---

[9] Defendants note that Plaintiffs' CRA argument is not reviewable, even if present facts justified its assertion. 5 U.S.C. § 805.

other concerns (some of which they have expressly declined to brief fully, even while seeking extraordinary relief, *see* Pls.' Br. at 43), amount to assertions that ongoing procedures did not measure up to the benchmarks Plaintiffs believe they should have, even while the Department has not brought those procedures to their conclusion.  *See* Pls.' Br. 42-45 (taking issue with the Department's NPRM cost estimates, consideration of several factors, and comment period).

If and when the Department issues a final rule in this regulatory process, it anticipates mounting a full substantive defense of that rule against any APA challenge.  But as yet, with no final action to defend, any such arguments would be hypothetical and thus inappropriate.  Plaintiffs have made out, in other words, no APA claim at all, to say nothing of one that will likely be successful.

**B.    Plaintiffs have not shown certainly impending irreparable injury.**

"Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176 (citation omitted).  Plaintiffs repeat their standing arguments here, averring that their lost servicing fees, tax revenue, interest income, as well as (with respect to the Bank of North Dakota) forgone state loan business, constitute irreparable injury.  Pls.' Br. at 45-47.  But Plaintiffs have not demonstrated that these harms will even come to pass, much less that they are irreparable.  *See supra* Part I.A; *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (the irreparable-injury showing is more stringent than injury-in-fact).  This shortcoming is dispositive.  *Siegel*, 234 F.3d at 1176; *see also Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1359 (N.D. Ga. 2022) ("To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." (quoting *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015))); *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) ("It is the political branches—not the courts—that are broadly tasked with managing government policies in the absence of any actual or imminent injury." (citing *Lewis v. Casey*, 518 U.S. 343, 349-50 (1996))).

**C.      The public interest would be disserved by an injunction.**

Where, as here, the federal government is the defendant, the third and fourth factors merge into a consideration of the public interest.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The public interest in this case clearly favors Defendants.  Through their emergency motion, Plaintiffs inappropriately seek to insert themselves into an ongoing administrative process before that process has concluded.[10] The very justiciability doctrines invoked above exist to prevent premature interference with the Executive Branch's discharge of its obligations under federal law.  And those concerns here are not abstract; they have materialized.  Shortly after receiving notice of the Court's September 5 order, in an abundance of caution, the Department ceased its preparatory work with servicers in anticipation of promulgating a final SDR rule.  Kvaal Decl. ¶ 31; *see also* Ex. 2.  Such instructions delay and complicate the implementation of any eventual final rule, creating considerable confusion along the way, contrary to Plaintiffs' assertion that an injunction "freeze[s] the status quo as it currently exists." Pls.' Br. at 47.

On the other side of the balance, Plaintiffs have not shown any impending injury to their own interests or others'.  Instead, they take issue (at 48) with the underlying policies, results, and legality of the NPRM.  Pls.' Br. at 48-49.  But the NPRM is not a final rule, and is only an expression of the agency's interlocutory views.  Plaintiffs' asserted concerns, in other words, are illusory.

**III.      PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.**

For the reasons above, the Court neither has jurisdiction nor is confronted with a final rule it could act upon.  Nevertheless, should the Court conclude that an injunction is warranted, the relief that Plaintiffs request is still overbroad, for several independent reasons.

---

[10] Notably, in addition to the generally available opportunity to comment on the proposed rules, *see* 89 Fed. Reg. at 27,564, Plaintiffs (through their lead counsel) were able to participate directly in the negotiated rulemaking process, through a seat on the committee itself.  *Id.* at 27,568.  They declined that opportunity.  *Id.* (naming as a participant "Josh Divine (alternate), Missouri Attorney General's Office who withdrew from the committee during the third session.").

**A.**    **Any relief should be limited to redressing any cognizable injuries of any Plaintiff State that can establish standing.**

Plaintiffs call on the Court to "issue relief against the rule in its entirety, and not allow the rule to be implemented in other States." Pls.' Br. at 49. Even ignoring the glaring absence of a final rule, this request amounts to an invitation for the Court to exceed longstanding constitutional and historical limits on its equitable powers. The Court should decline that invitation, even if Plaintiffs were to prevail on every other issue.

Article III demands that "a plaintiff's remedy . . . be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis*, 518 U.S. at 357). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) ("What is the traditional scope of injunctive relief? The 'extent necessary to protect the interests of the parties.'" (quoting *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003))). Thus, English and early American courts of equity typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).

These same principles suggest that any equitable relief issued here must be limited to any Plaintiff State that can establish standing. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); *see also Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Mem.) (Gorsuch, J., concurring) ("The district court's universal injunction defied [equity's] foundational principles. It did not just vindicate the plaintiffs' access to the drug treatments they sought. It purported to bar the enforcement of 'any provision' of the law against anyone." (internal citation omitted)). It is thus incorrect to say, as Plaintiffs do, that only one Plaintiff need show standing for all to be awarded relief. *See* Pls.' Br. at 20. It may be enough for one plaintiff to show standing such

29

that an appellate court has jurisdiction to reach the merits of that plaintiff's claims. *See id.* (quoting *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124-25 (11th Cir. 2019)). But for remedial purposes (including temporary injunctive relief), "standing is not dispensed in gross." *TransUnion*, 594 U.S. at 431. So one plaintiff's standing does not entitle the other plaintiffs to relief, absent independent showings of harm. *Lewis*, 518 U.S. at 349 ("It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, *actual* harm." (emphasis added)).

