UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

```
State of Missouri,           )
State of Georgia,            )
State of Alabama,            )
State of Arkansas,           )
State of Florida,            )
State of North Dakota, and   )
State of Ohio,               )
                             )
        Plaintiffs,          )
                             )
    vs.                      )   Case No. 2:24CV103
                             )
United States Department of  )
Education,                   )
                             )
Miguel A. Cardona, in his    )
official capacity as         )
Secretary, United States     )
Department of Education, and )
                             )
Joseph R. Biden, Jr., in his )
official capacity as         )
President of the United      )
States,                      )
        Defendants.          )
_____ )
```

MOTIONS HEARING
BEFORE THE HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT COURT JUDGE
TUESDAY, SEPTEMBER 18, 2024; 9:59 a.m.



FOR THE PLAINTIFFS:

    Joshua M. Divine, Esquire
    Reed C. Dempsey, Esquire
    Missouri Attorney General's Office
    Post Office Box 899
    Jefferson City, Missouri 65102
    (573)751-8870


FOR THE DEFENDANTS:

    Simon Gregory Jerome, Esquire
    Stephen Michael Pezzi, Esquire
    United States Department of Justice-Civil Division
    1100 L Street NW, Suite 12306
    Washington, DC 20005
    (202)445-4127

    Shannon Heath Statkus, Esquire
    United States Attorney's Office- Augusta
    Post Office Box 2017
    Augusta, Georgia 30901
    (706)724-0517


OFFICIAL COURT REPORTER:

    Lisa H. Davenport, RPR, FCRR
    Post Office Box 5485
    Aiken, South Carolina 29804
    (706)823-6468

1       (Call to Order at 9:59 a.m.)

2               THE CLERK:  The court calls case no. 2:24CV103.  The

3     State of Missouri, et al, v United States Department of

4     Education, et al.  Joshua Divine and Reed Dempsey for the

5     Plaintiffs.  Simon Jerome, Stephen Pezzi, and Shannon Statkus

6     for the Defendants.  Here for a motions hearing.

7               THE COURT:  Thank you.  Good morning, everyone.

8     Pardon me for a moment.  Technology.  It won't sign in the way

9     I want it to.  There we go.  All right.  I'm sorry.  Good

10    morning.

11      (Group responds simultaneously.)

12              THE COURT:  Pleasure to see all of you today.  So it

13    looks like on behalf of the Plaintiffs I have Joshua Divine?

14              MR. DEVINE:  Here, Your Honor.

15              THE COURT:  Good morning.

16              MR. DEVINE:  Good morning.

17              THE COURT:  And Reed Dempsey?

18              MR. DEMPSEY:  Good morning, Your Honor.

19              THE COURT:  Good morning.

20              And on behalf of the Government, Simon Gregory Jerome?

21              MR. JEROME:  Good morning, Your Honor.

22              THE COURT:  Good morning.

23              And Shannon Statkus, who I know.

24              MS. STATKUS:  Good morning, Your Honor.

25              THE COURT:  Good morning.

4

1           And Stephen Michael Pezzi?

2           MR. PEZZI:  Yes, Your Honor.

3           THE COURT:  Is that correct?

4           MR. PEZZI:  That's correct.

5           THE COURT:  Well, welcome to the Southern District of

6    Georgia.  I am glad to see all of you and to meet you and I

7    look forward to going through this hearing with you.  As I see

8    this today I have three primary matters to consider and that is

9    whether to convert the current temporary restraining order that

10   the court issued on the 5th of September to a preliminary

11   injunction.  Related to that is the Government Defendant's

12   motion to dismiss for venue and then a motion to clarify the

13   temporary restraining order as to the extent of that order and

14   what the Defendants could be allowed to do should the order

15   remain in place and should a preliminary injunction be issued.

16           As part of this I note that there was a consent motion

17   filed, Document 44, to file excess pages, and I am going to

18   orally grant that motion so that will take care of that

19   housekeeping.

20           So it's been well briefed and argued.  I appreciate

21   that.  Good lawyering always helps the Court to do a better

22   job.  I guess what I'll do is I'll look to the Plaintiffs if

23   you want to make some opening remarks or arguments.  I'm sorry.

24   I'm looking at the wrong table.  Quite frankly, I am just used

25   to seeing the Government over here and not over here, but,

1    anyway, I'll get that right in a minute.

2           Anyway, I'll let you make some opening statements or

3    whatever you'd like to say to the Court.  Then I'll let the

4    Defendant do the same thing and then I have sort of an agenda

5    that I want to follow to address what I see are the more

6    important issues today and that is particularly as it relates

7    to the injunctive relief and that is the issue of standing,

8    venue, and subject matter jurisdiction and then some related

9    matters.

10          So, with that, Mr. Divine, I assume -- you're first

11   chair -- you're going to take the wheel?

12          MR. DEVINE:  Yes, Your Honor.  Thank you.

13          THE COURT:  You may come to the lectern and we'll take

14   off.

15          MR. DEVINE:  Your Honor, we did discuss previously

16   that the Defendants may be doing their venue motion first and

17   then me following.  I am happy to follow that order.

18          THE COURT:  No, whatever you want to do.  Whatever

19   you've agreed to is fine with me.

20          MR. DEVINE:  Thank you, Your Honor.

21          THE COURT:  Go right ahead then.

22          Good morning.

23          MR. PEZZI:  Good morning, Your Honor.  Stephen Pezzi

24   from the Department of Justice on behalf of the Defendants.

25   With the Court's indulgence, as my friend Mr. Divine said I

1   would like to address the venue issues --

2           THE COURT:  Sure.

3           MR. PEZZI:  -- and Defendants' motion to dismiss first

4   and then my colleague, Mr. Jerome, will address the remaining

5   issues momentarily.

6           THE COURT:  All right.  Perfect.

7           MR. PEZZI:  So we have moved to dismiss for improper

8   venue for two separate and independent reasons and we think

9   Your Honor has to address those issues before getting to the

10  question of further injunctive relief for the merits of this

11  case.  The first argument is that the only Plaintiff on which

12  venue in this court could be based -- and I think Plaintiffs

13  concede this -- is based on the residence of the State of

14  Georgia and so the complaint does not articulate any other

15  theory of venue.  It is only -- venue here is only proper based

16  on Georgia's residence.

17          The first problem with that theory is that Georgia

18  lacks Article III standing and a Plaintiff who lacks

19  Article III standing cannot be the sole basis for venue in a

20  federal district court and the second wholly independent

21  problem with that theory which I'll get to in a moment is that

22  the State of Georgia resides based on the plain text of the

23  federal venue statute only in the judicial district in which it

24  has its principal place of business.  In this case that is the

25  state capitol of Atlanta in the Northern District of Georgia.

1          So on the first question, Georgia's lack of

2    Article III standing, it is important to keep track of the

3    various standing theories that are flying around in this case.

4    Your Honor's TRO order, for example, addressed the theory

5    advanced by Missouri with respect to its state instrumentality

6    called MOHELA that services federal student loans.

7          THE COURT:  Yes.

8          MR. PEZZI:  Plaintiff North Dakota also has

9    allegations about a state instrumentality that plays some role

10   in the student loan market.

11         Obviously, we have arguments there.  My colleague,

12   Mr. Jerome, will address them, if necessary, but none of that

13   helps the State of Georgia which articulates one and only one

14   theory of Article III standing.  It is based on a future loss

15   of state income tax revenue as a result of Georgia's own state

16   income tax laws.  Every court to consider that theory of

17   standing in the context of litigation related to student loan

18   discharge of which there's been quite a bit in the last few

19   years has all reached the same conclusion and it is that that

20   theory of standing is inconsistent with Supreme Court

21   precedent; in particular, two cases:  One called Pennsylvania v

22   New Jersey and one called Florida v Mellon.

23         The central problem whether you want to think of it as

24   a problem of self-inflicted injury or a problem of traceability

25   is the same.  It is that Georgia's theory turns on injuries it

1    believes it will suffer because of the application of its own

2    state income tax code and just to reiterate here the theory is

3    that the -- typically, a discharge of debt is taxable income

4    under the Internal Revenue Code.

5         There is a federal law that was enacted in 2021, the

6    American Rescue Plan Act, during the Covid era that changed

7    that temporarily until January of 2026 and so Georgia's theory

8    is that income that would -- debt that would have been forgiven

9    in the future sometime after 2026 now under the agency actions

10   contemplated here that they challenge will instead be forgiven

11   before 2026, thus will not be taxable income under federal

12   income tax law and Georgia in relevant part defines income for

13   Georgia's state income tax code starting with the baseline of

14   the federal definition.

15        Now the critical problem with that theory is it is

16   Georgia's decision and Georgia's decision alone to in part tie

17   its definition of income to the federal definition.  We know

18   this because, for example, Plaintiff Florida doesn't have a

19   state income tax at all and Georgia itself -- I think it is

20   undisputed and we cite a few examples in our briefs -- deviates

21   from the federal definition of income in various ways, large

22   and small.  Currently, they do not deviate from the definition

23   of income relating to the discharge of student loan debt, but,

24   again, that is solely a choice of the Georgia legislature and

25   there is no federal law constraint that requires the State of

1    Georgia to treat income that way.

2         So Plaintiffs' primary response, I think, to this

3    argument is that they have a sovereign interest in defining

4    income in the way they wish to define it which, I mean, we

5    don't dispute.  The problem with the theory is that whether

6    they change their laws to, you know, "fix" this problem, for

7    lack of a better word, or not, that is a decision of the

8    Georgia legislature.  Again, we cite three of the three cases

9    in our brief that have reached a conclusion on this issue in

10   the context of student loan discharge.  They all come out the

11   same way and there is no basis for a contrary conclusion.