Honoring the remedial bounds of equity here would also mean tailoring any future relief more narrowly than the Court's September 5 temporary restraining order arguably did (understandably, given the remarkably short timeframe within which the Court was asked to act). *See Georgia*, 46 F.4th at 1304. That order enjoins Defendants from "implementing the Third Mass Cancellation Rule," TRO at 5, leaving unclear whether the Department may continue its preparations for the eventual promulgation of a final SDR rule. Out of an abundance of caution, the Department immediately issued stop-work orders to its servicers and other vendors. Kvaal Decl. ¶ 31. But all of the harms Plaintiffs have alleged (however faintly) purportedly stem from the Department's forgiveness of loans—not from the Department's preparations to promulgate a final rule. Accordingly, a future order of breadth analogous to the temporary restraining order's would be "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" at this juncture. *See Califano*, 442 U.S. at 702.

That Plaintiffs also move under § 705 of the APA, rather than for a preliminary injunction alone, is no basis to depart from these constitutional and equitable constraints. The text of the statute settles the point:  5 U.S.C. § 705 authorizes a court "to the extent necessary to prevent irreparable injury" "to issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." Definitionally then, relief here must be limited to whatever "action" Plaintiffs can establish that both (1) has been taken by the agency and (2) has harmed them. Judge Wood recently affirmed these principles in *Kansas v. Department of Labor*, No. 2:24-cv-76, 2024 WL 3938839 (S.D. Ga. Aug. 26, 2024). There, despite finding that the plaintiffs were entitled to relief against a (final) rule issued by the Department of

Labor, the court expressly noted that "[n]ationwide relief is disfavored," *id.* at *10, even when plaintiffs invoked § 705, *id.* at *11.

Were the text not enough, Plaintiffs' prayer for relief runs headlong into the interpretive presumption (reaffirmed by the Supreme Court just months ago) that a statute ought not be construed "to depart from established [equitable] principles," "absent a clear command from Congress." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)); *see also Miller v. French*, 530 U.S. 327, 340 (2000) (quoting *Califano*, 442 U.S. at 705, then quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *Sampson v. Murray*,  415 U.S. 61, 68 n.15 (1974) (§ 705 "was primarily intended to reflect existing law."). Such a clear statement being absent from 5 U.S.C. § 705, the Court must exercise that traditional equitable authority, which manifests through the traditional preliminary-injunction factors (and their corresponding limits).  *See Starbucks Corp.*, 144 S. Ct. at 1576; *see also Texas*, 599 U.S. at 693-702 (Gorsuch, J., concurring) (suggesting that the same limitations apply to actions seeking vacatur under the APA); *Arizona v. Biden*, 40 F.4th 375, 396-97 (6th Cir. 2022) (Sutton, C.J., concurring) (similar).  Not only is a clear statement displacing traditional equitable principles missing, but rather the text of § 705 should be read to incorporate those principles itself through the phrase "necessary and appropriate process." *Cf.  Starbucks Corp.*, 144 S. Ct. at 1576-77 (analyzing the similar phrase "just and proper" as incorporating equitable principles).  So here, the whole of equity, with all its guardrails, governs Plaintiffs' request for relief.

**B.    The Court lacks authority to enter relief directly against the President.**

Plaintiffs have named President Biden as a defendant.  Compl. ¶ 28.  But "[w]ith regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *id.* at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866).  Accordingly, if the Court does not dismiss the case in its entirety, it should at least dismiss the President as a defendant, and likewise should not include him within the

scope of any injunction.  *See, e.g.*, *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 829 (N.D. Tex. 2022); *Oklahoma v. Biden*, 577 F. Supp. 3d 1245, 1254 (W.D. Okla. 2021).

## <u>CONCLUSION</u>

For these reasons, the Court should deny Plaintiffs' motions for a stay, temporary restraining order, or preliminary injunction.

Dated:  September 10, 2024

JILL E. STEINBERG
United States Attorney
Southern District of Georgia


/s/ Shannon H. Statkus
SHANNON H. STATKUS
Assistant United States Attorney
South Carolina Bar No. 70410
Post Office Box No. 2017
Augusta, Georgia 30903
Tel.:  (706) 724-0517

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director


/s/ Simon G. Jerome
STEPHEN M. PEZZI
 D.C. Bar No. 995500
 Senior Trial Counsel
SIMON GREGORY JEROME
 D.C. Bar. No. 1779245
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.:  (202) 514-2705
Email:  simon.g.jerome@usdoj.gov

*Counsel for Defendants*

33