12        THE COURT:  So, but, let me ask you under the Biden

13   versus Nebraska case -- and we found some Eleventh Circuit

14   cases that seem to follow the same theory and that is -- and I

15   alluded to it in the temporary restraining order.  I mean, once

16   the court determines that Missouri has standing, then I am not

17   required, am I, to go into the standing of Georgia and the

18   other Plaintiffs?  Isn't that what Biden versus Nebraska says?

19   I need not consider their standing and if I determine that

20   Missouri has standing, then the lawsuit can proceed?

21        MR. PEZZI:  Respectfully, Your Honor, I don't think

22   that is correct and I am happy to explain why.

23        THE COURT:  I'd like to hear it because that's -- I am

24   reading from Biden versus Nebraska: "Because we conclude that

25   the Secretary's plan harms MOHELA and thereby directly injures

1    Missouri conferring standing on that state we need not consider

2    the other theories of standing raised by the States."

3              MR. PEZZI:  That's right.  So we, obviously, have ---

4              THE COURT:  So are we reading that differently?

5              MR. PEZZI:  We have some disagreements that are not

6    relevant to my answer to this question which I will save for

7    Mr. Jerome to the extent it comes up, but what matters for this

8    question is that statement had nothing to do with venue.  Venue

9    was not challenged in that case.

10             THE COURT:  I understand.

11             MR. PEZZI:  And so there is no reason to think what

12   the Supreme Court was saying there was that a plaintiff who

13   lacks Article III standing can be the sole basis for venue in

14   federal district court.  Now courts have looked at that precise

15   question and we cite seven cases supporting our view that a

16   plaintiff who lacks Article III standing cannot be the sole

17   basis for venue in federal district court.

18             THE COURT:  Okay.

19             MR. PEZZI:  Plaintiffs cite zero cases to the

20   contrary.  I am aware of none and they don't even respond to

21   the cases that we cite for this proposition.  Now thinking

22   about it from a matter of first principles even if no court had

23   ever addressed this question I think that has to be the answer

24   and, in fact, it's why I think sometimes plaintiffs don't even

25   dispute this point when we raise this sort of argument in the

1   federal government.  Imagine instead that this lawsuit --

2   instead of Missouri and six other states, one of which was

3   Georgia -- was Missouri and one local concerned citizen of

4   Augusta, Georgia who was opposed to the federal government's

5   policies with respect to student loan debt.  I think,

6   obviously, everyone agrees that, you know, mere disagreement

7   with federal policy is not enough to get into federal court,

8   but I think on Missouri's theory and taken to the logical

9   conclusion the idea that standing for one is standing for all

10  even when there is a venue argument that would mean that you

11  could sue in any district -- any of the 93 federal districts in

12  America Missouri could sue.

13          All they need to do is recruit one local concerned

14  citizen to show up in the caption as the local venue-creating

15  plaintiff and then when the government moved to dismiss that

16  plaintiff for lack of standing and said plainly a local

17  concerned citizen can't get into federal court based on a mere

18  disagreement with federal policy, Missouri's response, I guess,

19  would be, no, it doesn't matter because Missouri has standing

20  and standing for one is standing for all.  I think that can't

21  possibly be right as a matter of first principles.  I have

22  never seen a case say that and I don't think Biden v Nebraska

23  answers the question.

24          Now on that point I guess the last thing I would say

25  is there's just no reason that Your Honor can't decide the

1   question of Georgia's Article III standing without having to --

2   there is just no -- it's not a particularly difficult question,

3   I guess, is what I would say.  Georgia's theory of Article III

4   standing is one that many courts have addressed, and we think

5   it is straightforward here.

6           THE COURT:  Okay.

7           MR. PEZZI:  The second theory of -- so before I get to

8   the second theory, to be clear our second theory is about the

9   location of the state capitol --

10          THE COURT:  Right.

11          MR. PEZZI:  -- and whether Georgia resides in every

12  district in Georgia or instead in the Northern District of

13  Georgia.  Your Honor does not have to decide that question if

14  Your Honor agrees with us on the first question that we were

15  just discussing.  Now if Your Honor disagrees with us on the

16  first question such that Your Honor reaches this question about

17  the location of the state capitol, our position on that

18  separate argument is based almost entirely on the plain text of

19  the federal venue statute.  So 28 U.S.C. § 1391(c)(1) -- if I

20  am bungling the citation, I apologize.  It is, of course, in

21  our brief.

22          THE COURT:  That's okay.  I've seen it.

23          MR. PEZZI:  It defines the word residency for "all

24  venue purposes".  It then lists the different possible

25  plaintiffs and defendants who sometimes appear in federal court

1  and the only possible fit for the State of Georgia here is in

2  1391(c)(2) which is "an entity with the capacity to sue and be

3  sued in its common name under applicable law, whether or not

4  incorporated."

5       Georgia is an entity with the capacity to sue and be

6  sued in its common name under applicable law.  It has done so

7  here and the language whether or not incorporated, of course,

8  suggests this is not limited to corporations, for example.  The

9  Plaintiffs' primary response to this theory is almost entirely

10  based on precedent -- out of circuit precedent, to be clear.

11  They correctly note and we do not -- did not dispute this in

12  our papers and I will not dispute it here today -- that the

13  courts that have looked at this question have consistently

14  rejected the federal government's position.  We think they have

15  done so based on a misreading of the plain text of the statute

16  and I think if Your Honor consults those decisions I hope Your

17  Honor will agree.

18       So there is only one Court of Appeals precedent on

19  this issue and that's a Ninth Circuit decision called

20  California v Azar that I think fairly openly adopts an atextual

21  reading of the statute for reasons of what it calls common

22  sense and it's similar to the position that the Plaintiffs

23  advance here which is just that in their view it doesn't make

24  sense to have states be subject to the same rule as these other

25  sorts of entities because states are different in some way,

1    and, respectfully, I think that is a perfectly fine argument to

2    be addressed to the U.S. Congress if there were to be some

3    amendment to the federal venue statute, but with respect to the

4    text that Congress actually enacted it is almost entirely

5    non-responsive to that argument.

6          Plaintiffs ---

7          THE COURT:  So the contention of the Government is

8    that those decisions are wrongly decided based upon the

9    language of the statute?

10         MR. PEZZI:  Correct, Your Honor.

11         THE COURT:  I mean, that sums it up.

12         MR. PEZZI:  That sums it up.  To be clear, most of

13   them do not even purport to grapple with the text of the

14   statute so I don't think it should be a particularly heavy lift

15   for Your Honor to do the sort of independent thinking on this

16   issue that we suggest that Your Honor do, but, yes, if I could

17   point you to an Eleventh Circuit case that resolved this in our

18   favor, I, obviously, would have.  The ---

19         THE COURT:  We couldn't find one either on either

20   side.

21         MR. PEZZI:  That is our view.

22         THE COURT:  Right.

23         MR. PEZZI:  Now, to be clear, there is a Fifth Circuit

24   opinion from 1892 --

25         THE COURT:  Which they cite.

1          MR. PEZZI:  -- which they cite and we explain in our

2    reply brief and I think this is quite clear -- I mean, our

3    argument is about the text of a statute that was enacted in the

4    1940s and that was amended as recently as 2011.  So I just

5    don't think it is possible for the Fifth Circuit to have

6    resolved that in 1892.  If you look at that 1892 opinion, I

7    mean, it does contain a passing remark about the state residing

8    everywhere in its borders, but it was a passing remark in the

9    context of a personal jurisdiction decision about corporations.

10   It did not even purport to, you know, make any sort of holding

11   about venue which is generally a statutory matter, and, again,

12   given that our argument is based on the text of the statute, it

13   couldn't possibly have been construing that statutory text in

14   1892.

15          THE COURT:  All right.

16          MR. PEZZI:  So we think this is an open question in

17   this court, but we think the plain text of the statute does not

18   allow for Plaintiffs' reading and, ultimately, you know, if

19   Congress were to enact a different provision that provided a

20   state specific rule for the residency of states, that could

21   very well change the matter, but unless and until Congress does

22   that, we are left with the statute it has enacted and we think

23   it clearly suggests that the State of Georgia resides for venue

24   purposes only in the Northern District of Georgia.

25          Unless Your Honor has questions about either ---

1          THE COURT:  I do not.  I think you've answered my

2    questions.  Let me make my notes here.

3          MR. PEZZI:  Certainly.  In the absence of further

4    questions, just the last thing I would say is as we noted in

5    our brief 28 U.S.C. § 1406 gives Your Honor a measure of

6    discretion in the instance of improper venue --

7          THE COURT:  Yes.

8          MR. PEZZI:  -- to either dismiss without prejudice or

9    transfer to another district in which the case could've been

10   brought.  We don't have a real dog in that fight, candidly, on

11   the side of the federal government.  I will say we argued that

12   the most appropriate exercise of that discretion would be

13   dismissal without prejudice in this case, and I don't think

14   Plaintiffs disputed that in their filing.

15         THE COURT:  All right.  Thank you.

16         MR. PEZZI:  Thank you, Your Honor.

17         THE COURT:  I want to hear now from the Plaintiffs in

18   rebuttal to your venue arguments.

19         MR. DEVINE:  Good morning, Your Honor.  May it please

20   the Court.

21         THE COURT:  Good morning.  You've heard what their

22   contentions are.  Tell me why you believe they're wrong.

23         MR. DEVINE:  Well, I'll hit venue first and then I'll

24   go into finality.  On the venue argument I'll discuss their

25   statutory question first.  I don't think the Court needs to

1    spend much time on that issue.  I think this may be the only

2    issue I have ever run across in my career where literally every

3    single court for 130 years has unanimously adopted the same

4    conclusion and that conclusion is in opposition to the position

5    my friend on the other side is advancing.

6           That includes a case from the old Fifth Circuit

7    stating what my friend says is common sense which is that

8    Georgia resides everywhere in Georgia. Every state resides

9    everywhere in every state.  Now it is true that the venue

10   statue is passed in 1948 as part of the reincorporation of the

11   general statutes across the books which, obviously, comes after

12   the case from the old Fifth Circuit, but that statute was

13   adopted on the backdrop of 50 years of precedent holding that a

14   state resides everywhere where that state, in fact, is and so I

15   don't think it is surprising that the statute simply doesn't

16   describe venue with respect to states at all.

17          My friend on the other side -- his argument rests

18   entirely on this idea that this second out of three provisions

19   which refers to businesses, that the second provision is

20   supposed to be exhaustive.  It's supposed to be a catch-all

21   provision.  It is supposed to include the states even though

22   states are not mentioned in there and contrary to what my

23   friend on the other side has said, other courts have, in fact,

24   taken a look at this statute.  They've said, you know, normally

25   when you have a catch-all, the catch-all comes at the end.  The

1    second out of three provisions is a really odd place to try to

2    find a catch-all.  We cited the Florida against United States

3    case which looks at the statutory text.  It also cites the

4    Atlanta -- Atlanta Railway decision from the 1890s as

5    precedent.  Literally, every single court has rejected their

6    position.

7            On standing I agree with Your Honor's position on

8    page 3 of the TRO order.  You don't need to consider Georgia

9    standing here because Missouri's standing is so clear.  In

10   fact, they don't even dispute our position, our principal

11   theory of standing.  They say that the court doesn't have

12   jurisdiction because of finality, but they don't dispute that

13   if we overcome the finality bar then Missouri's principal

14   theory of standing is correct.  I think this court should stop

15   there at that point.  There is no need to assess the standing

16   of any other state.

17           Now they ---

18           THE COURT:  But let me ask, I mean, in this case venue

19   is standing on the shoulders, if you would, of Georgia having

20   standing, is it not?

21           MR. DEVINE:  I think ---

22           THE COURT:  I am just asking because, I mean, if --

23   because the court certainly has the ability to assess and

24   evaluate Georgia standing and if the court were to find Georgia

25   had no standing, then would venue fail?

1          MR. DEVINE:  No, Your Honor.

2          THE COURT:  Okay.

3          MR. DEVINE:  So venue is not jurisdictional, first of

4     all --

5          THE COURT:  Right.

6          MR. DEVINE:  -- and I pointed out in the Kansas case

7     that court did actually dismiss Kansas and several other states

8     and so you had Alaska and Texas left over in Kansas and the

9     court proceeded at that point.

10         THE COURT:  Okay.

11         MR. DEVINE:  So because venue is not jurisdictional,

12    there is no need to transfer it.

13         Now my friend on other side creates a sort of, you

14    know, parade of horribles where Missouri teams up with, you

15    know, some local citizen in Augusta, Georgia and brings a suit

16    here, but the cases and the citations they cite for that

17    proposition apply only if the standing argument is frivolous.

18    That's what Wright and Miller says.  So if Georgia had a

19    completely frivolous like no reasonable court could think this

20    is a plausible standing argument, that might be a different

21    kind of scenario, but that's not what we have here.

22         In fact, you know, as my friend points out in the

23    student loan context there have been some other courts that

24    have rejected this theory of standing, but then the

25    Fifth Circuit has adopted it in many other contexts.  The

1   primary Supreme Court case that they cite is this Pennsylvania

2   against New Jersey case from the 1970s, but the Eleventh

3   Circuit has said that's a case about the Supreme Court's

4   original jurisdiction, not actual Article III standing.  That

5   is what the Eleventh Circuit has said.

6           Kansas, obviously, is not in the Eleventh Circuit so

7   it wasn't bound by that interpretation of the Pennsylvania

8   case, and the Pennsylvania case, of course, comes 25 years, 26

9   years before the Wyoming against Oklahoma case where the

10  Supreme Court expressly blesses this taxpayer revenue theory of

11  standing that Georgia is advancing here and I think there is

12  really no dispute that Georgia sort of has a Hobson's choice

13  right now.  There is no dispute that because of this rule

14  Georgia is going to lose out on revenue that it would have

15  otherwise received.  So Georgia is now faced with two options:

16  It can either just lose out on that revenue or it can change

17  its laws.  And so that Hobson's choice -- Georgia has to do

18  something.  On the first instance it is either standing because

19  it's a financial injury and then the second instance it is

20  standing because it's an injury requiring Georgia to change its

21  laws.

22          The Fifth Circuit has repeatedly recognized that any

23  federal action that requires or induces a state to change its

24  law is a sovereign injury that the state has standing to

25  challenge.  So if the only way for Georgia to avoid that

1    financial injury is to change its laws, then that's a sovereign

2    injury.

3          We also do dispute that dismissal would be appropriate

4    here.  We don't think that's the case if the court adopted

5    their positions.  I think transfer would be much more

6    appropriate at that point -- transfer to the Eastern District

7    of Missouri where we brought the first one.  Now, again, I

8    don't think that the court needs to get there, but I think

9    their strong contention for dismissal, the reason they are

10   pushing that so heavily is because they want to eliminate the

11   temporary restraining order so that they can forgive loans

12   immediately and that gets -- that's a good way of transitioning

13   into the other issues.

14         Your Honor, there is not much left to decide here.  As

15   I pointed out, they don't challenge our principal theory of

16   standing.  If we pass the finality bar, they don't challenge

17   our principal theory of standing and they don't even offer a

18   single argument on the merits on the statutory question.  They

19   have conceded that.  So the question is really just finality at

20   this point:  Is their rule final and does finality even matter

21   in this case?  And to answer that question I want to step back

22   and give the court a full picture of exactly what's been going

23   on.

24         THE COURT:  Okay.

25         MR. DEVINE:  So twice in the last two years the

1  Secretary has tried to mass cancel hundreds of billions of

2  dollars in student loans and twice the Supreme Court has

3  rejected those efforts.  Now each time the Secretary has

4  switched statutes.  So now he is on his third statute which is

5  the weakest of all three of them -- so weak, in fact, that in

6  2021, the President, Congress, the Speaker of the House and

7  even the Department itself all expressly disclaimed the idea

8  that the statute that they're relying on creates authority to

9  forgive.

10       THE COURT:  Was that the legal opinion attached to

11  your complaint?

12       MR. DEVINE:  The read room and sign memorandum?

13  That's correct.

14       THE COURT:  Yes.

15       MR. DEVINE:  Yes.  So what they decided here is the

16  best way to achieve their aim of canceling as much student debt

17  as possible is not actually to publish a rule and then defend

18  it in court.  That didn't work the first two times for them.

19  So, instead, what they decided is that the best way to do this

20  is just to forgive loans faster than anybody can sue and so

21  months ago they told the public we're going to publish this in

22  October.  We're going to publish this in October.  But then

23  behind closed doors in documents marked confidential they told

24  the loan servicing companies pay no heed to what we're saying

25  in public; we will forgive these loans and we are going to do

1    so in September, not October, and, in fact, we're so sure of

2    this that we are actually going to alter your contracts to

3    compel you to forgive in September.

4         Your Honor, I have a one-page demonstrative I'd like

5    to give the Court and my friend on the other side --

6         THE COURT:  Sure.

7         MR. DEVINE:  -- that just shows a timeline.

8         THE COURT:  Sure.  Do you have an extra copy of that

9    that you can let my law clerk peek at?

10        MR. DEVINE:  Yes, sir.

11        THE COURT:  Thank you.

12        MR. DEVINE:  Your Honor, recall that there are two

13   requirements for finality:  One is that the decision to forgive

14   can't be tentative.  So we're talking about the decision to

15   forgive right here and second is that there must be legal

16   consequences or obligations that flow from that decision and

17   this timeline definitively shows why their decision to forgive

18   was not tentative.  Instead, it shows that they decided to

19   forgive a long time ago and then in the three months since then

20   they have been working to implement that final decision.

21        So the first item on this list, Your Honor, is the

22   change request.  This comes on May 6 and right off the bat it

23   commits to loan forgiveness.  This is the first page of

24   Exhibit D that we filed and that says and I'm quoting, "Federal

25   student aid is in the process of implementing additional types

1    of loan forgiveness," and then it lists the four categories of

2    loan forgiveness that we've talked about throughout our brief.

3            Now they're not saying, well, there is this proposed

4    rule; we're deciding whether or not to forgive.  No, they are

5    saying we have already made that decision and we are

6    implementing that decision.  And, in fact, Your Honor, this is

7    May 6.  We're still in the comment period.  So interested

8    individuals haven't even had the opportunity to finish

9    commenting yet before they're sending this to the loan

10   servicing organizations, and attached to this initial change

11   request is the first attachment.

12           This attachment says here are the categories of

13   forgiveness and then there is a long list of technical

14   "requirements" for the loan servicing companies:  Here is the

15   information you're going to need to provide us; here is the

16   format you're going to need to provide it in; and, then,

17   critically, it says -- the first page -- the anticipated

18   implementation date is September 1.  I'll get back to that in a

19   minute.

20           Then we have the rest of May.  We have four

21   attachments that the Defendants send to the loan servicing

22   organizations -- versions two through five, essentially -- and

23   version five -- this is critically important.  This version

24   five talks about the dates that you see on the right-hand side

25   of the timeline.  Version five says between September 2 and

1    5th you -- the loan servicing organizations -- you must give

2    us these files.  You must correct any errors by September 6 and

3    then right after that we're going to send you "forgiveness

4    files" and you're going to need to process forgiveness

5    "immediately".

6            And then, Your Honor, so that's the end of May.  Then

7    we see a flurry of activity right in the middle of June.  So my

8    friend on the other side on page 18 of their brief they say

9    that, well, the question about forgiveness remains tentative

10   "until a contract modification is signed".  Well, Your Honor,

11   we figured out when this contract modification was signed.  It

12   became effective three months ago, June 14. Even under my

13   friend's statement in their brief the decision about

14   forgiveness was no longer tentative at that point because at

15   that moment MOHELA and the other loan servicing organizations

16   were contractually bound and required to forgive as soon as

17   they received the forgiveness files.

18           Then we get the very next business day, Your Honor,

19   June 17 -- that's a Monday.  This is critical.  It says at the

20   very beginning of the first sentence of this new document that

21   the defendants have sent to the loan servicing companies, "In

22   September 2024 the Biden-Harris Administration will launch the

23   federal student loan debt initiative." Your Honor, there is

24   nothing tentative about the statement.  After all, the

25   contracts became effective the previous business day.  So if

1    there was any ambiguity now or before now about whether their

2    decision was tentative or not, all of that ambiguity is gone.

3           They made crystal clear to the loan servicing

4    organizations we are going to do this.  We are going to do this

5    in September.  And then pages 3 to 6 of Exhibit L say that the

6    loan servicers must be "performance ready" by no later by

7    September 9.  Why September 9?  Well, the document makes that

8    clear, too, because September 9 is the debt relief surge date.

9    That's when the debt relief surge is scheduled for and then the

10   very next day -- again, we're on the third business day in a

11   row now -- the Defendant sends the loan servicing organizations

12   attachment version six and there are two things I want to

13   highlight about this.

14          This is Exhibit F that we filed attached to our

15   complaint.  There are two things I want to highlight about

16   this.  One, the substance between version five and version six

17   is identical.  Nothing about the substance changes.  The only

18   thing that changes is they changed the abbreviations from D1 to

19   M1, D2 to M2, just purely technical changes, but the actual

20   substance of forgiveness has not changed.  The second thing I

21   want to highlight is that if we look back at the first document

22   at the beginning of May that had an "anticipated"

23   implementation date, here on version six there is no

24   anticipated implementation date.  There is just an

25   implementation date at that point.

1          So to sum up these three critical consecutive business
2     dates, you have Friday, the contract is changed.  Now MOHELA
3     and the loan servicing organizations, you are contractually
4     bound and obligated to forgive the moment we tell you to do so.
5     Number two, the next business day they tell the loan servicing
6     organizations the administration is doing this and we're doing
7     this in September, and then, number three says, hey, remember
8     those dates that we told you about back at the end of May?
9     Yeah, we're not changing those dates.  We're sticking to them
10    because we need you to be prepared and ready to go by the
11    September 9 surge date.

12         And then what happens during the next two and a half
13    months?  Well, there is no version seven attachment.  There is
14    no version eight attachment.  All those things are final.
15    Instead, what we see is an August 1 email to millions of
16    borrowers saying we have no idea why you would want to opt out,
17    but if you want to opt out, you need to do so by the end of
18    August.  This August 1 email has the same exact categories of
19    forgiveness as in the initial May document.

20         Your Honor, in these next two months there is no
21    communication between the Defendants and the loan servicing
22    organizations saying, hey, actually, we're going to have to
23    delay the surge dates; we're going to do this some other time;
24    nobody is ready yet.  There aren't any -- we sued four business
25    days before the September 9 surge date.  If it wasn't going to

1   happen then, there would have been some kind of communication
2   to that effect.

3           In fact, when they did the second mass cancellation,
4   Your Honor -- this is July -- June and July 2023.  So the
5   Supreme Court announces its opinion at the end of June.
6   Minutes later the Secretary says I have just finalized the
7   second mass cancellation attempt.  He didn't call it that.  I
8   am paraphrasing but I've just finalized this next opinion.  The
9   next opinion -- the next opinion isn't published for 10 days
10  after that.

11          So here we are four business days before this is --
12  before this is supposed to go out.  This is going to be
13  published on the morning of September 9, if not earlier.  They
14  haven't submitted any evidence that this wasn't going to happen
15  at that time.  In fact, just the opposite.  Kvaal's Declaration
16  at paragraph 17 and 19 says and I quote, "They had always
17  intended to require the servicers to be prepared to issue loan
18  forgiveness and to do so at the beginning of September," and
19  then my friend's brief at page 17 "reiterates the Department's
20  intention to promulgate a final rule in early September 2024."
21  Your Honor, they have admitted that they were planning to
22  publish this final rule in early September.  The only reason
23  they haven't done so is because we found out about this and we
24  sued and we got the TRO.

25          Against all of this, Your Honor, they hang their hat

1  on one idea:  This hasn't been published.  The problem is they

2  never squarely deny -- in fact, they admit they were going to

3  publish this at the beginning of September.  That was always

4  their plan to do that.

5       There is also no requirement that final agency action

6  be published.  Every year there are countless final agency

7  actions that are never published in the Federal Register or are

8  only published days after final -- days after the decision is

9  finalized, but as I already said both the first mass

10  cancellation attempt and the second mass cancellation attempt

11  were finalized before they were actually published.  In fact,

12  we sued to challenge the first mass cancellation attempt before

13  publication and they didn't even dispute that it was final.

14       Your Honor, their definition of finality here which

15  they've never advanced in either of the previous two mass

16  cancellation attempts -- their definition of finality here is,

17  essentially, it doesn't becomes final until the Secretary

18  transmits the forgiveness files to the loan servicers for

19  forgiveness.  In other words, their definition is that it

20  doesn't become final until the very moment it becomes

21  completely unreviewable by a court.  That can't be the correct

22  answer here.

23       Your Honor, I think -- I want to stress I think a page

24  of history here is worth a volume of logic.  If we look at all

25  three mass cancellation attempts together, again, there is just

1   no credibility that they haven't made a final decision given

2   their relentless pursuit of mass cancellation over the past two

3   years.  Again, I already mentioned the first cancellation

4   attempt.  We sued before it was published.  They did not

5   dispute that it was final.  In fact, they even agreed to delay

6   forgiveness for a couple of weeks in October to let the court

7   have time to rule, but that backfired on them.  We ended up

8   prevailing in court so they didn't get to send out millions of

9   emails right before the mid-term election saying,

10  "Congratulations.  The Biden-Harris Administration has forgiven

11  your loans."  They didn't get to do that.

12          So then the second rule -- they finalize it in June

13  2023 and then they publish it the next month in July 2023.  Now

14  under the statute it's not supposed to go into full effect

15  until one year later -- July 2024 -- but then in February they

16  announce, actually, we've already started forgiving.  We've

17  already forgiven billions of dollars in loans under this.

18          So the States -- we had to scramble.  We put together

19  a lawsuit in just over a month and we ended up prevailing.  We

20  prevailed all the way up to the Supreme Court, but they were

21  successful in unlawfully forgiving billions of dollars of loans

22  because they were able to do that before we were able to put

23  our lawsuit together.

24          So this time they learned from those two previous

25  decisions and they learned that the best way to get forgiveness

1   is just to do so faster than the courts can rule on it, and I

2   think, Your Honor, perhaps, the most revealing aspect here that

3   shows that this is not tentative, it is final, is that they

4   have now had multiple opportunities to committing to wait 60

5   days after publication before forgiving.

6          They're required to do that under the Congressional

7   Review Act.  In fact, under the Higher Education Act they're

8   not allowed to implement anything for a whole year up until

9   next July.  The Chairwoman of Congressional Committee last

10  month -- we include this as an attachment --

11         THE COURT:  I saw it.

12         MR. DEVINE:  -- last month asked the Department of

13  Education, "Can you commit to actually following the law here

14  and not forgiving anything until after 30 to 60 days after

15  publication?"  The Secretary refused to do that.  I called the

16  Congresswoman's office on Friday and asked, "Has the Secretary

17  changed their mind?  Have they committed to doing this?"  They

18  said no.

19         I think looking at the documents it is clear why.

20  They made the decision to forgive loans long ago.  They have

21  been implementing that decision ever since because they want to

22  send millions of emails in the weeks -- in the weeks between

23  now and the November election they want to send millions of

24  emails saying, "Congratulations.  Kamala Harris has forgiven

25  your loans."  So this idea that, oh, gosh, we just have no idea

whether we are actually going to forgive or not, there is no credibility to that assertion at all.

They haven't provided any evidence to support their position at all, and, Your Honor, just to bring this back to the doctrine, recall two requirements:  The decision to forgive can't have been tentative -- I think we've clearly shown that -- and legal consequences or obligations must flow from that. When they changed that contract of MOHELA's and other loan servicers, MOHELA's legal obligations changed.  The legal consequences of $73 billion in forgiveness to millions of different student loan borrowers, that's a legal consequence that flows from that decision.

Now, Your Honor, I do think there is an easy doctrinal way out of the finality question.  I think we've made clear this is final, but even if it's not final it doesn't matter. As we pointed out in our brief under both the All Writs Act and this court's incidental jurisdiction -- what the Supreme Court has referred to incidental jurisdiction -- this court can enter temporary relief when an agency is trying to do exactly what they're trying to do now which is evade judicial review.

The ITT Development case that we cite from the old Fifth Circuit which is binding here cites the All Writs Act of 1789.  It says -- this is, essentially, the point of the All Writs Act is to allow courts to issue "status quo orders" to prevent agencies from avoiding judicial review and then the

1   Supreme Court in the Arrow Transportation case that we cite

2   goes even further and says this isn't just an All Writs Act

3   matter; in fact, the courts have inherent authority to do this.

4   If the court would have jurisdiction in the future to oversee

5   or review this agency action as this court clearly would under

6   the APA, then the court has incidental jurisdiction to impose a

7   temporary restraint to permit the case to fully ripen.

8           So, Your Honor, my friend on the other side says,

9   well, we promise we're not going to forgive anything until we

10  publish and, Your Honor, that is very cold comfort because, as

11  everybody here knows and they haven't disputed, after they

12  publish they can forgive within a matter of hours or days and

13  so this is a situation where the All Writs Act and this court's

14  incidental jurisdiction recognized by the Supreme Court -- this

15  is exactly the type of case where that kind of temporary relief

16  is appropriate.

17          It has long been their intention -- as they admit in

18  their brief, it's long been their intention to publish this

19  rule in early September and it's long been their intention to

20  forgive immediately thereafter.  I think in order for this

21  court to preserve jurisdiction under the All Writs Act and

22  incidental jurisdiction, this is a clear case where temporary

23  restraint is appropriate.

24          Now the Court -- at the very beginning the Court said,

25  you know, we're here to do a few things.  Your Honor mentioned

1   converting this to a PI.  I think there are really kind of two

2   different ways of moving forward.  Again, standing -- they

3   haven't challenged our principal theory of standing.  Merits --

4   they've offered no position at all on the statutory argument

5   and so I think that's conceded.

6          So I think this court could, basically, do one of two

7   things:  One is convert this to a PI and conclude at the same

8   time that the other side has waived their statutory arguments.

9   They've waived all of their arguments on the merits and so

10  convert this into a PI and then, you know, we're committed to

11  doing discovery quite quickly.  We are able to do that.  We can

12  get to final judgment as quickly as possible.

13         The other thing the Court could do is if the Court is

14  not interested in a full PI right now despite their concessions

15  is to extend the TRO past publication, past any kind of

16  supplemental briefs that might be necessary until the Court is

17  ready to issue a decision on the PI question, and if the Court

18  does that I would note that the 14-day time limit for TROs --

19  that only applies in ex parte circumstances.  It doesn't apply

20  here where my friend on the other side is given an opportunity

21  to be heard, and I would also say that there would be no harm

22  in either a TRO or a PI extending into the future.

23         As I mentioned under the Congressional Review Act they

24  can't implement this for 60 days anyway.  Under the Higher

25  Education Act they can't implement it until next July and so

1   for this court to enter a TRO or enter a PI would simply put

2   them in the same position they would be in anyway if they were

3   going to follow the CRA and if they were going to follow the

4   Higher Education Act.  I am happy to answer any questions that

5   the Court may have on any topic.

6            THE COURT:  Maybe after I hear their rebuttal.

7            MR. DEVINE:  All right.  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            All right.  I guess, Mr. Jerome, you're now prepared?

10           MR. JEROME:  Good morning, again, Your Honor.

11           THE COURT:  Good morning.

12           MR. JEROME:  I thought I would start with

13  jurisdiction.  I defer if the Court has a preference as between

14  standing or finality.

15           THE COURT:  It doesn't matter.  Whatever you're

16  prepared to offer is fine.

17           MR. JEROME:  In that case -- thank you, Your Honor --

18  I'll proceed by talking about the APA's requirement that an

19  action be final to permit judicial review.  I think it is

20  important at the outset to clarify what finality we're talking

21  about.  That concept has been a bit of a moving target through

22  this legislation -- excuse me -- through this litigation.

23           At the beginning my friends on the other side referred

24  to the Third Mass Cancellation Rule and that sounds a lot like

25  the product of a rule-making process.  I take it as forfeited

1   now that my friends are not talking about the NPRM that was

2   published in April.  That's the notice of proposed rule making.

3   I take it that now what we're now talking about is some sort of

4   amorphous decision purportedly taken by the agency represented

5   in the evidence that opposing counsel has submitted.

6        Your Honor, I think a proper understanding of that

7   evidence shows that in the relevant sense under the APA --

8   under the Administrative Procedures Act -- that the agency has

9   not made in a legally relevant sense any final decision at all.

10  I understand what my friend on the other side to be talking

11  about principally to be related to the contract modifications

12  that the Department undertook with its servicers.

13       I'd say, first of all, the modifications as I think is

14  apparent don't themselves effectuate any forgiveness.  There

15  has been no loan forgiveness under those modifications.

16       THE COURT:  But now their argument is that it

17  contractually obligated the servicers to forgive when the files

18  were delivered to them with instructions to pull the trigger.

19       MR. JEROME:  I understand, Your Honor.  So I think --

20  actually, if I could for a second, I think it's helpful to

21  clarify what forgiveness files we're talking about.

22       THE COURT:  Okay.  Go right ahead.

23       MR. JEROME:  The evidence in the record so far talking

24  about files -- production files, forgiveness files -- refers to

25  testing that the Department has done with its servicers.  It is

1   my understanding that the modifications that the agency entered

2   into with its servicers would -- if the agency sent

3   instructions to take certain actions would contractually

4   obligate the servicers to comply with those instructions.

5           Now we don't have the details of the contract

6   modifications before us.  My friend on the other side obtained

7   the records that he did through whatever process he did, but

8   suffice it to say I think if that information was helpful we

9   might see it here.  I am not prepared to say that the contract

10  modifications line up exactly to the NBRM and, certainly, it's

11  impossible to say because there is no final rule what the

12  content of that final rule would be or how the modifications

13  map up to ---

14          THE COURT:  But you acknowledge that the servicers

15  based upon the contract modification would be contractually

16  obligated to carry out forgiveness should under the final rule

17  they be instructed to do so?  Does the Government or does --

18  does the Government acknowledge that or agree to that?

19          MR. JEROME:  It is my understanding, Your Honor, that

20  if the Department provided instructions to the servicers ---

21          THE COURT:  They would be obligated?

22          MR. JEROME:  Yes, Your Honor.  That's my

23  understanding.

24          THE COURT:  All right.

25          MR. JEROME:  Now, importantly, though, those contract

1    modifications can be undone.  This is not final.  I think it's

2    useful to think about finality in contrast to some of the other

3    student loan litigation that my friend references.

4         We hear a lot about the HEROES Act litigation.  This

5    was the litigation concerning action the Department attempted

6    to take under the HEROES Act.  Your Honor, in that case it's

7    true that the required notices of waivers and modifications had

8    not yet been published by the Secretary of Education in the

9    Federal Register.  That said, the White House had posted on its

10   website as my friends know all too well President Biden's plan

11   to forgive student loans.  You know, I would say, first of all,

12   we didn't litigate the topic of finality and so there is really

13   not anything binding to be taken from that case, but I think

14   the government's conduct in that litigation is understandable

15   in light of an instruction from the White House that this sort

16   of forgiveness would be coming down the pike.

17        Here, Your Honor, we don't have that and I think

18   examining the concept of finality in the context of the APA is

19   a really useful exercise.  By only permitting judicial review

20   of final agency action Congress sought to prohibit exactly this

21   sort of litigation where prior to the agency and prior to the

22   Executive Branch announcing definitively a plan that you have

23   litigation that puts a stop to ongoing agency processes that

24   allows all sorts of disruptive use of resources both on the

25   court's part and on the Government's part.  I think if you

1   think about why that requirement exists in the statute it is to

2   prevent exactly what we see going on now.  So, as I said, the

3   modifications don't themselves effectuate forgiveness.  They

4   could be undone through subsequent modifications.  It is also

5   worth mentioning that the Kvaal Declaration establishes that

6   the Department would not have and will not effectuate any

7   forgiveness absent a final rule.  That is meaningful here.

8           In sum, the Executive Branch remains free to change

9   course.  It has not obligated itself to any course and so both

10  of the prongs of finality are missing here.  The Department has

11  definitively not consummated its decision-making process vis a

12  vis the NPRM that was published in April and it has

13  definitively not determined rights and obligations in a way

14  that's meaningful here and I add that sort of caveat at the end

15  because, as we just discussed, Your Honor, I do believe that

16  the contract modifications would obligate servicers to take

17  particular action that the Department has said it will not

18  instruct them to do absent a final rule, but to the extent that

19  Missouri is hanging its case that it has an interest to in the

20  instructions that the Department gives the servicers and those

21  legal rights and obligations, I think we'd run into other

22  justiciability problems.

23          THE COURT:  But let me ask the question, though.  The

24  concern that the Plaintiffs have is exactly what you just said.

25  There is no intent to forgive until the final rule is

1    published, but the documents they provided in support of their

2    complaint and their request for TRO suggest that that was going

3    to be almost simultaneous.  The rule would be published and the

4    word would go out forgive these debts without any ability for

5    anyone to come in under the normal course of final rule making

6    and file a complaint in a district court wherever in the

7    country and stop that process and so you understand their

8    concern was we know the Government is saying we do not plan to

9    forgive debts before the final rule is published, but the

10   question is then how quickly do you plan to forgive debts?

11             MR. JEROME:  Yes, Your Honor.  So I'll say, first off,

12   I can't say that there will certainly be a final rule.  I need

13   to -- it is important to underscore that important legal

14   distinction.  I am prepared to represent that the Department

15   will not take action under any final rule that is promulgated

16   out of the NPRM for at least 72 hours and so ---

17             THE COURT:  72 hours?

18             MR. JEROME:  Yes, Your Honor.

19             THE COURT:  Not the normal 60 days that you see under

20   the APA; correct?

21             MR. JEROME:  Your Honor, I would dispute that the APA

22   has an ordinary 60-day timeline for implementation of rules.  I

23   understand the arguments Plaintiffs have raised that I believe

24   to be premature at this juncture related to the Congressional

25   Review Act, but I am prepared to represent that the Department

 1  will wait at least ---

 2          THE COURT:  72 hours.

 3          MR. JEROME:  Yes, Your Honor.

 4          THE COURT:  Okay.

 5          MR. JEROME:  So, Your Honor, if I could just very

 6  quickly ---

 7          THE COURT:  Sure.  I'm sorry.  Go ahead.

 8          MR. JEROME:  Sure.  This isn't a case that we cited

 9  and I certainly don't want to sandbag the other side, but as

10  recently as a couple of years ago the Supreme Court emphasized

11  in a case in an entirely different subject matter about FOIA.

12  This is a case called U.S. Fish and Wildlife versus The Sierra

13  Club but the agencies delivered a process ---

14          THE COURT:  What is that cite?

15          MR. JEROME:  I'm sorry, Your Honor.  I'll have to grab

16  it for you in just a second.

17          THE COURT:  Okay.  That's fine if you'll let us know.

18          MR. JEROME:  The idea being that it is meaningful in a

19  legal sense that the agency's deliberating process does not end

20  until it has taken a final position and I think the evidence

21  that my friends have offered just does not meet that bar.  It

22  does not show -- I'd say it shows as much as the NPRM itself

23  did which is that the Department was considering promulgating a

24  final rule along the lines that it had identified.

25          THE COURT:  But if my TRO -- and I know you filed a

1    motion to clarify, but if my TRO is not designed to stop the

2    publication of the rule but is designed to prevent

3    implementation within 72 hours, then what's -- what's the

4    government's concern?  If all we're saying is -- because I hear

5    you saying that the desire is for a court not to interfere, if

6    you will, in the rule-making process, but if my injunction does

7    not or restraining order does not impact the final work and the

8    publication of that rule, then where is the problem because,

9    really, then the issue becomes implementation, does it not?

10            MR. JEROME:  I understand what Your Honor is saying.

11   I would say we represent equities larger than this case and,

12   certainly, it's not in our interest to see litigation of this

13   sort where there is an injunction in the absence in our view of

14   jurisdiction be entered with regard to any federal branch

15   activity.  So that is a line I will defend that the absence of

16   final agency action means the court has no power to act in the

17   end and so we think that the injunction would be inappropriate

18   on that basis.

19            THE COURT:  All right.

20            MR. JEROME:  Your Honor, to quickly respond to a

21   couple of counter-arguments on the finality point that I saw in

22   my friend's briefs and that I heard at the lectern today,

23   there's the notion that we've advanced a requirement that

24   publication in the Federal Register embody any sort of final

25   agency action.  I wouldn't go that far, but I would just say

1  even if Your Honor was looking outside the Federal Register

2  that evidence is not sufficient here.  We don't see a

3  definitive public-facing decision by the agency in a way that

4  determines legal rights and obligations.

5          THE COURT:  But didn't you send out an email to

6  borrowers to opt out?  I mean, that was sent out, was it not,

7  the 1st of August?

8          MR. JEROME:  I believe that date is right, Your Honor.

9          THE COURT:  All right.  So is that not a -- if I am a

10  borrower and I receive that email -- the congratulations -- or

11  I guess that wasn't the congratulations, but it, basically,

12  says if you want to opt out -- I guess what I am saying is that

13  looks pretty final to me, does it not?

14          MR. JEROME:  I disagree, Your Honor.  Respectfully, I

15  think what that says is something very similar to what the

16  April NPRM said which is that the Department is considering

17  taking these steps and similarly in the context of the contract

18  modifications the Department seeks to be in a position to

19  implement any such final rule, but I disagree that that commits

20  -- that that consummates -- in the words of Bennet v Spear that

21  that consummates the government's decision-making process and

22  that legal rights and obligations flow from that.  I think, in

23  fact, if you think about that second prong in particular it

24  would be silly for a borrower to come in to court and say,

25  well, I have a right to forgiveness because I got an email from

44

1   Secretary Cardona saying that the Department was considering

2   doing that.  I think that's laughable and I feel similar logic

3   applies here that there are no legal rights or obligations that

4   have been determined by that email.

5            THE COURT:  Okay.

6            MR. JEROME:  Your Honor, I finish on the finality

7   point more or less where I started which is to say that this

8   requirement of final agency action in the APA serves interests

9   of the Government and the courts alike in avoiding messy,

10  difficult entanglements in ongoing agency -- ongoing

11  proceedings that are committed to the agency and so for that

12  reason we believe that there is no finality and no subject

13  matter jurisdiction for the court to enter any order.

14           There is an additional jurisdictional obstacle in this

15  case which is an absence of standing and it is, of course, very

16  tightly related to the absence of finality.  My friend said

17  several times that we don't dispute that the standing theory of

18  Biden v Nebraska -- the loss of servicing revenues to MOHELA

19  applies here.  I don't understand where that contention is

20  coming from and I'll stick to what we said on page 14 of our

21  brief which is that albeit that the Supreme Court recognized a

22  particular theory on facts before it in that litigation, we

23  believe those facts are not present here.  As a reminder, the

24  White House had committed to a certain plan.  It intended to

25  take action under the HEROES Act.  Here we do not have such a

1    final commitment and we believe that the absence of that tight

2    nexus renders too speculative the claims that MOHELA will

3    imminently or certainly impendingly face injury absent an order

4    from the court.

5         Similarly, the Plaintiffs don't cite any case where an

6    NPRM has established standing.  I think that's meaningful.

7    Again, I understand that argument to have been abandoned, but

8    just to sort of reinforce we're not looking at the rule making

9    process here.  We're looking at the supposed decisions --

10   amorphous decisions - as encapsulated by the Department's

11   communications with its servicers.

12        In terms of administrative cost to MOHELA which is the

13   second theory, I think it's a little different just to make

14   sure we're on the same page.  The theory that the Supreme Court

15   accepted in Biden v Nebraska on very different facts was that

16   MOHELA services loan accounts and when those are closed

17   prematurely due to forgiveness that MOHELA will lose out on the

18   servicing revenues, effectively the money it would have made to

19   service those accounts in the future.

20        Here what my friend is referring to, I believe, are

21   the in the change request process the Department seeks to

22   identify costs that MOHELA will incur as a result of the

23   contract modification.  Importantly, the evidence my friends

24   point to is evidence not from the contract modification itself.

25   In other words, we don't know what costs, if any, MOHELA would

1   have stood to incur if action was taken under the contract

2   modification.  They point to something that is necessarily

3   un-final and tentative and say that that means there are

4   certainly impending costs to MOHELA, Your Honor, I respectfully

5   disagree.

6          There is also a theory of consolidation that has come

7   up, the idea being that borrowers will consolidate.  For very

8   similar reasons we say that this is speculative.  It's sort of

9   a step even further removed from the loss of servicing

10  revenues.  I would add, Your Honor, that there is a reference

11  to the Government urging consolidation and I would submit that

12  that urging even if communications from the federal government

13  can be read to encourage consolidation that that is legally

14  irrelevant from a standing point of view and also introduces a

15  causation problem.  At that point it is arguably the

16  government's encouragement, not the benefits of the action

17  being challenged -- again, this sort of amorphous decision that

18  is legally relevant.

19         The Bank of North Dakota theory suffers from very

20  similar speculation.  I would just add that the Mackinaw Center

21  case that we cite from the Sixth Circuit is very instructive on

22  the notion of competitor standing.  Importantly, that case

23  repeats the principle that appears in many other competitive

24  injury cases.  That competitive injury doctrine furnishes a

25  link between competition and injury but does not furnish a link

1   between a particular policy in competition as in the burden is

2   on the Plaintiffs to show increased competition and, Your

3   Honor, I don't believe that they've done that.

4          Finally, of course, the tax revenue theory that's been

5   advanced and has been rejected in multiple other courts not

6   only infects Plaintiff Georgia's standing but it infects the

7   several other states -- I believe it's four in total including

8   Georgia --

9          THE COURT:  I agree.

10         MR. JEROME:  -- that have articulated that.  I'll rest

11  on my colleague's arguments on that point.  Your Honor, while I

12  am on standing I do want to turn back to an issue that came up

13  in my colleague's presentation and I think that is a useful

14  one.  I will, of course, bracket the topic of venue.  I feel

15  all of the presentations have made clear that venue and

16  standing are different.  It is a good opportunity to remind

17  Your Honor that venue was not argued in the Kansas case --

18         THE COURT:  Right.

19         MR. JEROME:  -- and so to the extent there is anything

20  to be learned, I think it is quite little.

21         Your Honor, what we often see and the cases that my

22  friends point to -- most notably Biden v Nebraska itself -- say

23  that standing is enough for the court to proceed to the merits

24  of a claim.  I think there is a crucial difference between the

25  district court's own considerations and considerations of

1   appellate jurisdiction that come in and when you think about

2   the context in which those statements are made help make sense

3   of why it is okay for an appellate court to say that, but it is

4   inappropriate to say in the district court that a case can

5   proceed just because one plaintiff has standing.

6          Your Honor, as you know subject matter jurisdiction is

7   a requirement all the way up to the Supreme Court and standing

8   can be lost.  You can lose subject matter jurisdiction.  I

9   think in the context of the Eleventh Circuit of the Supreme

10  Court saying one is enough means out of judicial modesty the

11  court is not going to wade into these other theories that are

12  not necessary for it to opine on the ultimate legal question

13  but that those theories remain unaddressed.

14         Your Honor, in contrast in the district court I think

15  the ultimate question is one that we've briefed at length in

16  our opposition brief on the question of remedies.  For a

17  plaintiff to remain in a case you would think ultimately they

18  have a claim to some remedy or they could have a claim to some

19  remedy.  Here in the absence of standing there is nothing to

20  give these states at the end of the lawsuit.

21         My friend made a reference to proceeding to final

22  judgment.  I would argue that any injunction that Your Honor

23  offers now that the scope of the appropriate relief whether now

24  or at the end of the case is necessarily determined by the

25  extent of the injury that the Plaintiffs show individually.

1   The Eleventh Circuit reiterated this principle a few years ago

2   in the Georgia versus President of the United States case and

3   they said the extent of the appropriate remedy is determined by

4   the extent of the injury shown.  For that reason I think it is

5   both inappropriate to allow Plaintiffs who have not shown

6   standing even to proceed along in a suit, but more than that to

7   grant relief on the basis of their -- of their what, I don't

8   know.  Not of their injury; right?  Just of their presence in

9   the lawsuit I think is inappropriate.

10       Your Honor, very quickly I'll touch on the preliminary

11   injunction factors because they came up in my colleague's

12   presentation.

13       THE COURT:  Yes.

14       MR. JEROME:  I think I understand him to have asked

15   somehow that this court enter an order saying that we forfeited

16   arguments on the merits.  I find this difficult to understand.

17   I think as a base matter there is no final rule.  It's almost

18   nonsensical to assume that we could have articulated in good

19   faith arguments about a rule that does not exist.  In essence,

20   what my colleague is asking -- excuse me.  What my friend on

21   the other side is asking you to do is to issue an advisory

22   opinion about any student debt relief ever and I think that

23   that would be inappropriate.  I just would reiterate that I

24   don't believe we've waived any arguments about any final rule

25   should one be promulgated.

1          Finally, on irreparable harm I think for the same

2   reasons the states lack standing.  There is no irreparable harm

3   that they've shown here.  And I'm sorry, Your Honor.  I think I

4   said "finally", but I do very briefly --

5          THE COURT:  That's okay.  That's all right.

6          MR. JEROME:  -- want to touch on the scope of relief,

7   if I could.  I did just talk a few minutes ago about the

8   appropriate scope of any injunctive order being limited to the

9   injury shown that Your Honor credits.  In addition to the

10  Georgia versus President of the United States case I thought

11  there was a well-reasoned case fairly recently by Judge Wood in

12  the Kansas versus Department of Labor litigation.  We've cited

13  that case in our brief as well.

14         THE COURT:  Yes.

15         MR. JEROME:  Further, I think it's appropriate to ask

16  the Court that any order that it enters reflect the parties'

17  agreement in the context of the motion for clarification of its

18  September 5 order that promulgation of a final rule be

19  permitted.  We appear to agree that that should not be off the

20  table.

21         Finally, Your Honor, it appears that we agree on this

22  point as well, but I would just add emphasis to the request

23  from my friend on the other side that if the Court enters an

24  injunction in this case that it be a preliminary injunction and

25  not a temporary restraining order that would allow the

1   government if it sees fit --

2            THE COURT:  To appeal.

3            MR. JEROME:  -- in the future to seek immediate

4   appellate review.  Yes, Your Honor.

5            THE COURT:  I understand.

6            MR. JEROME:  Unless the Court has any other

7   questions ---

8            THE COURT:  What is your response to their argument on

9   the All Writs Act giving me --

10           MR. JEROME:  Yes, Your Honor.

11           THE COURT:  -- the authority to issue a restraining

12  order or an injunction for the purpose of preserving the right

13  to judicial review?

14           MR. JEROME:  I'll say, Your Honor, that my read of

15  those cases I can't dispute that the courts have acknowledged

16  in the terms that my friends suggest that there could exist a

17  source of jurisdiction.  I do -- I'll say, you know, it seems

18  to have come up in dictum most of the time that the facts of

19  those cases haven't necessarily matched this one on all fours.

20  It's not for me to say that the Supreme Court was wrong to say

21  something like that, but I do feel it is worthwhile to note

22  that these cases are from the old Fifth Circuit.  They are from

23  a Supreme Court decades and decades ago and in the intervening

24  years.

25           The court -- you know, the term that the court uses in

1   this 1960s case is potential jurisdiction.  I think that the

2   modern Supreme Court would be a bit more skeptical of potential

3   jurisdiction, but, Your Honor, I think more than that if Your

4   Honor credited that this was an available source of

5   jurisdiction putting aside the finality issues that we've

6   identified, I would say I think the paucity of cases shows that

7   it's an extraordinary scenario in which the court should

8   exercise that sort of authority and I would add that I think

9   the 72-hour window allows for another emergency order of the

10  sort that we saw in this very case and so the court would be on

11  surer jurisdictional ground to wait until the promulgation of a

12  final rule if one is published.

13          THE COURT:  All right.

14          MR. JEROME:  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          I'll now hear from you, Mr. Divine, on your response.

17          MR. DEVINE:  Thank you, Your Honor.  Just a couple of

18  quick points.  You know, I understand my friend on the other

19  side -- they have institutional interests.  I represent the

20  Government of Missouri.  I have been in similar situations and

21  so I respect that, but what we're dealing with here is an

22  extraordinary stark departure from ordinary APA practice.

23          I heard my friend on the other side to commit not to

24  complying with the Congressional Review Act.  They said they

25  would commit only to a 72-hour delay.  I want to read for the

1    Court the plain text of the Congressional Review Act which we

2    cite on page 37 of our complaint.  So the Congressional Review

3    Act applies when there is a major rule.  It applies extra

4    procedures not ordinarily applicable in the APA context.  They

5    don't dispute this.  They have -- they have classified this

6    rule as a major rule.  I think the $150 billion we can see why

7    and this says that a major rule shall take effect at the later

8    of the date occurring 60 days after the date on which Congress

9    receives the report submitted under paragraph one or the rule

10   is published in the Federal Register.  That is a plain text

11   requirement that they either submit this to Congress or they

12   publish this and then they wait 60 days.  My friend on the

13   other side said they're going to wait three days.  I think that

14   by itself is extraordinarily telling.

15         I also understand my friend on the other side to have

16   conceded that these contracts do, in fact, obligate MOHELA and

17   the other loan servicers to forgive as soon as the Secretary

18   tells them to forgive.  I think right there that's QED.  There

19   is nothing left except to conclude that the Secretary has made

20   a final decision; they've altered these contracts; MOHELA is

21   now under legal obligations that it was not under before

22   June 14.

23         Your Honor, on the All Writs Act situation I

24   understand my friend on the other side has said, well, you

25   know, this is -- you don't see more recent cases about this;

1   this really should be reserved for extraordinary situations and

2   I don't disagree, but, again, we come to this situation where

3   the Secretary has done extraordinary things in this situation

4   and has designed this exact rule to try to evade judicial

5   review.  72 hours is not a long time.  I mean, it took -- it

6   was something like a day and a half before it even got a judge

7   assigned to hear this matter in this case.

8         On standing, just a couple of really quick responses.

9   With respect to our first -- our principal theory of

10  standing -- they don't dispute anything.  The only thing they

11  raised with respect to that argument is the finality argument.

12  So if this court rejects their finality contention, then our

13  principal theory of standing is undisputed.

14        On the administrative costs I would point this court

15  to Exhibit L at page 6.  It is true that some of the

16  administrative costs are going to be reimbursed by the

17  Secretary.  That is true, but Exhibit L at 6 discusses several

18  different areas where the Secretary expressly says, MOHELA,

19  you're on your own for this; you're going to have to cover

20  these administrative costs yourself.

21        The Bank of North Dakota situation -- they cite this

22  Mackinaw case from the Sixth Circuit.  I believe the court

23  there had said one of the fundamental problems in that case was

24  that in the competitive standing situation the plaintiff hadn't

25  even identified what industry they were competing in and so

1    that was a fundamental flaw that caused the Sixth Circuit to

2    rule the way it did there.  And then there is this question

3    about whether Biden against Nebraska applies only to appellate

4    courts as my friend on the other side is suggesting or this

5    court and just four years ago in 2020 there's the Army Corps of

6    Engineers case from this court -- from Your Honor -- that we

7    cited adopting the exact opposite position.  If you go in

8    Westlaw and you search this, there are thousands of different

9    district court decisions that have adopted the version of Biden

10   against Nebraska and its predecessor case that we have adopted.

11          And then, finally, on the scope of relief the

12   Eighth Circuit has twice acknowledged and expressly found that

13   the only way to give Missouri and MOHELA full relief is to

14   create a rule -- an injunction against the entire rule and the

15   reason is quite simple.  These accounts are very dynamic.  The

16   Secretary can take accounts in and put them out, basically, at

17   the Secretary's leisure is my understanding.

18          There were two years ago two million accounts went

19   into MOHELA.  Earlier this year one and a half million accounts

20   left.  So if you don't do this against the entire rule itself

21   as the Eighth Circuit has determined, then MOHELA is not going

22   to get -- Missouri, rather, is not going to get full relief.

23   So the Eighth Circuit has twice determined that that kind of

24   full relief is necessary.  Both times the U.S. Solicitor

25   General went up to the Supreme Court and said the scope of

1    relief is way too broad and both times the U.S. Supreme Court

2    rejected their argument.

3          And then on the question of whether to convert this

4    into a PI as my friend on the other side is suggesting or to do

5    a TRO, Your Honor, I think we would be fine with either of

6    those, but in the context of a PI they haven't raised any

7    defense on the statutory -- on the statutory situation.  It's

8    quite clear that they have to go under Section 432.  That's

9    what they said in their proposed rule making.  We're also

10   talking about a negotiated rule making.  This is different from

11   ordinary notice and comment rule making.

12         Under negotiated rule making they are -- with some

13   exceptions, they are pretty much stuck with the text that they

14   propose.  They're not going to be able to change that.  We know

15   what statute they're relying on and they chose not to offer any

16   defense at all on the statutory question and that's not

17   surprising given that the President, Congress, the Speaker of

18   the House, and the Department all expressly disclaimed their

19   statutory argument just three years ago.

20         If the Court has any questions, I am happy to answer

21   those.  Otherwise, we appreciate the Court's time.

22         THE COURT:  Have you addressed your argument on 5 USC

23   705 -- whether that's the appropriate remedy versus an

24   injunction, restraining order?

25         MR. DEVINE:  I think the Court could go with either.

1    I think most of the circuit courts have said that 705 and 706
2    the standard is going to be the same as a TRO.

3              THE COURT:  Right.

4              MR. DEVINE:  Now what 705 and 706 do is they authorize
5    broader relief than the court's traditional equitable
6    authority.  So there have been some recent concurrences and
7    opinions from some of the justices at the Supreme Court saying
8    under a court's regular equitable authority you can't reach
9    beyond the plaintiff unless that is necessary to make the
10   plaintiff whole.  So, for example, in nuisance cases, for
11   example, you might enjoin the neighbor and that is going to
12   have incidental benefits on non-parties of the case, but that's
13   okay because that's the relief that you need in order to make
14   the plaintiff whole.

15              Now in 705 and 706 as the Fifth Circuit said in the
16   Career Colleges case that we cite what these statutes do is
17   they go further.  These are not plaintiff-specific remedies.
18   They are defendant-specific remedies.  They operate on the rule
19   itself and so an injunction or a rule under Section 705 is a
20   rule or is an order against the entire rule.  The rule just,
21   basically, goes away.  So 705, it stopped the rule.  It pauses
22   it.  That would be what would be appropriate here and then at a
23   final judgment stage 706 would be to vacate the rule entirely,
24   and, yes, that does have incidental effects on other parties
25   who might be interested, who might not be interested, but the

1   critical thing here is that 705 and 706 -- they operate on the

2   rule itself and pause or eliminate that rule and so all of

3   these questions about the Court's regular inherent equitable

4   authority, et cetera, and limits on that, they just don't apply

5   with respect to these statutory remedies.

6           THE COURT:  All right.

7           MR. DEVINE:  Thank you.

8           THE COURT:  Thank you.

9           Mr. Jerome, do you want to respond to any of what he

10  just told me?

11          MR. JEROME:  Thank you, Your Honor.  I would just say

12  quickly that we understand the standards under Section 705 and

13  the equitable authority of the court more generally to be the

14  same for the reasons that we've cited in our brief.

15          THE COURT:  Okay.

16          MR. JEROME:  I would add that Section 705 seems to be

17  a particularly odd fit in the absence of a rule for the court

18  to act on.

19          THE COURT:  All right.

20          MR. JEROME:  Thank you, Your Honor.

21          THE COURT:  That's what I wanted to hear from you.

22  All right.  Have we -- sort of on a housekeeping matter before

23  I address what I have just heard, have we dealt formally with

24  the issue of sealing the Exhibits D and F?

25          MR. DEVINE:  Yes, Your Honor.  I believe the

1   magistrate judge did yesterday.

2           THE COURT:  All right.  So he took care of that then.

3   I thought he did, but I wanted to hear it from you.  Okay.  All

4   right.  I have appreciated your very thorough arguments this

5   morning.  It is helpful to the court to come up with a final

6   decision.  What I plan to do is under the terms of my

7   restraining order I believe tomorrow would be the expiration

8   date.  I will extend it temporarily until I can issue a final

9   order in this case.  That will be at least 14 -- the 14-day

10  period.  So I will leave that in place.

11          I will issue a short order to that effect, but then we

12  will immediately work on a final order addressing either

13  extending a restraining order for an even longer period of time

14  or whether to enter a preliminary injunction.  Any questions?

15          MR. DEVINE:  No, Your Honor.

16          THE COURT:  None?

17          MR. JEROME:  Your Honor, I'd ask quickly about the

18  promulgation point that was highlighted in our motion to

19  clarify.

20          THE COURT:  The clarification?

21          MR. JEROME:  Yes, sir.

22          THE COURT:  I think we're all in agreement, are we

23  not, that the restraining order does not prohibit the final

24  publication of the rule.  It just will prohibit the

25  implementation -- in other words, forgiving debts or the other

1  matters covered in the restraining order, but in terms of the

2  work that the government is doing to finalize and publish the

3  rule, it should not affect that.  Is that ---

4        MR. DEVINE:  That's my understanding.

5        THE COURT:  Everyone is in agreement on that?

6        MR. JEROME:  Yes.  Thank you.

7        THE COURT:  All right.  Do I need to address that in

8  my short order extending the restraining order or is that clear

9  enough to the parties?

10        MR. DEVINE:  That's clear enough to us.  I won't speak

11  for them, though.

12        MR. JEROME:  That's clear enough --

13        THE COURT:  Is that clear enough?

14        MR. JEROME:  -- for us as well.  Yes, Your Honor.

15        THE COURT:  All right.  We'll get an order out

16  extending the restraining order while we complete our final

17  work.  Thank you all very much.  I hope you have a safe trip

18  back to your homes.

19     (The hearing is concluded.)

20

21

22

23

24

25

1                      CERTIFICATE OF REPORTER

2

3

4

5          I, Lisa H. Davenport, Federal Official Reporter, in and

6    for the United States District Court for the Southern District

7    of Georgia, do hereby certify that pursuant to Section 753,

8    Title 28, United States Code that the foregoing is a true and

9    correct transcript of the stenographically-reported proceedings

10   held and that the transcript page format is in conformance with

11   the regulations of the Judicial Conference of the United

12   States.

13                                              Digitally signed by Lisa
                                                Davenport
                                                Date: 2024.09.21
14   _____       12:18:45 -04'00'

15                       Lisa H Davenport, RPR, FCRR

16                       Federal Official Reporter

17

18

19

20

21

22

23

24

25